## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka, Jr., <br><br>        Plaintiffs-Appellees, <br><br>    v. <br><br> Donald J. Trump, in his official capacity as President of the United States; Scott Bessent, in his official capacity as Secretary of the Treasury; Russell Vought, in his official capacity as Director of the Office of Management and Budget; Peter A. Feldman, in his official capacity as Acting Chairman of the U.S. Consumer Product Safety Commission, <br><br>        Defendants-Appellants. | No. 25-1687 |

## TIME-SENSITIVE MOTION FOR A STAY PENDING APPEAL AND AN ADMINISTRATIVE STAY

This appeal arises from the district court's order reinstating three Commissioners of the Consumer Product Safety Commission (CPSC) whom the President has lawfully fired. The Supreme Court recently stayed similar orders reinstating Members of the Merits Systems Protections Board (MSPB) and the National Labor Relations Board (NLRB), whom the President had removed. The Supreme Court held that "the Government is likely to show that both" agencies "exercise considerable executive power,"

such that the President "may remove without cause" those agencies' principal officers. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). The Court additionally explained that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Id.* Thus, a stay was warranted "to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." *Id.*

Ignoring that clear directive, the district court here reinstated plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka, Jr., to their roles as principal officers of the Executive Branch notwithstanding the President's determination that they should not serve in those roles or wield executive power. Since being reinstated, plaintiffs have swiftly sought to implement a series of measures designed to undo CPSC actions taken since their removal and to explicitly frustrate the agency's compliance with Executive Orders. *See infra* pp.8-9. The court's reinstatement order thus works a grave harm to the separation of powers and undermines the President's ability to exercise his authority under the Constitution.

The government seeks a stay of the district court's order pending appeal, and an immediate administrative stay while this Court considers

2

the motion. We ask the Court for a ruling on our administrative stay request by Friday, June 20, so that the Solicitor General, if necessary, may seek emergency relief from the Supreme Court. Plaintiffs oppose a stay.

## REASONS FOR GRANTING A STAY

The Constitution vests the entirety of the "executive Power" in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; *id.* § 3. As the Supreme Court has long held, that executive power encompasses the authority to remove those who aid the President in carrying out his duties.

On May 8 and 9, 2025, the President exercised his Article II authority to remove plaintiffs from their positions as Commissioners of the CPSC—an Executive Branch agency that performs quintessentially executive functions. Plaintiffs sued to challenge that removal, and, on June 13, 2025, the district court granted summary judgment and issued an injunction reinstating plaintiffs to their offices.

The district court's extraordinary injunction significantly and unjustifiably intrudes on the President's constitutional authority to oversee the Executive Branch. And it utterly ignores the Supreme Court's stay order in *Wilcox*. A stay is therefore warranted to align with the Supreme Court's

instructions and to end significant ongoing harms being imposed by the unlawfully reinstated commissioners.

First, the district court erred in holding that the President lacks authority to remove plaintiffs from the CPSC except for "neglect of duty or malfeasance in office." 15 U.S.C. § 2053(a). That statutory restriction on the President's removal power is unconstitutional. The President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enterprise Fund v. Public Accounting Oversight Board*, 561 U.S. 477, 513-14 (2010). The Supreme Court in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), recognized a limited exception to that rule of at-will Presidential removal for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 216 (2020). This exception, however, does not encompass the CPSC, which plainly exercises significant executive power when it: promulgates legislative rules that are binding on regulated entities, 15 U.S.C. § 2056; bans hazardous products from the marketplace, *id.* § 2057; adjudicates violations of federal law, *id.* § 2064(c)-(d), (f); files enforcement suit in federal court with its own attorneys, *id.* § 2076(b)(7), or seeks millions of dollars in civil penalties, *id.* § 2069(a)(1). Because the

CPSC does not fit within the narrow *Humphrey's Executor* exception, Congress cannot restrict the President's removal authority.

Second, plaintiffs will not suffer irreparable harm in the absence of immediate reinstatement—indeed, it is "the Government [that] faces greater risk of harm" by their reinstatement. *Wilcox*, 145 S. Ct. at 1415. The district court wrongly concluded that plaintiffs would be irreparably harmed by being "deprived of participation in the affairs of the CPSC and access to the facilities and resources" to act as Commissioners. Dkt. 24 at 26. But public officials have no individual right to the powers of their offices. *See Raines v. Byrd*, 521 U.S. 811, 820 (1997) ("loss of political power" not irreparable harm).

Third, the balance of the equities and the public interest favor a stay. The relief plaintiffs obtained—an order reinstating three principal officers the President has chosen to remove from office—is extraordinary and virtually unheard of. Such an order would greatly impede the President's authority to exercise "all of" "the 'executive Power'" of the United States. *Seila Law*, 590 U.S. at 203. Allowing plaintiffs to exercise executive power over the President's objection unquestionably inflicts irreparable harm on both the Executive and the separation of powers.

## STATEMENT

## I.    Statutory and Regulatory Background

Congress created the CPSC in 1972 to regulate consumer products and protect consumers from "unreasonable risks of injury." Consumer Product Safety Act, Pub. L. No. 92-573, § 2(a)(1), (5), 86 Stat. 1207, 1207 (1972) (codified at 15 U.S.C. § 2051 *et seq.*); 15 U.S.C. § 2051(a)(1), (5). The agency is headed by five Commissioners, nominated by the President and confirmed by the Senate, who serve staggered seven-year terms. 15 U.S.C. § 2053(a)-(b). As relevant here, Congress provided that the Commissioners may be removed by the President during their seven-year terms for "neglect of duty or malfeasance in office but for no other cause." *Id.* § 2053(a).

Congress empowered the CPSC to "promulgate consumer product safety standards" by legislative rule, 15 U.S.C. § 2056(a), and to ban certain hazardous products from commerce entirely, *id.* § 2057. The agency can conduct adjudications to determine whether products pose a substantial hazard and can order the manufacturer to cease distribution and remedy the defect. *Id.* § 2064(c)-(d), (f). The CPSC may seek civil penalties for up to $120,000 per violation and up to $17.15 million in aggregate for violations of the consumer safety laws, *id.* § 2069; 86 Fed. Reg. 68,244, 68,244 (Dec. 1, 2021).

The CPSC may file injunctive actions in district court to restrain violations of its regulations, 15 U.S.C. § 2071, and may do so through its own attorneys if the Attorney General declines representation, *id.* § 2076(b)(7)(A). Violations of the Consumer Product Safety Act are crimes punishable by imprisonment, *id.* § 2070, and the CPSC has authority to prosecute "any criminal action" "through its own legal representative, with the concurrence of the Attorney General," *id.* § 2076(b)(7)(B).

## II.    Factual Background and District Court Proceedings

**1.** Plaintiffs Boyle, Hoehn-Saric, and Trumka were nominated to serve as CPSC Commissioners by President Biden and subsequently confirmed by the Senate. Dkt. 24 at 3-4. In May 2025, President Trump removed plaintiffs as CPSC Commissioners, *id.* at 4, without a determination that plaintiffs had neglected their duty or committed malfeasance in office, 15 U.S.C. § 2053(a). Plaintiffs thereafter sued in district court, seeking a declaration and an injunction to halt "any action to effectuate President Donald J. Trump's purported termination of Plaintiffs from their roles as Commissioners." *Id.* at 5. The district court denied plaintiffs' motion for a temporary restraining order or a preliminary injunction, and the parties filed cross-motions for summary judgment. *Id.*

The court granted summary judgment to the plaintiffs and reinstated them to their role as principal officers in the Executive Branch. Dkt. 24 at 2. The court understood that the President's constitutional authority "generally includes the ability to remove executive officials" and that Congress' "participat[ion] in the exercise of that power would infringe the constitutional principle of the separation of governmental powers." Dkt. 24 at 7 (quotation marks omitted). Nonetheless, the court held that the statutory restrictions on removing CPSC Commissioners were constitutional under the Supreme Court's decision in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). Dkt. 24 at 15, 23.

The court entered a declaratory judgment that the President's removal "is ultra vires, contrary to law, and without legal effect." Dkt. 25 at 1. The court further enjoined the Treasury Secretary, the Director of the Office of Management and Budget, and the Acting CPSC Chairman from "taking any action to effectuate Plaintiffs' unlawful terminations (until such time as Plaintiffs' terms expire pursuant to 15 U.S.C. § 2053)." *Id.*

**2.** The court entered its order on Friday, June 13, 2025. Dkt. 25. After being reinstated, the three plaintiffs constitute a majority of the CPSC Commissioners. On the evening of Monday, June 16, plaintiff Trumka moved for the Commission to promptly consider "several time critical

matters" on Tuesday morning, June 17. *See* Dkt. 31-1 at 2 (DeMoss Decl.).

That included (1) generally declaring all CPSC actions taken while plaintiffs

were removed to be "null, void, and of no effect," unless otherwise

specified; (2) declaring that a notice of proposed rulemaking approved by

two Commissioners was "null and void;" (3) immediately providing that "no

actions may be taken towards Reduction-in-Force of CPSC staff without a

majority vote of the Commission," and any current actions "must be

withdrawn immediately;" (4) and immediately firing "[a]ny staff who have

been hired, detailed, or otherwise placed at CPSC" to implement the

President's Executive Order regarding the Department of Government

Efficiency. Dkt. 31-3 at 3-5.

The Acting CPSC Chairman stated that "in light of the breadth of this

proposed language and its potential for extensive disruption," these items

should be discussed later after time for deliberation, particularly given the

holiday-shortened week "and the ongoing deconflict and recusal analysis."

Dkt. 31-3 at 3. Plaintiffs, however, instructed CPSC staff to attend the

meeting, stating that if staff did not attend they would be "ignor[ing] the

directive of the Commission." *Id.* at 2. Plaintiff Trumka followed this order

by stating "I suggest you [agency staff] read the [district] Court order and

decide whether you want to personally violate it." *Id.*

## ARGUMENT

The Supreme Court recently stayed two district court orders reinstating principal officers of the MSPB and NLRB who had been removed by the President, *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), and a similar stay is warranted here. *Wilcox* explained that the government was entitled to stay pending appeal to "avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." 145 S. Ct. at 1415. The Supreme Court's well-founded concern applies with acute force here. After the district court reinstated plaintiffs, they immediately sought not just to resume their duties, but to reverse all actions taken in the last month by the remaining CPSC Commissioners. That includes withdrawing proposed rules, firing staff, halting procedures already in place, and generally frustrating the agency's attempts to comply with Executive Orders. That is precisely the kind of disruption and interference with the President's constitutional authority that warrants an immediate administrative stay and a stay of the judgment pending appeal.

In considering a stay pending appeal, this Court considers four factors: the likelihood of success on the merits, the movant's irreparable injury, the balance of harms, and the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

I.    **The Government Is Likely To Prevail On The Merits**

The government is likely to prevail because the Constitution

empowers the President to remove, at will, principal officers leading a

freestanding component within the Executive Branch, such as CPSC

Commissioners, and because the district court's remedy exceeds its powers.

A.    **At-will removal is the general rule, and the CPSC does not fit within any exceptions**

**1.** Article II of the Constitution provides that "the 'executive Power'—

all of it—is 'vested in a President,' who must 'take Care that the Laws be

faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II,

§ 1, cl. 1; *id.* § 3). To discharge those responsibilities, the President "as a

general matter" has "authority to remove those who assist him in carrying

out his duties." *Free Enterprise Fund*, 561 U.S. at 513-14. "Without such

power, the President could not be held fully accountable for discharging his

own responsibilities; the buck would stop somewhere else." *Id.* at 514.

The Supreme Court has "recognized only two exceptions to the

President's unrestricted removal power." *Seila Law*, 591 U.S. at 203. First,

the Court has held that "Congress could provide tenure protections to

certain *inferior* officers with narrowly defined duties." *Id.* at 204. Second,

*Humphrey's Executor*, 295 U.S. 602, held that Congress could "give for-

cause removal protections to a multimember body of experts, balanced

11

along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. Those exceptions represent the "outermost constitutional limits of permissible restrictions on the President's removal power" under current precedent. *Id.*

There is no question that CPSC Commissioners are principal rather than inferior officers: they are appointed by the President with Senate confirmation, *see* U.S. Const. art. II, § 2, cl. 2; 5 U.S.C. § 7104(b), oversee their own department, and are not subservient to any other principal officer. Thus, the relevant question is whether the CPSC can be said to perform only "legislative and judicial functions" and therefore falls within the exception identified in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 216. It does not. As the Supreme Court made clear in *Seila Law*, that exception is limited to "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions" that exercise no executive power. 591 U.S. at 216-17 (quoting *Humphrey's Executor*, 295 U.S. at 632).

But the CPSC is no "mere legislative or judicial aid," *Seila Law*, 591 U.S. at 199—it is authorized to discharge quintessential executive duties. CPSC promulgates safety standards that bind manufacturers and distributors of commercial products, 15 U.S.C. § 2056(a), and can entirely

12

ban hazardous products outright, *id.* § 2057. *See Collins v. Yellen*, 594 U.S. 220, 254 (2021) (an agency "empowered to issue a 'regulation or order' * * * clearly exercises executive power"). The CPSC may adjudicate whether products pose a substantial hazard and can order relief, *Id.* § 2064(c)-(d), (f), and can seek millions of dollars in civil penalties for violations of consumer safety laws, *id.* § 2069.

The CPSC is authorized to bring civil actions in federal court, 15 U.S.C. § 2071, and is explicitly empowered to "prosecute * * * through its own legal representative * * * any criminal action" with the Attorney General's concurrence, *id.* § 2076(b)(7)(B). The ability to bring a criminal prosecution is core and essential executive authority.[1]

In *Wilcox*, the Supreme Court held that the government is likely to show that Members of the NLRB and MSPB "exercise considerable executive power." 145 S. Ct. at 1415. The CPSC assuredly "wield[s]" equal if not greater "executive power" than those agencies, and therefore must be accountable to the President by at-will removal. *See Seila Law*, 591 U.S. at

---

[1] *See also Seila Law*, 591 U.S. at 219 (describing authority to sue in federal court as "quintessentially executive power not considered in *Humphrey's Executor*"); *Buckley v. Valeo*, 424 U.S. 1, 138-40 (1976) (recognizing interpreting and enforcing law through litigation as executive function).

204 ("The President's power to remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II.").

The district court's contrary conclusion rests largely on an overbroad reading of *Humphrey's Executor* and its progeny, Dkt. 24 at 8-11, 14-23, stretching those decisions beyond their facts to encompass an agency that exercises substantial executive power. The Supreme Court in *Seila Law* made clear, however, that neither *Humphrey's Executor* nor the cases that followed extend so far. After *Seila Law*, "only a very narrow reading of those cases is still good law" and "little to nothing is left of the *Humphrey's* exception to the general rule that the President may freely remove his subordinates." *Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir. 2023) (Walker, J., concurring).

