# No. 25-1687

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

MARY BOYLE, ALEXANDER HOEHN-SARIC, and RICHARD TRUMKA, JR.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget; PETER A. FELDMAN, in his official capacity as Acting Chairman of the U.S. Consumer Product Safety Commission,

*Defendants-Appellants.*

---

On Appeal from the U.S. District Court for the
District of Maryland, No. 25-1628

---

## JOINT APPENDIX

---

NICOLAS A. SANSONE
STEPHANIE GARLOCK
ALLISON M. ZIEVE
   Public Citizen Litigation
   Group
   1600 20th Street NW
   Washington, DC 20009
   (202) 588-1000

Counsel for Plaintiffs-Appellees

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney
   General*

MARK R. FREEMAN
MICHAEL S. RAAB
LAURA E. MYRON
DANIEL AGUILAR
   Attorneys, Appellate Staff
   Civil Division
   U.S. Department of Justice
   950 Pennsylvania Avenue, NW
   Washington, DC 20530-0001
   (202) 305-1754

Counsel for Defendants-Appellants

# TABLE OF CONTENTS

**Page**

Dkt. 1. Complaint ....................................................................... JA1

Dkt. 6-2. First Declaration of Mary Boyle ...................................JA8

    Exh. A. Letter from Mary Boyle to CPSC Acting Chair
    (Apr. 10, 2025) ................................................................ JA13

    Exh. B. Letter from plaintiffs to CPSC Acting Chair
    (May 2, 2025) ................................................................. JA16

    Exh. C. Email from Trent Morse to Mary Boyle (May 9,
    2025) ............................................................................. JA19

Dkt. 6-3. First Declaration of Alexander Hoehn-Saric ...........................JA21

Dkt. 6-4. First Declaration of Richard Trumka Jr. ...................................JA25

    Exh. A. Letter from Trent Morse to Richard Trumka
    (May 8, 2025) .................................................................JA29

Dkt. 18-2. Plaintiffs' Statement of Undisputed Material Facts ............... JA31

Dkt. 18-3. Second Declaration of Mary Boyle ...............................JA37

Dkt. 18-4. Second Declaration of Alexander Hoehn-Saric .....................JA42

Dkt. 18-5. Second Declaration of Richard Trumka Jr. ...........................JA46

Dkt. 21-2. Defendants' Statement of Undisputed Material
Facts ................................................................................ JA51

Dkt. 24. Memorandum Opinion.................................................JA53

Dkt. 25. Summary Judgment Order...........................................JA84

Dkt. 26. Notice of appeal ........................................................JA86

Dkt. 29-1. Third Declaration of Richard Trumka Jr. .............................. JA88

Exh. A. Email from Matthew Campbell to Brien
Lorenze, et al. (June 13, 2025)......................................................... JA91

Exh. B. Email from CPSC Acting Chair to CPSC staff
(June 16, 2025) ................................................................................JA93

Dkt. 31-1. Declaration of Tripp DeMoss....................................................JA95

Exh. 2. Email chain re: Time Critical Additions to
Agenda Planning Meeting in Light of Judicial Order in
Boyle v. Trump (June 16-17, 2025)...............................................JA102

Exh. 3. Time Critical Ballot Vote Sheet (June 17, 2025) .............JA108

Exh. 4. CPSC General Policy and Procedures Regarding
Reduction-in-Force (January 15, 1987).........................................JA114

Dkt. 38. Memorandum Order ...............................................................JA121

District Court Docket Sheet....................................................................JA129

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| MARY BOYLE,<br><br>ALEXANDER HOEHN-SARIC, and<br><br>RICHARD TRUMKA JR.,<br><br>      *Plaintiffs*,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States,<br>    1600 Pennsylvania Avenue NW<br>    Washington, DC 20500,<br><br>SCOTT BESSENT, in his official capacity as Secretary of the Treasury,<br>    1500 Pennsylvania Avenue NW<br>    Washington, DC 20220,<br><br>RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget,<br>    725 17th Street NW<br>    Washington, DC 20503, and<br><br>PETER A. FELDMAN, in his official capacity as Acting Chairman of the U.S. Consumer Product Safety Commission,<br>    4330 East-West Highway, 4th Floor<br>    Bethesda, MD 20814,<br><br>      *Defendants*. | Civil Action No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Congress established the U.S. Consumer Product Safety Commission (CPSC) as an

independent federal agency, headed by a five-member commission. By statute, the President may

remove Commissioners only "for neglect of duty or malfeasance in office but for no other cause." 15 U.S.C. § 2053(a).

2.      Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. were nominated by former President Joseph R. Biden Jr. and confirmed by the Senate to serve as CPSC Commissioners for terms ending in October 2025, October 2027, and October 2028, respectively.

3.      On May 8 and May 9, 2025, individuals purporting to speak on behalf of President Donald J. Trump informed Plaintiffs that the President was terminating them, effective immediately, from their roles as CPSC Commissioners. No explanation was offered, including no suggestion that any Plaintiff had engaged in any neglect of duty or malfeasance in office.

4.      The purported terminations violate statutory restrictions on the President's removal authority, and any attempt to implement them exceeds the legal authority of those individuals who act on the President's behalf. The removals should be declared unlawful, and Defendants Scott Bessent, Russell Vought, and Peter A. Feldman should be enjoined from effectuating them.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(B) because Defendants are officers of the United States and a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred at CPSC headquarters in Bethesda, Maryland.

## PARTIES

7.      Plaintiff Mary Boyle is a member of the U.S. Consumer Product Safety Commission, with a term ending on October 27, 2025.

8.      Plaintiff Alexander Hoehn-Saric is a member of the U.S. Consumer Product Safety Commission, with a term ending on October 27, 2027.

9.    Plaintiff Richard Trumka Jr. is a member of the U.S. Consumer Product Safety Commission, with a term ending on October 27, 2028.

10.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

11.    Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official capacity.

12.    Defendant Russell Vought is the Director of the Office of Management and Budget and is sued in his official capacity.

13.    Defendant Peter A. Feldman is the Acting Chairman of the U.S. Consumer Product Safety Commission and is sued in his official capacity.

**FACTS**

14.    Congress enacted the Consumer Product Safety Act (CPSA), Pub. L. No. 92-573, 86 Stat. 1207, in 1972 to "protect the public against unreasonable risks of injury associated with consumer products," to "assist consumers in evaluating the comparative safety of consumer products," to "develop uniform safety standards for consumer products and to minimize conflicting State and local regulations," and to "promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries." 15 U.S.C. § 2051(b).

15.    To further these purposes, Congress created the CPSC as an "independent regulatory commission" composed of five Commissioners with "background and expertise in areas related to consumer products and protection of the public from risks to safety." *Id.* § 2053(a). Commissioners are appointed by the President and confirmed by the Senate, *id.*, to serve staggered, seven-year terms, *id.* § 2053(b)(1), with the possibility under certain circumstances of serving up to an additional year pending installation of a successor, *id.* § 2053(b)(2). Among other things,

Commissioners are responsible for promulgating standards for consumer-product safety, *id.* § 2056, recalling unreasonably hazardous products from the market, *id.* § 2057, and conducting product-safety investigations and research, *id.* § 2076.

16.    To ensure the independence of the CPSC Commissioners, Congress provided that they could be "removed by the President" prior to the end of their terms only "for neglect of duty or malfeasance in office but for no other cause." *Id.* § 2053(a). Congress determined that such independence is necessary to ensure that the CPSC remains "unfettered by political dictates, self-interested industry pressure or blind consumer zeal." 122 Cong. Rec. S15211 (daily ed. May 24, 1976).

17.    Plaintiffs were each nominated by former President Joseph R. Biden Jr. and confirmed by the Senate to serve as CPSC Commissioners.

18.    Plaintiff Mary Boyle was confirmed on June 22, 2022, to serve out the remainder of her predecessor's seven-year term, which expires on October 27, 2025. *See* 15 U.S.C. § 2053(b)(2) (providing that "[a]ny Commissioner appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the remainder of such term"). Pursuant to the CPSA, Plaintiff Boyle may continue to serve after October 27, 2025, until October 27, 2026, or until her successor is appointed, whichever comes first. *See id.*

19.    Plaintiff Alexander Hoehn-Saric was confirmed on October 7, 2021, to serve out the remainder of his predecessor's seven-year term, which expires on October 27, 2027. Pursuant to the CPSA, Plaintiff Hoehn-Saric may continue to serve after October 27, 2027, until October 27, 2028, or until his successor is appointed, whichever comes first.

20.    Plaintiff Richard Trumka Jr. was confirmed on November 16, 2021, for a term expiring on October 27, 2028.

21.    On May 8, 2025, Plaintiffs Boyle and Trumka received emails from Trent Morse, Deputy Director of Presidential Personnel. The bodies of the emails stated, in their entirety: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety Commission is terminated effective immediately. Thank you for your service."

22.    The following day, on May 9, Plaintiff Hoehn-Saric and his staff arrived at CPSC offices. CPSC security prevented Plaintiff Hoehn-Saric and his staff from going to their offices but allowed them to stay in the lobby. Plaintiff Hoehn-Saric made multiple attempts to call Defendant Peter A. Feldman, Acting Chairman of the CSPC. After Plaintiff Hoehn-Saric had waited in the lobby for approximately an hour, Defendant Feldman called and informed Plaintiff Hoehn-Saric that the President had terminated Plaintiff Hoehn-Saric from his role as CPSC Commissioner and that Plaintiff Hoehn-Saric should leave. Defendant Feldman did not identify any neglect of duty or malfeasance in office as justification for the purported termination.

23.    To effectuate Plaintiffs' purported terminations, Defendant Feldman has prevented Plaintiffs from executing their duties as Commissioners, including by barring their access to their offices and agency email accounts, and by terminating personnel who staff Plaintiffs' offices. On information and belief, Defendant Scott Bessent, who serves as Secretary of the Treasury, and Defendant Russell Vought, who serves as Director of the Office of Management and Budget, have deprived or imminently will deprive Plaintiffs of pay and benefits to which they are entitled.

24.    Plaintiffs have served ably in their roles as CPSC Commissioners, and the President lacks a statutorily cognizable basis for terminating them.

25.    Absent prompt relief, Plaintiffs will be deprived of pay and benefits to which they are entitled. They will also irretrievably lose the opportunity to perform the duties for which they were appointed and confirmed and on which American consumers depend for their safety.

## CLAIM FOR RELIEF

26.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires and in excess of legal authority.

27.    Article I of the U.S. Constitution vests "[a]ll legislative Powers" in Congress. U.S. Const. art. I, § 1. Members of the executive branch have no constitutional authority to amend or override statutes that have been lawfully enacted, and Article II of the U.S. Constitution requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

28.    The CPSA affords Plaintiffs a right to serve out their terms as CPSC Commissioners unless they are removed "by the President for neglect of duty or malfeasance in office." 15 U.S.C. § 2053(a). Congress has provided that "no other cause" may serve as a lawful basis for their removal from office. *Id.*

29.    President Trump's purported removal of Plaintiffs from their Commissioner roles violates the CPSA because the removals are not based on neglect of duty or malfeasance in office. The removals are therefore ultra vires, and they exceed the President's constitutional and statutory authority.

30.    Defendant Bessent's, Defendant Vought's, and Defendant Feldman's efforts to prevent Plaintiffs from executing their duties as Commissioners and to deprive them of their pay and benefits are likewise ultra vires and in excess of constitutional and statutory authority because they give effect to unlawful presidential removal decisions.

31.    Plaintiffs are entitled to declaratory relief against all Defendants and to injunctive relief against Defendants Bessent, Vought, and Feldman.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a.  Declare that Defendants' removal of Plaintiffs from their roles as CPSC Commissioners was unlawful and that Plaintiffs are entitled to continue serving out their terms as CPSC Commissioners;

b.  Enjoin Defendant Feldman from obstructing Plaintiffs in any way from carrying out their duties as CPSC Commissioners, including by terminating their staff and barring their access to agency resources;

c.  Enjoin Defendants Bessent, Vought, and Feldman from depriving Plaintiffs of the pay and benefits that Plaintiffs are entitled to receive as CPSC Commissioners, and order Defendants Bessent, Vought, and Feldman to restore all pay and benefits that have been unlawfully withheld from Plaintiffs and their staff;

d.  Award Plaintiffs their costs and attorneys' fees for this action; and

e.  Grant any other relief as this Court deems appropriate.

Dated: May 21, 2025                             Respectfully submitted,

                                                /s/ Stephanie Garlock
                                                Stephanie Garlock
                                                (D. Md. Bar No. 31594)
                                                Nicolas A. Sansone
                                                (*pro hac vice* application to be filed)
                                                Allison M. Zieve
                                                (*pro hac vice* application to be filed)
                                                Public Citizen Litigation Group
                                                1600 20th Street NW
                                                Washington, DC 20009
                                                (202) 588-1000

                                                *Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARY BOYLE, et al.,

   *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

   *Defendants*.

Civil Action No. 8:25-cv-1628-MJM

## DECLARATION OF MARY   OYLE

I, Mary Boyle, declare as follows:

1.  For nearly fifteen years, I have worked in senior positions across the Consumer Product Safety Commission (CPSC), including as Executive Director and General Counsel. In these roles, I worked on a broad range of issues, including policy, administration, litigation, product recalls, civil penalty negotiations, and the development of rules and regulations.

2.  After CPSC Commissioner Ann Marie Buerkle stepped down in 2019, President Joseph R. Biden Jr. nominated me in 2021 to serve out the remainder of her seven-year term, which expires on October 27, 2025. The Senate confirmed my nomination on June 22, 2022, and I began serving as a CPSC Commissioner on June 30, 2022.

3.  Under the Consumer Product Safety Act, if a successor to my position has not been confirmed prior to the expiration of my term on October 27, 2025, I may serve up to an additional year while awaiting the confirmation of a successor. I am not aware that a proposed successor has been nominated.

4.      At no point during my service as a Commissioner has President Biden or President Donald J. Trump voiced dissatisfaction with the quality of my work or my dedication to the job. At no point have I been accused by the President of neglect of duty or malfeasance in office.

5.      Following the inauguration of President Trump, the new administration announced a policy of reducing the size of the federal workforce. To effectuate this goal, the administration instituted a federal hiring freeze, offered the option of voluntary deferred resignation to federal workers, and acted through the newly created Department of Government Efficiency (DOGE) to initiate large-scale reductions in force (RIFs) across a wide range of federal agencies.

6.      Because of the hiring freeze, reorganizations, and deferred-resignation program, virtually every department within the CPSC is understaffed; some are not functioning at all.

7.      On February 26, 2025, the U.S. Office of Management and Budget and U.S. Office of Personnel Management issued a memorandum titled "Guidance on Agency RIF and Reorganization Plans Requested by *I ple entin  the President s  Depart ent of  overn ent  fficiency    or force   pti i ation Initiative*." The memorandum directed agency heads to develop and submit Agency RIF and Reorganization Plans (ARRPs) no later than March 13, 2025.

8.      Acting Chairman of the CPSC, Peter A. Feldman, submitted two ARRPs in response to the memorandum. Both ARRPs suggest staff cuts and reorganizations that I believe to be counterproductive to the CPSC's mission of preventing consumer-product injuries and deaths. On April 10, after Acting Chairman Feldman submitted the second ARRP, I sent him

2

correspondence objecting to the proposed plans on multiple grounds. A true and correct copy of this letter is attached as Exhibit A.

9.      Along with my fellow CPSC Commissioners Alexander Hoehn-Saric and Richard Trumka Jr., I expressed similar views in a May 2, 2025, letter to Acting Chairman Feldman. A true and correct copy of this letter is attached as Exhibit B.

10.     In addition to these letters, I voiced my strong concerns about the staff reductions and reorganizations at the agency at a May 7, 2025, meeting of the Commission.

11.     The following day, May 8, I received an email from Trent Morse, Deputy Director of Presidential Personnel. The body of the email stated, in its entirety: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety Commission is terminated effective immediately. Thank you for your service." A true and correct copy of the email is attached as Exhibit C.

12.     Neither in the email nor at any other time has the President or anyone speaking on his behalf communicated to me that the reason for my termination is neglect of duty or malfeasance in office. And any attempt to invoke either of these rationales would have been entirely unjustified.

13.     Since May 9, I have been unable to enter my office at the CPSC unescorted, access my CPSC email account, use my government-issued phone, log on to CPSC's computer network, or access any of my electronic files.

14.     The only CPSC employee who reports to me, my chief counsel, attempted to enter my office suite on May 9. Her electronic access to the building had been cut off, however, and agency officials barred her entry. At that time, she was asked to turn over her government identification badge. She also received a termination notice stating that the person with

appointing authority for her position — which I understand to refer to myself — left the agency on May 9.

15.    On May 15, I was escorted to my offices at CPSC headquarters to remove personal property and to return my CPSC identification badge, key fob, phone, credit card, and computer equipment to agency officials. My chief counsel entered her office under the escort of CPSC officials the following day, May 16, to retrieve her personal effects and return her government-issued phone and computer equipment.

16.    It is my understanding that I will no longer receive the pay and benefits to which I am entitled as a CPSC Commissioner. On May 15, I was provided a "separation package" with information about when my health insurance would terminate, information on options to acquire continuing coverage, and other personnel matters associated with separation from the agency.

17.    I take pride in my work as a CPSC Commissioner, and I believe that my work has played an important role in protecting consumers across the nation from injury and death. Every day that I am barred from fulfilling my duties as a Commissioner, I lose an irretrievable opportunity to do work that I believe is vital to the national interest and that is important to my own fulfillment. I also am prevented from participating in Commission proceedings through voting, debate with my fellow Commissioners, and engagement with staff, and as a result, my input is not being considered at a critical time for the future of the agency and the work that it does.

Executed this 20th day of May, 2025.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

*Mary Boyle*
_____
Mary Boyle

# EXHIBIT A



UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814
COMMISSIONER MARY T. BOYLE

April 10, 2025

Dear Acting Chair Feldman,

I write to formally object to the CPSC Agency RIF and Reorganization Plan, Phase II[1] that you drafted and intend to submit to the Office of Management and Budget and to the Office of Personnel Management. Your Plan does not represent my views. Additionally, the Plan was created without following the necessary process required for its authorization under CPSC statutes, directives, and procedures.

As the law makes clear, "[i]n carrying out any of his functions…the Chairman shall be governed by the general policies of the Commission." 15 U.S.C. section 2053(f)(2). The Commission has established policies and direction for staff through adoption of the FY2025 Operating Plan, approved unanimously on Nov. 6, 2024 to govern the current fiscal year. Last month, Congress appropriated funds at the Continuing Resolution level, which aligns with the budgetary direction set by the Operating Plan. To the extent that the RIF and Reorganization Plan you are now submitting deviates from the Commission-approved Plan—which it does substantially—such changes only can be effected by the Commission.

Our job as policymakers is to adhere to the mission Congress gave us: protecting consumers from dangerous products. As you correctly set forth on pages 10-11, the mechanisms for establishing Commission policies include the Strategic Plan, the Operating Plan, and the Mid-Year Review. Although I recognize that the statute instructs the Chairman of CPSC to exercise all the executive and administrative functions of the agency, those functions, as you acknowledge, are subject to the general policies of the Commission. Those policies are set by consensus of the bipartisan Commission, of which you are but one voice.

To the extent your policy preferences have evolved since you voted to approve the Operating Plan, you will have opportunities in the coming months to advance those positions. Indeed, the planning for FY2026 is already underway, and I look forward to receiving input from the public at the Agency Priorities Hearing scheduled for May 14.

---

[1] I object to the Phase I plan you submitted as well. I note that a copy of the Phase I Plan was provided to me by the CPSC Executive Director at 5:03 pm on March 13, 2025 with an accompanying email that stated he intended to transmit the document "this evening." I had no opportunity to review that Plan before it was submitted.

As the process for developing the FY2026 Operating Plan has already started, we will have ample opportunity to debate the issues raised by your RIF and Reorganization Plan—including your advocacy for the abolition of offices such as International Programs, Small Business Ombudsman, and Consumer Ombudsman—through established Commission protocols. Prior to that time, any unilateral changes you make absent Commission approval would be unauthorized.

Again, I object to the RIF and Reorganization Plans you drafted—Phase I and II—on both procedural and policy grounds.

Sincerely,

Mary T. Boyle
Commissioner

# EXHIBIT B



UNITED STATES
**CONSUMER PRODUCT SAFETY COMMISSION**
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814

May 2, 2025

**BY EMAIL AND HAND DELIVERY**
Peter Feldman, Acting Chairman
Consumer Product Safety Commission

Dear Acting Chairman Feldman:

Last month, the Congress passed, and the President signed into law an appropriations bill that provides $150 million to the Consumer Product Safety Commission ("CPSC") for Fiscal Year ("FY") 2025. This funding level allows the agency to continue at current staffing levels and, but for an unnecessary hiring freeze imposed by the White House, it would allow CPSC to fill critical gaps in staffing.

In response to the Administration's Joint OMB-OPM Memorandum *"Guidance on Agency RIF and Reorganization Plans Requested* by *Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative*," you submitted two "Agency Reorganization and RIF Plans" ("ARRPs") to the White House, both of which propose staff cuts and reorganizations that are unnecessary and counterproductive to the agency's mission. We believe that the proposed staff cuts would make CPSC less effective and increase the risk to the public of consumer product injuries and deaths. We object to these unnecessary actions.

CPSC currently has about 500 staff (down from a recent high of 574 in FY23) who monitor approximately $2 trillion in consumer product commerce annually, including about $1 trillion in imports. That being said, our true staffing is closer to 475 – a nearly 20 percent cut in less than two years – because approximately 25 employees are currently being paid but are not working after accepting the Trump Administration's "fork in the road" offer. Virtually every department is understaffed and some are functionally closed as a result of these shortages

While the White House may seek further reductions in staffing, we can't afford to lose any more employees. We fear that further reductions will undermine CPSC's compliance, inspection, scientific, and education efforts. Already, our diminished capacity is slowing our work, and deaths and injuries that might be prevented will likely occur.

Moreover, some of the proposed personnel changes may violate employees' rights under their collective bargaining agreements or violate merit system principles. Before any personnel actions are taken pursuant to the ARRP or other Administration direction, we urge the General Counsel's office to ensure compliance with all civil service laws and ensure at least 30 days' notice is given to the union that

represents CPSC staff. The union also should have the opportunity to have any concerns resolved consistent with their bargaining agreement.

Through the mid-year process scheduled in May, the Commission will consider and debate changes to agency policy and staffing for the rest of the year. Pending this review, efforts to terminate employees or reorganize the agency as laid out in the ARRP would violate the terms of the FY 25 operating plan and are not supported by a majority of the Commission.

Finally, in response to the Administration's OPM Memorandum "*Guidance on Implementing President Trump's Executive Order titled, 'Restoring Accountability To Policy-Influencing Positions Within the Federal Workforce'*" you submitted a request to undermine civil service protections from 72 vital positions in our agency. A majority of Commissioners object to this request and to any attempt to politicize the work of this agency.

We urge you not to take any actions that would diminish our agency's most valuable asset: our staff.

