No. 25-1687

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARY BOYLE, ALEXANDER HOEHN-SARIC,
and RICHARD TRUMKA, JR.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,
*Defendants-Appellants*.

On Appeal from the U.S. District Court for the
District of Maryland, No. 8:25-cv-01628

**BRIEF OF *AMICI CURIAE* FLORIDA, ALABAMA, ALASKA,
ARKANSAS, GEORGIA, IDAHO, INDIANA, IOWA,
KANSAS, KENTUCKY, LOUISIANA, MONTANA,
MISSISSIPPI, NORTH DAKOTA, OKLAHOMA, SOUTH
DAKOTA, TENNESSEE, TEXAS, UTAH, WEST VIRGINIA,
AND THE ARIZONA LEGISLATURE
IN SUPPORT OF APPELLANTS**

JAMES UTHMEIER
  *Attorney General of Florida*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@*
  *myfloridalegal.com*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
  *Counsel of Record*
NATHAN A. FORRESTER
JASON J. MUEHLHOFF
  *Chief Deputy Solicitors General*

August 18, 2025

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................iii

INTEREST OF *AMICI CURIAE* .............................................................. 1

SUMMARY OF ARGUMENT ..................................................................... 1

ARGUMENT ............................................................................................. 3

I.  The President has authority to remove Commissioners of the Consumer Products Safety Commission at will. ................... 3

II. By upsetting the separation of powers, "independent" executive officers and agencies threaten state sovereignty. ........................................................................... 9

III. Boyle, Hoehn-Saric, and Trumka are not entitled to reinstatement in any event. ........................................................ 11

    A.  Boyle, Hoehn-Saric, and Trumka did not invoke the exclusive avenue for challenging a federal officer's removal: the quo-warranto process. ........................ 12

    B.  Even if Boyle, Hoehn-Saric, and Trumka could seek relief outside of the quo-warranto process, the federal courts cannot grant their requested relief. ............. 17

        1.  Historically, equity courts would not remedy allegedly unlawful removals. ...................................... 17

        2.  Declaratory relief is unavailable because it too is a form of equitable relief. ................................... 23

        3.  Boyle, Hoehn-Saric, and Trumka have not shown a clear legal right to obtain mandamus. ................................................................ 24

CONCLUSION ........................................................................................ 29

CERTIFICATE OF COMPLIANCE ...................................................... 30

i

CERTIFICATE OF SERVICE.................................................................. 31

# TABLE OF AUTHORITIES

## Constitutional Provisions

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967)...................................................................23

*Andrade v. Lauer*,
  729 F.2d 1475 (D.C. Cir. 1984) ......................................14, 22

*Armstrong v. Exceptional Child Ctr.*,
  575 U.S. 320 (2015)..................................................................12

*Attorney General v. Earl of Clarendon*,
  17 Ves. Jr. 491, 34 Eng. Rep. 190 (Ch. 1810) ...............18, 19

*Baker v. Carr*,
  369 U.S. 186 (1962)..................................................................21

*Beebe v. Robinson*,
  52 Ala. 66 (1875) ......................................................................20

Berry v. Reagan,
  732 F.2d 949 (D.C. Cir. 1983) .................................................22

*Berry v. Reagan,
  No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983)* ...............22

*Bessent v. Dellinger*,
  145 S. Ct. 515 (2025)..............................................18, 22, 23

*Bittner v. United States*,
  143 S. Ct. 713 (2023)................................................................17

*Bonner v. State*,
  7 Ga. 473 (1849) ......................................................................26

*Case v. Beauregard*,
  101 U.S. 688 (1880)..................................................................23

*Chi. Sch. Finance Auth. v. City Council of City of Chi.*,
  472 N.E.2d 805 (Ill. 1984)........................................................27

*Chisholm v. Georgia*,
  2 U.S. (2 Dall.) 419 (1793) ..................................................9, 10

*Cochran v. McCleary*,
  22 Iowa 75 (1867)......................................................................20

*Collins v. Yellen*,
  594 U.S. 220 (2021)....................................................................9

*Delahanty v. Warner*,
  75 Ill. 185 (1874) ......................................................................20

iii

*Delgado v. Chavez*,
  140 U.S. 586 (1891)................................................................13, 25
*Eccles v. Peoples Bank*,
  333 U.S. 426 (1948)........................................................................23
*Edmond v. United States*,
  520 U.S. 651 (1997)..........................................................................5
*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012)............................................................................15
*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)..........................................................................8
*French v. Cowan*,
  10 A. 335 (Me. 1887) ................................................................26, 27
*Freytag v. Comm'r of Internal Revenue*,
  501 U.S. 868 (1991)........................................................................10
*Georgia v. Stanton*,
  73 U.S. (6 Wall.) 50 (1867)............................................................18
*Green v. Mansour*,
  474 U.S. 64 (1985)..........................................................................24
*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)........................................................................17
*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999)..................................................................18, 22
Hagner v. Heyberger,
  7 Watts & Serg. 104 (Penn. 1844) .............................................19, 20
*Heckler v. Ringer*,
  466 U.S. 602 (1984)..................................................................25, 27
*Humphrey's Ex'r v. United States*,
  295 U.S. 602 (1935)....................................................4, 5, 6, 7, 8, 9, 28
*In re Sawyer*,
  124 U.S. 200 (1888)..................................................18, 19, 20, 21, 22
*Johnson v. Horton*,
  63 F.2d 950 (9th Cir. 1933)............................................................23
*Kirtsaeng v. John Wiley & Sons, Inc.*,
  568 U.S. 519 (2013)........................................................................27
*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
  453 U.S. 1 (1981)......................................................................12, 13
*Morrison v. Olson*,
  487 U.S. 654 (1988)................................................................4, 7, 8