In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a provision prohibiting removal of Federal Trade Commissioners absent "inefficiency, neglect of duty, or malfeasance in office." 265 U.S. at 632. Despite reaffirming the then-recent holding in *Myers v. United States*, 272 U.S. 52 (1926), that the President "has unrestrictable power * * * to remove purely executive officers," the Court concluded that *Myers* did not control because the FTC Commissioner at issue was "an officer who occupies no place in the executive department

14

and who exercises no part of the executive power vested by the Constitution in the President," *id.* at 628, 632. Instead, *Humphrey's Executor* understood the FTC to be "an administrative body" that "carr[ied] into effect legislative policies" and "perform[ed] other specified duties as a legislative or judicial aid." *Id.* Those duties, according to the Court, "c[ould] not in any proper sense be characterized as an arm or an eye of the executive." *Id.* The Court understood the FTC not to be exercising executive power at all but rather to "act[] in part quasi legislatively and in part quasi judicially." *Id.* On that understanding, *Humphrey's Executor* upheld the provision restricting the removal of FTC Commissioners.

 *Humphrey's Executor* thus approved the constitutionality of for-cause removal provisions only for multimember boards that do not exercise any executive power. *See Seila Law*, 591 U.S. at 219 n.4 (recognizing that "what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court"). To be clear, the assumption on which *Humphrey's Executor* rests—that the FTC's powers at the time were not properly characterized as executive in nature—has "not withstood the test of time," Dkt. 24 at 15, and has been "repudiated" by the Supreme Court, *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring in part); *see also Morrison*, 487 U.S. at 689 n.28,

691 (noting that "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree").

In other words, even the 1935 FTC could today be understood as exercising executive power. *See Seila Law*, 591 U.S. at 216 n.2 (observing that *Humphrey's Executor*'s "conclusion that the FTC did not exercise executive power has not withstood the test of time"); *see also Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (noting that agencies may engage in activities that "take 'legislative' and 'judicial' forms, but [those activities] are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'"). But that is even more reason not to expansively read *Humphrey's Executor* as permitting removal protections for principal officers exercising executive powers that the Supreme Court did not consider when deciding that case.

The district court acknowledged that the CPSC possesses regulatory and enforcement power beyond those discussed in *Humphrey's Executor*, including the power to bring civil suits and prosecute crimes in federal court. Dkt. 24 at 18-19 & n.6. The district court did not view these powers as dispositive, focusing on the Attorney General's role in federal court and powers that the FTC in 1935 may have possessed. *Id.* Instead, the district

court stressed that the CPSC's multimember structure permitted Congress' removal restrictions. *Id.* at 20-22. But *Seila Law* made clear that the *Humphrey's Executor* exception applies only to multimember agencies similarly situated to how "the Court viewed the FTC (as it existed in 1935)," and therefore exercise "'*no part* of the executive power.'" *Seila Law*, 591 U.S. at 215 (quoting *Humphrey's Executor*, 295 U.S. at 628) (emphasis added). "[W]hat matters is the set of powers the Court considered as the basis for its decision." *Seila Law*, 591 U.S. at 219 n.4.

The district court also reasoned that the "degree to which the CPSC wields executive power * * * does not determine whether" the statutory removal restriction "interferes with the President's exercise of Article II powers and duties." Dkt. 24 at 21 (quotation marks and alterations omitted). But that analysis gets things exactly backwards. In striking down unconstitutional restrictions on the President's removal authority, the Supreme Court rejected the claim that the restrictions were permissible because the agency exercised "more limited" kinds of executive power. *Collins v. Yellen*, 594 U.S. 220, 251 (2021). Instead, the Court stressed that the "nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's [removal] power," *id.* at 251-52, and that "[c]ourts are not well-suited to weigh the relative

17

importance of the regulatory and enforcement authority of disparate agencies," and "the constitutionality of removal restrictions [does not] hinge[] on such an inquiry," *id*. at 253. Thus, the fact that the CPSC wields substantial and quintessential executive power means that the removal restrictions necessarily interfere with the President's Article II authority, and the CPSC does not fall within the narrow *Humphrey's Executor* exception. Commissioners are therefore removable at will by the President.

The district court's contrary conclusion is incorrect, and any doubt about the government's likelihood of success has been resolved by the Supreme Court's opinion and stay order in *Wilcox*, 145 S. Ct. at 1415.

**B.      Plaintiffs cannot show entitlement to reinstatement**

Defendants are also likely to succeed on a second ground. The district court erred by declaring that the President's "purported termination of Plaintiffs" is "without legal effect." Dkt. No. 25 at 1. The declaration, particularly when combined with an injunction prohibiting Defendants "from taking any action to effectuate Plaintiffs' unlawful terminations" amounts to *de jure* reinstatement. Such reinstatement "impinges on the 'conclusive and preclusive' power through which the President controls the Executive Branch that he is responsible for supervising." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559668, at *14 (D.C. Cir. Feb. 15, 2025)

(Katsas, J., dissenting) (quoting *Trump v. United States*, 603 U.S. 593, 614 (2024)). As Judge Katsas explained, there would be no doubt of "grave and irreparable" injury if the district court had ordered reinstatement of a dismissed Secretary of State, and any differences between the Department of State and the CPSC "go[] to the extent—not the character—of the President's injury." *Id.*

The Supreme Court has never suggested that reinstatement is an appropriate remedy in such circumstances. To the contrary, the Supreme Court recognized long ago that a court "has no jurisdiction * * * to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). The appointment and removal of principal officers is specifically entrusted to the President, *see Swan v. Clinton*, 100 F.3d 973, 979 (D.C. Cir. 1996) (recognizing that "principal officers of the United States * * * must be appointed, and removed, by the President"), and thus a court may not, by injunction, order the reinstatement of a principal officer the President has removed. Accordingly, when principal officers have been removed from their posts, they generally have challenged that removal in suits for back pay. *See Humphrey's Executor*, 295 U.S. at 612 (challenge sought "to recover a sum of money alleged to be due"); *Myers*, 272 U.S. at 106 (same); *Wiener*, 357 U.S. at

19

349-351 (1958) (same). That rule reflects the obvious Article II problems that arise if a court attempts to reinstate—that is, reappoint—a principal executive officer removed by the President. Even if an improperly removed officer is entitled to some legal remedy, the President cannot be compelled to retain the services of a principal officer whom he has removed from office. Indeed, the Supreme Court's *Wilcox* order explains that the President faces a great risk of harm "from an order allowing a removed officer to continue exercising the executive power." 145 S. Ct. at 1415. The same is true here.

An injunction reinstating plaintiffs also exceeds the scope of the district court's equitable powers. A federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement of a public official is not such a remedy. "It is * * * well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888). Thus, "the power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*; *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state

proceeding to remove a public officer" or that "withheld federal equity from staying removal of a *federal* officer" reflect "a traditional limit upon equity jurisdiction"); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another."). This principle applies equally where, as here, relief is directed to the President's subordinate officers. Since only the President has the authority to appoint, remove, and supervise agency heads, any relief preventing plaintiffs' removal "necessarily targets the President." *Dellinger*, 2025 WL 559669, at *13 n.2 (Katsas, J., dissenting).

The district court's order cannot be squared with these precedents. In its opinion, the court grappled with the above case law, concluding that it could provide declaratory relief limited to the declaration that the removal was "unlawful." Dkt. No. 24 at 25. The court also determined that it could grant equitable relief because it was not "enjoin[ing] the President to reappoint" plaintiffs. *Id.* But the court's declaration that the President's termination was "without legal effect" and its injunction that precludes subordinates "from taking any action to effectuate Plaintiffs' unlawful terminations", Dkt. No. 25 at 1, goes well beyond limited declaratory relief

and constitutes full reinstatement. However styled, an order reinstating a principal officer removed by the President violates Article II.

Furthermore, the district court's reliance (Dkt. 24 at 25) on the D.C. Circuit's decisions in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023), is misplaced. In neither case did the court review, much less sustain, a reinstatement order like the one presented here. Rather, the Court considered only its *jurisdiction* over an official's challenge to his removal. At most those cases can be read to stand for the proposition that equitable relief might be available to require a subordinate officer to allow a plaintiff to exercise some of the privileges of the office such as by "including [him] in Board meetings," or "giving him access to his former office." *Swan*, 100 F.3d at 980; *see also Severino*, 71 F.4th at 1043. The order issued by the district court here goes well beyond such *de facto* relief; it puts plaintiffs back in office and orders that they shall continue to serve as *de jure* members until the conclusion of their terms. Dkt. 25 at 1.

Moreover, in both *Swan* and *Severino*, the D.C. Circuit recognized that even *de facto* relief—an order directing subordinate officials to treat the officer as not having been removed—might not ultimately be available even if the plaintiff were to prevail on the merits. In *Swan*, the Court

recognized that the President could "undercut [the] relief" were he "to insist that" his preferred replacement "occupy the position," 100 F.3d at 980-81, and in *Severino*, the Court noted other potential obstacles and relied on the fact that "at the motion to dismiss stage," the plaintiff needed only to "plausibly allege that relief could be afforded," 71 F.4th at 1043.

In district court, plaintiffs sought to rely on several additional cases for their contention that courts exercise equitable power to order reinstatement. *See* Dkt. 18-1 at 14-16, 19-21; Reply at 14-15. But these cases recognize that, at most, courts may, in some cases, grant "injunctive relief to discharged federal *employees*," *Sampson v. Murray*, 415 U.S. 61, 78 (1974) (emphasis added), or—of even less help to plaintiffs—discharged municipal employees, *see, e.g.*, *Hunter v. Town of Mockville*, 897 F.3d 538, 562 (4th Cir. 2018). Neither plaintiffs nor the district court have identified any case in which a court exercised its equitable powers to reinstate a principal officer.

Finally, while the district court declined to enter a writ of mandamus, its suggestion that plaintiffs would be entitled to mandamus relief in the absence of injunctive relief is incorrect. *See* Dkt. 24 at 27 n.10, 29-30. For the reasons explained above, plaintiffs cannot show that they have a "clear"

right to relief, as required for mandamus. *Heckler v. Ringer*, 466 U.S. 602, 616 (1984).

## II.   The Remaining Factors Favor A Stay

The equitable factors likewise weigh decisively in the government's favor. In *Wilcox*, the Supreme Court stayed district court orders reinstating members of the MSPB and NLRB—premised on its observation that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." 145 S. Ct. at 1415.

As discussed above, the district court's order works an extraordinary harm to the President's authority to exercise "all of" "the 'executive Power'" of the United States. *Seila Law*, 590 U.S. at 203. Because of that order, three officers the President has chosen to remove are still exercising executive power over the President's objection. And plaintiffs have moved quickly and decisively to use this power to undo actions of the Commissioners who have retained the President's trust, and to frustrate the CPSC's compliance with the President's Executive Orders. *See supra* pp.8-9. That sort of harm to the Executive, and to the separation of powers, is transparently irreparable.

Conversely, a stay would not irreparably harm plaintiffs. Although plaintiffs' removal deprives them of employment and salary, such consequences ordinarily do not amount to irreparable injury, "however severely they may affect a particular individual." *Sampson*, 415 U.S. at 92 n.68. Thus, the traditional remedy for such claims has been an award of back pay at the end of the case, not interim reinstatement. *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting). Any harm arising from plaintiffs' inability to fulfill statutory duties is not irreparable; those duties are vested in the office, and plaintiffs have no personal right to exercise the powers of an office after they have been removed.

**CONCLUSION**

The Court should grant a stay pending appeal and an immediate administrative stay.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
DANIEL AGUILAR
*/s/ Laura E. Myron*
LAURA E. MYRON
  Appellate Staff, Civil Division
  U.S. Department of Justice
  950 Pennsylvania Ave., NW
  Washington, DC 20530
  (202) 514-4819
  Laura.e.myron@usdoj.gov

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it was prepared with Georgia 14-point, a proportionally spaced font, and the motion complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,189 words, according to the word count of Microsoft Office 365.

/s/ Laura E. Myron
Laura E. Myron

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on June 17, 2025, which will serve counsel for all parties.

/s/ Laura E. Myron
Laura E. Myron

# ADDENDUM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **MARY BOYLE, *et al.*,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civ. No. MJM-25-1628** |
| v. | * | |
| | * | |
| **DONALD J. TRUMP, in his official** | * | |
| **capacity as President of the United** | * | |
| **States, *et al.*,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. (collectively, "Plaintiffs") were appointed to serve as members of the United States Consumer Product Safety Commission ("CPSC") for terms prescribed by statute, subject to removal only for neglect of duty or malfeasance. On May 8 and 9, 2025, Plaintiffs received notifications sent on behalf of President Donald J. Trump purporting to terminate them from their positions without cause. Thereafter, Plaintiffs were denied access to facilities and resources necessary to fulfill their roles as CPSC Commissioners, and members of Plaintiffs' staff were discharged.

On May 21, 2025, Plaintiffs commenced this civil action for declaratory and injunctive relief against President Trump; Scott Bessent, Secretary of the Treasury; Russell Vought, Director of the Office of Management and Budget; and Peter A. Feldman, Acting Chairman of the CPSC (collectively, "Defendants"). Plaintiffs seek a declaratory judgment that their terminations were unlawful and an injunction against official action to effectuate their removal from office.

1

Defendants contend that the statute requiring cause for Plaintiffs' removal is inconsistent with the President's removal power under Article II of the U.S. Constitution and therefore invalid.

This matter is before the Court on the parties' cross-motions for summary judgment. On June 6, 2025, following expedited briefing, the Court conducted a hearing on the motions and took them under advisement. For the reasons set forth below, the Court finds no constitutional defect in the statutory restriction on Plaintiffs' removal and that Plaintiffs' purported removal from office was unlawful. The Court shall enter an Order granting Plaintiffs' motion, denying Defendants' motion, and providing declaratory and injunctive relief permitting Plaintiffs to resume their duties as CPSC Commissioners.

## I.    BACKGROUND

### A. Purpose, Functions, and Organization of the Consumer Product Safety Commission

In 1972, Congress passed the Consumer Product Safety Act ("CPSA"), Pub. L. No. 92-573, 86 Stat. 1207, and created the CPSC to advance the goals and purposes of the Act, 15 U.S.C. § 2053(a). The CPSA's purposes include (1) "protect[ing] the public against unreasonable risks of injury associated with consumer products;" (2) "assist[ing] consumers in evaluating the comparative safety of consumer products;" (3) "develop[ing] uniform safety standards for consumer products . . . ;" and (4) "promot[ing] research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries." *Id.* § 2051(b). The CPSC consists of five Commissioners nominated by the President and confirmed by the Senate. *Id.* § 2053(a). Each Commissioner must hold "background and expertise in areas related to consumer products and protection of the public from risks to safety." *Id.* The CPSC has the statutory authority to promulgate product-safety standards, *id.* § 2056(a); to conduct administrative proceedings and investigations, with the power to issue and enforce subpoenas, *id.* §§ 2064, 2076(a), (b)(3), (c);

2

and to initiate civil and criminal actions in federal court to enforce consumer product safety laws, *see id.* §§ 2069, 2070(a), 2071(a), 2076(b)(7); among other functions and powers.