Respectfully,


Alexander Hoehn-Saric
Commissioner
Consumer Product Safety Commission

Richard Trumka Jr.
Commissioner
Consumer Product Safety Commission

Mary T. Boyle
Commissioner
Consumer Product Safety Commission

2

**JA018**

# EXHIBIT C

**Boyle, Mary**

Fri, May 9, 7:02 AM (1 day ago)

to me

Sent from my iPhone

Begin forwarded message:

**From:** "Morse, Trent M. EOP/WHO" <Trent.M.Morse@who.eop.gov>
**Date:** May 8, 2025 at 6:48:05 PM EDT
**To:** "Boyle, Mary" <MBoyle@cpsc.gov>
**Subject: Message from PPO**

Mary,

On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety Commission is terminated effective immediately.

Thank you for your service.

Trent Morse

Deputy Director

Presidential Personnel

**JA020**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| |
|---|
| MARY BOYLE, et al., |
| *Plaintiffs*, |
| v. |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., |
| *Defendants*. |

Civil Action No. 8:25-cv-1628-MJM

**DECLARATION OF ALE ANDER HOEHN SARIC**

I, Alexander Hoehn-Saric, declare as follows:

1.      Throughout my career, I have worked extensively in the field of consumer protection. Among other things, I have worked on the U.S. Senate subcommittee responsible for overseeing the Consumer Product Safety Commission (CPSC) and have served as Chief Counsel for Communications and Consumer Protection with the U.S. House of Representatives Committee on Energy and Commerce.

2.      After CPSC Commissioner Elliot F. Kaye stepped down in 2021, President Joseph R. Biden Jr. nominated me to serve out the remainder of his seven-year term, which expires on October 27, 2027. The Senate confirmed my nomination on October 7, 2021, and I began serving as a CPSC Commissioner on October 13, 2021.

3.      Under the Consumer Product Safety Act, if a successor to my position has not been confirmed prior to the expiration of my term on October 27, 2027, I may serve up to an additional year while awaiting the confirmation of a successor. I am not aware that a proposed successor has been nominated.

4.      At no point during my service as a Commissioner has President Biden or President Donald J. Trump voiced dissatisfaction with the quality of my work or my dedication to the job. At no point have I been accused by the President of neglect of duty or malfeasance in office.

5.      Following the inauguration of President Trump, the new administration announced a policy of reducing the size of the federal workforce. To effectuate this goal, the administration instituted a federal hiring freeze, offered the option of voluntary deferred resignation to federal workers, and acted through the newly created Department of Government Efficiency (DOGE) to initiate large-scale reductions in force (RIFs) across a wide range of federal agencies.

6.      Because of the hiring freeze, reorganizations, and deferred-resignation program, virtually every department within the CPSC is understaffed; some are not functioning at all.

7.      On February 26, 2025, the U.S. Office of Management and Budget and U.S. Office of Personnel Management issued a memorandum titled "Guidance on Agency RIF and Reorganization Plans Requested by *I ple entin the President s Depart ent of overn ent fficiency or force pti i ation Initiative*." The memorandum directed agency heads to develop and submit Agency RIF and Reorganization Plans (ARRPs) no later than March 13, 2025.

8.      Acting Chairman of the CPSC, Peter A. Feldman, submitted two ARRPs in response to the memorandum. Both ARRPs suggest staff cuts and reorganizations that I believe to be counterproductive to the CPSC's mission of preventing consumer-product injuries and deaths. Along with my fellow CPSC Commissioners Mary Boyle and Richard Trumka Jr., I expressed these views in a May 2, 2025, letter to Acting Chairman Feldman. A true and correct copy of this letter is attached as Exhibit B to the Declaration of Mary Boyle.

9.      In addition to the letter, I voiced my strong concerns about the staff reductions and reorganizations at the agency at a May 7, 2025, meeting of the Commission.

10.     Two days later, on May 9, when two members of my staff and I arrived at work, CPSC security prevented us from proceeding to our offices and required us to wait in the lobby. I made multiple attempts to call Acting Chairman Feldman. After about an hour, Acting Chairman Feldman called me and informed me that the President had terminated me from my role as CPSC Commissioner and that I should leave the premises.

11.     Neither on that phone call nor at any other time has Acting Chairman Feldman or anyone purporting to speak on the President's behalf communicated to me that the reason for my termination is neglect of duty or malfeasance in office. And any attempt to invoke either of these rationales would have been entirely unjustified.

12.     Since May 9, I have been unable to enter my office at the CPSC unescorted, access my CPSC email account, use my government-issued phone, log on to CPSC's computer network, or access any of my electronic files. On May 15, I was escorted to my offices at CPSC headquarters to remove personal property and to return my CPSC identification badge, key fob, phone, credit card, and computer equipment to agency officials.

13.     Members of my staff have received termination notices stating that the person with appointing authority for their positions  which I understand to refer to myself  left the agency on May 9. They have been unable to enter their offices unescorted, access their CPSC email accounts, use their government-issued phones, log on to CPSC's computer network, or access their CPSC electronic files.

14.     It is my understanding that I will no longer receive the pay and benefits to which I am entitled as a CPSC Commissioner. On May 15, I was provided a "separation package" with information about personnel matters associated with separation from the agency.

15.     I take pride in my work as a CPSC Commissioner, and I believe that my work has played an important role in protecting consumers across the nation from injury and death. Every day that I am barred from fulfilling my duties as a Commissioner, I lose an irretrievable opportunity to do work that I believe is vital to the national interest and that is important to my own fulfillment. I also am prevented from participating in Commission proceedings through voting, debate with my fellow Commissioners, and engagement with staff, and as a result, my input is not being considered at a critical time for the future of the agency and the work that it does. Executed this 2ᵗʰ day of May, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Alexander Hoehn-Saric

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARY BOYLE, et al.,

       *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et al.,

      *Defendants*.

Civil Action No. 8:25-cv-1628-MJM

**DECLARATION OF RICHARD TRUMKA JR**

I, Richard Trumka Jr., declare as follows:

1.      Throughout my career, I have worked extensively in the field of consumer protection. Among other things, I have served as the Assistant Attorney General in the Consumer Protection Division of the Maryland Office of the Attorney General and as General Counsel and Staff Director of the Congressional Subcommittee on Economic and Consumer Policy.

2.      In July 2021, President Joseph R. Biden Jr. nominated me to serve a seven-year term as a Commissioner of the Consumer Product Safety Commission (CPSC). The Senate confirmed my nomination on November 16, 2021, and I began serving as a CPSC Commissioner on December 2, 2021. My term expires on October 27, 2028.

3.      At no point during my service as a Commissioner has President Biden or President Donald J. Trump voiced dissatisfaction with the quality of my work or my dedication to the job. At no point have I been accused by the President of neglect of duty or malfeasance in office.

4.      Following the inauguration of President Trump, the new administration announced a policy of reducing the size of the federal workforce. To effectuate this goal, the administration

instituted a federal hiring freeze, offered the option of voluntary deferred resignation to federal workers, and acted through the newly created Department of Government Efficiency (DOGE) to initiate large-scale reductions in force (RIFs) across a wide range of federal agencies.

5.    Because of the hiring freeze, reorganizations, and deferred-resignation program, virtually every department within the CPSC is understaffed; some are not functioning at all.

6.    On February 26, 2025, the U.S. Office of Management and Budget and U.S. Office of Personnel Management issued a memorandum titled "Guidance on Agency RIF and Reorganization Plans Requested by *I ple entin  the President s Depart ent of  overn ent fficiency   or force  pti i ation Initiative*." The memorandum directed agency heads to develop and submit Agency RIF and Reorganization Plans (ARRPs) no later than March 13, 2025.

7.    Acting Chairman of the CPSC, Peter A. Feldman, submitted two ARRPs in response to the memorandum. Both ARRPs suggest staff cuts and reorganizations that I believe to be counterproductive to the CPSC's mission of preventing consumer-product injuries and deaths. Along with my fellow CPSC Commissioners Mary Boyle and Alexander Hoehn-Saric, I expressed these views in a May 2, 2025, letter to Acting Chairman Feldman. A true and correct copy of this letter is attached as Exhibit B to the Declaration of Mary Boyle.

8.    In addition to the letter, I voiced my strong concerns about the staff reductions and reorganizations at the agency on multiple occasions, including through additional communications to Acting Chairman Feldman and during a May 7, 2025, meeting of the Commission.

9.    The following day, May 8, I received an email from Trent Morse, Deputy Director of Presidential Personnel. The body of the email stated, in its entirety: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety

Commission is terminated effective immediately. Thank you for your service." A true and correct copy of the email is attached as Exhibit A.

10.     Neither in the email nor at any other time has the President or anyone speaking on his behalf communicated to me that the reason for my termination is neglect of duty or malfeasance in office. And any attempt to invoke either of these rationales would have been entirely unjustified.

11.     Since May 9, I have been unable to enter my office at the CPSC unescorted, access my CPSC email account, use my government-issued phone, log on to CPSC's computer network, or access any of my electronic files. On Monday, May 19, 2025, I was given a brief window of time to enter my office at CPSC headquarters with an escort to retrieve my personal belongings and to return my CPSC identification badge, key fob, credit card, and computer equipment to agency officials.

12.     Members of my staff have received termination notices stating that the person with appointing authority for their positions   which I understand to refer to myself   left the agency on May 9. They have been unable to enter their offices unescorted, access their CPSC email accounts, use their government-issued phones, log on to CPSC's computer network, or access their CPSC electronic files.

13.     It is my understanding that I will no longer receive the pay and benefits to which I am entitled as a CPSC Commissioner. On May 15, I was provided a "separation package" with information about when my health insurance would terminate, information on options to acquire continuing coverage, and other personnel matters associated with separation from the agency.

14.     I take pride in my work as a CPSC Commissioner, and I believe that my work has played an important role in protecting consumers across the nation from injury and death. Every day that I am barred from fulfilling my duties as a Commissioner, I lose an irretrievable

opportunity to do work that I believe is vital to the national interest and that is important to my own fulfillment. I also am prevented from participating in Commission proceedings through voting, debate with my fellow Commissioners, and engagement with staff, and as a result, my input is not being considered at a critical time for the future of the agency and the work that it does. Executed this 21st day of May, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Richard Trumka Jr.

4

**JA028**

# EXHIBIT A

Rich Trumka <██████████████████>

## FW: Message from PPO

**Trumka Jr., Richard** <RTrumka@cpsc.gov>    Thu, May 8, 2025 at 11:37 PM
To: Rich Trumka <██████████████>

---

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Thursday, May 8, 2025 6:48 PM
**To:** Trumka Jr., Richard <RTrumka@cpsc.gov>
**Subject:** Message from PPO

Richard,

On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety Commission is terminated effective immediately.

Thank you for your service.

Trent Morse

Deputy Director

Presidential Personnel

*****!!! Unless otherwise stated, any views or opinions expressed in this e-mail (and any attachments) are solely those of the author and do not necessarily represent those of the U.S. Consumer Product Safety Commission. Copies of product recall and product safety information can be sent to you automatically via Internet e-mail, as they are released by CPSC. To subscribe or unsubscribe to this service go to the following web page: http://www.cpsc.gov/en/Newsroom/Subscribe *****!!!

**JA030**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| |
|---|
| MARY BOYLE, et al., |
| *Plaintiffs*, |
| v. |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., |
| *Defendants*. |

Civil Action No. 8:25-cv-1628-MJM

**PLAINTIFFS  STATEMENT OF
UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs submit the following statement of undisputed material facts in support of their motion for summary judgment.

1.      Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. were nominated by President Joseph R. Biden Jr. and confirmed by the Senate to serve as Commissioners on the Consumer Product Safety Commission (CPSC). Boyle Decl.   2; Hoehn-Saric Decl.   2; Trumka Decl.   2.

2.      Commissioner Boyle was confirmed on June 22, 2022, to serve out the remainder of a predecessor's term, set to expire on October 27, 2025, Boyle Decl.   2, although Commissioner Boyle may continue to serve until October 27, 2026, if a successor is not installed before that time. 15 U.S.C. § 2053(b)(2).

3.      Commissioner Hoehn-Saric was confirmed on October 7, 2021, to serve out the remainder of a predecessor's term, set to expire on October 27, 2027, Hoehn-Saric Decl.   2,

although Commissioner Hoehn-Saric may continue to serve until October 27, 2028, if a successor is not installed before that time. 15 U.S.C. § 2053(b)(2).

4.    Commissioner Trumka was confirmed on November 16, 2021, to serve a seven-year term that expires on October 27, 2028. Trumka Decl. ¶ 2.

5.    Commissioners Boyle, Hoehn-Saric, and Trumka have performed ably in their roles and have never been accused of neglect of duty or malfeasance in office by either of the Presidents under whom they have served. Boyle Decl. ¶ 4; Hoehn-Saric Decl. ¶ 4; Trumka Decl. ¶ 3.

6.    On May 8, 2025, Trent Morse, Deputy Director of Presidential Personnel, sent an email to Commissioner Boyle, the body of which stated, in full: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety Commission is terminated effective immediately. Thank you for your service." Boyle Decl. ¶ 11 & Exh. C.

7.    On May 8, 2025, Trent Morse, Deputy Director of Presidential Personnel, sent an email to Commissioner Trumka, the body of which stated, in full: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety Commission is terminated effective immediately. Thank you for your service." Trumka Decl. ¶ 9 & Exh. A.

8.    The emails to Commissioners Boyle and Trumka did not accuse either of them of neglect of duty or malfeasance in office. Boyle Decl. ¶ 12 & Exh. C; Trumka Decl. ¶ 10 & Exh. A.

9.    On May 9, when Commissioner Hoehn-Saric and two of his staff members arrived for work at CPSC headquarters, CPSC security prevented them from entering their offices and required them to wait in the lobby. Hoehn-Saric Decl. ¶ 10.

10.    While Commissioner Hoehn-Saric was waiting in the lobby, Acting Chairman Feldman called him and informed him that the President had terminated him from his role as CPSC Commissioner and that he should leave the premises of the CPSC. Hoehn-Saric Decl.    10.

11.    Acting Chairman Feldman did not accuse Commissioner Hoehn-Saric of neglect of duty or malfeasance in office. Hoehn-Saric Decl.    11.

12.    At no point has the President, or anybody purporting to speak on his behalf, attempted to justify Plaintiffs' terminations by accusing Plaintiffs of neglect of duty or malfeasance in office. Boyle Decl.    12; Hoehn-Saric Decl.    11; Trumka Decl.    10.

13.    Since May 9, Plaintiffs have been unable to enter their offices at CPSC unescorted, unable to access their CPSC email accounts, unable to use their government-issued phones, unable to log on to CPSC's computer network, and unable to access any of their electronic files. Boyle Decl.    13; Hoehn-Saric Decl.    12; Trumka Decl.    11.

14.    Plaintiffs were required to return their CPSC identification badges, keys, phones, credit cards, and computer equipment, and Plaintiffs' staff members have received termination notices that cite Plaintiffs' terminations as their basis. Boyle Decl.    14 15; Hoehn-Saric Decl.    12 13; Trumka Decl.    11 12.

15.    Plaintiffs have received "separation packages" and are no longer receiving the pay and benefits to which CPSC Commissioners are entitled. Boyle Decl.    16; Hoehn-Saric Decl.    14; Trumka Decl.    13.

16.    As long as Plaintiffs' terminations are given effect, Plaintiffs cannot participate in agency votes or discussions on issues that they believe are critical for the CPSC and the work it does to protect public safety. Boyle Decl.    17; Hoehn-Saric Decl.    15; Trumka Decl.    14.

3

17.    Prior to Plaintiffs' terminations, Acting Chairman Feldman produced plans for reductions in force and reorganizations at the CPSC that Plaintiffs believe will exacerbate existing understaffing problems at the agency and compromise the CPSC's ability to prevent consumer-product injuries and deaths. Boyle Decl.    8    Exh. B; Hoehn-Saric Decl.    8; Trumka Decl.    7.

18.    Plaintiffs would vote to oppose these plans were they not barred from performing their functions as CPSC Commissioners. Second Boyle Decl.    3; Second Hoehn-Saric Decl.    5; Second Trumka Decl.    3.

19.    Because they are barred from voting, Plaintiffs expect that Acting Chairman Feldman will be able to implement the reductions in force and reorganizations that Plaintiffs view as inimical to the CPSC's mission. Second Boyle Decl.    3; Second Hoehn-Saric Decl.    5; Second Trumka Decl.    3.

20.    At the time of Plaintiffs' termination, the CPSC was in the midst of a midyear review process, pursuant to which the agency evaluates the status of its available funds and recommends adjustments to the agency's operating plan for the year. Second Boyle Decl.    5; Second Hoehn-Saric Decl.    8; Second Trumka Decl.    7.

21.    Prior to their termination, Plaintiffs had expressed reservations about a proposed midyear review package and indicated that they would like to amend it. Second Hoehn-Saric Decl.    8; Second Trumka Decl.    7.

22.    After Plaintiffs were terminated, the two remaining CPSC Commissioners approved a version of the midyear review package that did not contain the amendments that Plaintiffs would have proposed had they not been terminated. Second Boyle Decl.    5; Second Hoehn-Saric Decl.    8; Second Trumka Decl.    7.

4

**JA034**

23.     In Plaintiffs' absence, the two remaining CPSC Commissioners have been adhering to a regulatory freeze and refusing to advance any regulations, including by issuing proposed regulations. Second Boyle Decl.    8.

24.     Progress on rules establishing safety standards for products such as electric bicycles, battery-operated toys, water beads, and lithium-ion batteries    which Plaintiffs would take steps to promote and advance    has been stalled or reversed since Plaintiffs' terminations. Second Boyle Decl.    9  11; Second Hoehn-Saric Decl.    9  10; Second Trumka Decl.    6.

25.     On May 28, the two remaining Commissioners received a vote package seeking public comment on opportunities for the CPSC to reduce compliance costs. Second Boyle Decl.   13; Second Trumka Decl.    13.

26.     Commissioners Boyle and Trumka would oppose this package because they view it as inconsistent with the CPSC's core mission of consumer protection, but they expect that the two remaining Commissioners will approve it. Second Boyle Decl.    13; Second Trumka Decl.   13.

27.     Pursuant to the CPSC's Fiscal Year 2025 operating plan, at least twelve substantive product standards and two procedural rules are due to be finalized prior to September 30, 2025. Second Trumka Decl.    10.

28.     As a result of Plaintiffs' terminations and underlying staffing shortages at the agency, Commissioner Trumka believes that the proposed rules will not all be issued and that those that are issued will not be evaluated with the rigor needed to ensure that they adequately protect the American public. Second Trumka Decl.    11.

29.     In Plaintiffs' absence, the CPSC has cancelled budgetary and planning meetings that Commissioner Trumka views as important. Second Trumka Decl.     5, 7.

Dated: May 30, 2025                    Respectfully submitted,

<u>/s/ Nicolas A. Sansone</u>
Nicolas A. Sansone
(admitted *pro hac vice*)
Stephanie Garlock
(D. Md. Bar No. 31594)
Allison M. Zieve
(admitted *pro hac vice*)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Plaintiffs*

6

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARY BOYLE, et al.,

**P**          ,

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et al.,

**d**     .

Civil Action No. 8:25-cv-1628-MJM

### SECOND DECLARATION OF MARY  OYLE

I, Mary Boyle, declare as follows:

1.       As explained in my initial declaration, executed on May 20, 2025, and filed in connection with Plaintiffs' motion for a temporary restraining order in this case, the actions that Defendants Donald J. Trump, Scott Bessent, Russell Vought, and Peter A. Feldman have taken to exclude me and my fellow Commissioners, Plaintiffs Alexander Hoehn-Saric and Richard Trumka Jr., from participating in the work of the Consumer Product Safety Commission (CPSC) pose grave and irreparable harm. I submit this second declaration to elaborate on the nature of that harm.

2.       As I have explained, the Acting Chairman of the CPSC, Peter A. Feldman, recently submitted two plans for reductions in force (RIFs) and reorganizations at the agency. I believe that the agency is already dangerously understaffed and that the Acting Chairman's plans, if implemented, would impair the CPSC's ability to prevent consumer-product injuries and deaths.

3.      A majority of the Commissioners would have the power to block these plans from going into effect and, were I not being unlawfully prevented from serving in my role as a Commissioner, I would vote to block them. Commissioners Hoehn-Saric and Trumka have expressed to me and to Acting Chairman Feldman that they would do the same. As matters stand, however, I believe that Acting Chairman Feldman is unlikely to receive opposition from the one other Commissioner now remaining at the agency and, therefore, will be able to implement RIFs and reorganizations that I view as inimical to the CPSC's mission.

4.      Beyond these threatened changes, I believe that the CPSC's consumer-protective mission is being degraded in other ways in the absence of Commissioners Hoehn-Saric and Trumka and me. Although my lack of access to internal agency communications and resources due to my unlawful termination means that I am not privy to all relevant developments at the agency, the information available to me suggests that the CPSC is not responsibly discharging its duties at this time.

5.      For example, on May 21, 2025, the two remaining Commissioners approved a midyear review package that kept in place controversial cuts that Acting Chairman Feldman had unilaterally made to the CPSC's International Programs Office and Office of Small Business Ombudsman; maintained dangerously low staff levels that are inconsistent with the level of funding authorized by appropriation approved by Congress in March 2025; and failed to fill critical staff positions that have remained vacant, including the Director of Compliance, Chief Financial Officer, Budget Officer, and Director of Human Resources, as well as a senior executive in the office of hazard reduction. Were I not barred from fulfilling my functions as a Commissioner, I would have voted against this profoundly deficient midyear review package,

and I would have offered amendments to reinstate full staffing for the depleted offices and to direct that critical vacancies be filled.

6. Meanwhile, Acting Chairman Feldman has unilaterally cancelled research contracts, including contracts supporting important work in reducing the flammability of consumer products. I would have voted to reinstate these contracts.

7. If I were not being prevented from carrying out my duties as a Commissioner, I would also be taking active steps to preserve the CPSC's ability to act effectively in the future, including by preparing a strong, safety-focused budget request for Fiscal Year (FY) 2026 and an FY 2026 Operating Plan that includes a robust agenda for advancing critical safety regulations.

8. The two remaining Commissioners, in contrast, are adhering to a regulatory freeze and refusing to advance any regulations, or even proposed regulations. I believe that this freeze directly harms consumers by failing to produce safety standards for hazardous items like electric bicycles, portable generators, table saws, water beads, and button and coin cell batteries found in toys. Without rules in place on these products, American consumers will be injured and killed.

9. I have been the CPSC's leading voice on adopting regulations on electric bicycles, especially those bicycles marketed to and used by children. According to a recent CPSC report, there were an estimated 53,200 emergency department visits, and 104 fatalities, between 2017 and 2022 related to electric bicycles. Prior to my termination, the CPSC issued an Advance Notice of Proposed Rulemaking for a set of safety standards for electric bicycles, and the Notice of Proposed Rulemaking was scheduled to issue this fiscal year. Following my termination, work on the proposed rule is now stalled.

10.    Similarly, the CPSC was scheduled to issue a final rule establishing safety standards for battery-operated toys this fiscal year. This rule, too, is now stalled.

11.    In at least one instance, the two remaining Commissioners have affirmatively voted to stop a rule that would have advanced but for the unlawful termination of me and my colleagues. On May 16, the CPSC was scheduled to publish a Notice of Proposed Rulemaking seeking public comment on proposed safety standards for lithium-ion batteries. Fires caused by these batteries have killed dozens of people and injured scores of others, and I believe that the proposed standards, if finalized, would save lives. Commissioners Hoehn-Saric and Trumka and I had voted to advance these standards; the two Commissioners who remain at the agency had voted against doing so. Following termination of me and my colleagues, the two remaining Commissioners voted to withdraw the Notice of Proposed Rulemaking.