*Murray v. Lewis,*
   576 So. 2d 264 (Fla. 1990) .................................................................27

*Newman v. United States ex rel. Frizzell,*
   238 U.S. 537 (1915)...........................................................................15

*Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO,*
   451 U.S. 77 (1981)..............................................................................12

*People ex rel. Arcularius v. City of New York,*
   3 Johns. Cas. 79 (N.Y. Sup. Ct. 1802) .........................................25, 26

*People ex rel. Dolan v. Lane,*
   55 N.Y. 217 (Ct. App. 1873)...............................................................26

*Republica v. Cobbett,*
   3 U.S. 467 (Pa. 1798) ......................................................................9, 10

*Samuels v. Mackel,*
   401 U.S. 66 (1971).............................................................................24

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
   591 U.S. 197 (2020)............................................. 3, 4, 5, 7, 9, 10, 11, 28

*Sheridan v. Colvin,*
   78 Ill. 237 (1875) ..............................................................................20

*State ex rel. McCaffery v. Aloe,*
   54 S.W. 494 (Mo. 1899) .....................................................................20

*State v. Otis,*
   230 P. 414 (Wash. 1924) ....................................................................25

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998)..............................................................................22

*Stern v. Marshall,*
   564 U.S. 462 (2011).............................................................................7

*Tappan v. Gray,*
   9 Paige Ch. 506 (Ch. Ct. N.Y. 1842) ..................................................20

*Taylor v. Kercheval,*
   82 F. 497 (C.C.D. Ind. 1897) .............................................................20

*Transamerica Mortg. Advisors, Inc. v. Lewis,*
   444 U.S. 11 (1979)..............................................................................16

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021)............................................................................5, 11

*United States v. Perkins,*
   116 U.S. 483 (1886)..............................................................................4

v

*Vitarelli v. Seaton,*
  *359 U.S. 535 (1959)*.............................................................22
*Walton v. House of Representatives of,*
  *Okla.*, 265 U.S. 487 (1924) ........................................18, 21
*Whitcomb v. Chavis,*
  403 U.S. 124 (1971) ..........................................................18
*White v. Berry*,
  171 U.S. 366 (1898) ..........................................................21
*Whitman v. Am. Trucking Ass'ns,*
  *Inc.*, 531 U.S. 457 (2001)....................................................7
*Wiener v. United States*,
  357 U.S. 349 (1958) .............................................................5

## Treatises and Compilations

15 U.S.C. § 2805(b)(1) ............................................................23
28 U.S.C. § 1361 ....................................................................27
29 U.S.C. § 153(a) ....................................................................9
42 U.S.C. § 1983 ....................................................................13
42 U.S.C. § 2000e-5(g) .............................................................3
8 U.S.C. § 1252(e)(1)...............................................................23
An Act To enact Part II of the District of Columbia Code, entitled
  Judiciary and Judicial Procedure codifying the general and
  permanent laws relating to the judiciary and judicial procedure of the
  District of Columbia, 77 Stat. 602, Pub. L. 88-241 (1963) .................14
D.C. Code § 16-3501 ........................................................13, 14
D.C. Code §§ 16-3545, 3548 .................................................16
D.C. Code §§ 16-3547 ...........................................................16
U.S. Const. art. II, § 1, cl. 1.....................................................3
U.S. Const. art. II, § 3 .............................................................3

## No table of authorities entries found.No table of authorities entries found.13

1 Annals of Cong. (1789) ........................................................28
1 Annals of Cong. 463.............................................................3
Eugene McQuillin, *A Treatise on the Law of Municipal Corporations*
  (1911)...............................................................................21

Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* (1909)................................................................................21

James L. High, *Extraordinary Legal Remedies* (1896)....................14, 25

James L. High, *Treatise on the Law of Injunctions* (2d ed. 1880)..........21

John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1760 (4th ed. 1918)................................................................................21

Joseph Story, *Commentaries on Equity Pleadings and the Incidents Thereof* (2d ed. 1840)..................................................................19

*Nikolas Bowie, Why the Constitution Was Written Down, 71 Stan. L. Rev. 1397 (2018)* .................................................................19

Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985 (2022)......19

*W.S. Holdsworth, English Corporation Law in the 16th and 17th Centuries, 31 Yale L.J. 382 (1922)* .....................................................19

## INTEREST OF *AMICI CURIAE*

Under Federal Rule of Appellate Procedure 29, the Attorney General of Florida—on behalf of the States of Florida, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Montana, Mississippi, North Dakota, Oklahoma, South Dakota, Tennessee, Texas, Utah, and West Virginia, and the Arizona Legislature—respectfully submits this brief as *amici curiae* in support of Appellants. *Amici* have an interest in ensuring that federal officials exercising significant executive authority are removable by the President, and thus democratically accountable to the people. Anything less is inconsistent with the Framers' design and risks intrusion on state sovereignty.