Congress established the CPSC as an "independent regulatory commission," *id.* § 2053(a), to ensure that it remained an expert body "unfettered by political dictates, self-interested industry pressure or blind consumer zeal," 122 Cong. Rec. S15211 (daily ed. May 24, 1976). Specific statutory guardrails were enacted to protect the Commission from political pressures, abrupt changes in composition, and loss of agency expertise. First, Congress provided that the Commissioners would serve staggered, seven-year terms, 15 U.S.C. § 2053(b)(1), and that any Commissioner appointed to fill a vacancy created by the premature departure of a predecessor would be appointed only for the remainder of the predecessor's term, *id.* § 2053(b)(2).[1] Second, Congress provided that "[n]ot more than three of the Commissioners shall be affiliated with the same political party." *Id.* § 2053(c). Third, and critical to the case here, Congress provided that the Commissioners may be "removed by the President" before the expiration of their terms only "for neglect of duty or malfeasance in office but for no other cause." *Id.* § 2053(a).

### B.  Plaintiffs' Purported Removal

The facts relevant to this case are uncontested. *See* ECF No. 21-2 (Defendants' Statement of Undisputed Material Facts, raising no dispute with Plaintiffs' Statement of Undisputed Material Facts, ECF No. 18-2). Each Plaintiff was nominated by President Joseph R. Biden and confirmed by the U.S. Senate to serve as a Commissioner of the CPSC. ECF No. 18-2, ¶ 1. Plaintiff Boyle was confirmed on June 2, 2022, to serve out the remainder of her predecessor's term, set to expire on October 27, 2025. *Id.* ¶ 2. Plaintiff Hoehn-Saric was confirmed on October 7, 2021, to serve

---

[1] A Commissioner appointed to serve out their predecessor's term may "continue to serve after the expiration of this term until his successor has taken office" or up to a maximum of one year. 15 U.S.C. § 2053(b)(2).

out the remainder of his predecessor's term, set to expire on October 27, 2027. *Id.* ¶ 3. Plaintiff

Trumka was confirmed on November 16, 2021, to serve a full seven-year term expiring on October

27, 2028. *Id.* ¶ 4. Each Plaintiff has a substantial professional background in the field of consumer

protection and the work of the CPSC. *See* ECF No. 6-2, ¶ 1; ECF No. 6-3, ¶ 1; ECF No. 6-4, ¶ 1.

Plaintiffs have performed ably in their roles and have never been accused of neglect of duty or

malfeasance in office by either President Trump or President Biden. ECF No. 18-2, ¶ 5.

Between May 8 and May 9, 2025, Plaintiffs were notified of their removal from their

positions as three of the CPSC's five sitting Commissioners. On May 8, Plaintiffs Boyle and

Trumka each received an email from Trent Morse, the Deputy Director of Presidential Personnel,

which stated, in full: "On behalf of President Donald J. Trump, I am writing to inform you that

your position on the Consumer Product Safety Commission is terminated effective immediately.

Thank you for your service." *Id.* ¶¶ 6–7. The following day, Plaintiff Hoehn-Saric and two of his

staff members attempted to access their offices at the CPSC headquarters[2] but were barred by

CPSC security. *Id.* ¶ 9. While waiting in the lobby, Plaintiff Hoehn-Saric received a phone call

from Acting Chairman Feldman, who informed him that President Trump had terminated him from

his role as a CPSC Commissioner. *Id.* ¶ 10.

Since May 9, Plaintiffs have been unable to enter their offices unescorted, log in to the

CPSC computer network, and access their CPSC email accounts and electronic files. *Id.* ¶ 13.

Plaintiffs were required to return their CPSC identification badges, keys, phones, credit cards, and

computer equipment. *Id.* ¶ 14. Plaintiffs' staff members have also received termination notices that

cite Plaintiffs' removal from office as the basis for termination. *Id.* Plaintiffs have received

---

[2] CPSC headquarters is located in Bethesda, Maryland. ECF No. 1, ¶ 6.

"separation packages" and understand that they will no longer be receiving the pay and benefits to which CPSC Commissioners are entitled. *Id.* ¶ 15.

### C. Procedural History

On May 21, 2025, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief against Defendants Trump, Bessent, Vought, and Feldman, in their official capacities. ECF No. 1. On the same date, Plaintiffs filed a Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. ECF No. 6. This motion seeks preliminary injunctive relief to prevent Defendants Bessent, Vought, and Feldman from "taking any action to effectuate President Donald J. Trump's purported termination of Plaintiffs from their roles as Commissioners of the [CPSC.]" ECF No. 6-5. Defendants filed a response in opposition to the motion on May 26, 2025. ECF No. 15.

On May 27, 2025, the Court conducted a hearing on Plaintiffs' request for a TRO and declined to issue temporary or preliminary injunctive relief. With the parties' agreement, the Court entered an Order setting a schedule for expedited briefing of Plaintiffs' motion for summary judgment. ECF No. 17. Thereafter, Plaintiffs filed a motion for summary judgment, ECF No. 18; Defendants filed a cross-motion for summary judgment and response in opposition to Plaintiffs' motion, ECF No. 21; and Plaintiffs filed a reply, ECF No. 22. On June 6, 2025, the Court conducted a hearing on the motions and took them under advisement.

Plaintiffs' central claim in this litigation is that Defendants acted ultra vires and in violation of the CPSA by removing them as CPSC Commissioners without cause and taking action to effectuate the purported terminations. ECF Nos. 18, 18-1 (Plaintiffs' Motion and Memorandum). Plaintiffs seek two forms of relief. First, Plaintiffs request a declaration that the "purported termination of Plaintiffs from their roles as [CPSC] Commissioners" is unlawful and "without legal effect." ECF No. 18-6 (proposed order). Second, Plaintiffs seek to enjoin Defendants

Bessent, Vought, and Feldman from "taking any action to effectuate the unlawful terminations . . . ." *Id.* In their cross-motion for summary judgment, Defendants primarily argue that the statutory for-cause restriction on the removal of CPSC Commissioners is inconsistent with the President's Article II removal authority and therefore unconstitutional. ECF Nos. 21, 21-1 (Defendants' Motion and Memorandum). Defendants also argue that relief in the form of reinstatement is beyond the authority of this Court. Defs.' Mem. at 1.

## II.    STANDARD OF REVIEW

A court may grant a party's summary judgment motion under Rule 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis omitted); *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), but the court is not

permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2510–11.

## III.     RELEVANT CASE LAW

Article II of the U.S. Constitution vests "[t]he executive Power" in the President, who "shall take Care that the Laws be faithfully executed[.]" The President's "executive Power" under Article II "generally includes the ability to remove executive officials, for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'" *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213–14, 140 S. Ct. 2183, 2197, 207 L. Ed. 2d 494 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 726, 106 S. Ct. 3181, 3188, 92 L. Ed. 2d 583 (1986)); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14, 130 S. Ct. 3138, 3164, 177 L. Ed. 2d 706 (2010) ("The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties."); *Collins v. Yellen*, 594 U.S. 220, 252, 141 S. Ct. 1761, 1784, 210 L. Ed. 2d 432 (2021) ("The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote."). For Congress "to draw to itself . . . the power to remove or the right to participate in the exercise of that power" would "infringe the constitutional principle of the separation of governmental powers." *Myers v. United States*, 272 U.S. 52, 161, 47 S. Ct. 21, 40, 71 L. Ed. 160 (1926).

But the President's power of removal is not absolute. The U.S. Supreme Court has recognized two exceptions that "represent what up to now have been the outermost constitutional

limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 591 U.S. at 218, 140 S. Ct. at 2200 (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). First, in *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S. Ct. 869, 79 L. Ed. 1611 (1935), and *Wiener v. United States*, 357 U.S. 349, 78 S. Ct. 1275, 2 L. Ed. 2d 1377 (1958), the Supreme Court upheld tenure protections for officers of "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions[.]" *Seila Law*, 591 U.S. at 216–17, 140 S. Ct. at 2198–99. Second, in *United States v. Perkins*, 116 U.S. 483, 6 S. Ct. 449, 29 L. Ed. 700 (1886), and *Morrison v. Olson*, 487 U.S. 654, 108 S. Ct. 2597, 101 L. Ed. 2d 569 (1988), the Supreme Court upheld tenure protections for "inferior officers with limited duties and no policymaking or administrative authority[.]" *Seila Law*, 591 U.S. at 217–18, 140 S. Ct. at 2199–200. Only the exception first recognized in *Humphrey's Executor* is at issue here.

### A. *Humphrey's Executor* and its progeny

In *Humphrey's Executor*, the Supreme Court unanimously upheld a statutory provision preventing the President from removing members of the Federal Trade Commission ("FTC") except for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 619, 55 S. Ct. at 870 (quoting 15 U.S.C. § 41). "Whether the power of the President to remove an officer shall prevail over the authority of Congress to condition the power by fixing a definite term and precluding a removal except for cause will depend upon the character of the office[.]" *Id.* at 631, 55 S. Ct. at 875, *quoted in Morrison*, 487 U.S. at 687, 108 S. Ct. at 2617. Examining the features of the FTC, the Court described this Commission as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Humphrey's Executor*, 295 U.S. at 628, 55 S. Ct. at 874. "Such a body[,]" the Court stated,

"[could not] in any proper sense be characterized as an arm or an eye of the executive[,]" noting that it performed its duties "without executive leave and, in the contemplation of the statute, . . . free from executive control." *Id.* The Commission was meant to be "nonpartisan" and "act with entire impartiality." *Id.* at 624, 55 S. Ct. at 872. The Court described the FTC's duties as "neither political nor executive," but instead called for "the trained judgment of a body of experts" "informed by experience." *Id.*

Considering the powers and functions of the FTC, the Court described them as "quasi legislative" in part and "quasi judicial" in part. *Id.* at 628, 55 U.S. at 874. The FTC acted "as a legislative agency" in "making investigations and reports" to Congress and "as an agency of the judiciary[]" in making recommendations to courts "as a master in chancery . . . ." *Id.*, *quoted in Seila Law*, 591 U.S. at 215, 140 S. Ct. at 2198. To the extent that the FTC exercised any "executive function," it was distinguishable from "executive power in the constitutional sense," as the FTC exercised executive functions "in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government."[3] *Humphrey's Executor*, 295 U.S. at 628, 50 S. Ct. at 874.

The Court then concluded that the President does not possess an "illimitable" power to remove officers like the members of the FTC, stating as follows:

> The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime. For it is quite evident that one who holds his office only during the pleasure of another cannot be

---

[3] In *Morrison v. Olson*, the Supreme Court called into doubt its conclusion in *Humphrey's Executor* that the FTC did not exercise executive power. 487 U.S. at 690 n.28, 108 S. Ct. at 2618 n.28, *cited in Seila Law*, 591 U.S. at 216 n.2, 140 S. Ct. at 2198 n.2.

> depended upon to maintain an attitude of independence against the
> latter's will.

*Id.* at 629, 55 S. Ct. at 874.

Two decades later, in *Wiener*, the Supreme Court applied its holding in *Humphrey's Executor* to uphold a suit for backpay by a member of the War Claims Commission who claimed that he was unlawfully discharged without cause. *Wiener*, 357 U.S. at 356, 78 S. Ct. at 1279. The statute that created this Commission provided that its three members were to be "appointed by the President, by and with the advice and consent of the Senate." *Id.* at 350, 78 S Ct. at 1276. The statute included "no provision for removal of a Commissioner[,]" but it prescribed that the Commission would exist and conduct its work for a limited term. *Id.* While recognizing the President's general removal power announced in *Myers*, the Court in *Wiener* viewed *Humphrey's Executor* as "narrowly confin[ing] the scope of the *Myers* decision to include only 'all purely executive officers.'" *Id.* at 352, 78 S. Ct. at 1277 (quoting *Humphrey's Executor*, 295 U.S. at 628, 55 S. Ct. at 874). Following the reasoning in *Humphrey's Executor*, the Court examined the character of the War Claims Commission and described it as "an adjudicatory body" intended to be independent of executive control. *Id.* at 353–56, 78 S. Ct. at 1278–79. The Court ultimately rejected "the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission[.]" *Id.* at 356, 78 S. Ct. at 1279. "[N]o such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it." *Id.*

At each opportunity since *Wiener*, the Supreme Court has declined to overturn *Humphrey's Executor*. *See, e.g.*, *Free Enterprise Fund*, 561 U.S. at 483–84, 130 S. Ct. at 3146–47 (reviewing constitutional limits on the President's removal power and stating, "The parties do not ask us to

reexamine any of these precedents, and we do not do so."); *Seila Law*, 591 U.S. at 228, 140 S. Ct. at 2206 ("While we do not revisit *Humphrey's Executor* or any other precedent today, we decline to elevate it into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority."). The Court has, however, reconsidered and recast some views articulated in *Humphrey's Executor* and *Wiener*. In *Morrison*, for instance, the Court recognized the "difficulty of defining" "executive" as a category and stated that "the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" 487 U.S. at 689, 108 S. Ct. at 2618; *see id.* at 487 U.S. at 689 n.28, 108 S. Ct. at 2618 n.28.

### B. *Seila Law*

More recently, in *Seila Law*, the Supreme Court declined to extend the *Humphrey's Executor* exception to justify statutory tenure protection for the sole director of the Consumer Financial Protection Bureau ("CFPB"). *Seila Law*, 591 U.S. at 220–32. 140 S. Ct. at 2201–07. Unlike the multimember Commissions at issue in *Humphrey's Executor* and *Wiener*, the CFPB was structured, by statute, under the leadership of a single director appointed to serve a term of five years and who could only be removed for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). The Court held that this statutory protection against removal ran afoul of the President's Article II removal power. *Seila Law*, 591 U.S. at 213, 140 S. Ct. at 2197.

As relevant here, the Supreme Court in *Seila Law* first held that *Humphrey's Executor* did not resolve the question of whether the CFPB Director's tenure protection was constitutional. *Id.* at 218–20, 140 S. Ct. at 2199–201. Foremost, the Court noted structural differences between the 2020 CFPB and the 1935 FTC at issue in *Humphrey's Executor*:

> Unlike the New Deal-era FTC upheld [in *Humphrey's Executor*], the CFPB is led by a single Director who cannot be described as a "body of experts" and cannot be considered "non-partisan" in the same sense as a group of officials drawn from both sides of the aisle. 295 U.S. at 624, 55 S. Ct. 869. Moreover, while the staggered terms of the FTC Commissioners prevented complete turnovers in agency leadership and guaranteed that there would always be some Commissioners who had accrued significant expertise, the CFPB's single-Director structure and five-year term guarantee abrupt shifts in agency leadership and with it the loss of accumulated expertise.