12.    The absence of regulations relating to these and other hazardous products will not only deprive the public of necessary safeguards, but it will impede the CPSC's ability to stop faulty and noncompliant products from coming into the country from overseas. Where a product is not the subject of a CPSC regulation, the CPSC lacks the ability to target those products for inspection at ports of entry to the United States and to prevent those products, where necessary, from entering the domestic market and causing injury and death.

13.    Instead of developing life-saving regulations, the CPSC, in the absence of me and my colleagues, is focused on reducing the costs to industry of existing rules. On May 28, staff presented the two remaining Commissioners with a vote package seeking public comment on opportunities for the CPSC to reduce compliance costs. A Commission vote is due June 3, and I have every expectation that the two remaining Commissioners will approve the package. Were I not being prevented from serving as a Commissioner, I would oppose devoting the CPSC's

4

**JA040**

scarce resources to reviewing potential cost savings for industry at the expense of furthering the agency's core mission of consumer protection. To the contrary, I would advance a forward-looking agenda to ensure that CPSC regulations keep pace with innovations in the market and protect American consumers against products presenting novel or emerging hazards, not just products for which existing regulations have long been in place.

Executed this 30th day of May, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Mary Boyle*

_____

Mary Boyle

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

MARY BOYLE, et al.,

      **P**     ,

      v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et al.,

      **d**   .

Civil Action No. 8:25-cv-1628-MJM

### SECOND DECLARATION OF ALE   ANDER HOEHN SARIC

I, Alexander Hoehn-Saric, declare as follows:

1.      As explained in my initial declaration, executed on May 20, 2025, and filed in connection with Plaintiffs' motion for a temporary restraining order in this case, the actions that Defendants Donald J. Trump, Scott Bessent, Russell Vought, and Peter A. Feldman have taken to exclude me and my fellow Commissioners, Plaintiffs Mary Boyle and Richard Trumka Jr., from participating in the work of the Consumer Product Safety Commission (CPSC) pose grave and irreparable harm. I submit this second declaration to elaborate on the nature of that harm.

2.      As I have explained, the Acting Chairman of the CPSC, Peter A. Feldman, recently submitted two plans for reductions in force (RIFs) and reorganizations at the agency. I believe that the agency is already dangerously understaffed and that the Acting Chairman's plans, if implemented, would impair the CPSC's ability to prevent consumer-product injuries and deaths.

3.      If the plans are implemented, critical offices, including the Consumer Ombudsman Office, Small Business Ombudsman Office, and Office of International Programs, will be eliminated, and significant numbers of staff from other offices  including the Office of

Communications, Office of Human Resources, Office of Equal Employment and Opportunity, and Office of Legislative Affairs   will be terminated, compromising the offices' ability to perform effectively.

4.      The Small Business Ombudsman Office, for example, is responsible for producing business guidance that the CPSC posts online; delivering webinars, holding meetings, and producing online content; distributing a monthly newsletter to more than 200,000 stakeholders; and communicating with small businesses daily. As things now stand, guidance from the office is already delayed, and website updates and responses to telephone and email inquiries have slowed or stopped. If the office closes, as it will under Acting Chairman Feldman's plans, businesses will be left without essential guidance and will incur unnecessary costs. Moreover, companies unable to obtain sufficient and timely guidance from the CPSC may inadvertently manufacture products that violate product safety laws and put U.S. consumers at risk of injury or death.

5.      A majority of the Commissioners would have the power to block Acting Chairman Feldman's plans from going into effect and, were I not being unlawfully prevented from serving in my role as a Commissioner, I would vote to block them. Commissioners Boyle and Trumka have expressed to me and to Acting Chairman Feldman that they would do the same. As matters stand, however, I believe that Acting Chairman Feldman is unlikely to receive opposition from the one other Commissioner now remaining at the agency and, therefore, will be able to implement RIFs, reorganizations, and office closures that I view as inimical to the CPSC's mission.

6.      My understanding is that the Office of Management and Budget has been encouraging Acting Chairman Feldman to terminate even more staff than he had proposed in the RIF plans that he submitted. Were I not being prevented from fulfilling my functions as a

Commissioner, I would work to maintain and even increase the CPSC's current staffing levels, rather than reducing them, to ensure that the agency can continue to perform effectively.

7. Beyond the threatened RIFs and reorganizations, I believe that the CPSC's mission is being degraded in other ways in the absence of Commissioners Boyle and Trumka and me. Although my lack of access to internal agency communications and resources due to my unlawful termination means that I am not privy to all relevant developments at the agency, the information available to me suggests that the CPSC is not responsibly discharging its duties at this time.

8. For example, when I was terminated, the CPSC was in the midst of a midyear review process, pursuant to which the agency evaluates the status of its available funds and recommends adjustments to the agency's operating plan for the year. Prior to my termination, CPSC staff had sent around a proposal for such adjustments, which my fellow Commissioners and I discussed at a May 7 meeting. Commissioners Boyle and Trumka and I indicated that we would have significant amendments to the proposal. I would have proposed or supported amendments to prioritize the promulgation of critical product-safety standards, stop personnel policies that would incentivize or cause staff reductions, and prevent agency reorganizations that would eliminate key offices at the CPSC. After my termination, however, the two remaining Commissioners voted to adopt the midyear proposal without the amendments that I would have suggested or promoted.

9. In addition, the CPSC is failing to advance mandatory product-safety standards that I believe are important to protect American consumers. For example, on May 13, after the termination of me and Commissioners Boyle and Trumka, the remaining two Commissioners halted the publication of a Notice of Proposed Rulemaking to establish mandatory safety standards for lithium-ion batteries used in micromobility products. An analysis by CPSC staff suggests that, had the proposed rule been in effect, it could have prevented thirty-nine deaths and 181 injuries

between 2019 and 2023. Monetarily, CPSC staff values the benefits of the rule at up to $580 million over a thirty-year period. Absent my participation in Commission proceedings, I understand that the rulemaking for lithium-ion batteries will be delayed or stopped.

10.     At the time of my removal, the CPSC was also working to prepare a proposed final mandatory safety standard for water beads, which CPSC staff expected to have ready for the Commissioners in the next month or two. This rule would address product hazards that have caused at least one death and 63 other incidents over a seven-year period. Absent my participation in Commission proceedings, I understand that progress on the rule will be delayed or stopped, with the effect that consumer products that cause an unreasonable risk of injury and death will continue to be sold to and used by American consumers.

Executed this 30th day of May, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Alexander Hoehn-Saric

4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARY BOYLE, et al.,

    *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et al.,

    *Defendants*.

Civil Action No. 8:25-cv-1628-MJM

### SECOND DECLARATION OF RICHARD TRUMKA JR.

I, Richard Trumka Jr., declare as follows:

1.     As explained in my initial declaration, executed on May 21, 2025, and filed in connection with Plaintiffs' motion for a temporary restraining order in this case, the actions that Defendants Donald J. Trump, Scott Bessent, Russell Vought, and Peter A. Feldman have taken to exclude me and my fellow Commissioners, Plaintiffs Mary Boyle and Alexander Hoehn-Saric, from participating in the work of the Consumer Product Safety Commission (CPSC) pose grave and irreparable harm. I submit this second declaration to elaborate on the nature of that harm.

2.     As I have explained, the Acting Chairman of the CPSC, Peter A. Feldman, recently submitted two plans for reductions in force (RIFs) and reorganizations at the agency. I believe that the agency is already dangerously understaffed and that the Acting Chairman's plans, if implemented, would impair the CPSC's ability to prevent consumer-product injuries and deaths.

3.     A majority of the Commissioners would have the power to block these plans from going into effect and, were I not being unlawfully prevented from serving in my role as a Commissioner, I would vote to block them. Commissioners Boyle and Hoehn-Saric have

expressed to me and to Acting Chairman Feldman that they would do the same. But as it stands, Acting Chairman Feldman is unlikely to receive opposition from the only other Commissioner now remaining at the agency and, therefore, will be able to implement RIFs and reorganizations that Commissioners Boyle and Hoehn-Saric and I view as inimical to the CPSC's mission.

4.     Beyond these threatened changes, I believe that the CPSC's consumer-protective mission is being degraded in other ways in the absence of Commissioners Boyle and Hoehn-Saric and me. Although my lack of access to internal agency communications and resources as a result of my unlawful termination means that I am not privy to all relevant developments at the agency, my understanding is that the CPSC has been failing to take actions that it should, and otherwise would, be taking.

5.     For example, prior to my termination, the CPSC had scheduled a public hearing for May 14, 2025, so that the CPSC could "receive views from interested parties about the Commission's agenda and priorities for fiscal year (FY) 2026, ... and for FY 2027." 90 Fed. Reg. 15564, 15564 (Apr. 14, 2025). This hearing is required by law. *See* 15 U.S.C. § 2053(j). Following my termination, this hearing was taken off the calendar and was not held.

6.     On May 16, the CPSC was scheduled to publish a Notice of Proposed Rulemaking seeking public comment on a set of proposed safety standards for lithium-ion batteries. These batteries have caused devastating fires and scores of deaths, and I believe that the proposed standard, if finalized, would save lives. Commissioners Boyle and Hoehn-Saric and I had voted to advance these standards; the two Commissioners who remain at the agency had voted against doing so. Following my termination, the two remaining Commissioners voted to withdraw the Notice of Proposed Rulemaking.

**JA047**

7.      When my colleagues and I were terminated, the CPSC was in the midst of a midyear review process, pursuant to which the agency evaluates the status of its available funds and recommends adjustments to the agency's operating plan for the year. Prior to my termination, CPSC staff had sent around a proposal for such adjustments, which my fellow Commissioners and I discussed at a May 7 meeting. Commissioners Boyle and Hoehn-Saric and I indicated that we would have significant amendments to the proposal. The Commissioners were set to meet again on May 21 to consider amendments to the proposal and cast our final votes. Following my termination, this meeting was taken off the calendar and was not held. Instead, on May 20, the two remaining Commissioners approved a midyear review package that kept in place unilateral cuts that Acting Chairman Feldman had made to the CPSC's International Programs Office and Office of Small Business Ombudsman; maintained dangerously low staff levels that are inconsistent with the level of funding authorized by appropriation approved by Congress in March 2025; and failed to fill critical staff positions that have remained vacant, including the Director of Compliance, Chief Financial Officer, Budget Officer, and Director of Human Resources, as well as a senior executive in the office of hazard reduction. I would have voted against this profoundly deficient midyear review package, and I would have offered amendments to reinstate full staffing for the depleted offices and to direct that critical vacancies be filled.

8.      Meanwhile, Acting Chairman Feldman has unilaterally cancelled research contracts, including contracts supporting important work in reducing the flammability of consumer products. I would have voted to reinstate these contracts.

9.      If I were not being prevented from carrying out my duties as a Commissioner, I would also be taking active steps to preserve the CPSC's ability to act effectively in the future,

including by preparing a strong, safety-focused budget request for Fiscal Year (FY) 2026 and an FY 2026 Operating Plan that includes a robust agenda for advancing critical safety regulations.

10.     I have grave concerns about the CPSC's ability to fulfill its FY 2025 operating plan absent my ongoing participation, and the participation of Commissioners Boyle and Hoehn-Saric. Under the CPSC's operating plan, the agency has expressed an intention to issue final rules regarding several potentially hazardous products by September 30, 2025. *See* CPSC, *Operating Plan: Fiscal Year 2025* at 12 (Feb. 25, 2025).[1] At least twelve substantive product standards and two procedural rules remain to be finalized before the deadline set out in the operating plan. At this time, agency staff would ordinarily be reviewing and evaluating public comments on proposed rules, performing cost-benefit analyses, evaluating possible regulatory alternatives, and compiling their work in a final briefing package. Acting Chairman Feldman, however, has taken the view that the agency is bound by executive order to pursue a deregulatory agenda. As such, I understand that he is not directing staff to push towards finalizing the rules by the deadline, and statements made by agency staff at the midyear briefing on May 7 confirm this understanding. I believe that Acting Chairman Feldman's understanding of the agency's obligations is incorrect, and if I were not barred from fulfilling my duties as a Commissioner, I would be directing staff to complete the regulatory work required by the FY 2025 operating plan.

11.     Due to staff shortages at the CPSC, accomplishing all of this necessary work in advance of the September 30 deadline would have been difficult even without the disruption caused by the unlawful termination of Commissioners Boyle and Hoehn-Saric and me. Unless we and our staff members are promptly reinstated, it is unrealistic to expect that the proposed rules

---

[1] https://www.cpsc.gov/s3fs-public/FY-2025-Op-Plan-revised-02-25-25.pdf?VersionId=eoC76a LTUB8Bq.If8WV6gezkjm9klj.1.

will all be issued and that those that are issued will be evaluated with the rigor needed to ensure that they adequately protect the American public.

12.    The absence of the regulations required by the FY 2025 operating plan will not only deprive the public of necessary safeguards, but it will also impede the CPSC's ability to stop faulty and noncompliant products from coming into the country from overseas. Where a product is not the subject of a CPSC regulation, the CPSC lacks the ability to target such products for inspection at ports of entry to the United States and to prevent those products, where necessary, from entering the domestic market and causing injury and death.

13.    Instead of developing life-saving regulations, the CPSC, in the absence of me and my colleagues, is focused on reducing the costs to industry of existing rules. On May 28, staff presented the two remaining Commissioners with a vote package seeking public comment on opportunities for the CPSC to reduce compliance costs. A Commission vote is due June 3, and I have every expectation that the two remaining Commissioners will approve the package. Were I not being prevented from serving as a Commissioner, I would oppose devoting the CPSC's scarce resources to reviewing potential cost savings for industry at the expense of furthering the agency's core mission of consumer protection. To the contrary, I would advance a forward-looking agenda to ensure that CPSC regulations keep pace with innovations in the market and protect American consumers against products presenting novel or emerging hazards, not just products for which existing regulations have long been in place.

Executed this 30th day of May, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Richard Trumka Jr.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BOYLE, *et al.*,

                    Plaintiffs,

        v.

TRUMP, *et al.*,

                    Defendants.

Case No. 8:25-cv-1628-MJM

## DEFENDANTS' STATEMENT OF
## UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56, Defendants submit the following statement of undisputed material facts in support of their motion for summary judgment.

1.  Defendants adopt and incorporate paragraphs 1-4 and 6-16 of Plaintiffs' Statement of Undisputed Material Facts. ECF No. 18-2. Defendants do not dispute the veracity of the remaining paragraphs but assert that those facts are not material to deciding the issues in the case. *See Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) ("A fact is material if it might affect the outcome of the suit under the governing law." (quotation omitted)).

Dated: June 2, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

/s/ *Abigail Stout*
ABIGAIL STOUT

(DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

*Attorney for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **MARY BOYLE,** *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civ. No. MJM-25-1628** |
| v. | * | |
| | * | |
| **DONALD J. TRUMP, in his official** | * | |
| **capacity as President of the United** | * | |
| **States,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. (collectively, "Plaintiffs") were appointed to serve as members of the United States Consumer Product Safety Commission ("CPSC") for terms prescribed by statute, subject to removal only for neglect of duty or malfeasance. On May 8 and 9, 2025, Plaintiffs received notifications sent on behalf of President Donald J. Trump purporting to terminate them from their positions without cause. Thereafter, Plaintiffs were denied access to facilities and resources necessary to fulfill their roles as CPSC Commissioners, and members of Plaintiffs' staff were discharged.

On May 21, 2025, Plaintiffs commenced this civil action for declaratory and injunctive relief against President Trump; Scott Bessent, Secretary of the Treasury; Russell Vought, Director of the Office of Management and Budget; and Peter A. Feldman, Acting Chairman of the CPSC (collectively, "Defendants"). Plaintiffs seek a declaratory judgment that their terminations were unlawful and an injunction against official action to effectuate their removal from office.

1

Defendants contend that the statute requiring cause for Plaintiffs' removal is inconsistent with the President's removal power under Article II of the U.S. Constitution and therefore invalid.

This matter is before the Court on the parties' cross-motions for summary judgment. On June 6, 2025, following expedited briefing, the Court conducted a hearing on the motions and took them under advisement. For the reasons set forth below, the Court finds no constitutional defect in the statutory restriction on Plaintiffs' removal and that Plaintiffs' purported removal from office was unlawful. The Court shall enter an Order granting Plaintiffs' motion, denying Defendants' motion, and providing declaratory and injunctive relief permitting Plaintiffs to resume their duties as CPSC Commissioners.

## I.    BACKGROUND

### A. Purpose, Functions, and Organization of the Consumer Product Safety Commission

In 1972, Congress passed the Consumer Product Safety Act ("CPSA"), Pub. L. No. 92-573, 86 Stat. 1207, and created the CPSC to advance the goals and purposes of the Act, 15 U.S.C. § 2053(a). The CPSA's purposes include (1) "protect[ing] the public against unreasonable risks of injury associated with consumer products;" (2) "assist[ing] consumers in evaluating the comparative safety of consumer products;" (3) "develop[ing] uniform safety standards for consumer products . . . ;" and (4) "promot[ing] research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries." *Id.* § 2051(b). The CPSC consists of five Commissioners nominated by the President and confirmed by the Senate. *Id.* § 2053(a). Each Commissioner must hold "background and expertise in areas related to consumer products and protection of the public from risks to safety." *Id.* The CPSC has the statutory authority to promulgate product-safety standards, *id.* § 2056(a); to conduct administrative proceedings and investigations, with the power to issue and enforce subpoenas, *id.* §§ 2064, 2076(a), (b)(3), (c);

2

and to initiate civil and criminal actions in federal court to enforce consumer product safety laws, *see id.* §§ 2069, 2070(a), 2071(a), 2076(b)(7); among other functions and powers.

Congress established the CPSC as an "independent regulatory commission," *id.* § 2053(a), to ensure that it remained an expert body "unfettered by political dictates, self-interested industry pressure or blind consumer zeal," 122 Cong. Rec. S15211 (daily ed. May 24, 1976). Specific statutory guardrails were enacted to protect the Commission from political pressures, abrupt changes in composition, and loss of agency expertise. First, Congress provided that the Commissioners would serve staggered, seven-year terms, 15 U.S.C. § 2053(b)(1), and that any Commissioner appointed to fill a vacancy created by the premature departure of a predecessor would be appointed only for the remainder of the predecessor's term, *id.* § 2053(b)(2).[1] Second, Congress provided that "[n]ot more than three of the Commissioners shall be affiliated with the same political party." *Id.* § 2053(c). Third, and critical to the case here, Congress provided that the Commissioners may be "removed by the President" before the expiration of their terms only "for neglect of duty or malfeasance in office but for no other cause." *Id.* § 2053(a).

**B. Plaintiffs' Purported Removal**

The facts relevant to this case are uncontested. *See* ECF No. 21-2 (Defendants' Statement of Undisputed Material Facts, raising no dispute with Plaintiffs' Statement of Undisputed Material Facts, ECF No. 18-2). Each Plaintiff was nominated by President Joseph R. Biden and confirmed by the U.S. Senate to serve as a Commissioner of the CPSC. ECF No. 18-2, ¶ 1. Plaintiff Boyle was confirmed on June 2, 2022, to serve out the remainder of her predecessor's term, set to expire on October 27, 2025. *Id.* ¶ 2. Plaintiff Hoehn-Saric was confirmed on October 7, 2021, to serve

---

[1] A Commissioner appointed to serve out their predecessor's term may "continue to serve after the expiration of this term until his successor has taken office" or up to a maximum of one year. 15 U.S.C. § 2053(b)(2).

out the remainder of his predecessor's term, set to expire on October 27, 2027. *Id.* ¶ 3. Plaintiff

Trumka was confirmed on November 16, 2021, to serve a full seven-year term expiring on October

27, 2028. *Id.* ¶ 4. Each Plaintiff has a substantial professional background in the field of consumer

protection and the work of the CPSC. *See* ECF No. 6-2, ¶ 1; ECF No. 6-3, ¶ 1; ECF No. 6-4, ¶ 1.

Plaintiffs have performed ably in their roles and have never been accused of neglect of duty or

malfeasance in office by either President Trump or President Biden. ECF No. 18-2, ¶ 5.

Between May 8 and May 9, 2025, Plaintiffs were notified of their removal from their

positions as three of the CPSC's five sitting Commissioners. On May 8, Plaintiffs Boyle and

Trumka each received an email from Trent Morse, the Deputy Director of Presidential Personnel,

which stated, in full: "On behalf of President Donald J. Trump, I am writing to inform you that

your position on the Consumer Product Safety Commission is terminated effective immediately.

Thank you for your service." *Id.* ¶¶ 6–7. The following day, Plaintiff Hoehn-Saric and two of his

staff members attempted to access their offices at the CPSC headquarters[2] but were barred by

CPSC security. *Id.* ¶ 9. While waiting in the lobby, Plaintiff Hoehn-Saric received a phone call

from Acting Chairman Feldman, who informed him that President Trump had terminated him from

his role as a CPSC Commissioner. *Id.* ¶ 10.

Since May 9, Plaintiffs have been unable to enter their offices unescorted, log in to the

CPSC computer network, and access their CPSC email accounts and electronic files. *Id.* ¶ 13.

Plaintiffs were required to return their CPSC identification badges, keys, phones, credit cards, and

computer equipment. *Id.* ¶ 14. Plaintiffs' staff members have also received termination notices that

cite Plaintiffs' removal from office as the basis for termination. *Id.* Plaintiffs have received

---

[2] CPSC headquarters is located in Bethesda, Maryland. ECF No. 1, ¶ 6.

"separation packages" and understand that they will no longer be receiving the pay and benefits to which CPSC Commissioners are entitled. *Id.* ¶ 15.

### C. Procedural History

On May 21, 2025, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief against Defendants Trump, Bessent, Vought, and Feldman, in their official capacities. ECF No. 1. On the same date, Plaintiffs filed a Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. ECF No. 6. This motion seeks preliminary injunctive relief to prevent Defendants Bessent, Vought, and Feldman from "taking any action to effectuate President Donald J. Trump's purported termination of Plaintiffs from their roles as Commissioners of the [CPSC.]" ECF No. 6-5. Defendants filed a response in opposition to the motion on May 26, 2025. ECF No. 15.

On May 27, 2025, the Court conducted a hearing on Plaintiffs' request for a TRO and declined to issue temporary or preliminary injunctive relief. With the parties' agreement, the Court entered an Order setting a schedule for expedited briefing of Plaintiffs' motion for summary judgment. ECF No. 17. Thereafter, Plaintiffs filed a motion for summary judgment, ECF No. 18; Defendants filed a cross-motion for summary judgment and response in opposition to Plaintiffs' motion, ECF No. 21; and Plaintiffs filed a reply, ECF No. 22. On June 6, 2025, the Court conducted a hearing on the motions and took them under advisement.