## SUMMARY OF ARGUMENT

As the Government explains, the district court erred on the merits. *See* Init. Br. 11–27. Core separation-of-powers principles, bolstered by long historical understanding, require that the President have the authority to remove at-will officials like Appellees Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka, Jr., who as Commissioners of the Consumer Products Safety Commission wield substantial executive power. That constitutional design indirectly preserves state sovereignty

by ensuring that "independent agencies" are democratically accountable should they attempt to intrude in state affairs.

The district court also fumbled the remedy. The court purported to provide three forms of relief. First, it purported to declare that "President Donald J. Trump's purported termination of Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") is ultra vires, contrary to law, and without legal effect." JA84. Second, it purported to reinstate the three commissioners "de facto," JA81, by enjoining the Secretary of the Treasury, the Director of the Office of Management and Budget, and the Acting Chairman of the Consumer Products Safety Commission ("CPSC") from "taking any action to effectuate Plaintiffs' unlawful terminations." JA84. Third, the court ruled that "[e]ven if de facto reinstatement is unavailable as a form of equitable relief, it is available alternatively by a writ of mandamus." JA81. That maneuver flouts Congress's decision to channel removal challenges through quo-warranto proceedings. Worse yet, the court ignored longstanding limits on its remedial authority. Its grant of injunctive relief violates the longstanding rule that courts may not use their equitable powers to remedy unlawful removals

2

absent an act of Congress. *See, e.g.*, 42 U.S.C. § 2000e-5(g) (authorizing courts to "reinstate[]" employees who suffer discrimination). And the court wrongly assumed it could sidestep that limit by reinstating Boyle, Hoehn-Saric, and Trumka through a declaration or a writ of mandamus. This Court should reverse.

## ARGUMENT

### I.  The President has authority to remove Commissioners of the Consumer Products Safety Commission at will.

"'[T]he 'executive Power'—all of it—is 'vested in a President, who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). And "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (1789) (J. Madison). That necessarily includes the authority to remove executive officers. Indeed, "lesser officers must remain accountable to the President," for it is his "authority they wield." *Seila Law*, 591 U.S. at 213. Without the power to remove, the President lacks the ability to compel compliance with his directives, *id.* at 213–14, and thus to fulfill his oath to execute the law, U.S. Const. art. II, § 3.

3

Given the "necessity of an energetic executive," *The Federalist* No. 70, at 472 (Hamilton) (Jacob E. Cooke, ed., 1961), and the legislative branch's historic tendency to "draw[] all power into its impetuous vortex," *The Federalist* No. 48, at 333 (Madison) (Jacob E. Cooke, ed., 1961), it is critical that the President's authority to direct and supervise the executive branch in the performance of its functions be protected from legislative encroachment. As a result, the Supreme Court has recognized only two exceptions to the President's otherwise "exclusive and illimitable power of removal." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935); *see also Seila Law*, 591 U.S. at 215 (referring to the President's "unrestricted removal power"). Neither exception covers a member of the CPSC.

The first exception is for certain inferior officers, and it has been applied to only two: a naval cadet-engineer, *United States v. Perkins*, 116 U.S. 483 (1886), and the so-called independent counsel, *Morrison v. Olson*, 487 U.S. 654 (1988). Whatever its continuing vitality, that inferior-officer exception is inapplicable to Commissioners of the CPSC. Commissioners are appointed by the President with the advice and consent of the Senate, 15 U.S.C. § 2053(a), and do not have a superior other than the

4

President. They thus qualify as principal officers under the chief criterion the Supreme Court has recognized for determining whether an Officer of the United States is principal or inferior. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021); *Edmond v. United States*, 520 U.S. 651, 662–63 (1997).

The second exception, recognized in *Humphrey's Executor* and later in *Wiener v. United States*, 357 U.S. 349 (1958), is for "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [i]s said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. That exception does not apply to the CPSC either, because the CPSC cannot say it is "charged with the enforcement of no policy except the policy of law." *Humphrey's Ex'r*, 295 U.S. at 624. To the contrary, the CPSC exercises considerable policymaking discretion in its authority to "promulgate consumer product safety standards" by legislative rule, 15 U.S.C. § 2056(a), and ban certain hazardous products from commerce entirely, *id.* § 2057. The CPSC also determines whether products pose a substantial hazard, and it has authority to direct the manufacturer to cease distribution, remedy the defect, and remit civil penalties. *Id.* §§ 2064(c)–(d), (f); 2069.

5

The CPSC also has considerable litigating and prosecutorial authority. It can file injunctive actions in district court to restrain violations of its regulations, 15 U.S.C. § 2071, including through its own attorneys if the Attorney General declines representation, *id*. § 2076(b)(7)(A). Not only that, it is a crime punishable by imprisonment to violate the Consumer Product Safety Act, *id*. § 2070, and the CPSC can prosecute "any criminal action" under its jurisdiction "through its own legal representative, with the concurrence of the Attorney General," *id*. § 2076(b)(7)(B).

The CPSC therefore exercises a significant "part of the executive power vested by the Constitution in the President" and should be considered a part of the executive department. *Humphrey's Ex'r*, 295 U.S. at 628. The Commissioners of the CPSC must be fully accountable to the President, just like any other executive officers, and cannot be shielded from presidential supervision by a statute restricting the grounds on which they may be removed.