*Id.* at 218, 140 S. Ct. at 2200. The Court then considered the governmental powers entrusted to the CFPB's single Director, noting that this single office carried rulemaking authority to administer 19 federal statutes, as well as "unilateral[]" powers to "issue final decisions awarding legal and equitable relief in administrative adjudications" and "to seek daunting monetary penalties against private parties on behalf of the United States in federal court[.]" *Id.* at 218–19, 140 S. Ct. at 2200.

The Supreme Court ultimately declined to exempt the CFPB Director from the President's general removal power, concluding that "an independent agency led by a single Director and vested with significant executive power . . . has no basis in history and no place in our constitutional structure." *Id.* at 220, 140 S. Ct. at 2201. Throughout its analysis, the Court repeatedly emphasized the concentration of the CFPB's "significant governmental power in the hands of a single individual accountable to no one." *Id.* at 224, 140 S. Ct. at 2203. The Court suggested that "the most telling indication of [the CFPB's] severe constitutional problem" was its "almost wholly unprecedented" structure. *Id.* at 220, 140 S. Ct. at 2201. The Court noted that there were only a few "isolated" examples of good-cause tenure protections for "principal officers who wield power alone rather than as members of a board or commission." *Id.* "In addition to being a historical anomaly, the CFPB's single-Director configuration is incompatible with our constitutional structure. Aside from the sole exception of the Presidency, that structure

12

scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 222–23, 140 S. Ct. at 2202.

Not only was the CFPB Director entrusted with an array of policymaking and enforcement powers "[w]ith no colleagues to persuade, and no boss or electorate looking over her shoulder," but other unique statutory features of the agency further insulated the Director from the electorally accountable President. *Id.* at 225, 140 S. Ct. at 2204. First, the Director's five-year term would leave some Presidents with no opportunity "to shape [the CFPB's] leadership and thereby influence its activities." *Id.* And the single-Director leadership structure gave Presidents no opportunity "to appoint any other leaders—such as a chair or fellow members of a Commission or Board—who [could] serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.* Second, unlike most independent agencies, the CFPB receives its funding outside of the normal appropriations process and therefore beyond the President's influence over appropriations. *Id.* at 226, 140 S. Ct. at 2204. Indeed, "the Director receives [funds for the CFPB] from the Federal Reserve, which is itself funded outside of the annual appropriations process" and beyond the control of the electorate. *Id.*

In consideration of the foregoing, the Court held that the CFPB Director's statutory tenure protection was unconstitutional. *Id.* at 220, 140 S. Ct. at 2201.

## IV.    PLAINTIFFS' REMOVAL FROM OFFICE

### A.  Violation of 15 U.S.C. § 2053(a)

No material facts are disputed in this case. *See* ECF Nos. 18-2, 21-2.[4] On May 8 and May 9, 2025, Plaintiffs received notifications on behalf of President Trump purporting to remove them

---

[4] Plaintiffs' Statement of Undisputed Facts, ECF No. 18-2, is supported by sworn declarations and exhibits provided by each Plaintiff, ECF Nos. 6-2, 6-3, 6-4, 18-3, 18-4, 18-5. Defendants do not dispute Plaintiffs' Statement. *See* ECF No. 21-2.

from their duly appointed positions as three of five sitting Commissioners of the CPSC. ECF No. 18-2, ¶¶ 6–7, 10. Since their purported terminations, Plaintiffs have been prevented from returning to their offices at CPSC headquarters without an escort and accessing CPSC resources necessary to perform their statutorily mandated duties. *Id.* ¶¶ 13–14. No Plaintiff has finished serving their term. *Id.* ¶¶ 1–4; *see also* 15 U.S.C. § 2053(b) (prescribing CPSC Commissioners' terms). By statute, the President could only remove Plaintiffs from their positions as CPSC Commissioners "for neglect of duty or malfeasance in office . . . ." 15 U.S.C. § 2053(a). But no Plaintiff has neglected their official duties, committed official malfeasance, or been accused of any neglect of duty or malfeasance. ECF No. 18-2, ¶ 5. Therefore, Plaintiffs' purported removals from office and efforts to prevent them from fulfilling their statutory duties as CPSC Commissioners violated 15 U.S.C. § 2053(a).

Although this case presents no material factual disputes, the contested legal issue central to this case is whether Plaintiffs' statutory tenure protection in 15 U.S.C. § 2053(a) infringes upon the President's Article II removal power. This Court holds that § 2053(a) is not inconsistent with Article II, agreeing with several other courts that statutory tenure protection for CPSC Commissioners is constitutionally justified by the *Humphrey's Executor* exception to the President's removal power. *See Consumers' Research v. CPSC*, 91 F.4th 342, 351–56 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414, 220 L. Ed. 2d 170 (2024); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 762–62 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 104 (2025); *United States v. SunSetter Prods. LP*, 2024 WL 1116062, at *2–4 (D. Mass. Mar. 14, 2024).

### B. Constitutionality of the Statutory For-Cause Removal Protections in 15 U.S.C. § 2053(a)

"[W]hether Congress can 'condition the [President's power of removal] by fixing a definite term and precluding a removal except for cause, will depend upon the character of the office.'"

14

*Morrison*, 487 U.S. at 687, 108 S. Ct. at 2617 (quoting *Humphrey's Executor*, 295 U.S. at 631, 55 S. Ct. at 875). "Because the Court limited its holding [in *Humphrey's Executor*] 'to officers of the kind here under consideration,' [295 U.S.] at 632, 55 S. Ct. 869, the contours of the *Humphrey's Executor* exception [to the President's removal power] depend upon the characteristics of the agency before the Court." *Seila Law*, 591 U.S. at 215, 140 S. Ct. at 2198. Specifically, "*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216, 140 S. Ct. at 2199; *but see Morrison*, 487 U.S. at 689, 108 S. Ct. at 2618 ("[T]he determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'").

Although *Humphrey's Executor's* characterization of the FTC in 1935 as non-executive has not withstood the test of time, *see id.* at 690, 108 S. Ct. at 2619, n.28, "[t]he Court identified several organizational features that helped explain [this] characterization[,]" *Seila Law*, 591 U.S. at 216, 140 S. Ct. at 2198–99:

> Composed of five members—no more than three from the same political party—the Board was designed to be "non-partisan" and to "act with entire impartiality." [*Humphrey's Executor*, 295 U.S.] at 624, 55 S. Ct. 869; *see id.*, at 619–620, 55 S. Ct. 869. The FTC's duties were "neither political nor executive," but instead called for "the trained judgment of a body of experts" "informed by experience." *Id.*, at 624, 55 S. Ct. 869 (internal quotation marks omitted). And the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a "complete change" in leadership "at any one time." *Ibid*.

*Id. Humphrey's Executor* remains good law and is binding on this Court, and, for reasons explained below, the Court finds that it applies to the CPSC.

First, the organization of the CPSC mirrors that of the FTC. The CPSC is "a multimember body of experts, balanced along partisan lines" and appointed to serve "staggered, seven-year terms . . . ." *Id.*; *see also* 15 U.S.C. 2053(a) (providing that the CPSC shall "consist[] of five Commissioners" who hold "background and expertise in areas related to consumer products and protection of the public from risks to safety"); *id.* § 2053(b) (assigning staggered seven-year terms to CPSC Commissioners, providing that "[a]ny Commissioner appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the remainder of such term"); *id.* § 2053(c) (providing that "[n]ot more than three of the [CPSC] Commissioners shall be affiliated with the same political party"). These structural features the CPSC shares with the FTC help the agency perform its functions impartially, ensures that it retains its expertise, and "avoid[s] a 'complete change' in leadership 'at any one time.'" *Seila Law*, 591 U.S. at 216, 140 S. Ct. at 2198–99 (quoting *Humphrey's Executor*, 295 U.S. at 624, 55 S. Ct. at 872).

Like that of the FTC, the CPSC's structure stands in stark contrast to the "anomalous" single-Director organization of the CFPB that the Supreme Court deemed unconstitutional in *Seila Law*. *See Seila Law*, 591 U.S. at 213–32, 140 S. Ct. at 2197–2207; *Consumers' Research*, 91 F.4th at 354 (describing "CFPB's *single-Director* structure" as "the defining feature that the Supreme Court in *Seila Law* relied on to hold the CFPB unconstitutional"). Unlike the CFPB's single-Director structure, the bipartisan, multimember structure of the CPSC and the FTC permits each Commissioner's authority to be checked by the others, encourages group deliberation and consensus building, and prevents any one Commissioner from holding an outsized amount of power. *See Seila Law*, 591 U.S. at 224–25, 140 S. Ct. at 2203–04 (noting that CFPB's Director has "no colleagues to persuade," and the CFPB's structure "vest[s] significant governmental power

in the hands" of a sole Director and does not permit opportunities for the Director's authority to be checked by "a chair or fellow members of a Commission or Board").

While sharing the FTC's organizational features, the CPSC also performs functions similar or identical to those of the FTC which, in 1935, *Humphrey's Executor* described as "quasi legislative and quasi judicial."[5] *Humphrey's Executor*, 295 U.S. at 629, 55 S. Ct. at 874. Both the FTC and CPSC hold "wide powers of investigation in respect of" private parties within their

---

[5] In *Morrison*, the Supreme Court explained that "the characterization of the agencies in *Humphrey's Executor* and *Wiener* as 'quasi-legislative' or 'quasi-judicial' in large part reflected our judgment that it was not essential to the President's proper execution of his Article II powers that these agencies be headed up by individuals who were removable at will." *Morrison*, 487 U.S. at 690–91, 108 S. Ct. at 2619. The Supreme Court's reasons for concluding in *Humphrey's Executor* that the power to remove FTC Commissioners at will was not essential to the President's authority under Article II are fully applicable to the CPSC Commissioners in the instant case.

The *Morrison* Court further stated, in a footnote, that *Humphrey's Executor*'s and *Wiener*'s use of the terms "quasi-legislative" and "quasi-judicial" may also "describe the circumstances in which Congress might be more inclined to find that a degree of independence from the Executive, such as that afforded by a 'good cause' removal standard, is necessary to the proper functioning of the agency or official." *Id.* at 691 n.30, 108 S. Ct. at 2619 n.30; *see also Humphrey's Executor*, 295 U.S. at 629, 55 S. Ct. at 874 ("The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties *independently of executive control* cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and *to forbid their removal except for cause in the meantime*." (emphasis added)).

Here, like the FTC in *Humphrey's Executor* and the War Claims Commission in *Wiener*, Congress constituted the CPSC to serve as an "independent regulatory commission," 15 U.S.C. § 2053(a), to ensure that it remained an expert body "unfettered by political dictates, self-interested industry pressure or blind consumer zeal," 122 Cong. Rec. S15211 (daily ed. May 24, 1976); *see also Humphrey's Executor*, 295 U.S. at 628, 55 S. Ct. at 874 ("[FTC's] duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control."); *Wiener*, 357 U.S. at 353–56, 78 S. Ct. at 1278–79 (emphasizing independence of War Claims Commission). The removal restriction for CPSC Commissioners in 15 U.S.C. § 2053(a) reflects and serves Congress's intent that this Commission—like those at issue in *Humphrey's Executor* and *Wiener*—maintain "a degree of independence from the Executive" as "necessary to the proper functioning of the [Commission]." *Morrison*, 487 U.S. at 691 n.30, 108 S. Ct. at 2619 n.30. And, as explained herein, the Court concludes that 15 U.S.C. § 2053(a) serves the legislative purpose of supporting the CPSC's independence, expertise, and impartiality without obstructing "the President's proper execution of his Article II powers" and duties. *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618.

17

regulatory ambit. *Id.* at 621, 55 S. Ct. at 871 (citing 15 U.S.C. § 46, prescribing authority of FTC to conduct investigations of individuals and corporations); 15 U.S.C. § 2076 (granting CPSC investigatory powers). And both Commissions have the authority to issue substantive rules and regulations to carry out the objectives of the statutes within their purview. *See* Federal Trade Commission Act, Pub. L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914), *codified as amended at* 15 U.S.C. § 46(g) (empowering FTC "to make rules and regulations for the purpose of carrying out the provisions of this Act"); 15 U.S.C. § 2056(a) (empowering CPSC to promulgate "consumer product safety standards").[6] Both the FTC and the CPSC are authorized to enforce the statutes they administer and conduct administrative adjudications as prescribed in those statutes. *See Humphrey's Executor*, 295 U.S. at 620–21, 55 S. Ct. at 870–71 (citing 15 U.S.C. § 45, authorizing and directing FTC "to prevent" private parties "from using unfair methods of competition in commerce" by issuing complaints alleging violations, conducting hearings, making factual findings, issuing orders, and seeking any further relief in federal court); 15 U.S.C. §§ 2061, 2064(c)–(d) (authorizing the CPSC to file actions for seizure of "imminently hazardous consumer product[s]" and to order remedial measures upon finding a substantial product hazard).

Defendants emphasize the CPSC's authority to enforce the laws within its jurisdiction through enforcement actions in federal court, which the *Seila Law* Court called "a quintessentially executive power not considered in *Humphrey's Executor*." Defs.' Mem. at 11–12 (quoting *Seila Law*, 591 U.S. at 219, 140 S. Ct. at 2200). However, the CPSC's authority to prosecute civil and criminal enforcement actions in federal court is restricted by the consent and involvement of the

---

[6] Defendants argue that *Humphrey's Executor* did not mention the 1935 FTC's authority to issue substantive regulations, much less rely on this authority in its discussion of executive power. Defs.' Mem. at 12. However, the FTC's rulemaking authority is plain on the face the Federal Trade Commission Act, which is cited and heavily relied upon in *Humphrey's Executor*.

18

Attorney General, who is accountable to, and subject to at-will removal by, the President. Specifically, the CPSC cannot prosecute or defend a civil case in federal court without written notice to the Attorney General and the Attorney General's election whether to represent the Commission in that civil action. 15 U.S.C. § 2076(b)(7)(A). Although the CPSA prescribes a role for the CPSC to play in criminal enforcement of consumer product safety laws, such criminal actions must be prosecuted through, or with the concurrence of, the Attorney General. *Id.* § 2076(b)(7)(B).