Plaintiffs' central claim in this litigation is that Defendants acted ultra vires and in violation of the CPSA by removing them as CPSC Commissioners without cause and taking action to effectuate the purported terminations. ECF Nos. 18, 18-1 (Plaintiffs' Motion and Memorandum). Plaintiffs seek two forms of relief. First, Plaintiffs request a declaration that the "purported termination of Plaintiffs from their roles as [CPSC] Commissioners" is unlawful and "without legal effect." ECF No. 18-6 (proposed order). Second, Plaintiffs seek to enjoin Defendants

Bessent, Vought, and Feldman from "taking any action to effectuate the unlawful terminations . . . ." *Id.* In their cross-motion for summary judgment, Defendants primarily argue that the statutory for-cause restriction on the removal of CPSC Commissioners is inconsistent with the President's Article II removal authority and therefore unconstitutional. ECF Nos. 21, 21-1 (Defendants' Motion and Memorandum). Defendants also argue that relief in the form of reinstatement is beyond the authority of this Court. Defs.' Mem. at 1.

## II.    STANDARD OF REVIEW

A court may grant a party's summary judgment motion under Rule 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis omitted); *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), but the court is not

permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2510–11.

### III.    RELEVANT CASE LAW

Article II of the U.S. Constitution vests "[t]he executive Power" in the President, who "shall take Care that the Laws be faithfully executed[.]" The President's "executive Power" under Article II "generally includes the ability to remove executive officials, for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'" *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213–14, 140 S. Ct. 2183, 2197, 207 L. Ed. 2d 494 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 726, 106 S. Ct. 3181, 3188, 92 L. Ed. 2d 583 (1986)); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14, 130 S. Ct. 3138, 3164, 177 L. Ed. 2d 706 (2010) ("The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties."); *Collins v. Yellen*, 594 U.S. 220, 252, 141 S. Ct. 1761, 1784, 210 L. Ed. 2d 432 (2021) ("The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote."). For Congress "to draw to itself . . . the power to remove or the right to participate in the exercise of that power" would "infringe the constitutional principle of the separation of governmental powers." *Myers v. United States*, 272 U.S. 52, 161, 47 S. Ct. 21, 40, 71 L. Ed. 160 (1926).

But the President's power of removal is not absolute. The U.S. Supreme Court has recognized two exceptions that "represent what up to now have been the outermost constitutional

7

limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 591 U.S. at 218, 140 S. Ct. at 2200 (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). First, in *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S. Ct. 869, 79 L. Ed. 1611 (1935), and *Wiener v. United States*, 357 U.S. 349, 78 S. Ct. 1275, 2 L. Ed. 2d 1377 (1958), the Supreme Court upheld tenure protections for officers of "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions[.]" *Seila Law*, 591 U.S. at 216–17, 140 S. Ct. at 2198–99. Second, in *United States v. Perkins*, 116 U.S. 483, 6 S. Ct. 449, 29 L. Ed. 700 (1886), and *Morrison v. Olson*, 487 U.S. 654, 108 S. Ct. 2597, 101 L. Ed. 2d 569 (1988), the Supreme Court upheld tenure protections for "inferior officers with limited duties and no policymaking or administrative authority[.]" *Seila Law*, 591 U.S. at 217–18, 140 S. Ct. at 2199–200. Only the exception first recognized in *Humphrey's Executor* is at issue here.

### A. *Humphrey's Executor* and its progeny

In *Humphrey's Executor*, the Supreme Court unanimously upheld a statutory provision preventing the President from removing members of the Federal Trade Commission ("FTC") except for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 619, 55 S. Ct. at 870 (quoting 15 U.S.C. § 41). "Whether the power of the President to remove an officer shall prevail over the authority of Congress to condition the power by fixing a definite term and precluding a removal except for cause will depend upon the character of the office[.]" *Id.* at 631, 55 S. Ct. at 875, *quoted in Morrison*, 487 U.S. at 687, 108 S. Ct. at 2617. Examining the features of the FTC, the Court described this Commission as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Humphrey's Executor*, 295 U.S. at 628, 55 S. Ct. at 874. "Such a body[,]" the Court stated,

"[could not] in any proper sense be characterized as an arm or an eye of the executive[,]" noting that it performed its duties "without executive leave and, in the contemplation of the statute, . . . free from executive control." *Id.* The Commission was meant to be "nonpartisan" and "act with entire impartiality." *Id.* at 624, 55 S. Ct. at 872. The Court described the FTC's duties as "neither political nor executive," but instead called for "the trained judgment of a body of experts" "informed by experience." *Id.*

Considering the powers and functions of the FTC, the Court described them as "quasi legislative" in part and "quasi judicial" in part. *Id.* at 628, 55 U.S. at 874. The FTC acted "as a legislative agency" in "making investigations and reports" to Congress and "as an agency of the judiciary[]" in making recommendations to courts "as a master in chancery . . . ." *Id.*, *quoted in Seila Law*, 591 U.S. at 215, 140 S. Ct. at 2198. To the extent that the FTC exercised any "executive function," it was distinguishable from "executive power in the constitutional sense," as the FTC exercised executive functions "in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government."[3] *Humphrey's Executor*, 295 U.S. at 628, 50 S. Ct. at 874.

The Court then concluded that the President does not possess an "illimitable" power to remove officers like the members of the FTC, stating as follows:

> The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime. For it is quite evident that one who holds his office only during the pleasure of another cannot be

---

[3] In *Morrison v. Olson*, the Supreme Court called into doubt its conclusion in *Humphrey's Executor* that the FTC did not exercise executive power. 487 U.S. at 690 n.28, 108 S. Ct. at 2618 n.28, *cited in Seila Law*, 591 U.S. at 216 n.2, 140 S. Ct. at 2198 n.2.

depended upon to maintain an attitude of independence against the
latter's will.

*Id.* at 629, 55 S. Ct. at 874.

Two decades later, in *Wiener*, the Supreme Court applied its holding in *Humphrey's
Executor* to uphold a suit for backpay by a member of the War Claims Commission who claimed
that he was unlawfully discharged without cause. *Wiener*, 357 U.S. at 356, 78 S. Ct. at 1279. The
statute that created this Commission provided that its three members were to be "appointed by the
President, by and with the advice and consent of the Senate." *Id.* at 350, 78 S Ct. at 1276. The
statute included "no provision for removal of a Commissioner[,]" but it prescribed that the
Commission would exist and conduct its work for a limited term. *Id.* While recognizing the
President's general removal power announced in *Myers*, the Court in *Wiener* viewed *Humphrey's
Executor* as "narrowly confin[ing] the scope of the *Myers* decision to include only 'all purely
executive officers.'" *Id.* at 352, 78 S. Ct. at 1277 (quoting *Humphrey's Executor*, 295 U.S. at 628,
55 S. Ct. at 874). Following the reasoning in *Humphrey's Executor*, the Court examined the
character of the War Claims Commission and described it as "an adjudicatory body" intended to
be independent of executive control. *Id.* at 353–56, 78 S. Ct. at 1278–79. The Court ultimately
rejected "the claim that the President could remove a member of an adjudicatory body like the War
Claims Commission merely because he wanted his own appointees on such a Commission[.]" *Id.*
at 356, 78 S. Ct. at 1279. "[N]o such power is given to the President directly by the Constitution,
and none is impliedly conferred upon him by statute simply because Congress said nothing about
it." *Id.*

At each opportunity since *Wiener*, the Supreme Court has declined to overturn *Humphrey's
Executor*. *See, e.g.*, *Free Enterprise Fund*, 561 U.S. at 483–84, 130 S. Ct. at 3146–47 (reviewing
constitutional limits on the President's removal power and stating, "The parties do not ask us to

reexamine any of these precedents, and we do not do so."); *Seila Law*, 591 U.S. at 228, 140 S. Ct. at 2206 ("While we do not revisit *Humphrey's Executor* or any other precedent today, we decline to elevate it into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority."). The Court has, however, reconsidered and recast some views articulated in *Humphrey's Executor* and *Wiener*. In *Morrison*, for instance, the Court recognized the "difficulty of defining" "executive" as a category and stated that "the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" 487 U.S. at 689, 108 S. Ct. at 2618; *see id.* at 487 U.S. at 689 n.28, 108 S. Ct. at 2618 n.28.

## B.  *Seila Law*

More recently, in *Seila Law*, the Supreme Court declined to extend the *Humphrey's Executor* exception to justify statutory tenure protection for the sole director of the Consumer Financial Protection Bureau ("CFPB"). *Seila Law*, 591 U.S. at 220–32. 140 S. Ct. at 2201–07. Unlike the multimember Commissions at issue in *Humphrey's Executor* and *Wiener*, the CFPB was structured, by statute, under the leadership of a single director appointed to serve a term of five years and who could only be removed for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). The Court held that this statutory protection against removal ran afoul of the President's Article II removal power. *Seila Law*, 591 U.S. at 213, 140 S. Ct. at 2197.

As relevant here, the Supreme Court in *Seila Law* first held that *Humphrey's Executor* did not resolve the question of whether the CFPB Director's tenure protection was constitutional. *Id.* at 218–20, 140 S. Ct. at 2199–201. Foremost, the Court noted structural differences between the 2020 CFPB and the 1935 FTC at issue in *Humphrey's Executor*:

11

**JA063**

> Unlike the New Deal-era FTC upheld [in *Humphrey's Executor*], the CFPB is led by a single Director who cannot be described as a "body of experts" and cannot be considered "non-partisan" in the same sense as a group of officials drawn from both sides of the aisle. 295 U.S. at 624, 55 S. Ct. 869. Moreover, while the staggered terms of the FTC Commissioners prevented complete turnovers in agency leadership and guaranteed that there would always be some Commissioners who had accrued significant expertise, the CFPB's single-Director structure and five-year term guarantee abrupt shifts in agency leadership and with it the loss of accumulated expertise.

*Id.* at 218, 140 S. Ct. at 2200. The Court then considered the governmental powers entrusted to the CFPB's single Director, noting that this single office carried rulemaking authority to administer 19 federal statutes, as well as "unilateral[]" powers to "issue final decisions awarding legal and equitable relief in administrative adjudications" and "to seek daunting monetary penalties against private parties on behalf of the United States in federal court[.]" *Id.* at 218–19, 140 S. Ct. at 2200.

The Supreme Court ultimately declined to exempt the CFPB Director from the President's general removal power, concluding that "an independent agency led by a single Director and vested with significant executive power . . . has no basis in history and no place in our constitutional structure." *Id.* at 220, 140 S. Ct. at 2201. Throughout its analysis, the Court repeatedly emphasized the concentration of the CFPB's "significant governmental power in the hands of a single individual accountable to no one." *Id.* at 224, 140 S. Ct. at 2203. The Court suggested that "the most telling indication of [the CFPB's] severe constitutional problem" was its "almost wholly unprecedented" structure. *Id.* at 220, 140 S. Ct. at 2201. The Court noted that there were only a few "isolated" examples of good-cause tenure protections for "principal officers who wield power alone rather than as members of a board or commission." *Id.* "In addition to being a historical anomaly, the CFPB's single-Director configuration is incompatible with our constitutional structure. Aside from the sole exception of the Presidency, that structure

scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 222–23, 140 S. Ct. at 2202.

Not only was the CFPB Director entrusted with an array of policymaking and enforcement powers "[w]ith no colleagues to persuade, and no boss or electorate looking over her shoulder," but other unique statutory features of the agency further insulated the Director from the electorally accountable President. *Id.* at 225, 140 S. Ct. at 2204. First, the Director's five-year term would leave some Presidents with no opportunity "to shape [the CFPB's] leadership and thereby influence its activities." *Id.* And the single-Director leadership structure gave Presidents no opportunity "to appoint any other leaders—such as a chair or fellow members of a Commission or Board—who [could] serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.* Second, unlike most independent agencies, the CFPB receives its funding outside of the normal appropriations process and therefore beyond the President's influence over appropriations. *Id.* at 226, 140 S. Ct. at 2204. Indeed, "the Director receives [funds for the CFPB] from the Federal Reserve, which is itself funded outside of the annual appropriations process" and beyond the control of the electorate. *Id.*

In consideration of the foregoing, the Court held that the CFPB Director's statutory tenure protection was unconstitutional. *Id.* at 220, 140 S. Ct. at 2201.

## IV.    PLAINTIFFS' REMOVAL FROM OFFICE

### A.  Violation of 15 U.S.C. § 2053(a)

No material facts are disputed in this case. *See* ECF Nos. 18-2, 21-2.[4] On May 8 and May 9, 2025, Plaintiffs received notifications on behalf of President Trump purporting to remove them

---

[4] Plaintiffs' Statement of Undisputed Facts, ECF No. 18-2, is supported by sworn declarations and exhibits provided by each Plaintiff, ECF Nos. 6-2, 6-3, 6-4, 18-3, 18-4, 18-5. Defendants do not dispute Plaintiffs' Statement. *See* ECF No. 21-2.

from their duly appointed positions as three of five sitting Commissioners of the CPSC. ECF No. 18-2, ¶¶ 6–7, 10. Since their purported terminations, Plaintiffs have been prevented from returning to their offices at CPSC headquarters without an escort and accessing CPSC resources necessary to perform their statutorily mandated duties. *Id.* ¶¶ 13–14. No Plaintiff has finished serving their term. *Id.* ¶¶ 1–4; *see also* 15 U.S.C. § 2053(b) (prescribing CPSC Commissioners' terms). By statute, the President could only remove Plaintiffs from their positions as CPSC Commissioners "for neglect of duty or malfeasance in office . . . ." 15 U.S.C. § 2053(a). But no Plaintiff has neglected their official duties, committed official malfeasance, or been accused of any neglect of duty or malfeasance. ECF No. 18-2, ¶ 5. Therefore, Plaintiffs' purported removals from office and efforts to prevent them from fulfilling their statutory duties as CPSC Commissioners violated 15 U.S.C. § 2053(a).

Although this case presents no material factual disputes, the contested legal issue central to this case is whether Plaintiffs' statutory tenure protection in 15 U.S.C. § 2053(a) infringes upon the President's Article II removal power. This Court holds that § 2053(a) is not inconsistent with Article II, agreeing with several other courts that statutory tenure protection for CPSC Commissioners is constitutionally justified by the *Humphrey's Executor* exception to the President's removal power. *See Consumers' Research v. CPSC*, 91 F.4th 342, 351–56 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414, 220 L. Ed. 2d 170 (2024); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 762–62 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 104 (2025); *United States v. SunSetter Prods. LP*, 2024 WL 1116062, at *2–4 (D. Mass. Mar. 14, 2024).

### B. Constitutionality of the Statutory For-Cause Removal Protections in 15 U.S.C. § 2053(a)

"[W]hether Congress can 'condition the [President's power of removal] by fixing a definite term and precluding a removal except for cause, will depend upon the character of the office.'"

*Morrison*, 487 U.S. at 687, 108 S. Ct. at 2617 (quoting *Humphrey's Executor*, 295 U.S. at 631, 55 S. Ct. at 875). "Because the Court limited its holding [in *Humphrey's Executor*] 'to officers of the kind here under consideration,' [295 U.S.] at 632, 55 S. Ct. 869, the contours of the *Humphrey's Executor* exception [to the President's removal power] depend upon the characteristics of the agency before the Court." *Seila Law*, 591 U.S. at 215, 140 S. Ct. at 2198. Specifically, "*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216, 140 S. Ct. at 2199; *but see Morrison*, 487 U.S. at 689, 108 S. Ct. at 2618 ("[T]he determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'").

Although *Humphrey's Executor's* characterization of the FTC in 1935 as non-executive has not withstood the test of time, *see id.* at 690, 108 S. Ct. at 2619, n.28, "[t]he Court identified several organizational features that helped explain [this] characterization[,]" *Seila Law*, 591 U.S. at 216, 140 S. Ct. at 2198–99:

> Composed of five members—no more than three from the same political party—the Board was designed to be "non-partisan" and to "act with entire impartiality." [*Humphrey's Executor*, 295 U.S.] at 624, 55 S. Ct. 869; *see id.*, at 619–620, 55 S. Ct. 869. The FTC's duties were "neither political nor executive," but instead called for "the trained judgment of a body of experts" "informed by experience." *Id.*, at 624, 55 S. Ct. 869 (internal quotation marks omitted). And the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a "complete change" in leadership "at any one time." *Ibid.*

*Id. Humphrey's Executor* remains good law and is binding on this Court, and, for reasons explained below, the Court finds that it applies to the CPSC.

First, the organization of the CPSC mirrors that of the FTC. The CPSC is "a multimember body of experts, balanced along partisan lines" and appointed to serve "staggered, seven-year terms . . . ." *Id.*; *see also* 15 U.S.C. 2053(a) (providing that the CPSC shall "consist[] of five Commissioners" who hold "background and expertise in areas related to consumer products and protection of the public from risks to safety"); *id.* § 2053(b) (assigning staggered seven-year terms to CPSC Commissioners, providing that "[a]ny Commissioner appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the remainder of such term"); *id.* § 2053(c) (providing that "[n]ot more than three of the [CPSC] Commissioners shall be affiliated with the same political party"). These structural features the CPSC shares with the FTC help the agency perform its functions impartially, ensures that it retains its expertise, and "avoid[s] a 'complete change' in leadership 'at any one time.'" *Seila Law*, 591 U.S. at 216, 140 S. Ct. at 2198–99 (quoting *Humphrey's Executor*, 295 U.S. at 624, 55 S. Ct. at 872).

Like that of the FTC, the CPSC's structure stands in stark contrast to the "anomalous" single-Director organization of the CFPB that the Supreme Court deemed unconstitutional in *Seila Law*. *See Seila Law*, 591 U.S. at 213–32, 140 S. Ct. at 2197–2207; *Consumers' Research*, 91 F.4th at 354 (describing "CFPB's *single-Director* structure" as "the defining feature that the Supreme Court in *Seila Law* relied on to hold the CFPB unconstitutional"). Unlike the CFPB's single-Director structure, the bipartisan, multimember structure of the CPSC and the FTC permits each Commissioner's authority to be checked by the others, encourages group deliberation and consensus building, and prevents any one Commissioner from holding an outsized amount of power. *See Seila Law*, 591 U.S. at 224–25, 140 S. Ct. at 2203–04 (noting that CFPB's Director has "no colleagues to persuade," and the CFPB's structure "vest[s] significant governmental power

16

in the hands" of a sole Director and does not permit opportunities for the Director's authority to be checked by "a chair or fellow members of a Commission or Board").

While sharing the FTC's organizational features, the CPSC also performs functions similar or identical to those of the FTC which, in 1935, *Humphrey's Executor* described as "quasi legislative and quasi judicial."[5] *Humphrey's Executor*, 295 U.S. at 629, 55 S. Ct. at 874. Both the FTC and CPSC hold "wide powers of investigation in respect of" private parties within their

---

[5] In *Morrison*, the Supreme Court explained that "the characterization of the agencies in *Humphrey's Executor* and *Wiener* as 'quasi-legislative' or 'quasi-judicial' in large part reflected our judgment that it was not essential to the President's proper execution of his Article II powers that these agencies be headed up by individuals who were removable at will." *Morrison*, 487 U.S. at 690–91, 108 S. Ct. at 2619. The Supreme Court's reasons for concluding in *Humphrey's Executor* that the power to remove FTC Commissioners at will was not essential to the President's authority under Article II are fully applicable to the CPSC Commissioners in the instant case.

The *Morrison* Court further stated, in a footnote, that *Humphrey's Executor*'s and *Wiener*'s use of the terms "quasi-legislative" and "quasi-judicial" may also "describe the circumstances in which Congress might be more inclined to find that a degree of independence from the Executive, such as that afforded by a 'good cause' removal standard, is necessary to the proper functioning of the agency or official." *Id.* at 691 n.30, 108 S. Ct. at 2619 n.30; *see also Humphrey's Executor*, 295 U.S. at 629, 55 S. Ct. at 874 ("The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties *independently of executive control* cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and *to forbid their removal except for cause in the meantime*." (emphasis added)).

Here, like the FTC in *Humphrey's Executor* and the War Claims Commission in *Wiener*, Congress constituted the CPSC to serve as an "independent regulatory commission," 15 U.S.C. § 2053(a), to ensure that it remained an expert body "unfettered by political dictates, self-interested industry pressure or blind consumer zeal," 122 Cong. Rec. S15211 (daily ed. May 24, 1976); *see also Humphrey's Executor*, 295 U.S. at 628, 55 S. Ct. at 874 ("[FTC's] duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control."); *Wiener*, 357 U.S. at 353–56, 78 S. Ct. at 1278–79 (emphasizing independence of War Claims Commission). The removal restriction for CPSC Commissioners in 15 U.S.C. § 2053(a) reflects and serves Congress's intent that this Commission—like those at issue in *Humphrey's Executor* and *Wiener*—maintain "a degree of independence from the Executive" as "necessary to the proper functioning of the [Commission]." *Morrison*, 487 U.S. at 691 n.30, 108 S. Ct. at 2619 n.30. And, as explained herein, the Court concludes that 15 U.S.C. § 2053(a) serves the legislative purpose of supporting the CPSC's independence, expertise, and impartiality without obstructing "the President's proper execution of his Article II powers" and duties. *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618.

regulatory ambit. *Id.* at 621, 55 S. Ct. at 871 (citing 15 U.S.C. § 46, prescribing authority of FTC to conduct investigations of individuals and corporations); 15 U.S.C. § 2076 (granting CPSC investigatory powers). And both Commissions have the authority to issue substantive rules and regulations to carry out the objectives of the statutes within their purview. *See* Federal Trade Commission Act, Pub. L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914), *codified as amended at* 15 U.S.C. § 46(g) (empowering FTC "to make rules and regulations for the purpose of carrying out the provisions of this Act"); 15 U.S.C. § 2056(a) (empowering CPSC to promulgate "consumer product safety standards").[6] Both the FTC and the CPSC are authorized to enforce the statutes they administer and conduct administrative adjudications as prescribed in those statutes. *See Humphrey's Executor*, 295 U.S. at 620–21, 55 S. Ct. at 870–71 (citing 15 U.S.C. § 45, authorizing and directing FTC "to prevent" private parties "from using unfair methods of competition in commerce" by issuing complaints alleging violations, conducting hearings, making factual findings, issuing orders, and seeking any further relief in federal court); 15 U.S.C. §§ 2061, 2064(c)–(d) (authorizing the CPSC to file actions for seizure of "imminently hazardous consumer product[s]" and to order remedial measures upon finding a substantial product hazard).

Defendants emphasize the CPSC's authority to enforce the laws within its jurisdiction through enforcement actions in federal court, which the *Seila Law* Court called "a quintessentially executive power not considered in *Humphrey's Executor*." Defs.' Mem. at 11–12 (quoting *Seila Law*, 591 U.S. at 219, 140 S. Ct. at 2200). However, the CPSC's authority to prosecute civil and criminal enforcement actions in federal court is restricted by the consent and involvement of the

---

[6] Defendants argue that *Humphrey's Executor* did not mention the 1935 FTC's authority to issue substantive regulations, much less rely on this authority in its discussion of executive power. Defs.' Mem. at 12. However, the FTC's rulemaking authority is plain on the face the Federal Trade Commission Act, which is cited and heavily relied upon in *Humphrey's Executor*.

Attorney General, who is accountable to, and subject to at-will removal by, the President. Specifically, the CPSC cannot prosecute or defend a civil case in federal court without written notice to the Attorney General and the Attorney General's election whether to represent the Commission in that civil action. 15 U.S.C. § 2076(b)(7)(A). Although the CPSA prescribes a role for the CPSC to play in criminal enforcement of consumer product safety laws, such criminal actions must be prosecuted through, or with the concurrence of, the Attorney General. *Id.* § 2076(b)(7)(B).