If there were any question about that analysis, the *Humphrey's Executor* exception should be interpreted as narrowly as possible. *Humphrey's Executor* indulged the fiction that a so-called "independent" agency "exercises no part of the executive power vested by the Constitution in

the President." 295 U.S. at 628. It went so far as to propose the existence of a new class of officers—"a *de facto* fourth branch of Government," *Seila Law*, 591 U.S. at 240 (Thomas, J., concurring)—that acted "in part quasi-legislatively and in part quasi-judicially." *Humphrey's Ex'r*, 295 U.S. at 628. *Humphrey's Executor* did so based on reasoning "devoid of textual or historical precedent for the novel principle it set forth." *Morrison*, 487 U.S. at 726 (Scalia, J., dissenting). If an officer exercises "quasi-legislative" power, that officer belongs in the legislative branch. If, on the other hand, an officer exercises "quasi-adjudicative" power, that officer belongs in the judicial branch. It could hardly be otherwise, since Congress "lacks the authority to delegate its legislative power." *Seila Law*, 591 U.S. at 247 (Thomas, J., concurring) (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001)). Congress also "cannot authorize the use of judicial power by officers acting outside of the bounds of Article III." *Id.* (citing *Stern v. Marshall*, 564 U.S. 462, 484 (2011)). In suggesting the opposite, *Humphrey's Executor* defied one of the most basic principles of the separation of powers embodied in the American experiment.

Not surprisingly, *Humphrey's Executor* has seen its already shaky foundations eroded over the years. In *Morrison*, the Supreme Court

sidestepped *Humphrey's Executor*'s troublesome reliance "on the terms 'quasi-legislative' and 'quasi-judicial,'" instead grounding its endorsement of tenure protection for the independent counsel on the conclusion that tenure protection did not "unduly trammel[] on executive authority." 487 U.S. at 689, 691. The decision similarly avoided scrutiny in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, in part because the parties there "agree[d] that the Commissioners [of the Securities and Exchange Commission] cannot themselves be removed by the President except under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office.'" 561 U.S. 477, 487 (2010) (quoting *Humphrey's Ex'r*, 295 U.S. at 620). But the majority opinion in *Free Enterprise Fund* is replete with reminders that allowing officers to "execute the laws" without plenary presidential supervision "is contrary to Article II's vesting of the executive power in the President"—a principle squarely in conflict with *Humphrey's Executor*. 561 U.S. at 496. And most recently, in *Seila Law* and again in *Collins v. Yellen*, 594 U.S. 220 (2021), the Supreme Court took particular care not to widen the application of *Humphrey's Executor* beyond its essential facts.

8

This history counsels in favor of treating the exception for politically balanced, multi-member commissions narrowly. And because that exception does not fit the CPSC in all relevant respects, the Commissioners of the CPSC are not entitled to the removal protections set forth in 15 U.S.C. § 2053(a).

## II. By upsetting the separation of powers, "independent" executive officers and agencies threaten state sovereignty.

Federalism concerns also weigh in the balance. Indeed, whether Congress may shield executive officials from presidential oversight has grave ramifications for *amici* States. Before joining the union, "the several States had absolute and unlimited sovereignty within their respective boundaries." *Republica v. Cobbett*, 3 U.S. 467, 473 (Pa. 1798). By entering a compact under the Constitution, the States "surrendered" some of that sovereignty to the United States. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 435 (1793) (Iredell, J., dissenting). But "in every instance where [their] sovereignty ha[d] not been delegated to the United States, [the States remained] completely sovereign." *Id.* The result was a "system of government" that "differ[ed], in form and spirit, from all other governments, that ha[d] [t]heretofore existed in the world"—a carefully calibrated balance of power between States and the federal government.

9

*Respublica*, 3 U.S. at 473. "[T]he United States ha[s] no claim to any authority but such as the States have surrendered to [it]." *Chisholm*, 2 U.S. at 435 (Iredell, J., dissenting).

When ceding that sovereign power, the States ensured that it would be divided among distinct branches of the federal government. They "viewed the principle of the separation of powers as the central guarantee of a just government." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 870 (1991). To protect their sovereignty and preserve individual liberty, the founding States "scrupulously avoid[ed] concentrating power in the hands of any single individual." *Seila Law*, 591 U.S. at 223. The one exception was the executive branch. Because an "energetic executive" is "essential" to perform that branch's "unique responsibilities," the Framers decided to "fortif[y]" that power in "one man." *Id.* at 223–24. To mitigate their concerns over power consolidation, they made the executive branch "the most democratic and politically accountable" in the federal government. *Id.* at 224. Only the President and Vice President are "elected by the entire Nation." *Id.* And because of the nature of the electoral college, they are elected not just by the People, but also by the States.