Defendants argue that the *Humphrey's Executor* exception does not apply to the CPSC because its powers, including the aforementioned enforcement powers, exceed those of the 1935 FTC and constitute "substantial executive power." Defs.' Mem. at 8–15 (citing *Seila Law*, 591 U.S. at 219, 140 S. Ct. at 2200). To be sure, at one point, the Court in *Seila Law* described the *Humphrey's Executor* exception as applicable to "multimember expert agencies that do not wield substantial executive power[.]" *Seila Law*, 591 U.S. at 218, 140 S. Ct. at 2199–200. At other points, however, *Seila Law* describes the exception as applicable to "expert agencies led by a *group* of principal officers[,]" *id.* at 204, 140 S. Ct. at 2192 (emphasis in original), and "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions," *id.* at 217, 140 S. Ct. at 2199, without mention of any degree of "executive power." In *Morrison*, the Court recognized "[t]he difficulty of defining such categories of 'executive' or 'quasi-legislative' officials[,]" and noted that, by modern standards, the 1935 FTC—the agency at issue in *Humphrey's Executor*—would be "considered 'executive,' at least to some degree." 487 U.S. at 690 n.28, 108 S. Ct. at 2619 n.28. Still, *Humphrey's Executor* remains good law and is binding. But, as the Fifth Circuit concluded in *Consumers' Research*, the Supreme Court's precedents leave unclear "*how much*" executive power an agency must wield "before [it] loses protection under the *Humphrey's* exception." 91

19

F.4th at 353. And this Court's reading of the Supreme Court's precedents suggests that the exercise of powers described as "executive" in nature, by itself, is not dispositive of whether an agency is disqualified from the *Humphrey's Executor* exception.

First, in *Morrison*, the Supreme Court stated that assessing the constitutionality of a removal restriction should not focus on "rigid" categorization of an official's powers as "purely executive," "quasi-legislative," and "quasi-judicial." *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618. Instead, the Court's removal analysis focuses on "ensur[ing] that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Id.*

Later, in *Seila Law*, the Court did not consider the "significant executive power" entrusted to the CFPB in isolation, but instead considered it within the context of its historically anomalous single-Director leadership structure. *See* 591 U.S. at 213–32, 140 S. Ct. at 2197–2207. The Court invalidated the CFPB Director's statutory removal restriction because the agency was both "led by a single Director *and* vested with significant executive power." *Id.* at 220, 140 S. Ct. at 2201 (emphasis added). Notwithstanding the "significant executive power" wielded by the CFPB, Chief Justice Roberts suggested in Part IV of the Court's opinion[7] that Congress could solve the constitutional problem presented in the removal restriction by "converting the CFPB into a multimember agency." *Id.* at 237, 140 S. Ct. at 2211.

---

[7] This part of the Chief Justice's opinion was not joined by a majority of the Court, but it was joined by two other Justices. And a separate group of four Justices joined an opinion dissenting from the majority's conclusion that the CFPB's removal restriction was unconstitutional. *Seila Law*, 591 U.S. at 284–96, 140 S. Ct. at 2238–44 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part). The foregoing suggests that a majority of the Court at the time of *Seila Law* would have likely approved of a statutory for-cause removal restriction for a multimember commission like the CPSC.

Finally, in *Collins*, the Court clarified that "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." 594 U.S. at 251–52, 141 S. Ct. at 1784. "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies," and "the constitutionality of removal restrictions" does not "hinge[] on such an inquiry." *Id.* at 253, 141 S. Ct. at 1785.

In accordance with *Morrison* and *Collins*, this Court declines Defendants' invitation to engage in categorizing the CPSC's varied set of functions and powers as executive or non-executive. The degree to which the CPSC wields executive power (in the modern sense) alone does not determine whether the removal restriction in 15 U.S.C. § 2053(a) "interfere[s] with the President's exercise" of Article II powers and duties. *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618. The Supreme Court's reasoning in *Seila Law* demonstrates that the agency's structure also must be considered. In that case, the CFPB's organization under a single Director with statutory protection against removal, while serving a five-year term, impermissibly insulated the agency from the President's influence. *Seila Law*, 591 U.S. at 213–20, 140 S. Ct. at 2197–201. The CPSC, in contrast, is not so insulated.

The CPSC's five-member, staggered-term design would likely provide multiple opportunities each presidential term for an electorally accountable President to appoint a new Commissioner.[8] Such frequent opportunities for the elected President "to shape [the Commission's] leadership and thereby influence its activities[]" were not available under CFPB's

---

[8] Indeed, President Trump will have the opportunity to appoint Plaintiff Boyle's successor when her term expires no later than October 27 of this year and, at that point, possibly create a majority on the Commission aligned with his political preferences. ECF No. 18-2, ¶ 2; 15 U.S.C. § 2053(a)–(c). Opportunities to appoint Plaintiffs Hoehn-Saric's and Trumka's successors will follow on October 27, 2027, and October 27, 2028. ECF No. 18-2, ¶¶ 3–4.

leadership structure, given the single Director's five-year term and for-cause removal restriction. *Id.* at 225, 140 S. Ct. at 2204. Thus, the leadership structure of the CPSC, even with statutory tenure protection, permits presidential control and electoral accountability to a degree that was foreclosed by the CFPB Director's statutory tenure protection before it was invalidated in *Seila Law*. *See id.* at 220–26, 140 S. Ct. at 2201–04; *Consumers' Research*, 91 F.4th at 354 ("[CPSC] Commissioners' staggered appointment schedule means that each President *does* 'have an[] opportunity to shape [the Commission's] leadership and thereby influence its activities.'" (quoting *Seila Law*, 591 U.S. at 226, 140 S. Ct. at 2204)). Furthermore, like most independent agencies— and unlike the CFPB—the CPSC is funded through the normal appropriations process, further subjecting it to presidential influence and electoral accountability. *See id.* 591 U.S. at 226, 140 S. Ct. at 2204 (describing how CFPB's unique funding mechanism outside the appropriations process further insulates that agency from the President's influence and the control of the electorate); *Consumers' Research*, 91 F.4th at 355 ("[T]he President *can* 'influence' the [CPSC's] activities via the budgetary process." (quoting *Seila Law*, 591 U.S. at 226, 140 S. Ct. at 2204)).

Thus, unlike tenure protection for the CFPB Director, tenure protection for traditional multimember, staggered-term agencies like the CPSC and the 1935 FTC "does not interfere with" the President's Article II duties and powers, *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618, and it is not "incompatible with our constitutional structure[,]" *Seila Law*, 591 U.S. at 222, 140 S. Ct. at 2202.

Finally, and importantly—unlike the CFPB at issue in *Seila Law*—the structure and powers Congress prescribed for the CPSC are well-established in the history and tradition of the federal government. In *Consumers' Research*, the Fifth Circuit held that the CPSC's statutory removal restriction was supported by "historical pedigree." 91 F.4th at 354; *see also Leachco*, 103 F.4th at

762–63 (Tenth Circuit analyzing and citing *Consumers' Research* approvingly). This Court agrees. In *Seila Law*, the Supreme Court drew a clear contrast between "a traditional independent agency headed by a multimember board or commission," like the CPSC, 591 U.S. at 207, 140 S. Ct. at 2193, and the CFPB's "almost wholly unprecedented" single-Director leadership structure, describing this "lack of historical precedent" as "[p]erhaps the most telling indication of [a] severe constitutional problem . . . ." *id.* at 220, 140 S. Ct. at 2201 (quoting *Free Enterprise Fund*, 561 U.S. at 505, 130 S. Ct. at 3159). The Court also recognized that statutory removal restrictions were in place in "some two-dozen multimember independent agencies," without giving any indication of a constitutional defect among these provisions. *Seila Law*, 591 U.S. at 230, 140 S. Ct. at 2206. The historical precedent for statutory removal restrictions among traditional multimember independent agencies gives strong indication that 15 U.S.C. § 2053(a) does not violate Article II.

In sum, the CPSC closely resembles the 1935 FTC in both structure and function, and therefore qualifies for the *Humphrey's Executor* exception. The restriction against Plaintiffs' removal under 15 U.S.C. § 2053(a) does not offend the President's Article II removal power because the CPSC is a traditional "multimember bod[y] with 'quasi-judicial' or 'quasi-legislative' functions," akin to those of the FTC. *Seila Law*, 591 U.S. at 217, 140 S. Ct. at 2199 (quoting *Humphrey's Executor*, 295 U.S. at 632, 55 S. Ct. 869); *see also Morrison*, 487 U.S. at 689–90, 108 S. Ct. 2618–19 (explaining Supreme Court's use of terms "quasi-judicial" or "quasi-legislative"). Accordingly, the Court finds as a matter of law that the President's purported removal of Plaintiffs from their positions as CPSC Commissioners absent "neglect of duty or malfeasance in office" was unlawful, 15 U.S.C. § 2053(a), and Plaintiffs are entitled to appropriate relief.

## V.    REMEDIES

### A.  Declaratory Relief

The first form of relief Plaintiffs request is a declaratory judgment that "President Donald J. Trump's purported termination of Plaintiffs from their roles as Commissioners of the [CPSC] is ultra vires, contrary to law, and without legal effect." ECF No. 18-6.

The Declaratory Judgment Act authorizes a federal district court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The U.S. Court of Appeals for the Fourth Circuit "has long recognized the discretion afforded to district courts in determining whether to render declaratory relief." *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.*, 139 F.3d 419, 421 (4th Cir. 1998) (per curiam). "A district court should issue a declaration when it will help in 'clarifying and settling' legal relationships and will 'terminate and afford relief from the uncertainty, insecurity, and controversy' driving the suit." *Reyazuddin v. Montgomery Cnty., Md.*, 754 F. App'x 186, 192–93 (4th Cir. 2018) (quoting *Aetna*, 139 F.3d at 423).

The Court finds declaratory relief to be appropriate in this case. First, there is a live controversy between the parties over whether the President has lawfully removed, or may lawfully remove, Plaintiffs from their offices as CPSC Commissioners absent "neglect of duty or malfeasance in office" under 15 U.S.C. § 2053(a). In seeking, last month, to remove Plaintiffs from their positions permanently and without cause, the President's legal interests are presently adverse to Plaintiffs'. A declaration would serve to clarify and settle the parties' legal relationships and relieve the parties from "the uncertainty, insecurity, and controversy" driving this litigation. *Reyazuddin*, 754 F. App'x at 192–93 (quoting *Aetna*, 139 F.3d at 423). Having found that

Plaintiffs' removal from their roles as CPSC Commissioners without cause is unlawful, the Court will grant Plaintiffs a declaration consistent with this ruling.

### B.  Injunctive Relief

Second, Plaintiffs seek an Order from this Court enjoining Defendants Bessent, Vought, and Feldman from "taking any action to effectuate [Plaintiffs'] purported terminations[.]" Pls.' Mot. Defendants argue that the Court lacks the equitable power to order Plaintiffs' reinstatement and the only relief available to Plaintiffs is backpay. Defs.' Mem. at 17–20. It is correct that "the general availability of injunctive relief . . . depend[s] on traditional principles of equity jurisdiction[,]" *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19, 119 S. Ct. 1961, 1968, 144 L. Ed. 2d 319 (1999) (citation omitted), and "a court of equity has no jurisdiction over the appointment and removal of public officers," *In re Sawyer*, 124 U.S. 200, 212, 8 S. Ct. 482, 488, 31 L. Ed. 402 (1888). Defendants, however, misconstrue the equitable relief Plaintiffs seek. Plaintiffs do not seek to enjoin the President to reappoint them. With the President's purported termination of each Plaintiff declared effectively invalid as a matter of law, Plaintiffs seek only to enjoin the President's subordinates from obstructing their performance of their duties as CPSC Commissioners and their access to the resources necessary for such performance. This Court is persuaded that the injunctive relief Plaintiffs seek is available in this case. *See Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023) (court's "jurisdiction does not depend on deciding whether an injunction ordering a presidential appointment would be available or appropriate" where the court "can enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment") (citing *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)).

After succeeding on the merits of its claim, a plaintiff seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006). When the government is the defendant, the inquiry into the last two factors merge. *Kravitz v. United States Dep't of Com.*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (citing *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016), and *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *EBay*, 547 U.S. at 391, 126 S. Ct. at 1839.

Here, Plaintiffs have suffered irreparable harm in having been deprived of participation in the affairs of the CPSC and access to the facilities and resources available and necessary to perform their statutory duties as CPSC Commissioners for the past month. Plaintiffs are unlawfully barred from participating in ongoing, consequential decisions of the CPSC that will substantially impact Commission operations and its work on behalf of the public. ECF No. 18-2, ¶ 16. Specifically, Plaintiffs are prevented from voting on Acting Chairman Feldman's proposed plan for reductions in force at the CPSC, which Plaintiffs believe will aggravate existing understaffing issues and compromise the Commission's ability to function.[9] *Id.* ¶ 17. In Plaintiffs' absence, the Acting Chairman will be able to implement his proposed plan without their input or opposition. *Id.* ¶¶ 17–

---

[9] This Court takes no position on any differences of opinion between Plaintiffs and the Acting Chairman respecting administration of the CPSC or any other matters of policy. Considering that each Plaintiff has been duly appointed to serve on the CPSC, however, the Court does find harm in the bar Defendants have unlawfully placed on their participation in the Commission's deliberations on matters of policy.

19. In the time that the CPSC has been operating without Plaintiffs' participation, the Commission has stalled the progress of certain product-safety rules that Plaintiffs believe are necessary to protect consumers, *id.* ¶¶ 23–24, 27–28; canceled budgetary and planning meetings that Plaintiffs view as important, *id.* ¶ 29; and voted to withdraw a Notice of Proposed Rulemaking for safety standards that Plaintiffs had supported, *id.* ¶ 24. The foregoing irreparable harms are certain to continue in the absence of injunctive relief, as the President has purported to discharge each Plaintiff permanently from their office as a CPSC Commissioner. Without an injunction, Plaintiffs would be prevented from serving out the remainder of their limited terms and therefore forever lose the opportunity to fulfill the statutory duties assigned to them.

Plaintiffs' injuries cannot be redressed adequately through money damages or through a remedy at law (apart from the drastic, last-resort remedy of a writ of mandamus).[10] *See Grundmann v. Trump*, --- F. Supp. 3d ---, 2025 WL 782665, at *16–17 (D.D.C. Mar. 12, 2025) ("[a] check in the mail does not address the gravamen" of losing the opportunity to "serve [one's] country at the highest possible level in [one's] field"); *Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914 (D.D.C. Mar. 6, 2025), *hearing in banc denied sub nom. Harris v. Bessent*, No. 25-5037, 2025 WL 1033740 (D.C. Cir. Apr. 7, 2025) (being "deprived of the ability to carry out [one's] congressional mandate . . . cannot be retroactively cured by monetary damages"), *appeal filed* No. 25-5057 (D.C. Cir.). "[T]he loss of the ability to do what Congress specifically directed [Plaintiffs] to do cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, 766 F.