Defendants argue that the *Humphrey's Executor* exception does not apply to the CPSC because its powers, including the aforementioned enforcement powers, exceed those of the 1935 FTC and constitute "substantial executive power." Defs.' Mem. at 8–15 (citing *Seila Law*, 591 U.S. at 219, 140 S. Ct. at 2200). To be sure, at one point, the Court in *Seila Law* described the *Humphrey's Executor* exception as applicable to "multimember expert agencies that do not wield substantial executive power[.]" *Seila Law*, 591 U.S. at 218, 140 S. Ct. at 2199–200. At other points, however, *Seila Law* describes the exception as applicable to "expert agencies led by a *group* of principal officers[,]" *id.* at 204, 140 S. Ct. at 2192 (emphasis in original), and "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions," *id.* at 217, 140 S. Ct. at 2199, without mention of any degree of "executive power." In *Morrison*, the Court recognized "[t]he difficulty of defining such categories of 'executive' or 'quasi-legislative' officials[,]" and noted that, by modern standards, the 1935 FTC—the agency at issue in *Humphrey's Executor*—would be "considered 'executive,' at least to some degree." 487 U.S. at 690 n.28, 108 S. Ct. at 2619 n.28. Still, *Humphrey's Executor* remains good law and is binding. But, as the Fifth Circuit concluded in *Consumers' Research*, the Supreme Court's precedents leave unclear "*how much*" executive power an agency must wield "before [it] loses protection under the *Humphrey's* exception." 91

19

F.4th at 353. And this Court's reading of the Supreme Court's precedents suggests that the exercise of powers described as "executive" in nature, by itself, is not dispositive of whether an agency is disqualified from the *Humphrey's Executor* exception.

First, in *Morrison*, the Supreme Court stated that assessing the constitutionality of a removal restriction should not focus on "rigid" categorization of an official's powers as "purely executive," "quasi-legislative," and "quasi-judicial." *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618. Instead, the Court's removal analysis focuses on "ensur[ing] that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Id.*

Later, in *Seila Law*, the Court did not consider the "significant executive power" entrusted to the CFPB in isolation, but instead considered it within the context of its historically anomalous single-Director leadership structure. *See* 591 U.S. at 213–32, 140 S. Ct. at 2197–2207. The Court invalidated the CFPB Director's statutory removal restriction because the agency was both "led by a single Director *and* vested with significant executive power." *Id.* at 220, 140 S. Ct. at 2201 (emphasis added). Notwithstanding the "significant executive power" wielded by the CFPB, Chief Justice Roberts suggested in Part IV of the Court's opinion[7] that Congress could solve the constitutional problem presented in the removal restriction by "converting the CFPB into a multimember agency." *Id.* at 237, 140 S. Ct. at 2211.

---

[7] This part of the Chief Justice's opinion was not joined by a majority of the Court, but it was joined by two other Justices. And a separate group of four Justices joined an opinion dissenting from the majority's conclusion that the CFPB's removal restriction was unconstitutional. *Seila Law*, 591 U.S. at 284–96, 140 S. Ct. at 2238–44 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part). The foregoing suggests that a majority of the Court at the time of *Seila Law* would have likely approved of a statutory for-cause removal restriction for a multimember commission like the CPSC.

Finally, in *Collins*, the Court clarified that "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." 594 U.S. at 251–52, 141 S. Ct. at 1784. "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies," and "the constitutionality of removal restrictions" does not "hinge[] on such an inquiry." *Id.* at 253, 141 S. Ct. at 1785.

In accordance with *Morrison* and *Collins*, this Court declines Defendants' invitation to engage in categorizing the CPSC's varied set of functions and powers as executive or non-executive. The degree to which the CPSC wields executive power (in the modern sense) alone does not determine whether the removal restriction in 15 U.S.C. § 2053(a) "interfere[s] with the President's exercise" of Article II powers and duties. *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618. The Supreme Court's reasoning in *Seila Law* demonstrates that the agency's structure also must be considered. In that case, the CFPB's organization under a single Director with statutory protection against removal, while serving a five-year term, impermissibly insulated the agency from the President's influence. *Seila Law*, 591 U.S. at 213–20, 140 S. Ct. at 2197–201. The CPSC, in contrast, is not so insulated.

The CPSC's five-member, staggered-term design would likely provide multiple opportunities each presidential term for an electorally accountable President to appoint a new Commissioner.[8] Such frequent opportunities for the elected President "to shape [the Commission's] leadership and thereby influence its activities[]" were not available under CFPB's

---

[8] Indeed, President Trump will have the opportunity to appoint Plaintiff Boyle's successor when her term expires no later than October 27 of this year and, at that point, possibly create a majority on the Commission aligned with his political preferences. ECF No. 18-2, ¶ 2; 15 U.S.C. § 2053(a)–(c). Opportunities to appoint Plaintiffs Hoehn-Saric's and Trumka's successors will follow on October 27, 2027, and October 27, 2028. ECF No. 18-2, ¶¶ 3–4.

leadership structure, given the single Director's five-year term and for-cause removal restriction. *Id.* at 225, 140 S. Ct. at 2204. Thus, the leadership structure of the CPSC, even with statutory tenure protection, permits presidential control and electoral accountability to a degree that was foreclosed by the CFPB Director's statutory tenure protection before it was invalidated in *Seila Law*. *See id.* at 220–26, 140 S. Ct. at 2201–04; *Consumers' Research*, 91 F.4th at 354 ("[CPSC] Commissioners' staggered appointment schedule means that each President *does* 'have an[] opportunity to shape [the Commission's] leadership and thereby influence its activities.'" (quoting *Seila Law*, 591 U.S. at 226, 140 S. Ct. at 2204)). Furthermore, like most independent agencies— and unlike the CFPB—the CPSC is funded through the normal appropriations process, further subjecting it to presidential influence and electoral accountability. *See id.* 591 U.S. at 226, 140 S. Ct. at 2204 (describing how CFPB's unique funding mechanism outside the appropriations process further insulates that agency from the President's influence and the control of the electorate); *Consumers' Research*, 91 F.4th at 355 ("[T]he President *can* 'influence' the [CPSC's] activities via the budgetary process." (quoting *Seila Law*, 591 U.S. at 226, 140 S. Ct. at 2204)).

Thus, unlike tenure protection for the CFPB Director, tenure protection for traditional multimember, staggered-term agencies like the CPSC and the 1935 FTC "does not interfere with" the President's Article II duties and powers, *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618, and it is not "incompatible with our constitutional structure[,]" *Seila Law*, 591 U.S. at 222, 140 S. Ct. at 2202.

Finally, and importantly—unlike the CFPB at issue in *Seila Law*—the structure and powers Congress prescribed for the CPSC are well-established in the history and tradition of the federal government. In *Consumers' Research*, the Fifth Circuit held that the CPSC's statutory removal restriction was supported by "historical pedigree." 91 F.4th at 354; *see also Leachco*, 103 F.4th at

762–63 (Tenth Circuit analyzing and citing *Consumers' Research* approvingly). This Court agrees. In *Seila Law*, the Supreme Court drew a clear contrast between "a traditional independent agency headed by a multimember board or commission," like the CPSC, 591 U.S. at 207, 140 S. Ct. at 2193, and the CFPB's "almost wholly unprecedented" single-Director leadership structure, describing this "lack of historical precedent" as "[p]erhaps the most telling indication of [a] severe constitutional problem . . . ." *id.* at 220, 140 S. Ct. at 2201 (quoting *Free Enterprise Fund*, 561 U.S. at 505, 130 S. Ct. at 3159). The Court also recognized that statutory removal restrictions were in place in "some two-dozen multimember independent agencies," without giving any indication of a constitutional defect among these provisions. *Seila Law*, 591 U.S. at 230, 140 S. Ct. at 2206. The historical precedent for statutory removal restrictions among traditional multimember independent agencies gives strong indication that 15 U.S.C. § 2053(a) does not violate Article II.

In sum, the CPSC closely resembles the 1935 FTC in both structure and function, and therefore qualifies for the *Humphrey's Executor* exception. The restriction against Plaintiffs' removal under 15 U.S.C. § 2053(a) does not offend the President's Article II removal power because the CPSC is a traditional "multimember bod[y] with 'quasi-judicial' or 'quasi-legislative' functions," akin to those of the FTC. *Seila Law*, 591 U.S. at 217, 140 S. Ct. at 2199 (quoting *Humphrey's Executor*, 295 U.S. at 632, 55 S. Ct. 869); *see also Morrison*, 487 U.S. at 689–90, 108 S. Ct. 2618–19 (explaining Supreme Court's use of terms "quasi-judicial" or "quasi-legislative"). Accordingly, the Court finds as a matter of law that the President's purported removal of Plaintiffs from their positions as CPSC Commissioners absent "neglect of duty or malfeasance in office" was unlawful, 15 U.S.C. § 2053(a), and Plaintiffs are entitled to appropriate relief.

23

V.    **REMEDIES**

    **A. Declaratory Relief**

The first form of relief Plaintiffs request is a declaratory judgment that "President Donald J. Trump's purported termination of Plaintiffs from their roles as Commissioners of the [CPSC] is ultra vires, contrary to law, and without legal effect." ECF No. 18-6.

The Declaratory Judgment Act authorizes a federal district court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The U.S. Court of Appeals for the Fourth Circuit "has long recognized the discretion afforded to district courts in determining whether to render declaratory relief." *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.*, 139 F.3d 419, 421 (4th Cir. 1998) (per curiam). "A district court should issue a declaration when it will help in 'clarifying and settling' legal relationships and will 'terminate and afford relief from the uncertainty, insecurity, and controversy' driving the suit." *Reyazuddin v. Montgomery Cnty., Md.*, 754 F. App'x 186, 192–93 (4th Cir. 2018) (quoting *Aetna*, 139 F.3d at 423).

The Court finds declaratory relief to be appropriate in this case. First, there is a live controversy between the parties over whether the President has lawfully removed, or may lawfully remove, Plaintiffs from their offices as CPSC Commissioners absent "neglect of duty or malfeasance in office" under 15 U.S.C. § 2053(a). In seeking, last month, to remove Plaintiffs from their positions permanently and without cause, the President's legal interests are presently adverse to Plaintiffs'. A declaration would serve to clarify and settle the parties' legal relationships and relieve the parties from "the uncertainty, insecurity, and controversy" driving this litigation. *Reyazuddin*, 754 F. App'x at 192–93 (quoting *Aetna*, 139 F.3d at 423). Having found that

24

**JA076**

Plaintiffs' removal from their roles as CPSC Commissioners without cause is unlawful, the Court will grant Plaintiffs a declaration consistent with this ruling.

### B. Injunctive Relief

Second, Plaintiffs seek an Order from this Court enjoining Defendants Bessent, Vought, and Feldman from "taking any action to effectuate [Plaintiffs'] purported terminations[.]" Pls.' Mot. Defendants argue that the Court lacks the equitable power to order Plaintiffs' reinstatement and the only relief available to Plaintiffs is backpay. Defs.' Mem. at 17–20. It is correct that "the general availability of injunctive relief . . . depend[s] on traditional principles of equity jurisdiction[,]" *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19, 119 S. Ct. 1961, 1968, 144 L. Ed. 2d 319 (1999) (citation omitted), and "a court of equity has no jurisdiction over the appointment and removal of public officers," *In re Sawyer*, 124 U.S. 200, 212, 8 S. Ct. 482, 488, 31 L. Ed. 402 (1888). Defendants, however, misconstrue the equitable relief Plaintiffs seek. Plaintiffs do not seek to enjoin the President to reappoint them. With the President's purported termination of each Plaintiff declared effectively invalid as a matter of law, Plaintiffs seek only to enjoin the President's subordinates from obstructing their performance of their duties as CPSC Commissioners and their access to the resources necessary for such performance. This Court is persuaded that the injunctive relief Plaintiffs seek is available in this case. *See Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023) (court's "jurisdiction does not depend on deciding whether an injunction ordering a presidential appointment would be available or appropriate" where the court "can enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment") (citing *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)).

25

**JA077**

After succeeding on the merits of its claim, a plaintiff seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006). When the government is the defendant, the inquiry into the last two factors merge. *Kravitz v. United States Dep't of Com.*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (citing *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016), and *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *EBay*, 547 U.S. at 391, 126 S. Ct. at 1839.

Here, Plaintiffs have suffered irreparable harm in having been deprived of participation in the affairs of the CPSC and access to the facilities and resources available and necessary to perform their statutory duties as CPSC Commissioners for the past month. Plaintiffs are unlawfully barred from participating in ongoing, consequential decisions of the CPSC that will substantially impact Commission operations and its work on behalf of the public. ECF No. 18-2, ¶ 16. Specifically, Plaintiffs are prevented from voting on Acting Chairman Feldman's proposed plan for reductions in force at the CPSC, which Plaintiffs believe will aggravate existing understaffing issues and compromise the Commission's ability to function.[9] *Id.* ¶ 17. In Plaintiffs' absence, the Acting Chairman will be able to implement his proposed plan without their input or opposition. *Id.* ¶¶ 17–

---

[9] This Court takes no position on any differences of opinion between Plaintiffs and the Acting Chairman respecting administration of the CPSC or any other matters of policy. Considering that each Plaintiff has been duly appointed to serve on the CPSC, however, the Court does find harm in the bar Defendants have unlawfully placed on their participation in the Commission's deliberations on matters of policy.

19. In the time that the CPSC has been operating without Plaintiffs' participation, the Commission has stalled the progress of certain product-safety rules that Plaintiffs believe are necessary to protect consumers, *id.* ¶¶ 23–24, 27–28; canceled budgetary and planning meetings that Plaintiffs view as important, *id.* ¶ 29; and voted to withdraw a Notice of Proposed Rulemaking for safety standards that Plaintiffs had supported, *id.* ¶ 24. The foregoing irreparable harms are certain to continue in the absence of injunctive relief, as the President has purported to discharge each Plaintiff permanently from their office as a CPSC Commissioner. Without an injunction, Plaintiffs would be prevented from serving out the remainder of their limited terms and therefore forever lose the opportunity to fulfill the statutory duties assigned to them.

Plaintiffs' injuries cannot be redressed adequately through money damages or through a remedy at law (apart from the drastic, last-resort remedy of a writ of mandamus).[10] *See Grundmann v. Trump*, --- F. Supp. 3d ---, 2025 WL 782665, at \*16–17 (D.D.C. Mar. 12, 2025) ("[a] check in the mail does not address the gravamen" of losing the opportunity to "serve [one's] country at the highest possible level in [one's] field"); *Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914 (D.D.C. Mar. 6, 2025), *hearing in banc denied sub nom. Harris v. Bessent*, No. 25-5037, 2025 WL 1033740 (D.C. Cir. Apr. 7, 2025) (being "deprived of the ability to carry out [one's] congressional mandate . . . cannot be retroactively cured by monetary damages"), *appeal filed* No. 25-5057 (D.C. Cir.). "[T]he loss of the ability to do what Congress specifically directed [Plaintiffs] to do cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, 766 F.

---

[10] As explained in Part III.C *infra*, the legal remedy of mandamus is available, *see In re Sawyer*, 124 U.S. 200, 212, 8 S. Ct. 482, 488, 31 L. Ed. 402 (1888), but the writ a "drastic" remedy to be granted only when there are "no other adequate means to attain the relief" sought, *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 402–03, 96 S. Ct. 2119, 2123–24, 48 L. Ed. 2d 725 (1976). Here, the Court finds that a writ of mandamus would be appropriate in the alternative to a permanent injunction.

Supp. 3d 57, 70–71 (D.D.C. Feb. 12, 2025), *appeal dismissed*, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025); *see also, e.g.*, *LeBlanc v. U.S. Privacy & Civil Liberties Oversight Bd.*, --- F. Supp. 3d ---, 2025 WL 1454010, at *28–32 (D.D.C. May 21, 2025) (unlawful termination of an independent agency head "implicate[s] core separation of powers issues" and is "strikingly different from . . . 'routine' employment circumstances"). And the Fourth Circuit has identified reinstatement as an appropriate equitable remedy for wrongful discharge. *See Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 562 (4th Cir. 2018) (citing *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991)).

Finally, a permanent injunction reinstating Plaintiffs to their positions as CPSC Commissioners is favored by the balance of relevant hardships and does not run counter to the public interest. The CPSC plays a vital, congressionally prescribed role in "protect[ing] the public against unreasonable risks of injury associated with consumer products[,] . . . assist[ing] consumers in evaluating the comparative safety of consumer products[,]" and "develop[ing] uniform safety standards for consumer products[,]" among other purposes. 15 U.S.C. § 2051(b). Depriving this five-member Commission of three of its sitting members threatens severe impairment of its ability to fulfill its statutory mandates and advance the public's interest in safe consumer products. This hardship and threat to public safety significantly outweighs any hardship Defendants might suffer from Plaintiffs' participation on the CPSC. The Court notes again that Plaintiff Boyle's term ends in October of this year, at which point the President will have an opportunity to appoint her successor and exert significant influence over the agency. Defendants have identified no public interest in depriving this five-member Commission of three members.

The Court finds it to be in the public interest to have the persons duly appointed to occupy these key leadership positions resume their roles.[11]

Accordingly, the Court finds Plaintiffs' requested injunctive relief appropriate and shall grant it.

### C. Mandamus

Even if de facto reinstatement is unavailable as a form of equitable relief, it is available alternatively by a writ of mandamus. *See In re Sawyer*, 124 U.S. at 212, 8 S. Ct. at 488 ("The jurisdiction to determine the title to a public office belongs exclusively to the courts of law, and is exercised either by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*, according to the circumstances of the case, and the mode of procedure, established by the common law or by statute.").

A federal district court has "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. But "[m]andamus is a 'drastic' remedy that must be reserved for 'extraordinary situations' involving the performance of official acts or duties." *Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016) (quoting *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 402, 96 S. Ct. 2119, 2123, 48 L. Ed.2d 725 (1976)).

---

[11] In denying Plaintiffs' request for preliminary injunctive relief, the Court found that the preliminary record did not provide a clear showing that the balance of equities favored such relief. This finding was supported by the emergency Order recently entered by the Supreme Court in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), where the Court determined that a stay of preliminary injunctive relief in that case was "appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." Disruption might have resulted in the instant case if Plaintiffs had been reinstated while this case was in its preliminary posture, only to have the Court later deny relief in its final judgment and subject Plaintiffs to removal again. The risk of such disruption is no longer a factor now that the Court is granting *permanent* injunctive relief as a final judgment.

[T]o establish the conditions necessary for issuance of a writ of mandamus, the party seeking the writ must demonstrate that (1) he has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief he desires; and (5) the issuance of the writ will effect right and justice in the circumstances.

*U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999) (citing *Kerr*, 426 U.S. at 403, 96 S. Ct. at 2124).

The Court finds that the wrongful removal of a presidentially appointed Commissioner of an independent federal agency presents an "extraordinary" situation involving interference with the performance of official duties and, therefore, is suited for mandamus relief. *Cumberland Cnty. Hosp. Sys.*, 816 F.3d at 52. Each Plaintiff, having been duly appointed to serve as a CPSC Commissioner and not lawfully removed from that position, "has a clear and indisputable right to" to their office, and Defendants have a "clear" and "official" duty to provide each Plaintiff access to the resources necessary and available for each Plaintiff to perform their official duties. *Rahman*, 198 F.3d at 511. If equitable relief in the form of a permanent injunction is unavailable, then there would be "no other adequate means to attain the relief" to which each Plaintiff is entitled. *Id.* And, in these circumstances, issuance of a writ of mandamus would be right and just. *Id.*

30

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is granted, and Defendants' Cross-Motion for Summary Judgment is denied. Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is denied as moot. The Court shall issue a separate declaratory judgment and permanent injunction consistent with this Memorandum Opinion.

_6/13/25_
Date

Matthew J. Maddox
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **MARY BOYLE,** *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civ. No. MJM-25-1628** |
| **v.** | * | |
| | * | |
| **DONALD J. TRUMP,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \*

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this  13th  day of June, 2025, by the United States District Court for the District of Maryland, hereby ORDERED that:

1. Plaintiffs' Motion for Summary Judgment (ECF No. 18) is GRANTED;

2. Defendants' Cross-Motion for Summary Judgment (ECF No. 21) is DENIED;

3. Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 6) is DENIED as moot;

4. It is DECLARED that President Donald J. Trump's purported termination of Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") is ultra vires, contrary to law, and without legal effect; and

5. Defendants Scott Bessent, Russell Vought, and Peter A. Feldman are ENJOINED from taking any action to effectuate Plaintiffs' unlawful terminations (until such time as Plaintiffs' terms expire pursuant to 15 U.S.C. § 2053), including by:

- Barring Plaintiffs' access to agency resources (including, but not limited to, Plaintiffs' office spaces, CPSC telephone and computer equipment, CPSC email accounts, and physical and electronic files) to which Plaintiffs had access prior to May 8, 2025;

- Giving effect to the purported termination of Plaintiffs' staff members; or

- Withholding from Plaintiffs and their staff members the pay and benefits that they were entitled to receive in connection with their roles at the CPSC prior to May 8, 2025.

And it is further ORDERED Plaintiffs' unopposed Motion for Leave to Waive Requirement Under Local Rule 102.2(a) to Provide Addresses in Complaint Caption (ECF No. 2) is GRANTED.

The Clerk shall CLOSE this case.

Matthew J. Maddox
United States District Judge

JA085

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| BOYLE, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 8:25-cv-1628-MJM |
| TRUMP, *et al.*, | |
| Defendants. | |

## <u>NOTICE OF APPEAL</u>

Defendants—President Donald J. Trump, in his official capacity as President of the United States; Scott Bessent, in his official capacity as Secretary of the Treasury; Russell Vought, in his official capacity as Director of the Office of Management and Budget; and Peter A. Feldman, in his official capacity as Acting Chairman of the U.S. Consumer Product Safety Commission—respectfully provide notice that they hereby appeal to the United States Court of Appeals for the Fourth Circuit the Court's Order (ECF No. 25) and accompanying Memorandum Opinion (ECF No. 24) entered on June 13, 2025, which granted Plaintiffs' motion for summary judgment and denied Defendants' cross-motion for summary judgment.

Dated: June 16, 2025

Respectfully submitted,

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

/s/ *Abigail Stout*
ABIGAIL STOUT

**JA086**

(DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

*Attorney for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARY BOYLE, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>*Defendants.* | Civil Action No. 8:25-cv-1628-MJM |

### THIRD DECLARATION OF RICHARD TRUMKA JR.

I, Richard Trumka Jr., declare as follows:

1.      On Friday, June 13, 2025, this Court issued a memorandum opinion and order declaring that President Donald J. Trump's purported termination of me and two of my fellow Commissioners at the Consumer Product Safety Commission (CPSC), Plaintiffs Mary Boyle and Alexander Hoehn-Saric, was unlawful and without legal effect. The order enjoined Defendants Scott Bessent, Russell Vought, and Peter A. Feldman from giving effect to the terminations.