Independent agencies threaten this compact. *See, e.g.*, *Seila Law*, 591 U.S. at 246 (Thomas, J., concurring) (observing that cases like *Humphrey's Executor* "laid the foundation for a fundamental departure from our constitutional structure"). They represent one of the founding States' worst fears: the consolidation of power in one or a few democratically unaccountable officials. *See* 591 U.S. at 222–24. Without "a politically accountable officer [to] take responsibility" for the exercise of executive power, "the public [and the States] can only wonder 'on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Arthrex*, 594 U.S at 16 (quoting *The Federalist* No. 70, at 476 (A. Hamilton) (Jacob E. Cooke, ed., 1961)). By eviscerating the "clear and effective chain of command down from the President, on whom all people vote," the actions of independent agencies are deprived of "legitimacy and accountability to the public." *Id.* at 11 (internal quotation marks omitted).

## III. Boyle, Hoehn-Saric, and Trumka are not entitled to reinstatement in any event.

The lawfulness of their removals aside, Boyle, Hoehn-Saric, and Trumka still are not entitled to reinstatement. First, they did not seek writs of quo warranto under the D.C. Code, the exclusive remedial

process for removed officials. Second, courts sitting in equity have histor-ically lacked the power to reinstate a public official, whether through an injunction or through a declaration. Third, Boyle, Hoehn-Saric, and Trumka have not established a clear legal right to reinstatement, as nec-essary to obtain a writ of mandamus.

### A. Boyle, Hoehn-Saric, and Trumka did not invoke the ex-clusive avenue for challenging a federal officer's re-moval: the quo-warranto process.

Congress may "foreclose" freestanding legal avenues for relief and instead channel legal challenges through a statutory enforcement scheme. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 328–29 (2015); *see Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19–20 (1981). To express such an "intent," *Armstrong*, 575 U.S. at 328, Congress typically codifies a "comprehensive" enforcement and "remedial scheme" for a given context, *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451 U.S. 77, 93–94 (1981). In *Sea Clammers*, for instance, this Court determined that two federal environmental laws were "elaborate enforcement provisions" suf-ficient to foreclose alternative enforcement through other causes of ac-tion. 453 U.S. at 13–15. Those federal laws "conferr[ed] authority to sue

12

. . . both on government officials and private citizens" for violations of those laws, and "specified procedures" and available remedies. *Id.* at 13–14. Given that "comprehensive enforcement scheme," the Court concluded that Congress "must be chary" in allowing other means of enforcement—even other express causes of action like 42 U.S.C. § 1983. *Id.* at 14–15, 20.

Congress has similarly erected a broad remedial scheme for federal officers challenging their removals: the D.C. Code's quo-warranto process. *See* D.C. Code § 16-3501 *et seq.*

Historically, the writ of quo warranto was the exclusive process for clearing one's title to office. *Delgado v. Chavez*, 140 U.S. 586, 590 (1891) ("[Q]uo warranto is a plain, speedy, and adequate, as well as the recognized, remedy for trying the title to office[.]"). That writ derived from ancient England and was used by "the king, against one who usurped or claimed any office, franchise or liberty of the crown, to inquire" into whether that individual had the right to exercise that office, franchise, or liberty. James L. High, *Extraordinary Legal Remedies* §§ 591–92 (1896) (quo warranto literally means "by what right"). The king's attorney general "prosecuted" the suit, *id.* § 603, though eventually private

13

individuals were able to use the writ to litigate their own disputes over title to office and "quiet the possession" of that office, *id.* § 602.

Congress built upon that common law in enacting the modern quo-warranto framework within the D.C. Code, which sets out a clear and exclusive process for a removed federal officer to challenge her removal. *See* Pub. L. No. 88-241, § 1, 77 Stat. 602, 1963); *Andrade v. Lauer*, 729 F.2d 1475, 1497–98 (D.C. Cir. 1984). The Code dictates what situations are covered: where a person "usurps, intrudes into, or unlawfully holds or exercises" a federal office. D.C. Code § 16-3501. It provides how the law is enforced: a "civil action" against the intruder, *id.*, with rules for pleading, *id.* §§ 16-3541, 3544; and "notice" to the alleged intruder, *id.* § 16-3542. And it tells litigants where to sue: in "the United States District Court for the District of Columbia." *Id.* § 16-3501.

The Code also details who may enforce the provisions: usually, the Attorney General or a United States attorney. *Id.* §§ 16-3502, 16-3503. But "[i]f the Attorney General or United States attorney refuses" to sue, an "interested person may apply to the court" to proceed anyway. *Id.* § 16-3503; *see also Newman v. United States ex rel. Frizzell*, 238 U.S. 537, 544, 550–51 (1915) (explaining that the Code "gives a person who has been

14

unlawfully ousted before his term expired, a right, on proof of interest, to the issuance of the writ").

Last, as critical here, the Code outlines the available remedies. If quo warranto is issued, the district court must "oust[] and exclude[]" the intruder from office and allow "the relator [to] recover his costs" from the litigation. *Id.* § 16-3545. And the Code authorizes compensatory damages, permitting the "relator" to sue "the party ousted and recover the damages sustained by the relator" after obtaining judgment in the initial quo-warranto case. *Id.* § 16-3548.

"Given the painstaking detail with which the [Code] sets out the method" for challenging a removal, it should be clear "Congress intended" the Code to be the "exclusive" process for testing one's title to office. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11–13 (2012). Yet Boyle, Hoehn-Saric, and Trumka did not so much as mention "quo warranto" in their complaint, let alone invoke the D.C. Code's quo-warranto process or allege facts showing that they have complied with its procedural requirements.