---

[10] As explained in Part III.C *infra*, the legal remedy of mandamus is available, *see In re Sawyer*, 124 U.S. 200, 212, 8 S. Ct. 482, 488, 31 L. Ed. 402 (1888), but the writ a "drastic" remedy to be granted only when there are "no other adequate means to attain the relief" sought, *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 402–03, 96 S. Ct. 2119, 2123–24, 48 L. Ed. 2d 725 (1976). Here, the Court finds that a writ of mandamus would be appropriate in the alternative to a permanent injunction.

Supp. 3d 57, 70–71 (D.D.C. Feb. 12, 2025), *appeal dismissed*, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025); *see also, e.g.*, *LeBlanc v. U.S. Privacy & Civil Liberties Oversight Bd.*, --- F. Supp. 3d ---, 2025 WL 1454010, at *28–32 (D.D.C. May 21, 2025) (unlawful termination of an independent agency head "implicate[s] core separation of powers issues" and is "strikingly different from . . . 'routine' employment circumstances"). And the Fourth Circuit has identified reinstatement as an appropriate equitable remedy for wrongful discharge. *See Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 562 (4th Cir. 2018) (citing *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991)).

Finally, a permanent injunction reinstating Plaintiffs to their positions as CPSC Commissioners is favored by the balance of relevant hardships and does not run counter to the public interest. The CPSC plays a vital, congressionally prescribed role in "protect[ing] the public against unreasonable risks of injury associated with consumer products[,] . . . assist[ing] consumers in evaluating the comparative safety of consumer products[,]" and "develop[ing] uniform safety standards for consumer products[,]" among other purposes. 15 U.S.C. § 2051(b). Depriving this five-member Commission of three of its sitting members threatens severe impairment of its ability to fulfill its statutory mandates and advance the public's interest in safe consumer products. This hardship and threat to public safety significantly outweighs any hardship Defendants might suffer from Plaintiffs' participation on the CPSC. The Court notes again that Plaintiff Boyle's term ends in October of this year, at which point the President will have an opportunity to appoint her successor and exert significant influence over the agency. Defendants have identified no public interest in depriving this five-member Commission of three members.

28

The Court finds it to be in the public interest to have the persons duly appointed to occupy these key leadership positions resume their roles.[11]

Accordingly, the Court finds Plaintiffs' requested injunctive relief appropriate and shall grant it.

### C. Mandamus

Even if de facto reinstatement is unavailable as a form of equitable relief, it is available alternatively by a writ of mandamus. *See In re Sawyer*, 124 U.S. at 212, 8 S. Ct. at 488 ("The jurisdiction to determine the title to a public office belongs exclusively to the courts of law, and is exercised either by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*, according to the circumstances of the case, and the mode of procedure, established by the common law or by statute.").

A federal district court has "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. But "[m]andamus is a 'drastic' remedy that must be reserved for 'extraordinary situations' involving the performance of official acts or duties." *Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016) (quoting *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 402, 96 S. Ct. 2119, 2123, 48 L. Ed.2d 725 (1976)).

---

[11] In denying Plaintiffs' request for preliminary injunctive relief, the Court found that the preliminary record did not provide a clear showing that the balance of equities favored such relief. This finding was supported by the emergency Order recently entered by the Supreme Court in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), where the Court determined that a stay of preliminary injunctive relief in that case was "appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." Disruption might have resulted in the instant case if Plaintiffs had been reinstated while this case was in its preliminary posture, only to have the Court later deny relief in its final judgment and subject Plaintiffs to removal again. The risk of such disruption is no longer a factor now that the Court is granting *permanent* injunctive relief as a final judgment.

> [T]o establish the conditions necessary for issuance of a writ of
> mandamus, the party seeking the writ must demonstrate that (1) he
> has a clear and indisputable right to the relief sought; (2) the
> responding party has a clear duty to do the specific act requested;
> (3) the act requested is an official act or duty; (4) there are no other
> adequate means to attain the relief he desires; and (5) the issuance
> of the writ will effect right and justice in the circumstances.

*U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999) (citing *Kerr*, 426 U.S. at 403, 96 S. Ct. at 2124).

The Court finds that the wrongful removal of a presidentially appointed Commissioner of an independent federal agency presents an "extraordinary" situation involving interference with the performance of official duties and, therefore, is suited for mandamus relief. *Cumberland Cnty. Hosp. Sys.*, 816 F.3d at 52. Each Plaintiff, having been duly appointed to serve as a CPSC Commissioner and not lawfully removed from that position, "has a clear and indisputable right to" to their office, and Defendants have a "clear" and "official" duty to provide each Plaintiff access to the resources necessary and available for each Plaintiff to perform their official duties. *Rahman*, 198 F.3d at 511. If equitable relief in the form of a permanent injunction is unavailable, then there would be "no other adequate means to attain the relief" to which each Plaintiff is entitled. *Id.* And, in these circumstances, issuance of a writ of mandamus would be right and just. *Id.*

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is granted, and Defendants' Cross-Motion for Summary Judgment is denied. Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is denied as moot. The Court shall issue a separate declaratory judgment and permanent injunction consistent with this Memorandum Opinion.

_6/13/25_
Date

_____
Matthew J. Maddox
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MARY BOYLE, *et al.*, | \* |
| | \* |
| | \* |
| Plaintiffs, | \* |
| | \*     Civ. No. MJM-25-1628 |
| v. | \* |
| | \* |
| DONALD J. TRUMP, *et al.*, | \* |
| | \* |
| Defendants. | \* |
| | \* |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this _13th_ day of June, 2025, by the United States District Court for the District of Maryland, hereby ORDERED that:

1. Plaintiffs' Motion for Summary Judgment (ECF No. 18) is GRANTED;

2. Defendants' Cross-Motion for Summary Judgment (ECF No. 21) is DENIED;

3. Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 6) is DENIED as moot;

4. It IS DECLARED that President Donald J. Trump's purported termination of Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") is ultra vires, contrary to law, and without legal effect; and

5. Defendants Scott Bessent, Russell Vought, and Peter A. Feldman are ENJOINED from taking any action to effectuate Plaintiffs' unlawful terminations (until such time as Plaintiffs' terms expire pursuant to 15 U.S.C. § 2053), including by:

- Barring Plaintiffs' access to agency resources (including, but not limited to, Plaintiffs' office spaces, CPSC telephone and computer equipment, CPSC email accounts, and physical and electronic files) to which Plaintiffs had access prior to May 8, 2025;

- Giving effect to the purported termination of Plaintiffs' staff members; or

- Withholding from Plaintiffs and their staff members the pay and benefits that they were entitled to receive in connection with their roles at the CPSC prior to May 8, 2025.

And it is further ORDERED Plaintiffs' unopposed Motion for Leave to Waive Requirement Under Local Rule 102.2(a) to Provide Addresses in Complaint Caption (ECF No. 2) is GRANTED.

The Clerk shall CLOSE this case.

Matthew J. Maddox
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BOYLE, et al.,

                Plaintiffs,

     v.

TRUMP, et al.,

                Defendants.

Case No. 8:25-cv-1628-MJM

## DEFENDANTS' OPPOSED MOTION FOR LEAVE TO FILE THE DECLARATION OF TRIPP DEMOSS

Defendants respectfully seek leave to file a declaration in support of Defendants' Motion to Stay the Court's Order Pending Appeal (ECF No. 27). The declaration of Tripp DeMoss, Senior Counsel to Defendant Acting Chair Peter A. Feldman ("DeMoss Declaration") is attached as Exhibit A to this Motion. Counsel for Defendants has contacted counsel for Plaintiffs, who have stated that they oppose Defendants' motion.

The Court "has broad discretion to grant leave to file supplemental materials." *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 473 F. Supp. 3d 529, 535 (D. Md. 2020) (granting motion for leave to file supplemental memorandum for a party to "alert the court to new factual developments" that bore on the motion). The exercise of this Court's discretion is warranted here, where the proposed declaration explains the "harm from an order allowing a removed officer to continue exercising the executive power" and the "disruptive effect of the repeated removal and reinstatement of officers during the pendency of . . . litigation." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Specifically, the DeMoss Declaration recounts that on June 16, 2025, at approximately 5:49 p.m. EST, now-reinstated Commissioner Trumka circulated an agenda

planning proposal.[1] DeMoss Declaration at ¶ 5–6; *see also* Exhibit 2 to DeMoss Declaration. The agenda planning proposal, among other things, sought to undo actions taken since May 8, 2025; adopt a policy that would result in the immediate termination of certain personnel; and require a majority Commission vote for any reduction-in-force ("RIF") actions. Exhibit 2 to DeMoss Declaration. In light of the "breadth of the proposed language and its potential for extensive disruption of agency operations, the shortened holiday week, and the ongoing deconflict and recusal analysis," the Acting Chair determined that a meeting the morning of June 17 was not practicable. *Id*. In response, now-reinstated Commissioner Trumka proceeded to hold an unauthorized, "emergency" meeting anyway, ordering the agenda planning committee to either attend or "personally violate [this Court's order]." *Id*. The three reinstated Commissioners then approved the Ballott Vote package. DeMoss Declaration at ¶ 14. This purported meeting epitomizes the chaos that has and will continue to ensue during the course of litigation where the final verdict on whether plaintiffs were unlawfully removed has not yet been rendered on appeal. Indeed, Acting Chairman Feldman or Commissioner Dziak maintain that the meeting was unauthorized and invalid. *Id*.

In addition to the procedural chaos, as the DeMoss Declaration explains, the agenda proposal will be extremely disruptive to the Agency by, for example, terminating personnel, changing all Records of Commission Action for votes taken since May 8, 2025 to render them "null, void, and of no effect," and notifying the Office of the Federal Register that the vote to withdraw a particular notice of proposed rulemaking is "null and void" and to "direct publication" of the notice. Exhibit 3 to DeMoss Declaration. The proposal is doubly disruptive because it

---

[1] The proposal was circulated after Defendants had filed their Motion for a Stay of this Court's Order Pending Appeal.

conflicts with the balance of powers set forth in the Consumer Product Safety Act and would usurp the Acting Chairman's authority over personnel—which the statute gives him and the Commission has always understood the Chair to have. *See, e.g.*, DeMoss Declaration at ¶¶ 11, 17–18, 20. To avoid the great "harm" that the Commission faces from the recently reinstated Commissioners wielding executive power and the "disruptive effect" of reinstatement during litigation, this Court should grant Defendants' motion to stay pending appeal. *Wilcox*, 145 S. Ct. at 1415.

Defendants accordingly respectfully request that the Court grant leave to file the DeMoss Declaration in support of their Motion to Stay the Court's Order Pending Appeal.

Dated: June 17, 2025

Respectfully submitted,

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

/s/ *Abigail Stout*
ABIGAIL STOUT
(DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

*Attorney for Defendants*

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| BOYLE, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 8:25-cv-1628-MJM |
| TRUMP, *et al.*, | |
| Defendants. | |

<u>**DECLARATION OF TRIPP DEMOSS**</u>

1.      My name is Tripp DeMoss.  I am currently employed at the Consumer Product Safety Commission ("CPSC") as the Senior Counsel to Acting Chairman Peter A. Feldman since May 5, 2025.  As Senior Counsel, I provide advice and counsel to Acting Chairman Feldman on various legal issues facing him in his role as acting chairman of the CPSC. The following is based on my personal knowledge or information provided to me in the course of performing my official duties.

2.      Acting Chairman Feldman serves as, among other things, principal executive officer of the CPSC that exercises all executive and administrative functions of the commission. 15 U.S.C. § 2053(f)(1).

3.      I am familiar with the litigation in the above-styled matter, whereby on Friday, June 13, 2025, this Court issued an order directing that CPSC Commissioners Richard Trumka, Jr., Alexander Hoen-Saric, and Mary Boyle be reinstated to their positions from which they had been previously removed at the direction of President Donald Trump on May 8-9, 2025.

4.      Pursuant to the CPSC's decision-making procedures (hereinafter referred to as the "DMPs"), which have traditionally governed the decision-making process of the CPSC since their

adoption in 2010, the staffs of each CPSC Commissioner may meet on a weekly basis to set the agenda of the Commission. DMP III.A provides that "(t)he Commission agenda shall be set, scheduled, and acted upon" through a process including that the "Agenda Planning Committee shall…meet at a regularly scheduled time every week as practicable." DMP III.A.1.  A copy of the DMPs are attached to this declaration as **Exhibit 1**.[1] It is agency practice that the acting chairman's staff convenes meetings of the Agenda Planning Committee, including scheduling, facilitating, presiding, and rescheduling where appropriate.

### Proposed Agenda Directives

5.    On Monday June 16, 2025, at 5:49 p.m. EST, all members of the CPSC's Agenda Planning Committee, which includes staff for all CPSC Commissioners, as well as myself, received an email from now-reinstated CPSC Commissioner Richard Trumka, Jr. A copy of the email is attached to this declaration as **Exhibit 2**.[2]

6.    Commissioner Trumka's proposal requested that several time-critical matters be added to the Commission's agenda on an emergency basis. Exhibit 2.

7.    The Commission has not completed any formal process to deconflict the three reinstated Commissioners from official Commission business related to this litigation, nor has the Commission sought to deconflict specific Commission officers.

8.    The three reinstated Commissions are adverse parties in a lawsuit against Acting Chairman Feldman with a financial interest in the litigation, and as such should be properly recused from matters relating to the litigation.

---

[1] The DMPs are marked "FOR OFFICIAL USE ONLY- DO NOT DISTRIBUTE OUTSIDE THE COMMISSION." A copy of the DMPs are being submitted under seal.

[2] Exhibit 2 is an email thread beginning with a scheduling invitation from Acting Chairman Feldman's office.

9.      On Tuesday, June 17, 2025, at 9:44 a.m., Acting Chairman Feldman sent an email to the members of the Agenda Planning Committee rescheduling the 10:00 a.m. Agenda Planning Meeting, citing specific issues that needed to be addressed prior to the meeting. Exhibit 2. The Acting Chairman rescheduled the meeting because, among other reasons, the Commission has not completed any formal process to deconflict the three reinstated Commissioners from official Commission business related to this litigation, nor has the Commission sought to deconflict specific Commission officers or seek recusals.

10.     Commissioner Boyle sent an email at 10:09 a.m. with a response, as shown in Exhibit 2. Email traffic in a similar vein followed, including an email sent at 10:23 a.m. by Commissioner Trumka to CPSC staff. Exhibit 2.

11.     These emails and the requested actions further demonstrate the disruption caused by reinstatement. Indeed, it indicates a usurpation of the Acting Chairman's executive authority to supervise personnel and distribute agency business.

**Invalid Meeting of the Agenda Planning Committee on June 17, 2025**

12.     Upon information and belief, it is my understanding that a meeting purporting to be a meeting of the Agenda Planning Meeting Committee, took place on or about June 17, 2025 at some point after 10:00 a.m., with the staffs of reinstated Commissioners Trumka, Boyle and Hoen-Saric participating.