2.      At 1:36 PM on the day the opinion issued, the CPSC's General Counsel, Matthew A. Campbell, emailed a copy of the opinion and order to the agency's senior leadership. The email stated that "[t]he CPSC and its officers and employees should give full effect to th[e] order, which requires that Commissioners Hoehn-Saric, Trumka and Boyle and their staff be fully reinstated to the same position, with the same rights and privileges, as they held before the President terminated them on May 9, 2025." A true and correct copy of the email is attached as Exhibit A.

**JA088**

3.      Later that afternoon, I arrived at CPSC headquarters with a member of my staff. Agency staff issued us identity cards, fobs for accessing the building, keys to our offices, and agency laptops. We also received access to our agency email accounts and files.

4.      Upon my return to the office, I emailed members of staff, and they responded to me as they normally would. Many CPSC staff members have welcomed me back to the agency, both in emails and in conversations.

5.      Following our purported terminations, CPSC webpages concerning me and Commissioners Boyle and Hoehn-Saric had been moved to the "Past Commissioners" tab of the CPSC website. By 4:01 PM on Friday, June 13, the webpages, profiles, and statements of myself and Commissioners Boyle and Hoehn-Saric were restored to the "Current Commissioners" tab. At my request, the CPSC web team posted two statements to my official CPSC webpage, one at 4:58 PM and one at 5:35 PM.

6.      On Monday, June 16, all members of my staff and I reported to work at the CPSC as usual. We met with Information Technology and Human Resources, were placed back on the payroll, and received access to the agency resources and benefits that we had prior to our unlawful terminations. Throughout the day, we met with staff and other Commissioners and conducted business as usual. I exchanged emails with stakeholders, including the CPSC's General Counsel and Inspector General, and reviewed materials that had been circulated to the Commissioners during the period of my unlawful termination, including materials related to an open matter on which the Commissioners are set to vote by Wednesday, June 18.

7.      I saw that Commissioners Boyle and Hoehn-Saric were also physically present at CPSC headquarters and in their offices on Monday, June 16. I met with Commissioner Boyle and with Commissioner Hoehn-Saric and his staff, and I discussed agency business with them. From

2

our conversations, I am aware that Commissioners Boyle and Hoehn-Saric had been speaking about substantive agency business with CPSC staff.

8.      I observed Commissioners Boyle and Hoehn-Saric meeting with Information Technology to regain access to the CPSC's computer systems, and I have received emails from both of them through their CPSC email addresses.

9.      At 11:50 AM on Monday, June 16, the CPSC's Acting Chairman Peter A. Feldman emailed agency staff to confirm that Commissioners Boyle and Hoehn-Saric and I "are to be extended all privileges and professional courtesies as members" of the CPSC and that the agency is to "proceed with as little disruption as possible." A true and correct copy of the email is attached as Exhibit B.

10.     In short, everything at CPSC is operating as it had been before Commissioners Boyle and Hoehn-Saric and I were unlawfully terminated from our positions at the agency on May 8 and 9 of this year.

Executed this 17th day of June, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Richard Trumka Jr.

3

**JA090**

# EXHIBIT A

**Nick Sansone**

| | |
|---|---|
| **From:** | Campbell, Matthew <MCampbell@cpsc.gov> |
| **Sent:** | Friday, June 13, 2025 1:36 PM |
| **To:** | Lorenze, Brien; Ray, DeWane; Evans, Annette; Springs, Pamela |
| **Cc:** | COPF - Acting Chairman Feldman's Office; CODD - Comm Dziak's Office; COMB - Comm Boyle's Office; COAH - Comm Hoehn-Saric's Office; CORT - Comm Trumka's Office |
| **Subject:** | Boyle, et al. v. Trump, et al., No. 8:25-cv-01628 (D. Md.) |
| **Attachments:** | Boyle Court Order.pdf; Boyle Court Mem Opinion.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

All,

Judge Maddox just issued an order in *Boyle, et al. v. Trump, et al.*, No. 8:25-cv-01628 (D. Md.), holding that President Trump's termination of Commissioners Hoehn-Saric, Trumka and Boyle was unlawful. (See attached order and decision.) The Court has enjoined the defendants from taking any action to effectuate those terminations. The order specifically states that the CPSC may not:

- Bar Plaintiffs' access to agency resources (including, but not limited to, Plaintiffs' office spaces, CPSC telephone and computer equipment, CPSC email accounts, and physical and electronic files) to which Plaintiffs had access prior to May 8, 2025;
- Give effect to the purported termination of Plaintiffs' staff members; or
- Withhold from Plaintiffs and their staff members the pay and benefits that they were entitled to receive in connection with their roles at the CPSC prior to May 8, 2025.

The CPSC and its officers and employees should give full effect to this order, which requires that Commissioners Hoehn-Saric, Trumka and Boyle and their staff be fully reinstated to the same position, with the same rights and privileges, as they held before the President terminated them on May 9, 2025.

Please let me know if you have any questions or comments. Thanks.

Matt

Matthew A. Campbell
General Counsel
U.S. Consumer Product Safety Commission
4330 East West Highway
Bethesda, MD 20814
(301) 504-6464 (office)
(240) 393-2685 (cell)

# EXHIBIT B

## Nick Sansone

| | |
|---|---|
| **From:** | Feldman, Peter <PFeldman@cpsc.gov> |
| **Sent:** | Monday, June 16, 2025 11:50 AM |
| **To:** | Everyone - Feds Only |
| **Subject:** | Update on Boyle v. Trump Litigation and Commission Developments |
| **Attachments:** | Boyle Court Order.pdf |

Dear Staff,

I want to share an important update regarding the *Boyle et al. v. Trump* litigation.

This past Friday, a federal judge in the U.S. District Court for the District of Maryland issued an order that, among other things, permits the Commissioners fired by President Trump (Boyle, Hoehn-Saric, and Trumka) and their staff members to return to their roles at CPSC. A copy of the full order is attached to this e-mail.

While I anticipate that this ruling will be appealed, during the interim, the returning Commissioners and their staffs are to be extended all privileges and professional courtesies as members of this agency.

It is my intention to proceed with as little disruption as possible during the pendency of this litigation. The work of the CPSC is too important to pause or politicize. Over the past several weeks, the Commission has performed exceptionally—your efforts have resulted in historic progress, including setting a number of recall records and achieving new efficiencies.

I want to maintain this momentum and continue delivering results that protect the public. Thank you for your unwavering commitment to this agency and its vital mission.

Sincerely,

Peter A. Feldman
Acting Chairman
U.S. Consumer Product Safety Commission

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BOYLE, *et al.*,

     Plaintiffs,

   v.

TRUMP, *et al.*,

     Defendants.

Case No. 8:25-cv-1628-MJM

## DECLARATION OF TRIPP DEMOSS

1. My name is Tripp DeMoss.  I am currently employed at the Consumer Product Safety Commission ("CPSC") as the Senior Counsel to Acting Chairman Peter A. Feldman since May 5, 2025.  As Senior Counsel, I provide advice and counsel to Acting Chairman Feldman on various legal issues facing him in his role as acting chairman of the CPSC. The following is based on my personal knowledge or information provided to me in the course of performing my official duties.

2. Acting Chairman Feldman serves as, among other things, principal executive officer of the CPSC that exercises all executive and administrative functions of the commission. 15 U.S.C. § 2053(f)(1).

3. I am familiar with the litigation in the above-styled matter, whereby on Friday, June 13, 2025, this Court issued an order directing that CPSC Commissioners Richard Trumka, Jr., Alexander Hoen-Saric, and Mary Boyle be reinstated to their positions from which they had been previously removed at the direction of President Donald Trump on May 8-9, 2025.

4. Pursuant to the CPSC's decision-making procedures (hereinafter referred to as the "DMPs"), which have traditionally governed the decision-making process of the CPSC since their

adoption in 2010, the staffs of each CPSC Commissioner may meet on a weekly basis to set the agenda of the Commission. DMP III.A provides that "(t)he Commission agenda shall be set, scheduled, and acted upon" through a process including that the "Agenda Planning Committee shall…meet at a regularly scheduled time every week as practicable." DMP III.A.1. A copy of the DMPs are attached to this declaration as **Exhibit 1.**[1] It is agency practice that the acting chairman's staff convenes meetings of the Agenda Planning Committee, including scheduling, facilitating, presiding, and rescheduling where appropriate.

### Proposed Agenda Directives

5.     On Monday June 16, 2025, at 5:49 p.m. EST, all members of the CPSC's Agenda Planning Committee, which includes staff for all CPSC Commissioners, as well as myself, received an email from now-reinstated CPSC Commissioner Richard Trumka, Jr. A copy of the email is attached to this declaration as **Exhibit 2.**[2]

6.     Commissioner Trumka's proposal requested that several time-critical matters be added to the Commission's agenda on an emergency basis. Exhibit 2.

7.     The Commission has not completed any formal process to deconflict the three reinstated Commissioners from official Commission business related to this litigation, nor has the Commission sought to deconflict specific Commission officers.

8.     The three reinstated Commissions are adverse parties in a lawsuit against Acting Chairman Feldman with a financial interest in the litigation, and as such should be properly recused from matters relating to the litigation.

---

[1] The DMPs are marked "FOR OFFICIAL USE ONLY- DO NOT DISTRIBUTE OUTSIDE THE COMMISSION." A copy of the DMPs are being submitted under seal.

[2] Exhibit 2 is an email thread beginning with a scheduling invitation from Acting Chairman Feldman's office.

9. On Tuesday, June 17, 2025, at 9:44 a.m., Acting Chairman Feldman sent an email to the members of the Agenda Planning Committee rescheduling the 10:00 a.m. Agenda Planning Meeting, citing specific issues that needed to be addressed prior to the meeting. Exhibit 2. The Acting Chairman rescheduled the meeting because, among other reasons, the Commission has not completed any formal process to deconflict the three reinstated Commissioners from official Commission business related to this litigation, nor has the Commission sought to deconflict specific Commission officers or seek recusals.

10. Commissioner Boyle sent an email at 10:09 a.m. with a response, as shown in Exhibit 2. Email traffic in a similar vein followed, including an email sent at 10:23 a.m. by Commissioner Trumka to CPSC staff. Exhibit 2.

11. These emails and the requested actions further demonstrate the disruption caused by reinstatement. Indeed, it indicates a usurpation of the Acting Chairman's executive authority to supervise personnel and distribute agency business.

**Invalid Meeting of the Agenda Planning Committee on June 17, 2025**

12. Upon information and belief, it is my understanding that a meeting purporting to be a meeting of the Agenda Planning Meeting Committee, took place on or about June 17, 2025 at some point after 10:00 a.m., with the staffs of reinstated Commissioners Trumka, Boyle and Hoen-Saric participating.

13. The three reinstated Commissioners purported to convene this meeting of the Agenda Planning Committee without the participation of Acting Chairman Feldman, Commissioner Dziak or other Agenda Planning Committee members. The result of that meeting was the ostensible approval for a "Time Critical Ballot Vote" regarding "Commission Directions and Commission Policy Regarding Reductions in Force and Staff Details." A copy of the ballot is

- 3 -

attached as **Exhibit 3**. The meeting took place despite a prior and valid cancellation of the meeting by Acting Chairman Feldman, which was cancelled pursuant to his authority as chief executive officer of the CPSC. Exhibit 2. The meeting was cancelled to allow staff to undertake a potential deconfliction and recusal analysis. Exhibit 2.

14.     At approximately 2:00 p.m., a Ballot Vote package was approved by the three reinstated Commissioners, with the abstention of Acting Chairman Feldman and Commissioner Dziak. My understanding is that Acting Chairman Feldman and Commissioner Dziak maintain that the meeting was unauthorized and invalid.

15.     The Ballot Vote package appears to have been included on the Commission Agenda as an emergency addition.  It adopts a "Commission Policy Regarding Reductions in Force and Staff Details" ("Personnel Policy"), that is "effective immediately."  Exhibit 3.

16.     This Personnel Policy requires majority vote of the Commission for any "actions...taken towards Reduction-in-Force of CPSC staff" "[n]otwithstanding the Directives or other policies governing the Commission." *Id.*  The policy also requires that "[a]ny actions to implement or initiate Reductions in Force that are underway...be withdrawn immediately unless approved by a majority vote of the Commission." *Id.* The Personnel Policy also immediately terminates "[a]ny staff who have been hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's 'Department of Government Efficiency' Cost Efficiency Initiative* Executive Order" without majority approval. *Id.*  The policy immediately revokes their access to digital systems and direct security to "ensure that they are securely removed without damage to CPSC property." *Id.* Additionally, the Personnel Policy declares that "[i]t is the policy of the Commission that no staff shall be hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of*

- 4 -

*Government Efficiency" Cost Efficiency Initiative* Executive Order without approval by a majority vote of the Commission." *Id.*

17.    Implementation of this Personnel Policy is disruptive because it conflicts with, undermines, and disrupts the Commission's balance of powers laid out by statute. Under the Consumer Product Safety Act, the Chairman is the "principal executive officer of the Commission, and he shall exercise *all of the executive and administrative functions* of the Commission, including (A) the *appointment and supervision of personnel employed under the Commission . . .*, (B) the distribution of business among personnel appointed and supervised by the Chairman and among administrative units of the Commission, and (C) the use and expenditure of funds." 15 U.S.C. § 2053 (f)(1) (emphasis added).  Additionally, the statute provides that while the Chairman needs the approval of the Commission to appoint or remove certain enumerated statutory officers, 15 U.S.C. § 2053 (g)(1), he is expressly authorized—subject to the Commission's general policies, decisions, findings and determinations—to "employ such other officers and employees (including attorneys) as are necessary in the execution of the Commission's functions." 15 U.S.C. § 2053 (g)(1), (g)(2).

18.    The Chairman's power over personnel also extends to reductions in force ("RIFs") and has always been understood to extend to RIFs.  In addition to the statute—which vests the power to hire and fire (subject to certain exceptions not relevant here) in the Chairman, and the Executive Director, who reports to the Chairman—the Commission's internal directives provide that the Chairman is authorized to conduct all RIFs.  For example, CPSC Dir. 0949.1, Reductions In Force (attached as **Exhibit 4**"), has provided since at least January 15, 1987, that "RIF action will be initiated only when necessary and *as approved by the Chairman or Executive Director*." (Emphasis added).

- 5 -

19.    In 2024, then-Chairman Hoehn-Saric—a plaintiff in this case—instituted a RIF to reduce headcount and manage the Agency to meet an anticipated lower appropriation in fiscal year 2026. He did so under his statutory authority as Chairman, without seeking a vote of the Commission.

20.    Likewise, under the statute, the Chairman has exclusive power to manage personnel, including the personnel that have been or may be hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order. The power to employ "such other officers and employees of the Commission" is the Chairman's alone and the statute vests no independent authority in non-chair Commissioners to terminate these employees. 15 U.S.C. § 2053 (g)(2).

21.    In short, the reinstated Commissioners have invalidated almost every action of the CPSC prior to their reinstatement, calling into question the legal validity of the important safety work of the Commission, reversing work to effectuate many of President Trump's lawful executive orders regarding the operations of federal agencies, and undermining CPSC's vital mission on behalf of American families.

22.    As the Supreme Court put it on May 22, 2025, in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), "[a] stay is appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." The reinstated Commissioners' actions are actively disrupting and will continue to disrupt the business of the CPSC. Orderly functioning of the CPSC will be next to impossible if the three reinstated commissioners are permitted to remain at the CPSC, if the vote taken by the reinstated Commissioners on June 17, 2025, is any indication.

- 6 -

* * *

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 17th day of June, 2025.

Tripp DeMoss
Senior Counsel

JA101

# Exhibit 2

**From:** Trumka Jr., Richard <████████████████>
**Sent:** Tuesday, June 17, 2025 10:23 AM
**To:** Boyle, Mary <████████████>; Feldman, Peter <████████████████; Agenda Planning Committee
<████████████████████████>
**Cc:** Vehafric, Noah <████████████████>
**Subject:** Re: Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

To the staff on the agenda planning committee, let me be clear: you are instructed to attend the meeting as usual. If you chose to ignore the directive of the Commission, I suggest you read the Court order and decide whether you want to personally violate it.

Get Outlook for iOS

**From:** Boyle, Mary <████████████████>
**Sent:** Tuesday, June 17, 2025 10:16:15 AM
**To:** Feldman, Peter <████████████████>; Trumka Jr., Richard <████████████████>; Agenda Planning Committee <████████████████████████>
**Cc:** Vehafric, Noah <████████████████>
**Subject:** RE: Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

To the staff on the agenda planning Committee,

On behalf of a majority of the Commission (Commissioners Boyle, Trumka, and Hoehn-Saric) we direct you to attend the previously scheduled agenda planning meeting for which a link was sent last evening.

**From:** Boyle, Mary
**Sent:** Tuesday, June 17, 2025 10:09 AM
**To:** Feldman, Peter <████████████████>; Trumka Jr., Richard <████████████████>; Agenda Planning Committee <████████████████████████>
**Cc:** Vehafric, Noah <████████████████>
**Subject:** RE: Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

I do not see any authority that permits a single Commissioner to unilaterally cancel agenda planning.  I intend to instruct my staff to attend the scheduled meeting and make motions accordingly.  To the extent that other offices do not attend, that has no bearing on the scheduled meeting or what transpires there.

Mary

**From:** Feldman, Peter <████████████████>
**Sent:** Tuesday, June 17, 2025 9:44 AM
**To:** Trumka Jr., Richard <████████████████>; Agenda Planning Committee

**JA103**

 ███████████████████ >

Cc: Vehafric, Noah ████████████ >

**Subject:** RE: Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

While it still technically feasible to hold Agenda Planning this morning, in light of the breadth of this proposed language and its potential for extensive disruption of agency operations, the shortened holiday week, and the ongoing deconflict and recusal analysis, I have determined that the agenda planning meeting this week is no longer practicable. We will resume regular agenda planning meetings at a future date after the conflict analysis is complete and any necessary recusals are effectuated.

Thank you,

Peter

---

**From:** Trumka Jr., Richard < ████████████ >
**Sent:** Monday, June 16, 2025 5:49 PM
**To:** Agenda Planning Committee < ██████████████████ >
**Cc:** Vehafric, Noah < ████████████ >
**Subject:** Time Critical Additions to Agenda Planning Meeting in Light of Judicial Order in Boyle v. Trump

All,

Pursuant to Section V(A) of the Decision Making Procedures, I have determined that the Commission must address several time critical matters and hereby request that these be added to the Commission's agenda on an emergency basis under Section III(A), (B), and (C).

I request that the Agenda Planning Committee convene at 10:00 a.m. tomorrow, June 17, 2025, its regularly scheduled weekly meeting time, to decide whether to add the following proposed Commission meetings and policies to the agenda as a matter designated for a time critical vote. The proposed item would be circulated to the Commission on June 17, 2025 at 11:00 a.m. to be due on June 17, 2025 at 2:00 p.m. Per this poll, the usual procedures allowing extension of a vote date or conversion of a ballot vote to a decisional meeting would not apply to this deadline or to any of the deadlines specified below, except by a majority vote of the Commission:

* * *

Notwithstanding the Decision Making Procedures, the Commission directs as follows:

Despite the President's unlawful attempt to fire three Commissioners on the evening of May 8, 2025, the Commission continued to consist of five Commissioners from May 8 to the present. Order, *Boyle v. Trump*, 8:25-cv-01628-MJM (D. Md. June 13, 2025) ("President Donald J. Trump's purported termination of Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") is ultra vires, contrary to law, and without legal effect."). Three Commissioners are—and have been—necessary to constitute a quorum for the transaction of Commission business. 15 U.S.C. § 2053(d). All matters that were presented to fewer than all five Commissioners for a vote from May 8, 2025 to the present were improperly presented and failed to receive support from a majority of the Commission. The results of any votes on such matters are therefore null and void, unless otherwise specified below.

The Commission directs as follows:

- On June 18, 2025, staff shall submit a proposed Performance Budget Request to the Commission for a ballot vote due on June 25, 2025 at 5:00 p.m. This vote cannot be extended or converted to a decisional except by majority vote of the Commission.
- A public Mid-Year Decisional is hereby rescheduled for June 25, 2025 at 10:00 a.m. This vote cannot be extended or converted to a ballot except by majority vote of the Commission.
- By Friday, June 20, 2025, staff shall prepare and send to the *Federal Register* for publication a notice announcing that the Commission will conduct a hybrid public hearing concerning the Commission's agenda and priorities for fiscal years 2026 and 2027 on July 16, 2025, at 10:00 a.m. Further, the notice shall reopen the public registration and comment period until 5:00 p.m. on July 9, 2025.
- Any Records of Commission Action for votes taken between May 8, 2025, and the present shall be updated by the Secretary no later than 5:00 p.m. today to indicate that any decisions purportedly taken are null, void, and of no effect.
  - Notwithstanding the above, any Compliance Actions taken during that time period with the approval of two Commissioners—including recalls and Corrective Action Plans—is now approved by the full Commission and shall remain in effect unless the full Commission takes further action.
  - In addition, notwithstanding the above, the *Federal Register* Notices titled "Agency Information Collection Activities; Proposed Collection; Carbon Monoxide Poisoning and Prevention Grant Application Program" and "Agency Information Collection; Proposed Collection; Pool Safely Grant Program Application" that were approved by two Commissioners on June 3, 2025, are now approved by the full Commission and shall remain in effect.
- No later than 5:00 p.m. today, the Secretary shall notify the Office of the Federal Register that the vote by only two Commissioners on May 13, 2025 to withdraw CPSC's *Notice of Proposed Rulemaking to Establish a Safety Standard for Lithium-Ion Batteries in Micromobility Products and Electrical Systems of Micromobility Products Containing Such Batteries* (NPR on Lithium-Ion Batteries) is null and void and  direct publication of the NPR on Lithium-Ion Batteries that was adopted by the Commission on April 30, 2025.
- No later than 5:00 p.m. tomorrow, June 18, 2025, the Executive Director shall provide all Commissioners with: (1) a list of all contracts that were cancelled between May 8, 2025 and the present, with a description of the work and dollar amounts for each contract; and (2) a status update on the contracts for projects that two Commissioners supported via a ballot vote due on May 21, 2025 titled "Ballot Vote: Fiscal Year 2025 Proposed Operating Plan Alignment and Midyear Review." All activity to implement that ballot vote shall be paused until further notice from a majority of the Commission.
- The following policy is adopted by the Commission, effective immediately:

Commission Policy Regarding Reductions in Force and Staff Details

Notwithstanding the Directives or other policies governing the Commission, no actions may be taken towards Reduction-in-Force of CPSC staff without a majority vote of the Commission. Any actions to implement or initiate Reductions in Force that are underway must be withdrawn immediately unless approved by a majority vote of the Commission.

Notwithstanding the Directives or other policies governing the Commission, any individual who is detailed or otherwise onboarded to the CPSC for the express purpose of facilitating compliance with President Trump's January 20, 2025, Executive Order, *Establishing and Implementing the President's Department of Government Efficiency,* must be approved by a majority vote of the Commission.

Any staff who have been hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order without majority approval by the full Commission are hereby terminated effective immediately and their access to digital systems and CPSC's physical premises shall be immediately revoked.  Security shall ensure that they are securely removed without damage to CPSC property.

It is the policy of the Commission that no staff shall be hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order without approval by a majority vote of the Commission.