One way or another, the Code does not permit the reinstatement Boyle, Hoehn-Saric, and Trumka seek. It authorizes just three remedies for federal officers challenging their removals: (1) legal "oust[er]" of the

15

"intrude[r]," (2) physical "exclu[sion]" of the intruder from the office, or (3) "damages" for the removed official. D.C. Code §§ 16-3545, 16-3548. Nowhere does it authorize reinstatement, either through an injunction or a writ of mandamus. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) (explaining that a statute that "expressly provides a particular remedy or remedies" typically excludes other remedies). That silence is deafening here, seeing that Congress *did* authorize reinstatement in the Code for quo-warranto proceedings involving D.C.-based corporations. *See* D.C. Code §§ 16-3547 ("[T]he court may render judgment . . . that the relator, if entitled to be declared elected, be admitted to the office."), 16-3546 (authorizing the court to "perpetually restrain[] and enjoin[] [defendants] from the commission or continuance of the acts complained of"). "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 143 S. Ct. 713, 720 (2023). Here, the difference is that Congress permitted reinstatement for *corporate* officers but left to the President the power to reinstate *federal* officers. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[T]he character of those who [may] exercise

16

government authority" "is a decision of the most fundamental sort for a sovereign entity[.]").

In sum, Boyle, Hoehn-Saric, and Trumka failed to travel under the D.C. Code—Congress's chosen mechanism for adjudicating federal-officer removals. Nor would the Code authorize the relief they seek in any event. For either reason, the Court should stay the district court's reinstatement orders.

**B.    Even if Boyle, Hoehn-Saric, and Trumka could seek relief outside of the quo-warranto process, the federal courts cannot grant their requested relief.**

Independent of that, Boyle, Hoehn-Saric, and Trumka's claims fail because courts sitting in equity have never been empowered to reinstate public officials. Boyle, Hoehn-Saric, and Trumka cannot dodge that limitation by requesting a declaration or a writ of mandamus.

**1.    Historically, equity courts would not remedy allegedly unlawful removals.**

"The remedial powers of an equity court . . . are not unlimited." *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971). Federal courts may issue only equitable remedies "traditionally accorded by courts of equity." *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., joined by Alito, J., dissenting) (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond*

17

*Fund, Inc.*, 527 U.S. 308, 319 (1999)). And history teaches that "[a] court of equity has no jurisdiction over the appointment and removal of public officers." *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 490 (1924); *Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) (finding it "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers" (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).

That rule flows from English common law. Recognizing the critical "distinction between judicial and political power," English courts would not wield equity to vindicate a litigant's "political right[]" to office. *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 71, 76 & n.20 (1867) (collecting cases); *see Sawyer*, 124 U.S. at 212 (collecting cases, including *Attorney General v. Earl of Clarendon*, 17 Ves. Jr. 491, 498, 34 Eng. Rep. 190, 193 (Ch. 1810)). In *Earl of Clarendon*, for instance, the English Court of Chancery declined to remove public-school officers for lack of necessary legal qualifications. 34 Eng. Rep. at 191. According to that court, a court of equity "has no jurisdiction with regard either to the election or the [removal] of" officers. *Id.* at 193. Contemporary English cases agreed. *See* Joseph Story, *Commentaries on Equity Pleadings and the Incidents Thereof*

§§ 467–70 (2d ed. 1840) (explaining that equity courts would not adjudicate rights of a "political nature"); Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985, 2011–12 (2022).[1]

American courts imported that principle after the Framing. In the early 19th century, courts nationwide denied equitable relief to removed officials, even when the official's ouster was illegal and unauthorized. *Tappan v. Gray*, 9 Paige Ch. 506, 508–09 (Ch. Ct. N.Y. 1842); *see also Hagner*, 7 Watts & Serg. at 105; *Sawyer*, 124 U.S. at 212 (collecting cases). *Hagner* is emblematic. There, the Supreme Court of Pennsylvania

---

[1] Although *Earl of Clarendon* and some cases cited in *Sawyer* involved corporate officers, those legal entities were treated more like governments and public entities. Colonial governments, for example, were created through corporate charters, with "shareholders" acting like modern-day voters and voting for corporate boards that looked like modern-day state and local governments. Nikolas Bowie, *Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397, 1416–21 (2018); see also Letter from John Adams to the Inhabitants of the Colony of Massachusetts-Bay, Apr. 1775, https://founders.archives.gov/documents/Adams/06-02-02-0072-0015. And as noted in *Hagner v. Heyberger*, limits on equitable jurisdiction that applied to "private corporations" apply "à fortiori" to "public officer[s] of a municipal character." 7 Watts & Serg. 104, 105 (Penn. 1844); *see also* W.S. Holdsworth, *English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382, 383–84 (1922) (For both public and private corporations, "creation by and subordination to the state are the only terms upon which the existence of large associations of men can be safely allowed to lead an active life.").

declined to enjoin a defendant from unlawfully acting as a school director because it possessed no more power than "an English court of chancery." *Hagner*, 7 Watts & Serg. at 106–07. Because chancery courts traditionally "would not sustain the injunction proceeding to try the election or [removal] of corporators of any description," Pennsylvania's high court held that it could not either. *Id.* Other courts took a similar tack throughout Reconstruction.[2]