13.     The three reinstated Commissioners purported to convene this meeting of the Agenda Planning Committee without the participation of Acting Chairman Feldman, Commissioner Dziak or other Agenda Planning Committee members. The result of that meeting was the ostensible approval for a "Time Critical Ballot Vote" regarding "Commission Directions and Commission Policy Regarding Reductions in Force and Staff Details." A copy of the ballot is

attached as **Exhibit 3**. The meeting took place despite a prior and valid cancellation of the meeting by Acting Chairman Feldman, which was cancelled pursuant to his authority as chief executive officer of the CPSC. Exhibit 2. The meeting was cancelled to allow staff to undertake a potential deconfliction and recusal analysis. Exhibit 2.

14.     At approximately 2:00 p.m., a Ballot Vote package was approved by the three reinstated Commissioners, with the abstention of Acting Chairman Feldman and Commissioner Dziak. My understanding is that Acting Chairman Feldman and Commissioner Dziak maintain that the meeting was unauthorized and invalid.

15.     The Ballot Vote package appears to have been included on the Commission Agenda as an emergency addition.  It adopts a "Commission Policy Regarding Reductions in Force and Staff Details" ("Personnel Policy"), that is "effective immediately."  Exhibit 3.

16.     This Personnel Policy requires majority vote of the Commission for any "actions...taken towards Reduction-in-Force of CPSC staff" "[n]otwithstanding the Directives or other policies governing the Commission."  *Id.*  The policy also requires that "[a]ny actions to implement or initiate Reductions in Force that are underway…be withdrawn immediately unless approved by a majority vote of the Commission."  *Id.* The Personnel Policy also immediately terminates "[a]ny staff who have been hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's 'Department of Government Efficiency' Cost Efficiency Initiative* Executive Order" without majority approval.  *Id.*  The policy immediately revokes their access to digital systems and direct security to "ensure that they are securely removed without damage to CPSC property."  *Id.* Additionally, the Personnel Policy declares that "[i]t is the policy of the Commission that no staff shall be hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of*

*Government Efficiency" Cost Efficiency Initiative* Executive Order without approval by a majority vote of the Commission." *Id.*

17.     Implementation of this Personnel Policy is disruptive because it conflicts with, undermines, and disrupts the Commission's balance of powers laid out by statute. Under the Consumer Product Safety Act, the Chairman is the "principal executive officer of the Commission, and he shall exercise *all of the executive and administrative functions* of the Commission, including (A) the *appointment and supervision of personnel employed under the Commission . . .,* (B) the distribution of business among personnel appointed and supervised by the Chairman and among administrative units of the Commission, and (C) the use and expenditure of funds." 15 U.S.C. § 2053 (f)(1) (emphasis added).  Additionally, the statute provides that while the Chairman needs the approval of the Commission to appoint or remove certain enumerated statutory officers, 15 U.S.C. § 2053 (g)(1), he is expressly authorized—subject to the Commission's general policies, decisions, findings and determinations—to "employ such other officers and employees (including attorneys) as are necessary in the execution of the Commission's functions." 15 U.S.C. § 2053 (g)(1), (g)(2).

18.     The Chairman's power over personnel also extends to reductions in force ("RIFs") and has always been understood to extend to RIFs.  In addition to the statute—which vests the power to hire and fire (subject to certain exceptions not relevant here) in the Chairman, and the Executive Director, who reports to the Chairman—the Commission's internal directives provide that the Chairman is authorized to conduct all RIFs.  For example, CPSC Dir. 0949.1, Reductions In Force (attached as "**Exhibit 4**"), has provided since at least January 15, 1987, that "RIF action will be initiated only when necessary and *as approved by the Chairman or Executive Director*." (Emphasis added).

- 5 -

19.    In 2024, then-Chairman Hoehn-Saric—a plaintiff in this case—instituted a RIF to reduce headcount and manage the Agency to meet an anticipated lower appropriation in fiscal year 2026. He did so under his statutory authority as Chairman, without seeking a vote of the Commission.

20.    Likewise, under the statute, the Chairman has exclusive power to manage personnel, including the personnel that have been or may be hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order. The power to employ "such other officers and employees of the Commission" is the Chairman's alone and the statute vests no independent authority in non-chair Commissioners to terminate these employees. 15 U.S.C. § 2053 (g)(2).

21.    In short, the reinstated Commissioners have invalidated almost every action of the CPSC prior to their reinstatement, calling into question the legal validity of the important safety work of the Commission, reversing work to effectuate many of President Trump's lawful executive orders regarding the operations of federal agencies, and undermining CPSC's vital mission on behalf of American families.

22.    As the Supreme Court put it on May 22, 2025, in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), "[a] stay is appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." The reinstated Commissioners' actions are actively disrupting and will continue to disrupt the business of the CPSC. Orderly functioning of the CPSC will be next to impossible if the three reinstated commissioners are permitted to remain at the CPSC, if the vote taken by the reinstated Commissioners on June 17, 2025, is any indication.

\* \* \*

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 17th day of June, 2025.

_____
Tripp DeMoss
Senior Counsel

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| _____ | * |
| **Plaintiff,** | * |
| **v.** | *     **Case No.** _____ |
| | * |
| _____ | * |
| **Defendant.** | * |

### NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☐    Exhibit _____ which is an attachment to _____

_____

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by_____.

_____      *Abigail Stout*
_____

Date                              Signature

_____

Printed Name and Bar Number

_____

Address

_____

Email Address

_____

Telephone Number

_____

Fax Number

# Exhibit 2

---

**From:** Trumka Jr., Richard <█████████████>
**Sent:** Tuesday, June 17, 2025 10:23 AM
**To:** Boyle, Mary <██████████████>; Feldman, Peter <█████████████; Agenda Planning Committee
<███████>
**Cc:** Vehafric, Noah <████████████>
**Subject:** Re: Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

To the staff on the agenda planning committee, let me be clear: you are instructed to attend the meeting as usual. If you chose to ignore the directive of the Commission, I suggest you read the Court order and decide whether you want to personally violate it.

Get Outlook for iOS

---

**From:** Boyle, Mary <██████████████>
**Sent:** Tuesday, June 17, 2025 10:16:15 AM
**To:** Feldman, Peter <█████████████>; Trumka Jr., Richard <█████████████>; Agenda Planning Committee <███████████████>
**Cc:** Vehafric, Noah <█████████████>
**Subject:** RE: Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

To the staff on the agenda planning Committee,

On behalf of a majority of the Commission (Commissioners Boyle, Trumka, and Hoehn-Saric) we direct you to attend the previously scheduled agenda planning meeting for which a link was sent last evening.

---

**From:** Boyle, Mary
**Sent:** Tuesday, June 17, 2025 10:09 AM
**To:** Feldman, Peter <█████████████>; Trumka Jr., Richard <█████████████>; Agenda Planning Committee <███████████████>
**Cc:** Vehafric, Noah <█████████████>
**Subject:** RE: Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

I do not see any authority that permits a single Commissioner to unilaterally cancel agenda planning. I intend to instruct my staff to attend the scheduled meeting and make motions accordingly. To the extent that other offices do not attend, that has no bearing on the scheduled meeting or what transpires there.

Mary

---

**From:** Feldman, Peter <█████████████>
**Sent:** Tuesday, June 17, 2025 9:44 AM
**To:** Trumka Jr., Richard <█████████████>; Agenda Planning Committee

< ██████████████████████ >
**Cc:** Vehafric, Noah ████████████ >
**Subject:** RE: Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

While it still technically feasible to hold Agenda Planning this morning, in light of the breadth of this proposed language and its potential for extensive disruption of agency operations, the shortened holiday week, and the ongoing deconflict and recusal analysis, I have determined that the agenda planning meeting this week is no longer practicable. We will resume regular agenda planning meetings at a future date after the conflict analysis is complete and any necessary recusals are effectuated.

Thank you,

Peter

**From:** Trumka Jr., Richard < ████████████ >
**Sent:** Monday, June 16, 2025 5:49 PM
**To:** Agenda Planning Committee < ████████████████████ >
**Cc:** Vehafric, Noah < ████████████ >
**Subject:** Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

All,

Pursuant to Section V(A) of the Decision Making Procedures, I have determined that the Commission must address several time critical matters and hereby request that these be added to the Commission's agenda on an emergency basis under Section III(A), (B), and (C).

I request that the Agenda Planning Committee convene at 10:00 a.m. tomorrow, June 17, 2025, its regularly scheduled weekly meeting time, to decide whether to add the following proposed Commission meetings and policies to the agenda as a matter designated for a time critical vote. The proposed item would be circulated to the Commission on June 17, 2025 at 11:00 a.m. to be due on June 17, 2025 at 2:00 p.m. Per this poll, the usual procedures allowing extension of a vote date or conversion of a ballot vote to a decisional meeting would not apply to this deadline or to any of the deadlines specified below, except by a majority vote of the Commission:

* * *

Notwithstanding the Decision Making Procedures, the Commission directs as follows:

Despite the President's unlawful attempt to fire three Commissioners on the evening of May 8, 2025, the Commission continued to consist of five Commissioners from May 8 to the present. Order, *Boyle v. Trump*, 8:25-cv-01628-MJM (D. Md. June 13, 2025) ("President Donald J. Trump's purported termination of Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") is ultra vires, contrary to law, and without legal effect."). Three Commissioners are—and have been—necessary to constitute a quorum for the transaction of Commission business. 15 U.S.C. § 2053(d). All matters that were presented to fewer than all five Commissioners for a vote from May 8, 2025 to the present were improperly presented and failed to receive support from a majority of the Commission. The results of any votes on such matters are therefore null and void, unless otherwise specified below.

The Commission directs as follows:

- On June 18, 2025, staff shall submit a proposed Performance Budget Request to the Commission for a ballot vote due on June 25, 2025 at 5:00 p.m. This vote cannot be extended or converted to a decisional except by majority vote of the Commission.
- A public Mid-Year Decisional is hereby rescheduled for June 25, 2025 at 10:00 a.m. This vote cannot be extended or converted to a ballot except by majority vote of the Commission.
- By Friday, June 20, 2025, staff shall prepare and send to the *Federal Register* for publication a notice announcing that the Commission will conduct a hybrid public hearing concerning the Commission's agenda and priorities for fiscal years 2026 and 2027 on July 16, 2025, at 10:00 a.m. Further, the notice shall reopen the public registration and comment period until 5:00 p.m. on July 9, 2025.
- Any Records of Commission Action for votes taken between May 8, 2025, and the present shall be updated by the Secretary no later than 5:00 p.m. today to indicate that any decisions purportedly taken are null, void, and of no effect.
    - Notwithstanding the above, any Compliance Actions taken during that time period with the approval of two Commissioners—including recalls and Corrective Action Plans—is now approved by the full Commission and shall remain in effect unless the full Commission takes further action.
    - In addition, notwithstanding the above, the *Federal Register* Notices titled "Agency Information Collection Activities; Proposed Collection; Carbon Monoxide Poisoning and Prevention Grant Application Program" and "Agency Information Collection; Proposed Collection; Pool Safely Grant Program Application" that were approved by two Commissioners on June 3, 2025, are now approved by the full Commission and shall remain in effect.
- No later than 5:00 p.m. today, the Secretary shall notify the Office of the Federal Register that the vote by only two Commissioners on May 13, 2025 to withdraw CPSC's *Notice of Proposed Rulemaking to Establish a Safety Standard for Lithium-Ion Batteries in Micromobility Products and Electrical Systems of Micromobility Products Containing Such Batteries* (NPR on Lithium-Ion Batteries) is null and void and  direct publication of the NPR on Lithium-Ion Batteries that was adopted by the Commission on April 30, 2025.
- No later than 5:00 p.m. tomorrow, June 18, 2025, the Executive Director shall provide all Commissioners with: (1) a list of all contracts that were cancelled between May 8, 2025 and the present, with a description of the work and dollar amounts for each contract; and (2) a status update on the contracts for projects that two Commissioners supported via a ballot vote due on May 21, 2025 titled "Ballot Vote: Fiscal Year 2025 Proposed Operating Plan Alignment and Midyear Review." All activity to implement that ballot vote shall be paused until further notice from a majority of the Commission.
- The following policy is adopted by the Commission, effective immediately:

Commission Policy Regarding Reductions in Force and Staff Details

Notwithstanding the Directives or other policies governing the Commission, no actions may be taken towards Reduction-in-Force of CPSC staff without a majority vote of the Commission. Any actions to implement or initiate Reductions in Force that are underway must be withdrawn immediately unless approved by a majority vote of the Commission.

Notwithstanding the Directives or other policies governing the Commission, any individual who is detailed or otherwise onboarded to the CPSC for the express purpose of facilitating compliance with President Trump's January 20, 2025, Executive Order, *Establishing and Implementing the President's Department of Government Efficiency,* must be approved by a majority vote of the Commission.

Any staff who have been hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order without majority approval by the full Commission are hereby terminated effective immediately and their access to digital systems and CPSC's physical premises shall be immediately revoked. Security shall ensure that they are securely removed without damage to CPSC property.

It is the policy of the Commission that no staff shall be hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order without approval by a majority vote of the Commission.

- No later than 5:00 p.m. tomorrow, June 18, 2025, CPSC's Chief Information Officer shall submit to all Commissioners an audit log containing the activities of Nate Cavanaugh, Justin Fox, and/or any person brought to CPSC for the purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order and who may have accessed and/or exfiltrated CPSC data from May 8, 2025 to the present. The Chief Information Officer shall assist Commissioners in interpreting and understanding what actions were taken with respect to CPSC's data systems during that period.

---

**From:** Vehafric, Noah <█████████████>
**Sent:** Monday, June 16, 2025 5:01 PM
**To:** Agenda Planning Committee <████████████████████>
**Subject:** Agenda Planning, June 17

**For Official Use Only**

Good afternoon,

Please find the proposed agenda for this week's meeting attached. Tomorrow's Agenda Planning meeting will be **fully virtual** on Microsoft Teams using this link.

Thank you,

**Noah Vehafric**

Special Assistant to Acting Chairman Peter A. Feldman

U.S. Consumer Product Safety Commission | Office of the Acting Chairman



4330 East West Highway | Bethesda, MD 20814

**Mobile:** ███████

*Keeping Consumers Safe*

Follow Us: Facebook, X, Instagram, YouTube, LinkedIn, Bluesky, Truth Social

*****!!! Unless otherwise stated, any views or opinions expressed in this e-mail (and any attachments) are solely those of the author and do not necessarily represent those of the U.S. Consumer Product Safety Commission. Copies of product recall and product safety information can be sent to you automatically via Internet e-mail, as they are released by CPSC. To subscribe or unsubscribe to this service go to the following web page: http://www.cpsc.gov/en/Newsroom/Subscribe *****!!!