- No later than 5:00 p.m. tomorrow, June 18, 2025, CPSC's Chief Information Officer shall submit to all Commissioners an audit log containing the activities of Nate Cavanaugh, Justin Fox, and/or any person brought to CPSC for the purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order and who may have accessed and/or exfiltrated CPSC data from May 8, 2025 to the present. The Chief Information Officer shall assist Commissioners in interpreting and understanding what actions were taken with respect to CPSC's data systems during that period.

---

**From:** Vehafric, Noah <██████████████>
**Sent:** Monday, June 16, 2025 5:01 PM
**To:** Agenda Planning Committee <████████████████████████>
**Subject:** Agenda Planning, June 17

**For Official Use Only**

Good afternoon,

Please find the proposed agenda for this week's meeting attached. Tomorrow's Agenda Planning meeting will be **fully virtual** on Microsoft Teams using this link.

Thank you,

**Noah Vehafric**

Special Assistant to Acting Chairman Peter A. Feldman

U.S. Consumer Product Safety Commission | Office of the Acting Chairman



4330 East West Highway | Bethesda, MD 20814

**Mobile:** ████████

*Keeping Consumers Safe*

Follow Us: Facebook, X, Instagram, YouTube, LinkedIn, Bluesky, Truth Social

*****!!! Unless otherwise stated, any views or opinions expressed in this e-mail (and any attachments) are solely those of the author and do not necessarily represent those of the U.S. Consumer Product Safety Commission. Copies of product recall and product safety information can be sent to you automatically via Internet e-mail, as they are released by CPSC. To subscribe or unsubscribe to this service go to the following web page: http://www.cpsc.gov/en/Newsroom/Subscribe *****!!!

# Exhibit 3

**TO:**        The Commission                                            **DATE:** June 17, 2025
                  Alberta E. Mills, Secretary

**THROUGH:**  Brien Lorenze, Executive Director

**FROM:**     Matthew A. Campbell, General Counsel

**SUBJECT:**  Commission Directions and Commission Policy Regarding Reductions in Force and Staff Details

---

**TIME CRITICAL BALLOT VOTE DUE**:  June 17, 2025, at 2 pm

       Attached for the Commission's consideration is a list of Commission directions and a Commission Policy Regarding Reductions in Force and Staff Details.

       The Commission has designated this matter as time critical, pursuant to section V of the Commission's Decision-Making Procedures.

       Please indicate your vote on the following options:

I.  Approve the attached Commission direction and policy as drafted.


_____        _____
 (Signature)                                 (Date)


II.  Approve the attached Commission direction and policy, with the following changes:

_____

_____

_____

_____


_____        _____

**JA109**

_____          _____
(Signature)                                                              (Date)

III.    Do not approve the attached Commission direction and policy.


_____          _____
(Signature)                                                              (Date)

IV.    Take other action specified below.

_____

_____

_____

_____


_____          _____
(Signature)                                                              (Date)


Attachment

**JA110**

Notwithstanding the Decision Making Procedures, the Commission directs as follows:

Despite the President's unlawful attempt to fire three Commissioners on the evening of May 8, 2025, the Commission continued to consist of five Commissioners from May 8 to the present. Order, *Boyle v. Trump*, 8:25-cv-01628-MJM (D. Md. June 13, 2025) ("President Donald J. Trump's purported termination of Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") is ultra vires, contrary to law, and without legal effect."). Three Commissioners are—and have been—necessary to constitute a quorum for the transaction of Commission business. 15 U.S.C. § 2053(d). All matters that were presented to fewer than all five Commissioners for a vote from May 8, 2025 to the present were improperly presented and failed to receive support from a majority of the Commission. The results of any votes on such matters are therefore null and void, unless otherwise specified below.

The Commission directs as follows:

- On June 18, 2025, staff shall submit a proposed Performance Budget Request to the Commission for a ballot vote due on June 25, 2025 at 5:00 p.m. This vote cannot be extended or converted to a decisional except by majority vote of the Commission.

- A public Mid-Year Decisional is hereby rescheduled for June 25, 2025 at 10:00 a.m. This vote cannot be extended or converted to a ballot except by majority vote of the Commission.

- By Friday, June 20, 2025, staff shall prepare and send to the *Federal Register* for publication a notice announcing that the Commission will conduct a hybrid public hearing concerning the Commission's agenda and priorities for fiscal years 2026 and 2027 on July 16, 2025, at 10:00 a.m. Further, the notice shall reopen the public registration and comment period until 5:00 p.m. on July 9, 2025.

- Any Records of Commission Action for votes taken between May 8, 2025, and the present shall be updated by the Secretary no later than 5:00 p.m. today to indicate that any decisions purportedly taken are null, void, and of no effect.

  - Notwithstanding the above, any Compliance Actions taken during that time period with the approval of two Commissioners—including recalls and Corrective Action Plans—is now approved by the full Commission and shall remain in effect unless the full Commission takes further action.

  - In addition, notwithstanding the above, the *Federal Register* Notices titled "Agency Information Collection Activities; Proposed Collection; Carbon

Monoxide Poisoning and Prevention Grant Application Program" and "Agency Information Collection; Proposed Collection; Pool Safely Grant Program Application" that were approved by two Commissioners on June 3, 2025, are now approved by the full Commission and shall remain in effect.

- No later than 5:00 p.m. today, the Secretary shall notify the Office of the Federal Register that the vote by only two Commissioners on May 13, 2025 to withdraw CPSC's *Notice of Proposed Rulemaking to Establish a Safety Standard for Lithium-Ion Batteries in Micromobility Products and Electrical Systems of Micromobility Products Containing Such Batteries* (NPR on Lithium-Ion Batteries) is null and void and  direct publication of the NPR on Lithium-Ion Batteries that was adopted by the Commission on April 30, 2025.

- No later than 5:00 p.m. tomorrow, June 18, 2025, the Executive Director shall provide all Commissioners with: (1) a list of all contracts that were cancelled between May 8, 2025 and the present, with a description of the work and dollar amounts for each contract; and (2) a status update on the contracts for projects that two Commissioners supported via a ballot vote due on May 21, 2025 titled "Ballot Vote: Fiscal Year 2025 Proposed Operating Plan Alignment and Midyear Review." All activity to implement that ballot vote shall be paused until further notice from a majority of the Commission.

- The following policy is adopted by the Commission, effective immediately:

Commission Policy Regarding Reductions in Force and Staff Details

Notwithstanding the Directives or other policies governing the Commission, no actions may be taken towards Reduction-in-Force of CPSC staff without a majority vote of the Commission. Any actions to implement or initiate Reductions in Force that are underway must be withdrawn immediately unless approved by a majority vote of the Commission.

Notwithstanding the Directives or other policies governing the Commission, any individual who is detailed or otherwise onboarded to the CPSC for the express purpose of facilitating compliance with President Trump's January 20, 2025, Executive Order, *Establishing and Implementing the President's Department of Government Efficiency,* must be approved by a majority vote of the Commission.

Any staff who have been hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order without majority approval by the full Commission are hereby terminated effective immediately and their access to digital

systems and CPSC's physical premises shall be immediately revoked.  Security shall ensure that they are securely removed without damage to CPSC property.

It is the policy of the Commission that no staff shall be hired, detailed, or otherwise placed at CPSC for the express purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order without approval by a majority vote of the Commission.

- No later than 5:00 p.m. tomorrow, June 18, 2025, CPSC's Chief Information Officer shall submit to all Commissioners an audit log containing the activities of Nate Cavanaugh, Justin Fox, and/or any person brought to CPSC for the purpose of carrying out *Implementing The President's "Department Of Government Efficiency" Cost Efficiency Initiative* Executive Order and who may have accessed and/or exfiltrated CPSC data from May 8, 2025 to the present. The Chief Information Officer shall assist Commissioners in interpreting and understanding what actions were taken with respect to CPSC's data systems during that period.

# Exhibit 4



# **O**rder

0949.1
January 15, 1987

## PERSONNEL PROCESSES - PERSONNEL ACTIONS

GENERAL POLICY AND PROCEDURES REGARDING REDUCTION-IN-FORCE

1.     PURPOSE.  This Directive establishes general Consumer Product Safety Commission policy and certain procedures concerning reduction-in-force.  It provides basic information and is designed to supplement Office of Personnel Management (OPM) regulations.

2.     SCOPE.   This Directive applies to all positions in the competitive and excepted service, except those in the Senior Executive Service.

3.     CANCELLATION. This Directive supersedes Order 0949.1, dated August 21, 1980, General Policy and Procedures Regard-ing Reduction-in-Force which is hereby cancelled.

4.     REFERENCES.

        a.      5 U.S.C. 3502.

        b.      5 CFR Part 351.

        c.      Federal Personnel Manual, Chapters 302, 311 and 351.

        d.      CPSC Order 0330.6, dated September 12, 1978, Authority to Certain CPSC Officials for the Power of Appointment.

5.     POLICY.

        a.   It is the policy of the Commission to institute reduction-in-force proceedings only when necessary to assure continued efficient and effective operation of the Commission and its components. Conditions requiring reduc-

**JA115**

tion-in-force include but are not limited to the following:
reduction in personnel ceiling, reduction in Commission
funding, reorganization of the Commission or its components,
adjustment in workload or mission requirements, and need to
provide a position for a person exercising reemployment or
restoration rights. Reduction-in-force action will be ini-iated only
when necessary and as approved by the Chairman or Executive Director.

     b. Reduction-in-force will be conducted in accord-
ance with the provisions of this Directive and the regula-
tions and procedures prescribed by the Office of Personnel
Management. Placement assistance will be provided to
affected individuals to minimize personal impact.

6.   COMPETITIVE AREAS.

     a. Competitive areas are units, based on organi-
zational and geographic distinctions, within which employees
are considered for retention during the course of a reduc-
tion-in-force action. See 5 CFR □ 351.402. In accordance
with the guidelines provided in Chapter 351 of the Federal
Personnel Manual, the following competitive areas are
established recognizing statutory organizational distinc-
tions within the Commission and the geographic distribution
of employees:

     (1)  Washington, D.C. Metropolitan Area.
Separate competitive areas are established within CPSC in
the Washington, D.C. Metropolitan Area, as follows:

     (a) The immediate offices of the Chairman
and Commissioners are separate competitive areas. See Con-
sumer Product Safety Act of 1972, Sec. 4(f)(1).

     (b) All other remaining CPSC organizations in the
Washington, D.C. Metropolitan Area are combined into
a single competitive area.

     (2)  Field Service.

     (a) The competitive area for each Regional Office shall be its
local geographic commuting area.

**JA116**

(b)   Each District Office or Resident
Post located outside the commuting area of a CPSC Regional Office or outside of
the Headquarters commuting area is a separate competitive area.

b.    Within each of the competitive areas established above, competitive
and excepted service employees will
compete separately in a reduction-in-force.

7.    COMPETITIVE LEVELS.

a.  Competitive levels are groupings of similar
positions in a competitive area within which employees
compete for retention. These are positions at the same
grade (or occupational level) and classification series
and which are similar enough in duties, qualification
requirements, pay schedules, and working conditions so that
the incumbent of one position could successfully perform
the critical elements of any other position upon entry into it, without any loss of
productivity beyond that normally expected in the orientation of any
new, but fully qualified employee.

b.  CPSC will use position classification definitions
issued by the Office of Personnel Management in establishing
competitive levels. In general, published series and title
definitions will apply to CPSC's competitive level designa-
tions.  When broader or more specific definitions are
necessary to meet CPSC's unique and varied work situations,
appropriate additional definitions will be prepared in the
Division of Personnel Management.

8.    CREDIT FOR PERFORMANCE.

a.    An employee's entitlement to additional service credit shall be based
on the employee's three annual performance ratings of record received during the
three year period prior to the date of issuance of reduction-in-force notices.

b.  An employee who does not have a performance rating of record for any
of those three years shall receive credit for an assumed rating of fully satisfactory
for each of the years needed to credit the employee with three ratings.

c.  The number of years credit for each level of
rating is:

| Outstanding | (O) | 20 years |
|---|---|---|
| Highly Satisfactory | (H) | 16 years |
| Fully Satisfactory | (F) | 12 years |
| Assumed Rating ( | (A) | 12 years |
| Minimally Satisfactory (M) | | 0 years |
| Unsatisfactory | (U) | 0 years |

d.  The numerical credit for each or the last three ratings of record, expressed in years of service, shall be added and then divided by three to determine the average for performance service credit.  The number shall be rounded to the next higher whole number if a fraction is obtained in the above process.  The number obtained shall be added to an employee's actual years of service.

e.  An employee who has received a written decision to demote him or her because of unacceptable performance, competes from the position to which he or she has been or will be demoted.

9.     RETENTION STANDING - COMPETITIVE SERVICE.  Within each competitive level competing employees are grouped into Retention Groups and Subgroups.  The descending order of retention standing by group is:  GrouP I, Group II, and Group III.  Within each group, the descending subgroup order is: Subgroup AD, Subgroup A, and Subgroup B.  Within subgroups the order begins with the earliest service computation date plus adjustments for performance ratings as prescribed by the Office of Personnel Management. The terms "probation" and "trial period" as used below do not include supervisory and managerial probationary periods.

a. TENURE GROUP I.

Includes each career employee who either has completed probation or is not required to serve a probationary period.

b.  TENURE GROUP II.

Includes employees serving under career conditional appointments and under career appointments who are serving a probationary period.

c.  TENURE GROUP III.

Includes indefinite employees, employees under temporary

appointments pending establishment of registers (TAPER), employees under term appointment, status quo employees, and employees under any other non-status, nontemporary appointments.

    d. SUBGROUP AD.

    Employees with veteran's preference who have a compensable service-connected disability of 30 percent or more.

    e.   SUBGROUP A.

    Employees with veteran's preference not included in Subgroup AD.

    f. SUBGROUP B.

    Employees without veteran's preference.

10.   RETENTION STANDING - EXCEPTED SERVICE. Within each competitive level, competing employees in the excepted service are grouped into retention groups with the same designations as are used for employees in the competitive service except that an employee who completes one year of continuous excepted service under a temporary appointment is in Tenure Group III.

11.   REDUCTION-IN-FORCE-NOTICES.

    a.  Requirement. Each competing employee subject to reduction-in-force action is entitled to a written notice as prescribed in OPM regulations, 5 CFR Part 351, Subpart H and in Chapter 351, Subchapter 8 of the Federal Personnel Manual. A reduction-in-force notice is an official, personal, written communication addressed to the employee and issued by the Director, Division of Personnel Management. The notice will contain information concerning the employee's rights during a reduction-in-force.

    b.  Notice Period. An employee is entitled to receive a reduction-in-force notice at least 30 full calendar days before the effective date of the reduction-in-force action. The notice shall not be issued more than 90 calendar days before the date of the action.

12.    RECORDS. Official agency records of reduction-in-force actions will be maintained by the Division of Personnel Management in accordance with Office of Personnel Management regulations.

13.    INTERPRETATION OF POLICY AND PROCEDURE. Questions relating to the interpretation or application of this Directive will be referred to the Director, Division of Personnel Management.

(Original Signed By )

Terrence Scanlon
Chairman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                             |     |                        |
|-----------------------------|-----|------------------------|
|                             | *   |                        |
| **MARY BOYLE,** *et al.*,   | *   |                        |
|                             | *   |                        |
| **Plaintiffs,**             | *   |                        |
|                             | *   | **Civ. No. MJM-25-1628** |
| **v.**                      | *   |                        |
|                             | *   |                        |
| **DONALD J. TRUMP,** *et al.*, | *   |                        |
|                             | *   |                        |
| **Defendants.**             | *   |                        |
|                             | *   |                        |

\* \* \* \* \* \* \* \* \* \*

**MEMORANDUM ORDER**

On June 13, 2025, the Court entered a Memorandum Opinion and Order granting Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. (collectively, "Plaintiffs") declaratory and injunctive relief. ECF Nos. 24 & 25. The Order declares the purported removal of Plaintiffs from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") without legal effect and enjoins official action that would effectuate Plaintiffs' removal. *Id.* On June 16, 2025, defendants Donald J. Trump, President of the United States; Scott Bessent, Secretary of the Treasury; Russell Vought, Director of the Office of Management and Budget; and Peter A. Feldman, Acting Chairman of the CPSC (collectively, "Defendants") filed a Notice of Appeal. ECF No. 26.

Currently pending before this Court are three motions filed by Defendants: a Motion to Stay the Court's Order Pending Appeal ("Motion to Stay"), ECF No. 27; a Motion for Leave to File the Declaration of Tripp DeMoss ("Motion for Leave"), ECF No. 31; and a Motion to Seal,

1

**JA121**

ECF No. 35.[1] Pursuant to Local Rule 105.11 (D. Md. 2023), the Court shall defer ruling on the Motion to Seal until 14 days after its filing date. Plaintiffs filed responses to Defendants' Motion to Stay, ECF No. 29, and the Motion for Leave, ECF No. 32. Defendants filed a reply in support of each motion, ECF Nos. 36 and 37, respectively. For reasons explained below, the Motion for Leave is granted, and the Motion to Stay is denied.

### I.    Motion for Leave to File Declaration

In their Motion for Leave, Defendants request leave to file the declaration of Tripp DeMoss, dated June 17, 2025, in support of their Motion to Stay. ECF No. 31. The declaration is attached to the Motion for Leave, ECF No. 31-1, along with several exhibits, ECF Nos. 31-2 through 31-5. In their response, Plaintiffs argue that Defendants' Motion for Leave is untimely because it was filed one day after the Motion to Stay and after Plaintiffs filed their response to that motion. ECF No. 32. Plaintiffs do not offer any substantive argument that the Court should deny Defendants the opportunity to supplement the record in support of their Motion to Stay. The Court notes that Defendants filed their Motion to Stay promptly—one business day after the Court entered its Order granting Plaintiffs declaratory and injunctive relief. ECF No. 27. Defendants explain that Mr. DeMoss's declaration describes events that occurred after their Motion to Stay was filed. ECF No. 36. The Court finds the timing of Defendants' filings to be justified and, in its

---

[1] Defendants also filed an emergency motion to stay in their appeal. *Boyle v. Trump*, Appeal No. 25-1687, Doc. 13 (4th Cir. June 17, 2025).

While the "filing of a notice of appeal" generally "divests the district court of its control over those aspects of the case involved in the appeal[,]" *City of Martinsville, Virginia v. Express Scripts, Inc.*, 128 F.4th 265, 269 (4th Cir. 2025) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 103 S. Ct. 400, 74 L. Ed. 2d 225 (1982), and *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 143 S. Ct. 1915, 216 L. Ed. 2d 671 (2023)), a district court may retain jurisdiction to stay an injunction granted in a final judgment, pursuant to Rule 62(c) of the Federal Rules of Civil Procedure. *See* 11 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2904 (3d ed. 2025) (citing cases). Defendants' Motion for Leave and Motion to Seal are ancillary to their Motion to Stay. The Court finds that it has jurisdiction to decide the motions Defendants filed in this matter, even while Defendants' appeal is pending.

discretion, will permit Defendants to supplement the record in support of their Motion to Stay. The Motion for Leave is granted.

## II.    Motion to Stay Pending Appeal

In their Motion to Stay, Defendants request a stay of the Court's Order granting an injunction against any action by Defendants Bessent, Vought, and Feldman to effectuate Plaintiffs' purported removal from their offices as CPSC Commissioners. ECF No. 27. Plaintiffs oppose this motion. ECF No. 29. Courts consider four factors in deciding whether to stay an injunction pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425–26, 129 S. Ct. 1749, 1756, 173 L. Ed. 2d 550 (2009) (quoting *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987)). The first two factors are "the most critical." *Id.* at 434, 129 S. Ct. at 1761. Here, the *Nken* factors do not warrant a stay.

First, Defendants fail to make "a strong showing that [they are] likely to succeed on the merits" of their defense that the President's without-cause removal of Plaintiffs from office was justified by his removal power under Article II of the U.S. Constitution. *Nken*, 556 U.S. at 426, 129 S. Ct. at 1756. For the reasons explained in its Memorandum Opinion, this Court has found that Plaintiffs' removal from office was unlawful under 15 U.S.C. § 2053(a), which permits removal only for "neglect of duty or malfeasance in office," and that this statutory removal protection is constitutionally justified by the *Humphrey's Executor* exception to the President's unrestrained removal power under Article II.

In *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S. Ct. 869, 79 L. Ed. 1611 (1935), the Supreme Court "held that Congress could create expert agencies led by a *group* of principal officers removable by the President only for good cause." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204, 140 S. Ct. 2183, 2192, 207 L. Ed. 2d 494 (2020). *Humphrey's Executor* provides an exception to the President's "unrestrictable power . . . to remove purely executive officers" for "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions[.]" *Id.* at 217, 140 S. Ct. at 2199 (quoting *Humphrey's Executor*, 295 U.S. at 632, 55 S. Ct. at 875). This Court has found that, like the agency at issue in *Humphrey's Executor*, the CPSC is "a multimember body of experts, balanced along partisan lines" and appointed to serve "staggered, seven-year terms[,]" *Seila Law*, 591 U.S. at 216, 140 S. Ct. at 2198–99, that performs functions the Supreme Court has described as "quasi legislative and quasi judicial[,]" *Humphrey's Executor*, 295 U.S. at 629, 55 S. Ct. at 874. *See also* ECF No. 24 (Mem. Op.) at 16–20; 15 U.S.C. § 2053(a)–(c) (listing qualifications and terms for CPSC Commissioners). As explained in the Memorandum Opinion, the structure and funding of the CPSC permits the President to exert influence over the CPSC, notwithstanding the removal restriction in 15 U.S.C. § 2053(a) and is supported by historical precedent. ECF No. 24 (Mem. Op) at 21–23. Likewise, the U.S. Courts of Appeals for the Fifth and Tenth Circuits have also concluded that the removal restriction in § 2053(a) is constitutional under *Humphrey's Executor*. *See Consumers' Research v. CPSC*, 91 F.4th 342, 351–56 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414, 220 L. Ed. 2d 170 (2024); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 762 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 104 (2025); *accord United States v. SunSetter Prods. LP*, 2024 WL 1116062, at *2–4 (D. Mass. Mar. 14, 2024).

*Humphrey's Executor* remains good law. *See Seila Law*, 591 U.S. at 228, 140 S. Ct. at 2206; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483–84, 130 S. Ct. 3138,

4

**JA124**

3146–47, 177 L. Ed. 2d 706 (2010). And this Court is bound to apply the Supreme Court's precedent where it is directly applicable, "even if [it] thinks the precedent is in tension with 'some other line of decisions.'" *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136, 143 S. Ct. 2028, 2038, 216 L. Ed. 2d 815 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 1921, 104 L. Ed. 2d 526 (1989)).

Defendants offer no new evidence or argument to persuade the Court that it erred in its ruling. As they argued in opposition to Plaintiffs' summary judgment motion, Defendants contend that *Humphrey's Executor* does not apply to the CPSC because it exercises executive power. ECF No. 27 at 3. But, as explained in the Memorandum Opinion, the performance of executive functions alone is not dispositive of whether *Humphrey's Executor* applies. *See* ECF No. 24 (Mem. Op.) 20–23; *Collins v. Yellen*, 594 U.S. 220, 251–52, 141 S. Ct. 1761, 1784, 210 L. Ed. 2d 432 (2021) ("[T]he nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head."). Defendants rely principally upon a stay order the Supreme Court entered in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025). But the order in *Wilcox* confirms that an exception to the President's removal power may apply, notwithstanding a likelihood that the agencies subject to that order "exercise considerable executive power[.]" 145 S. Ct. at 1415.