This Court confirmed that equitable constraint in *Sawyer*. A locally elected officer there obtained a federal injunction barring local officials from removing him. 124 U.S. at 204–06. After the local officials were held in contempt of that injunction, the Court issued a writ of habeas corpus to vacate their convictions because the injunction was issued without jurisdiction. This Court explained that a federal equity court "has no jurisdiction . . . over the appointment and removal of public officials." *Id.* at

---

[2] *See, e.g.*, *Cochran v. McCleary*, 22 Iowa 75, 91 (1867) ("The right to a public office or franchise cannot, as the authorities above cited show, be determined in equity."); *Delahanty v. Warner*, 75 Ill. 185, 186 (1874) (similar); *Sheridan v. Colvin*, 78 Ill. 237, 247 (1875) (similar); *Beebe v. Robinson*, 52 Ala. 66, 73 (1875) (similar); *Taylor v. Kercheval*, 82 F. 497, 499 (C.C.D. Ind. 1897) (similar); *State ex rel. McCaffery v. Aloe*, 54 S.W. 494, 496 (Mo. 1899) (similar).

210.[3] A wall of contemporary treatises echoed that understanding.[4] As one 19th-century commentator put it, "[n]o principle of the law of injunctions" "is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers or their title to office." 2 High, *Law of Injunctions* § 1312.

By contrast, there is no established tradition of equity courts' remedying unlawful removals, at least not without express statutory authorization. *See Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) ("'No English case' involved 'a bill for an injunction to restrain the appointment or removal of a municipal officer.'" (quoting *Sawyer*, 124 U.S. at 212)). We know of only two cases[5] in which a federal court sitting in equity reinstated a removed officer, all of which were decided in the later 20th

---

[3] *See also White v. Berry*, 171 U.S. 366, 377 (1898); *Walton*, 265 U.S. at 490; *Baker v. Carr*, 369 U.S. 186, 231 (1962).

[4] *See* 2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909); 4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1760 (4th ed. 1918); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 n.98 (1911).

[5] *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983); *Vitarelli v. Seaton*, 359 U.S. 535 (1959).

21

century, and none of which grappled with limits on federal remedial power. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by" rulings have "no precedential effect."). The lack of historical pedigree for removal-related remedies proves that they were "unknown to traditional equity practice." *Grupo Mexicano*, 527 U.S. at 327.

The absence of a historical equitable remedy is confirmed by the presence of a historical *legal* remedy: the writ of quo warranto. "[T]he exclusive remedy" for "direct[ly] attack[ing]" one's removal has traditionally been "a *quo warranto* action." *Andrade*, 729 F.2d at 1497; *see also Johnson v. Horton*, 63 F.2d 950, 953 (9th Cir. 1933) (agreeing with appellees that "the question of the title to the office cannot be tried by a proceeding in equity, but that the exclusive remedy is by a writ of quo warranto" (quotation omitted)). And because a "court of equity will not entertain a case for relief where the complainant has an adequate legal remedy," quo warranto undercuts any "novel equitable power to return an agency head to his office." *Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) (quoting *Case v. Beauregard*, 101 U.S. 688, 690 (1880)).

22

## 2. Declarative relief is unavailable because it too is a form of equitable relief.

Those same considerations foreclose declaratory relief. "[D]eclaratory judgment[s]," after all, are a "form[] of equitable relief." *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948); *accord Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967) (holding that "[t]he declaratory judgment and injunctive remedies are equitable in nature"). Congress, as well as this Court, has adopted that view. *See* 15 U.S.C. § 2805(b)(1) (stating that "the court shall grant such equitable relief as the court determines is necessary . . . including declaratory judgment"); 8 U.S.C. § 1252(e)(1) (prohibiting "declaratory, injunctive, or other equitable relief" in certain circumstances).

This rule makes sense. A declaration "has virtually the same practical impact as a formal injunction would," *Samuels v. Mackel*, 401 U.S. 66, 72 (1971), such that "equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment," *id.* at 73. In enacting the Declaratory Judgment Act, "Congress . . . explicitly contemplated that the courts would decide to grant or withhold declaratory relief on the basis of traditional equitable principles." *Id.* at 70. A declaratory

23

judgment is therefore "not available when," as here, "the result would be a partial end run around" other equitable precedents. *Green v. Mansour*, 474 U.S. 64, 73 (1985).

Declaratory relief—like its injunctive sibling—provides no quarter for Boyle, Hoehn-Saric, and Trumka.

### 3. Boyle, Hoehn-Saric, and Trumka have not shown a clear legal right to obtain mandamus.

Last, the district court wrongly suggested in the alternative that mandamus would be warranted. *See* App. 81–82. But that analysis was mistaken for two reasons. First, as already discussed, *see supra* Part III.B.1, Congress displaced any use of mandamus to reinstate federal officers through the quo-warranto statute. Second, even if federal courts could use mandamus to reinstate officers, mandamus could issue only if the defendant has shirked a "clear" legal duty, and the duties implicated here are far from clear. *Heckler v. Ringer*, 466 U.S. 602, 615–16 (1984).