# Exhibit 3



United States
**Consumer Product Safety Commission**

# Time Critical Ballot Vote Sheet

**TO:** The Commission                                                              **DATE:** June 17, 2025
Alberta E. Mills, Secretary

**THROUGH:** Brien Lorenze, Executive Director

**FROM:** Matthew A. Campbell, General Counsel

**SUBJECT:** Commission Directions and Commission Policy Regarding Reductions in Force and Staff Details

---

**TIME CRITICAL BALLOT VOTE DUE**:  June 17, 2025, at 2 pm

Attached for the Commission's consideration is a list of Commission directions and a Commission Policy Regarding Reductions in Force and Staff Details.

The Commission has designated this matter as time critical, pursuant to section V of the Commission's Decision-Making Procedures.

Please indicate your vote on the following options:

I.   Approve the attached Commission direction and policy as drafted.


_____                    _____
(Signature)                                                              (Date)


II.  Approve the attached Commission direction and policy, with the following changes:

_____

_____

_____

_____


_____                    _____


**U.S. Consumer Product**                **National Product Testing**
**Safety Commission**                     **and Evaluation Center**
4330 East–West Highway              5 Research Place
Bethesda, MD 20814                     Rockville, MD 20850

THIS DOCUMENT HAS NOT BEEN REVIEWED                CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                            UNDER CPSA 6(b)(1)

_____        _____
(Signature)                                              (Date)

III.    Do not approve the attached Commission direction and policy.


_____        _____
(Signature)                                              (Date)

IV.    Take other action specified below.

_____

_____

_____

_____


_____        _____
(Signature)                                              (Date)


Attachment

THIS DOCUMENT HAS NOT BEEN REVIEWED                CLEARED FOR PUBLIC RELEASE
OR ACCEPTED BY THE COMMISSION                           UNDER CPSA 6(b)(1)

Notwithstanding the Decision Making Procedures, the Commission directs as follows:

Despite the President's unlawful attempt to fire three Commissioners on the evening of May 8, 2025, the Commission continued to consist of five Commissioners from May 8 to the present. Order, *Boyle v. Trump*, 8:25-cv-01628-MJM (D. Md. June 13, 2025) ("President Donald J. Trump's purported termination of Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") is ultra vires, contrary to law, and without legal effect."). Three Commissioners are—and have been—necessary to constitute a quorum for the transaction of Commission business. 15 U.S.C. § 2053(d). All matters that were presented to fewer than all five Commissioners for a vote from May 8, 2025 to the present were improperly presented and failed to receive support from a majority of the Commission. The results of any votes on such matters are therefore null and void, unless otherwise specified below.

The Commission directs as follows:

- On June 18, 2025, staff shall submit a proposed Performance Budget Request to the Commission for a ballot vote due on June 25, 2025 at 5:00 p.m. This vote cannot be extended or converted to a decisional except by majority vote of the Commission.

- A public Mid-Year Decisional is hereby rescheduled for June 25, 2025 at 10:00 a.m. This vote cannot be extended or converted to a ballot except by majority vote of the Commission.

- By Friday, June 20, 2025, staff shall prepare and send to the *Federal Register* for publication a notice announcing that the Commission will conduct a hybrid public hearing concerning the Commission's agenda and priorities for fiscal years 2026 and 2027 on July 16, 2025, at 10:00 a.m. Further, the notice shall reopen the public registration and comment period until 5:00 p.m. on July 9, 2025.

- Any Records of Commission Action for votes taken between May 8, 2025, and the present shall be updated by the Secretary no later than 5:00 p.m. today to indicate that any decisions purportedly taken are null, void, and of no effect.

    - Notwithstanding the above, any Compliance Actions taken during that time period with the approval of two Commissioners—including recalls and Corrective Action Plans—is now approved by the full Commission and shall remain in effect unless the full Commission takes further action.

    - In addition, notwithstanding the above, the *Federal Register* Notices titled "Agency Information Collection Activities; Proposed Collection; Carbon

Monoxide Poisoning and Prevention Grant Application Program" and "Agency Information Collection; Proposed Collection; Pool Safely Grant Program Application" that were approved by two Commissioners on June 3, 2025, are now approved by the full Commission and shall remain in effect.

- No later than 5:00 p.m. today, the Secretary shall notify the Office of the Federal Register that the vote by only two Commissioners on May 13, 2025 to withdraw CPSC's *Notice of Proposed Rulemaking to Establish a Safety Standard for Lithium-Ion Batteries in Micromobility Products and Electrical Systems of Micromobility Products Containing Such Batteries* (NPR on Lithium-Ion Batteries) is null and void and  direct publication of the NPR on Lithium-Ion Batteries that was adopted by the Commission on April 30, 2025.

- No later than 5:00 p.m. tomorrow, June 18, 2025, the Executive Director shall provide all Commissioners with: (1) a list of all contracts that were cancelled between May 8, 2025 and the present, with a description of the work and dollar amounts for each contract; and (2) a status update on the contracts for projects that two Commissioners supported via a ballot vote due on May 21, 2025 titled "Ballot Vote: Fiscal Year 2025 Proposed Operating Plan Alignment and Midyear Review." All activity to implement that ballot vote shall be paused until further notice from a majority of the Commission.

- The following policy is adopted by the Commission, effective immediately:

Commission Policy Regarding Reductions in Force and Staff Details

Notwithstanding the Directives or other policies governing the Commission, no actions may be taken towards Reduction-in-Force of CPSC staff without a majority vote of the Commission. Any actions to implement or initiate Reductions in Force that are underway must be withdrawn immediately unless approved by a majority vote of the Commission.

Notwithstanding the Directives or other policies governing the Commission, any individual who is detailed or otherwise onboarded to the CPSC for the express purpose of facilitating compliance with President Trump's January 20, 2025, Executive Order, *Establishing and Implementing the President's Department of Government Efficiency,* must be approved by a majority vote of the Commission.

Any staff who have been hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order without majority approval by the full Commission are hereby terminated effective immediately and their access to digital

THIS DOCUMENT HAS NOT BEEN REVIEWED
OR ACCEPTED BY THE COMMISSION

CLEARED FOR PUBLIC RELEASE
UNDER CPSA 6(b)(1)

systems and CPSC's physical premises shall be immediately revoked.  Security shall ensure that they are securely removed without damage to CPSC property.

It is the policy of the Commission that no staff shall be hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order without approval by a majority vote of the Commission.

- No later than 5:00 p.m. tomorrow, June 18, 2025, CPSC's Chief Information Officer shall submit to all Commissioners an audit log containing the activities of Nate Cavanaugh, Justin Fox, and/or any person brought to CPSC for the purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order and who may have accessed and/or exfiltrated CPSC data from May 8, 2025 to the present. The Chief Information Officer shall assist Commissioners in interpreting and understanding what actions were taken with respect to CPSC's data systems during that period.

Exhibit 4



**Order**

0949.1

January 15, 1987

PERSONNEL PROCESSES - PERSONNEL ACTIONS

GENERAL POLICY AND PROCEDURES REGARDING REDUCTION-IN-FORCE

1. <u>PURPOSE</u>. This Directive establishes general Consumer Product Safety Commission policy and certain procedures concerning reduction-in-force. It provides basic information and is designed to supplement Office of Personnel Management (OPM) regulations.

2. <u>SCOPE</u>. This Directive applies to all positions in the competitive and excepted service, except those in the Senior Executive Service.

3. <u>CANCELLATION</u>. This Directive supersedes Order 0949.1, dated August 21, 1980, General Policy and Procedures Regard-ing Reduction-in-Force which is hereby cancelled.

4. <u>REFERENCES</u>.

    a.    5 U.S.C. 3502.

    b.    5 CFR Part 351.

    c.    Federal Personnel Manual, Chapters 302, 311 and 351.

    d.    CPSC Order 0330.6, dated September 12, 1978, Authority to Certain CPSC Officials for the Power of Appointment.

5. <u>POLICY</u>.

    a.  It is the policy of the Commission to institute reduction-in-force proceedings only when necessary to assure continued efficient and effective operation of the Commission and its components. Conditions requiring reduc-

USCA4 Appeal: 25-1687    Doc: 13    Filed: 06/17/2025    Pg: 90 of 95

tion-in-force include but are not limited to the following: reduction in personnel ceiling, reduction in Commission funding, reorganization of the Commission or its components, adjustment in workload or mission requirements, and need to provide a position for a person exercising reemployment or restoration rights. Reduction-in-force action will be ini-iated only when necessary and as approved by the Chairman or Executive Director.

b. Reduction-in-force will be conducted in accordance with the provisions of this Directive and the regulations and procedures prescribed by the Office of Personnel Management. Placement assistance will be provided to affected individuals to minimize personal impact.

6.    COMPETITIVE AREAS.

a. Competitive areas are units, based on organizational and geographic distinctions, within which employees are considered for retention during the course of a reduction-in-force action. See 5 CFR ☐ 351.402. In accordance with the guidelines provided in Chapter 351 of the Federal Personnel Manual, the following competitive areas are established recognizing statutory organizational distinctions within the Commission and the geographic distribution of employees:

(1)    Washington, D.C. Metropolitan Area. Separate competitive areas are established within CPSC in the Washington, D.C. Metropolitan Area, as follows:

(a)    The immediate offices of the Chairman and Commissioners are separate competitive areas. See Consumer Product Safety Act of 1972, Sec. 4(f)(1).

(b)    All other remaining CPSC organizations in the Washington, D.C. Metropolitan Area are combined into a single competitive area.

(2)    Field Service.

(a)    The competitive area for each Regional Office shall be its local geographic commuting area.



(b)   Each District Office or Resident
Post located outside the commuting area of a CPSC Regional Office or outside of
the Headquarters commuting area is a separate competitive area.

b.    Within each of the competitive areas established above, competitive
and excepted service employees will
compete separately in a reduction-in-force.

7.    <u>COMPETITIVE LEVELS</u>.

a.  Competitive levels are groupings of similar
positions in a competitive area within which employees
compete for retention. These are positions at the same
grade (or occupational level) and classification series
and which are similar enough in duties, qualification
requirements, pay schedules, and working conditions so that
the incumbent of one position could successfully perform
the critical elements of any other position upon entry into it, without any loss of
productivity beyond that normally expected in the orientation of any
new, but fully qualified employee.

b.  CPSC will use position classification definitions
issued by the Office of Personnel Management in establishing
competitive levels. In general, published series and title
definitions will apply to CPSC's competitive level designa-
tions.  When broader or more specific definitions are
necessary to meet CPSC's unique and varied work situations,
appropriate additional definitions will be prepared in the
Division of Personnel Management.

8.    <u>CREDIT FOR PERFORMANCE</u>.

a.    An employee's entitlement to additional service credit shall be based
on the employee's three annual performance ratings of record received during the
three year period prior to the date of issuance of reduction-in-force notices.

b.  An employee who does not have a performance rating of record for any
of those three years shall receive credit for an assumed rating of fully satisfactory
for each of the years needed to credit the employee with three ratings.

c.  The number of years credit for each level of
rating is:

| | | |
|---|---|---|
| Outstanding | (O) | 20 years |
| Highly Satisfactory | (H) | 16 years |
| Fully Satisfactory | (F) | 12 years |
| Assumed Rating ( | (A) | 12 years |
| Minimally Satisfactory | (M) | 0 years |
| Unsatisfactory | (U) | 0 years |

d.  The numerical credit for each or the last three ratings of record, expressed in years of service, shall be added and then divided by three to determine the average for performance service credit.  The number shall be rounded to the next higher whole number if a fraction is obtained in the above process.  The number obtained shall be added to an employee's actual years of service.

e.  An employee who has received a written decision to demote him or her because of unacceptable performance, competes from the position to which he or she has been or will be demoted.

9.    RETENTION STANDING - COMPETITIVE SERVICE.  Within each competitive level competing employees are grouped into Retention Groups and Subgroups.  The descending order of retention standing by group is:  GrouP I, Group II, and Group III.  Within each group, the descending subgroup order is: Subgroup AD, Subgroup A, and Subgroup B.  Within subgroups the order begins with the earliest service computation date plus adjustments for performance ratings as prescribed by the Office of Personnel Management.  The terms "probation" and "trial period" as used below do not include supervisory and managerial probationary periods.

a. TENURE GROUP I.

Includes each career employee who either has completed probation or is not required to serve a probationary period.

b.  TENURE GROUP II.

Includes employees serving under career conditional appointments and under career appointments who are serving a probationary period.

c.  TENURE GROUP III.

Includes indefinite employees, employees under temporary

appointments pending establishment of registers (TAPER), employees under term appointment, status quo employees, and employees under any other non-status, nontemporary appointments.

d. SUBGROUP AD.

Employees with veteran's preference who have a compensable service-connected disability of 30 percent or more.

e. SUBGROUP A.

Employees with veteran's preference not included in Subgroup AD.

f. SUBGROUP B.

Employees without veteran's preference.

10. RETENTION STANDING - EXCEPTED SERVICE. Within each competitive level, competing employees in the excepted service are grouped into retention groups with the same designations as are used for employees in the competitive service except that an employee who completes one year of continuous excepted service under a temporary appointment is in Tenure Group III.

11. REDUCTION-IN-FORCE-NOTICES.

a. Requirement. Each competing employee subject to reduction-in-force action is entitled to a written notice as prescribed in OPM regulations, 5 CFR Part 351, Subpart H and in Chapter 351, Subchapter 8 of the Federal Personnel Manual. A reduction-in-force notice is an official, personal, written communication addressed to the employee and issued by the Director, Division of Personnel Management. The notice will contain information concerning the employee's rights during a reduction-in-force.

b. Notice Period. An employee is entitled to receive a reduction-in-force notice at least 30 full calendar days before the effective date of the reduction-in-force action. The notice shall not be issued more than 90 calendar days before the date of the action.

12.    <u>RECORDS</u>. Official agency records of reduction-in-force actions will be maintained by the Division of Personnel Management in accordance with Office of Personnel Management regulations.

13.    <u>INTERPRETATION OF POLICY AND PROCEDURE</u>. Questions relating to the interpretation or application of this Directive will be referred to the Director, Division of Personnel Management.


(Original Signed By )

Terrence Scanlon
Chairman

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| BOYLE, *et al.*,<br><br>     Plaintiffs,<br><br> v.<br><br>TRUMP, *et al.*,<br><br>     Defendants. | Case No. 8:25-cv-1628-MJM |

## [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR LEAVE TO FILE THE DECLARATION OF TRIPP DEMOSS

Upon consideration of Defendants' Motion for Leave to File the Declaration of Tripp DeMoss and any accompanying opposition and/or reply, it is hereby:

**ORDERED** that Defendants' Motion for Leave to File is **GRANTED**. It is further

**ORDERED** that the Declaration of Robert DeMoss, including any exhibits attached thereto, shall be deemed filed.

**SO ORDERED**.

Dated this __ day of ____, 2025      BY THE COURT:

                   _____

                   Matthew J. Maddox
                   United States District Judge