Second, Defendants fail to establish any irreparable injury absent a stay. It is important to note that the injunction granted by this Court merely returned the composition of the CPSC to the status quo that existed less than two months ago and had been in place before Defendants took office. Defendants attempt to show irreparable injury by citing a generalized harm based on Plaintiffs' exercise of powers duly vested in them as CPSC Commissioners. ECF No. 27 at 3. The only evidence of case-specific harm Defendants offer are descriptions of official actions Plaintiffs

5

**JA125**

have taken since resuming their duties last week. ECF No. 36 at 2. Trent DeMoss, Senior Counsel to Acting Chairman Feldman, asserts in his declaration that Plaintiffs conducted an "unauthorized and invalid" meeting last week, ECF No. 31-1, ¶ 14, and that they are seeking to implement policies in a way that circumvents governing provisions of the Consumer Product Safety Act, describing such actions as "disruptive," *id.* ¶ 17. The Court finds, however, that Mr. DeMoss's declaration describes, at best, differences of opinion he has with Plaintiffs over substantive and procedural matters of policy internal to the CPSC. Policy differences of this nature preexisted this litigation. *See* ECF Nos. 6-2 through 6-4 (Plaintiffs' declarations describing events that preceded notification of their removal). Differences in views over internal policy matters are to be expected of a multimember adjudicatory body that is bipartisan by design, like the CPSC. *See* 15 U.S.C. § 2053(c).[2] Moreover, Defendants fail to establish that any injury to them caused by Plaintiffs' participation in CPSC business cannot be repaired if they succeed in their appeal or when Commissioner Boyle's term expires in October of this year, even if Defendants' appeal is unsuccessful. *See* ECF No. 6-2, ¶ 2. Thus, Defendants' fail to show any *irreparable* injury they would suffer without a stay.

Third, the Court finds that a stay of its Order "will substantially injure the other parties interested in the proceeding[,]" *Nken*, 556 U.S. at 426, 129 S. Ct. at 1756—specifically, Plaintiffs. Each Plaintiff serves a term as Commissioner limited by statute, 15 U.S.C. § 2053(b); each Plaintiff's term expires on a date certain, ECF Nos. 6-2 through 6-4, ¶ 2. Accordingly, each day Plaintiffs are deprived of the opportunity and resources necessary to perform the functions and duties they were duly appointed to perform as CPSC Commissioners is time lost that they—and

---

[2] To the extent that any Plaintiffs' official actions amount to malfeasance, Defendants may find relief in the removal statute they claim to be unconstitutional in this litigation. *See* 15 U.S.C. § 2053(a) (permitting President to remove any CPSC Commissioner "for neglect of duty or malfeasance in office but for no other cause").

the public—cannot regain, whether or not they prevail on appeal. *See* ECF No. 24 (Mem. Op.) at 26–28 (describing irreparable harms caused by Plaintiffs' purported termination). Thus, while Defendants fail to demonstrate any irreparable injury absent a stay, the irreparable harm to Plaintiffs that would result from a stay is clear.

Fourth, the public interest does not favor a stay. *See id.* at 28–29 (finding that public interest and balance of equities favor injunction). The CPSC serves the public's interest in ensuring safety among products in the marketplace in various ways detailed in the Memorandum Opinion, *id.*, and in Plaintiffs declarations, ECF Nos. 18-3 through 18-5. There is no dispute that each Plaintiff has performed their duties as CPSC Commissioners ably and has brought to this role substantial expertise in the field of consumer protection. ECF Nos. 6-2 through 6-4. Plaintiffs are three of the CPSC's five Commissioners—60% of the agency's duly appointed leadership. A stay would only deprive the CPSC of Plaintiffs' abilities and expertise and, therefore, poses a danger to the vital role the CPSC plays in ensuring the safety of consumer products on the market. *See, e.g.*, ECF No. 18-3, ¶¶ 10–13 (describing certain "life-saving" regulations under consideration by the CPSC pertaining to lithium-ion batteries and battery-operated toys, which Plaintiffs support but the remaining two Commissioners have not supported); ECF Nos. 6-2 through 6-4 (each Plaintiff stating, "I believe that my work has played an important role in protecting consumers across the nation from injury and death."). The Court finds the public's interest in protection from hazardous and unsafe consumer products to exceed the public interests presented in support of the injunctions stayed by the Supreme Court's order in *Wilcox*. *See Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914, at *17 (D.D.C. Mar. 6, 2025) (finding that public interest in "efficient and peaceful resolution of labor conflicts" supports injunction reinstating member of National Labor Relations Board); *Harris v. Bessent*, No. CV 25-412 (RC), 2025 WL 679303, at *14 (D.D.C. Mar. 4, 2025)

(finding that public interest "in having governmental agencies abide by" federal law supports injunction reinstating member of Merit Systems Protection Board).

Meanwhile, on the other side of the balance, the only specific harms Defendants claim result from Plaintiffs' participation in CPSC business are official actions and positions Plaintiffs have taken concerning personnel matters internal to the CPSC. *See* ECF Nos. 31 & 36. Defendants do not identify any way in which the public would be harmed or placed at risk by Plaintiffs' performance of the duties they were duly appointed to perform. And Defendants offer no information or evidence to dispute Plaintiffs' sworn statements describing how their participation as CPSC Commissioners serves the public's interest in safe consumer products. Defendants make no attempt to show that, in Plaintiffs' absence from the CPSC, the public will be adequately protected from hazards and risks presented in certain consumer products.

In sum, none of the four *Nken* factors supports a stay of the injunction. Accordingly, Defendant's Motion to Stay must be denied.

### III.    Conclusion

For the reasons stated herein, it is this ___23rd___ day of June, 2025, by the United States District Court for the District of Maryland, hereby

ORDERED that Defendants' Motion for Leave to File the Declaration of Tripp DeMoss (ECF No. 31) is GRANTED; and it is further

ORDERED that Defendants' Motion to Stay the Court's Order Pending Appeal (ECF No. 27) is DENIED.

_____
Matthew J. Maddox
United States District Judge

CourtLink® (Dockets)

## Document: 8:25cv1628, Boyle Et Al V. Trump Et Al

---

## 8:25cv1628, Boyle Et Al V. Trump Et Al

US District Court Docket

United States District Court, Maryland

(Greenbelt)

Update Now

**This case was retrieved on 08/03/2025**

▼Header

**Case Number:** 8:25cv1628                    **Class Code:** Closed

**Date Filed:** 05/21/2025                      **Closed:** 06/13/2025

**Assigned To:** Judge Matthew J. Maddox        **Statute:** 15:005

**Nature of Suit:** Other Statutory Actions      **Jury Demand:** None
(890)
                                                **Demand Amount:** $0
**Cause:**
                                                **NOS Description:** Other Statutory Actions
**Lead Docket:** None

**Other Docket:** Fourth Circuit, 25-01687

**Jurisdiction:** U.S. Government Defendant

▼Participants

| Litigants | Attorneys |
|---|---|
| Mary Boyle | Allison M. Zieve |
| **Plaintiff** | PRO HAC VICE;ATTORNEY TO BE NOTICED |
|  | Public Citizen Litigation Group |

**JA129**

## Litigants                          ## Attorneys

1600 20th Street Nw
Washington, DC 20009
USA
202-588-1000 Email:Azieve@citizen.Org

Nicolas A. Sansone
PRO HAC VICE;ATTORNEY TO BE NOTICED
Public Citizen
1600 20th Street Nw
Washington, DC 20009
USA
202-588-1000 Email:Nsansone@citizen.Org

Stephanie Garlock
ATTORNEY TO BE NOTICED
Public Citizen
1600 20th Street, Nw
Washington, DC 20009
USA
202-588-7750 Email:Sgarlock@citizen.Org

Alexander Hoehn-Saric          Allison M. Zieve
**Plaintiff**                  PRO HAC VICE;ATTORNEY TO BE NOTICED
                               Public Citizen Litigation Group
                               1600 20th Street Nw
                               Washington, DC 20009
                               USA
                               202-588-1000 Email:Azieve@citizen.Org

Nicolas A. Sansone
PRO HAC VICE;ATTORNEY TO BE NOTICED
Public Citizen
1600 20th Street Nw
Washington, DC 20009
USA
202-588-1000 Email:Nsansone@citizen.Org

Stephanie Garlock
ATTORNEY TO BE NOTICED

| Litigants | Attorneys |
|---|---|
| | Public Citizen |
| | 1600 20th Street, Nw |
| | Washington, DC 20009 |
| | USA |
| | 202-588-7750 Email:Sgarlock@citizen.Org |
| RICHARD TRUMKA, JR. **Plaintiff** | Allison M. Zieve |
| | PRO HAC VICE;ATTORNEY TO BE NOTICED |
| | Public Citizen Litigation Group |
| | 1600 20th Street Nw |
| | Washington, DC 20009 |
| | USA |
| | 202-588-1000 Email:Azieve@citizen.Org |
| | |
| | Nicolas A. Sansone |
| | PRO HAC VICE;ATTORNEY TO BE NOTICED |
| | Public Citizen |
| | 1600 20th Street Nw |
| | Washington, DC 20009 |
| | USA |
| | 202-588-1000 Email:Nsansone@citizen.Org |
| | |
| | Stephanie Garlock |
| | ATTORNEY TO BE NOTICED |
| | Public Citizen |
| | 1600 20th Street, Nw |
| | Washington, DC 20009 |
| | USA |
| | 202-588-7750 Email:Sgarlock@citizen.Org |
| Donald J. Trump in his official capacity as President of the United States \| **Defendant** | Abigail Stout |
| | LEAD ATTORNEY;ATTORNEY TO BE NOTICED |
| | DOJ-Civ |
| | 950 Pennsylvania Avenue, Nw |
| | Washington, DC 20530-0001 |
| | USA |
| | 404-731-2159 |
| | Email:Abigail.Stout@usdoj.Gov |
| Scott Bessent in his official capacity as Secretary of the | Abigail Stout |
| | LEAD ATTORNEY;ATTORNEY TO BE NOTICED |

| Litigants | Attorneys |
|---|---|
| Treasury \|<br>**Defendant** | DOJ-Civ<br>950 Pennsylvania Avenue, Nw<br>Washington, DC 20530-0001<br>USA<br>404-731-2159<br>Email:Abigail.Stout@usdoj.Gov |
| Russell Vought<br>in his official capacity as Director of the<br>Office of Management and Budget \|<br>**Defendant** | Abigail Stout<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>950 Pennsylvania Avenue, Nw<br>Washington, DC 20530-0001<br>USA<br>404-731-2159<br>Email:Abigail.Stout@usdoj.Gov |
| Peter A. Feldman<br>in his official capacity as Acting Chairman of<br>the U.S. Consumer Product Safety<br>Commission \|<br>**Defendant** | Abigail Stout<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>950 Pennsylvania Avenue, Nw<br>Washington, DC 20530-0001<br>USA<br>404-731-2159<br>Email:Abigail.Stout@usdoj.Gov |

## ▼Proceedings

Retrieve Document(s)

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Free | 1 | 05/21/2025 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number AMDDC-11991176.), filed by Mary Boyle, Richard Trumka, Jr, Alexander Hoehn-Saric. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons) (Garlock, Stephanie) (Entered: 05/21/2025) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Free | 2 | 05/21/2025 | MOTION re 1 Complaint, for Leave to Waive Requirement Under Local Rule 102.2(a) to Provide Addresses in Complaint Caption by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Garlock, Stephanie) (Entered: 05/21/2025) | |
| ☐ | Free | 3 | 05/21/2025 | NOTICE of Appearance by Stephanie Garlock on behalf of All Plaintiffs (Garlock, Stephanie) (Entered: 05/21/2025) | |
| ☐ | Free | 4 | 05/21/2025 | MOTION to Appear Pro Hac Vice for Nicolas A. Sansone (Filing fee $100, receipt number AMDDC-11991444.) by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr(Garlock, Stephanie) (Entered: 05/21/2025) | |
| ☐ | Free | 5 | 05/21/2025 | MOTION to Appear Pro Hac Vice for Allison M. Zieve (Filing fee $100, receipt number AMDDC-11991499.) by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr(Garlock, Stephanie) (Entered: 05/21/2025) | |
| ☐ | Free | 6 | 05/21/2025 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr (Attachments: # 1 Memorandum in Support, # 2 Attachment (Declaration of Mary Boyle), # 3 Attachment (Declaration of Alexander Hoehn-Saric), # 4 Attachment (Declaration of Richard Trumka Jr.), # 5 Text of Proposed Order)(Garlock, Stephanie) (Entered: 05/21/2025) | |
| ☐ | Free | 7 | 05/22/2025 | QC NOTICE: 4 Motion to Appear Pro Hac Vice filed by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr. needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | the motion. (mh4s, Deputy Clerk) (Entered: 05/22/2025) | |
| ☐ | Free | 8 | 05/22/2025 | QC NOTICE: 5 Motion to Appear Pro Hac Vice filed by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr. needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 05/22/2025) | |
| ☐ | Free | 9 | 05/22/2025 | CORRECTED MOTION to Appear Pro Hac Vice for Nicolas A. Sansone by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr. The fee has already been paid.(Garlock, Stephanie) (Entered: 05/22/2025) | |
| ☐ | Free | 10 | 05/22/2025 | CORRECTED MOTION to Appear Pro Hac Vice for Allison M. Zieve by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr. The fee has already been paid.(Garlock, Stephanie) (Entered: 05/22/2025) | |
| | | 11 | 05/22/2025 | PAPERLESS ORDER granting 9 Corrected Motion to Appear Pro Hac Vice on behalf of Nicolas A. Sansone. Directing attorney Nicolas A. Sansone to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 5/22/2025. (mh4s, Deputy Clerk) (Entered: 05/22/2025) | |
| | | 12 | 05/22/2025 | PAPERLESS ORDER granting 10 Corrected Motion to Appear Pro Hac Vice on behalf of Allison M. Zieve. Directing attorney Allison M. Zieve to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option | |

**JA134**

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | must be selected when registering. Signed by Clerk on 5/22/2025. (mh4s, Deputy Clerk) (Entered: 05/22/2025) | |
| ☐ | Free | 13 | 05/22/2025 | NOTICE of Appearance by Abigail Stout on behalf of All Defendants (Stout, Abigail) (Entered: 05/22/2025) | |
| | | | 05/22/2025 | Telephone Conference held on 5/22/2025 before Judge Matthew J. Maddox. (rc2s, Deputy Clerk) (Entered: 05/27/2025) | |
| ☐ | Free | 14 | 05/23/2025 | ORDERED that a hearing on the plaintiffs' Motion for a Temporary Restraining Order is scheduled for Tuesday, May 27, 2025, at 12:00 p.m. in Courtroom 5C. Signed by Judge Matthew J. Maddox on 5/23/2025. (kb3s, Deputy Clerk) (Entered: 05/23/2025) | |
| ☐ | Free | 15 | 05/26/2025 | RESPONSE in Opposition re 6 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought.(Stout, Abigail) (Entered: 05/26/2025) | |
| ☐ | Online | 16 | 05/27/2025 | Motion Hearing held on 5/27/2025 re 6 MOTION for Temporary Restraining Order filed by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr. before Judge Matthew J. Maddox.(Court Reporter: Ronda Thomas) (jks, Deputy Clerk) (Entered: 05/27/2025) | |
| ☐ | Free | 17 | 05/27/2025 | ORDER re 5/27/25 hearing: vacating briefing schedule previously entered for the Motion for Preliminary Injunction and setting briefing scheduling for plaintiffs' forthcoming expedited motion for summary judgment; setting hearing date for such motion. Signed by Judge Matthew J. Maddox on 5/23/2025. (dass, Deputy Clerk) (Entered: 05/28/2025) | |
| ☐ | Free | 18 | 05/30/2025 | MOTION for Summary Judgment by Mary Boyle, Alexander Hoehn-Saric, Richard | |

**JA135**

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Trumka, Jr (Attachments: # 1 Memorandum in Support, # 2 Supplement Statement of Undisputed Material Facts, # 3 Affidavit Second Declaration of Mary Boyle, # 4 Affidavit Second Declaration of Alexander Hoehn-Saric, # 5 Affidavit Second Declaration of Richard Trumka Jr., # 6 Text of Proposed Order)(Sansone, Nicolas) (Entered: 05/30/2025) | |
| ☐ | Free | 19 | 06/02/2025 | Summons Issued 60 days as to Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(kb3s, Deputy Clerk) (Entered: 06/02/2025) | |
| ☐ | Online | 20 | 06/03/2025 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 5/27/2025, before Judge Matthew J. Maddox. Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Total number of pages filed: 52. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 6/24/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/2/2025. (Entered: 06/03/2025) | |
| ☐ | Free | 21 | 06/04/2025 | RESPONSE in Opposition re 18 MOTION for Summary Judgment and Cross-Motion for Summary Judgment filed by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought. (Attachments: # 1 Memorandum in | |

**JA136**

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Support Memorandum In Support of Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment, # 2 Attachment Defendant's Statement of Undisputed Material Facts, # 3 Exhibit Exhibit A, # 4 Text of Proposed Order Defendant's Proposed Order)(Stout, Abigail) (Entered: 06/04/2025) | |
| ☐ | Free | 22 | 06/05/2025 | REPLY to Response to Motion re 18 MOTION for Summary Judgment filed by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr. (Sansone, Nicolas) (Entered: 06/05/2025) | |
| ☐ | Online | 23 | 06/06/2025 | Motion Hearing held on 6/6/2025 re 18 MOTION for Summary Judgment filed by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr. 21 Response and Cross-Motion for Summary Judgment before Judge Matthew J. Maddox. (Court Reporter: Ronda Thomas) (Rebecca Maldeis, Deputy Clerk - Courtroom 5C) (Entered: 06/06/2025) | |
| ☐ | Free | 24 | 06/13/2025 | MEMORANDUM OPINION. Signed by Judge Matthew J. Maddox on 6/13/2025. (kb3s, Deputy Clerk) (Entered: 06/13/2025) | |
| ☐ | Free | 25 | 06/13/2025 | ORDER Denying as moot 6 Motion for TRO; Denying as moot 6 Motion for Preliminary Injunction; granting 18 Motion for Summary Judgment; Denying 21 RESPONSE in Opposition re 18 MOTION for Summary Judgment and Cross-Motion for Summary Judgment; Granting 2 MOTION re 1 Complaint, for Leave to Waive Requirement Under Local Rule 102.2(a) to Provide Addresses in Complaint Caption . Signed by Judge Matthew J. Maddox on 6/13/2025. (kb3s, Deputy Clerk) (Entered: 06/13/2025) | |

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| ☐ | Free | 26 | 06/16/2025 | NOTICE OF APPEAL by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought. (Stout, Abigail) (Entered: 06/16/2025) | |
| ☐ | Free | 27 | 06/16/2025 | MOTION to Stay the Court's Order Pending Appeal by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought (Attachments: # 1 Text of Proposed Order) (Stout, Abigail) (Entered: 06/16/2025) | |
| ☐ | Free | 28 | 06/17/2025 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 26 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(jf3s, Deputy Clerk) (Entered: 06/17/2025) | |
| ☐ | Free | 29 | 06/17/2025 | RESPONSE in Opposition re 27 MOTION to Stay the Court's Order Pending Appeal filed by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr. (Attachments: # 1 Affidavit Third Declaration of Richard Trumka Jr., # 2 Text of Proposed Order)(Sansone, Nicolas) (Entered: 06/17/2025) | |
| ☐ | Free | 30 | 06/17/2025 | USCA Case Number 25-1687 for 26 Notice of Appeal filed by Peter A. Feldman, Scott Bessent, Russell Vought and Donald J. Trump. Case Manager - Jeff Neal (jf3s, Deputy Clerk) (Entered: 06/17/2025) | |
| ☐ | Free | 31 | 06/17/2025 | MOTION for Leave to File Declaration of Tripp DeMoss by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought (Attachments: # 1 Exhibit Exhibit A - DeMoss Declaration, # 2 Exhibit Exhibit 1 - DMPs - Notice of Filing Under Seal, # 3 Exhibit Exhibit 2 - Email Thread, # 4 Exhibit | |

**JA138**

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Exhibit 3 - Ballot Vote Sheet, # 5 Exhibit Exhibit 4 - CPSC RIF Processes, # 6 Text of Proposed Order Proposed Order)(Stout, Abigail) (Entered: 06/17/2025) | |
| ☐ | Free | 32 | 06/18/2025 | RESPONSE to Motion re 31 MOTION for Leave to File Declaration of Tripp DeMoss filed by Mary Boyle, Alexander Hoehn-Saric, Richard Trumka, Jr.(Sansone, Nicolas) (Entered: 06/18/2025) | |
| ☐ | Online | 33 | 06/18/2025 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 6/6/2025, before Judge Matthew J. Maddox. Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 7/9/2025. Redacted Transcript Deadline set for 7/21/2025. Release of Transcript Restriction set for 9/16/2025. (Entered: 06/18/2025) | |
| ☐ | Online | 34 | 06/18/2025 | -SEALED - NOTICE of Filing Under Seal Exhibit 1 to Motion for Leave to File Declaration of Tripp DeMoss by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought re 31 MOTION for Leave to File Declaration of Tripp DeMoss (Stout, Abigail) (Entered: 06/18/2025) | |
| ☐ | Online | 35 | 06/18/2025 | MOTION to Seal Exhibit 1 to Motion for Leave to File Declaration of Tripp DeMoss by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought (Attachments: # 1 | |

**JA139**

| | Availability | # | Date | Proceeding Text | Source |
|---|---|---|---|---|---|
| | | | | Text of Proposed Order)(Stout, Abigail) (Entered: 06/18/2025) | |
| ☐ | Free | 36 | 06/19/2025 | REPLY to Response to Motion re 27 MOTION to Stay the Court's Order Pending Appeal filed by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought.(Stout, Abigail) (Entered: 06/19/2025) | |
| ☐ | Online | 37 | 06/19/2025 | REPLY to Response to Motion re 31 MOTION for Leave to File Declaration of Tripp DeMoss filed by Scott Bessent, Peter A. Feldman, Donald J. Trump, Russell Vought.(Stout, Abigail) (Entered: 06/19/2025) | |
| ☐ | Free | 38 | 06/23/2025 | Memorandum Order granting 31 Motion for Leave to File Declaration of Tripp DeMoss ; denying 27 Motion to Stay the Court's Order Pending Appeal. Signed by Judge Matthew J. Maddox on 6/23/2025. (kb3s, Deputy Clerk) (Entered: 06/23/2025) | |
| ☐ | Free | 39 | 07/01/2025 | ORDER of USCA Denying the motion for an administrative stay and a stay pending appeal (ECF 13) in this case as to 26 Notice of Appeal filed by Peter A. Feldman, Scott Bessent, Russell Vought and Donald J. Trump. (slss, Deputy Clerk) (Entered: 07/01/2025) | |
| ☐ | Free | 40 | 07/07/2025 | ORDER granting 35 MOTION to Seal Exhibit 1 to Motion for Leave to File Declaration of Tripp DeMoss. Signed by Judge Matthew J. Maddox on 7/7/2025. (kb3s, Deputy Clerk) (Entered: 07/07/2025) | |

Retrieve Document(s)

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**JA140**