**a.** For starters, it is still uncertain whether Boyle, Hoehn-Saric, and Trumka hold legitimate title to office, and they may not establish that title for the first time in a mandamus proceeding. Rather, Boyle, Hoehn-Saric, and Trumka must first settle the cloud over their titles through the quo-warranto process. *See, e.g.*, *People ex rel. Arcularius v. City of*

24

*New York*, 3 Johns. Cas. 79, 79–80 (N.Y. Sup. Ct. 1802) ("The proper remedy, in the first instance, is by an information in the nature of a quo warranto, by which the rights of the parties may be tried."); High, *Extraordinary Legal Remedies* § 49. Only then is their title sufficiently "clear" to justify reinstatement through mandamus. *Heckler*, 466 U.S. at 615–16.

That two-step process has stood for centuries. Courts used mandamus to "compel" only "clear and specific dut[ies]" that were "positively required by law." High, *Extraordinary Legal Remedies* § 24. Yet at common law, "the only efficacious and specific" way to clear up one's "title to an office" was through the writ of quo warranto. *Id.* § 49; *see also Delgado v. Chavez*, 140 U.S. 586, 590 (1891); *State v. Otis*, 230 P. 414, 458 (Wash. 1924) ("The petition here shows that the title to an office is involved, and that is a question which may arise just as well where there is only one person asserting title as where there are two."); *People ex rel. Dolan v. Lane*, 55 N.Y. 217, 219 (Ct. App. 1873) ("Indeed, it is doubtful whether the title to an office ought ever to be tried collaterally on proceedings by mandamus instituted in behalf of a party out of possession."). Until quo warranto issued to clarify one's title to office, disputes over title precluded

25

the clarity necessary for reinstatement through mandamus. *See French v. Cowan*, 10 A. 335, 339–40 (Me. 1887).

For that reason, the common law developed a two-step process for a removed officer seeking to oust an intruder and obtain reinstatement. First, officers would resolve clouds on their title through quo warranto: By "*quo warranto*," the courts would "test the title to the office." *Id.* at 340.[6] Then, the aggrieved official would seek mandamus if the executive refused to restore them to their office: "[B]y *mandamus* the legal officer is put in his place." *Id.*; *see also Chi. Sch. Finance Auth. v. City Council of City of Chi.*, 472 N.E.2d 805, 808 (Ill. 1984) (refusing to issue writ of mandamus because the court had "confidence that the city council will perform its [legal] duty"); *Murray v. Lewis*, 576 So. 2d 264, 267 (Fla. 1990) (similar). Congress presumptively incorporated the same limitations into the modern mandamus framework. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (Congress legislates against the backdrop

---

[6] *See also The King v. Mayor of Colchester*, 100 Eng. Rep. 141, 141–42 (K.B. 1788); *City of New York*, 3 Johns. Cas. at 79; *The Queen v. Councillors of Derby*, 112 Eng. Rep. 528, 528–29 (Q.B. 1837); *The Queen v. Phippen*, 112 Eng. Rep. 734, 735 (Q.B. 1838); *Bonner v. State*, 7 Ga. 473, 479–80 (1849).

of common law); *see also Heckler*, 466 U.S. at 616 (noting that "[t]he com-mon-law writ of mandamus" is "codified in 28 U.S.C. § 1361").

The district court's orders do not lay a glove on that common-law analysis. The common law teaches that the removed official must first clear title through quo warranto, and only then seek reinstatement through mandamus. Yet Boyle, Hoehn-Saric, and Trumka have neither sought quo warranto nor met the procedural prerequisites for that writ. Reinstatement is thus unavailable through mandamus as well.

**b.** In any event, even if the Court could determine rights and restore officers through mandamus in one fell swoop, Boyle, Hoehn-Saric, and Trumka are not "clear[ly]" right on the merits. *Heckler*, 466 U.S. at 616–17. Given the President's nearly "unrestricted removal power" over offic-ers "who wield executive power," he and his subordinates have no duty to reinstate Boyle, Hoehn-Saric, and Trumka. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020). As set out above, *see supra* Part I, the CPSC wields "executive power" and does not fall into either of the two narrow exceptions to the President's at-will removal authority. Under our constitutional system, "if any power whatsoever is in its na-ture Executive, it is the power of appointing, overseeing, and controlling

27

those who execute the laws." *Seila Law*, 591 U.S. at 213 (quoting 1 Annals of Cong. 463 (1789)). That "illimitable power" has been confirmed by this Court again and again. *Humphrey's Ex'r v. United States*, 295 U.S. 602, 631 (1935); *see also Seila Law LLC*, 591 U.S. at 215. Boyle, Hoehn-Saric, and Trumka thus have not shown a clear legal right to interfere with the President's removals through judicial reinstatement.

28

## CONCLUSION

The Court should reverse.

August 18, 2025                          Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

*/s/ Jeffrey Paul DeSousa*
JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
  *Counsel of Record*
NATHAN A. FORRESTER
JASON J. MUEHLHOFF
  *Chief Deputy Solicitors General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*

State of Florida
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,749 words. It also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

*/s/ Jeffrey Paul DeSousa*
Jeffrey Paul DeSousa
Acting Solicitor General

## CERTIFICATE OF SERVICE

I certify that on August 18, 2025, I caused this document to be electronically filed with the Clerk of Court using this Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Jeffrey Paul DeSousa*
Jeffrey Paul DeSousa
Acting Solicitor General