No. 25-1687

IN THE

# United States Court of Appeals for the Fourth Circuit

---

MARY BOYLE, *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES, *et al.*,

*Defendants-Appellants*.

---

On Appeal to Reverse the Order Issued
by the United States District Court
for the District of Maryland

---

## BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS

---

John J. Vecchione
Zhonette Brown
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
john.vecchione@ncla.legal
*Counsel for* amicus curiae *the New Civil Liberties Alliance*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1687__        Caption: __Boyle, et al. v. Trump, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__New Civil Liberties Alliance__
(name of party/amicus)

_____

 who is _____Amicus Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐ YES ☐ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?     ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John J. Vecchione       Date:    08/18/2025

Counsel for: New Civil Liberties Alliance

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ii

INTEREST OF THE AMICUS CURIAE .................................................1

INTRODUCTION AND SUMMARY ......................................................3

ARGUMENT ...................................................................................5

  I. AN ABSOLUTE AND UNQUALIFIED REMOVAL AUTHORITY IS
     INHERENTLY NECESSARY TO PRESERVE EXECUTIVE POWER .............5

  II. AN HISTORICAL UNDERSTANDING OF EXECUTIVE POWER FURTHER
      CONFIRMS THE PRESIDENT'S REMOVAL AUTHORITY IS ABSOLUTE
      AND UNQUALIFIED ..........................................................7

  III. UNLIKE THE CONSTITUTION'S APPOINTMENTS CLAUSE, THE POWER
       OF REMOVAL IS ABSOLUTE ............................................10

  IV. ONLY BY POSSESSING AN ABSOLUTE REMOVAL AUTHORITY CAN THE
       PRESIDENT "TAKE CARE THAT THE LAWS BE FAITHFULLY
       EXECUTED" .................................................................12

  V. THE ACTIONS OF THE REINSTATED COMMISSIONERS CONFIRM ONLY
      AN ABSOLUTE REMOVAL CAN SAFEGUARD OUR CONSTITUTIONAL
      STRUCTURE .................................................................14

CONCLUSION ..............................................................................17

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Buckley v. Valeo,*
424 U.S. 1 (1976)..................................................................14

*Collins v. Yellen,*
594 U.S. 220 (2021)................................................................9

*Cunningham v. Neagle,*
135 U.S. 1 (1890)..............................................................5, 13

*Fleming v. U.S. Dep't of Agric.,*
987 F.3d 1093 (D.C. Cir. 2021)..............................................6

*Free Enter. Fund v. PCAOB,*
561 U.S. 477 (2010)............................................6, 10, 12, 13

*Myers v. United States,*
272 U.S. 52 (1926)..............................................5, 10, 12, 13

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020)....................................................5, 6, 10

*United States v. Arthrex, Inc.,*
594 U.S. 1 (2021)..............................................................4, 6

CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 1, cl. 1.............................................3, 8

U.S. Const. art. II, § 2, cl. 2................................................3

U.S. Const. art. II, § 3....................................................3, 8, 12

OTHER AUTHORITIES

Exec. Order No. 14,210,
90 Fed. Reg. 9,669 (Feb. 11, 2025) ....................................14

Exec. Order No. 14,215,
90 Fed. Reg. 10,447 (Feb. 18, 2025) ..................................14

Exec. Order No. 14,219,
90 Fed. Reg. 10,583 (Feb. 19, 2025) ..................................................... 14

James Madison (June 22, 1789),
*in* 11 Documentary History of the First Federal Congress (Charles
Bangs Bickford, et al., eds. The Johns Hopkins Univ. Press, 1992) ... 11

John Vining (May 19, 1789),
*in* 10 Documentary History of the First Federal Congress (Charlene
Bangs Bickford, et al., eds., The Johns Hopkins Univ. Press, 1992) .. 10

Notice of Hearing,
90 Fed. Reg. 26,983 (June 25, 2025) ..................................................... 15

Philip Hamburger,
Delegation or Divesting,
115 Nw. L. Rev. Online 88 (2020) ..................................................... 7, 8

The Federalist No. 78,
(Alexander Hamilton) (Cooke ed., 1961) ................................................ 8

U.S. CPSC,
Minutes of Commission Meeting: Safety Standard for Lithium-Ion
Batteries Used in Micromobility Products (Apr. 30, 2025) .................. 16

## INTEREST OF THE AMICUS CURIAE[1]

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization and public-interest law firm devoted to defending constitutional freedoms from the administrative state's depredations. Professor Philip Hamburger founded NCLA to challenge multiple constitutional defects in the modern administrative state through original litigation, *amicus curiae* briefs, and other advocacy. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, and the right to have laws made by the nation's elected lawmakers through constitutionally prescribed channels (*i.e.*, the right to self-government). These selfsame civil rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, the President, federal agencies, and sometimes even the Judiciary, have neglected them for so long.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

NCLA aims to defend civil liberties—primarily by asserting constitutional constraints on the administrative state. Although the American People still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional state within the Constitution's United States is the focus of NCLA's concern.

NCLA is particularly disturbed in this case by the district court's entry of an order declaring President Donald J. Trump's termination of Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their roles as Commissioners of the Consumer Product Safety Commission ("CPSC") *ultra vires*, contrary to law, and without legal effect. That order flouts the Constitution's separation of powers and unconstitutionally overrides the President's absolute authority to remove executive branch officials. The lower court's permanent injunction enjoining Defendants from taking any action to effectuate Plaintiffs' purportedly unlawful terminations (until such time as Plaintiffs' terms expire pursuant to 15 U.S.C. § 2053), proves additionally troubling. By effectively reinstating Plaintiffs, rather than merely allowing them to sue

for, say, backpay, the order compels the President to act contrary to his judgment "[to] take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The actions taken by Plaintiffs immediately following their ill-advised, court-mandated reinstatement aptly illustrate the gravity of the constitutional violation and why any attempt by Congress to limit the President's ability to fire principal officers represents a serious  affront to separation of powers.

## INTRODUCTION AND SUMMARY

Article II provides the executive power is "vested in a President of the United States of America." The text, structure, and historical context of Article II establish that the President, as the sole head of the Executive Branch, holds an absolute and unqualified removal authority over principal officers in the Executive Branch.

Three aspects of Article II are relevant to the question of the President's removal authority. *First*, Article II, § 1, Clause 1, vests the "executive Power" in the President of the United States. U.S. Const. art. II, § 1, cl. 1. *Second*, § 3 of the same Article enjoins the President to "take Care that the Laws be faithfully executed." *Id.* § 3. *And third*, § 2, Clause 2 of Article II, the Appointments Clause, provides that the President

"shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."[2]

When read together and in light of the proper historical understanding of the functional and structural nature of the provisions, and particularly the Constitution's express mandates governing the appointment of "Officers of the United States"—and its corresponding silence concerning their removal—Article II confers upon the President an absolute and unqualified removal authority. Accordingly, neither Congress nor the Courts have authority to interfere in the President's unilateral decision to remove Plaintiffs Boyle, Hoehn-Saric, and Trumka Jr. from their roles as Commissioners of the CPSC.

---

[2] The Constitution does provide for alternative means of appointing *inferior* officers; however, by definition, an "inferior" officer must have a "superior" other than the President. *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021) (quoting *Edmond v. United States*, 520 U.S. 651, 662 (1997)) (internal quotation marks omitted). Because Commissioners of the CPSC have no such "superior," it necessarily follows that they are principal officers.

## ARGUMENT

### I. AN ABSOLUTE AND UNQUALIFIED REMOVAL AUTHORITY IS INHERENTLY NECESSARY TO PRESERVE EXECUTIVE POWER

The Constitution provides the executive power "shall be vested" in the President. The President, by himself, however, cannot execute the law, so he necessarily must rely on a hierarchy of subordinates—whether officers or employees—to do most of the execution. *See Myers v. United States*, 272 U.S. 52, 134 (1926); *Cunningham v. Neagle*, 135 U.S. 1, 63-64 (1890). Yet, the President, by use of subordinate officers or employees, does not also *irretrievably* delegate away his "executive power." Rather, that power remains fully and permanently vested in the President. As this Court held in *Seila Law LLC v. CFPB*, the President maintains the authority both to "supervise and [to] remove the agents who wield executive power in his stead." 591 U.S. 197, 238 (2020).

Such removal authority is, in fact, essential if executive power is to be accountable. As the Court explained in *Myers*, 272 U.S. at 134, "[t]he imperative reasons requiring [the President to possess] an unrestricted power to remove the most important of his subordinates in their most important duties must therefore control the interpretation of the Constitution as to all appointed by him." *See, e.g.*, *Seila Law*, 591 U.S. at

5

238 ("In our constitutional system, the executive power belongs to the President, and that power generally includes the ability to supervise and remove the agents who wield executive power in his stead."); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010) ("Since 1789, the Constitution has been understood to empower the President to keep … officers accountable—by removing them from office, if necessary."); *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1114 (D.C. Cir. 2021) (Rao, J., concurring-in-part and dissenting-in-part) ("Article II executive power necessarily includes the power to remove subordinate officers, because anything traditionally considered to be part of the executive power 'remained with the President' unless 'expressly taken away' by the Constitution.") (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789)).

Indeed, because of the vast growth in executive power, it is more important than ever that such power be accountable through Presidential removal. *See Arthrex,* 594 U.S. at 11 (quoting *Free Enter. Fund*, 561 U.S. at 498) ("Today, thousands of officers wield executive power on behalf of the President in the name of the United States. That power acquires its legitimacy and accountability to the public through 'a

clear and effective chain of command' down from the President, on whom all the people vote."). Accordingly, faithfulness to the Vesting Clause of Article II requires recognition of the President's untrammeled authority to remove executive branch officials, for if the President cannot retain and remove those who execute the law, he no longer holds the full law-executing authority bestowed on the Executive by the Constitution.

## II.   AN HISTORICAL UNDERSTANDING OF EXECUTIVE POWER FURTHER CONFIRMS THE PRESIDENT'S REMOVAL AUTHORITY IS ABSOLUTE AND UNQUALIFIED

The "executive power" is much broader than merely the power to execute the laws. Undoubtedly, such power includes the execution of law, but at the Founding the concept of "executive power" also encompassed the nation's action, strength, or force. This more expansive understanding reinforces the conclusion that the President's "executive power" includes the authority to remove subordinates at will.

An understanding of executive power as the "nation's action, strength, or force" was a familiar concept at the time of the Founding. *See* Philip Hamburger, *Delegation or Divesting*, 115 Nw. L. Rev. Online 88, 110-16 (2020). For example, Jean-Jacques Rousseau associated executive power with society's "force," and Thomas Rutherforth defined it as the

society's "joint strength." *See id.* at 112. As Alexander Hamilton understood and explained, the Constitution divides the government's powers into those of "Force," "Will," and "Judgment"—that is, executive force, legislative will, and judicial judgment. The Federalist No. 78, at 523 (Alexander Hamilton) (Cooke ed., 1961).

This vision of executive power included law enforcement but also much more. Conceiving of the executive power in this way has the advantage of, for example, explaining the President's power in foreign policy, which cannot easily be understood as mere law enforcement. That the Constitution adopted this broad vision of executive power is clear from its text—in particular, from the contrast between the President's "executive Power," U.S. Const. art. II, § 1, and his duty to "take Care that the Laws be faithfully executed," *id.* § 3. Article II frames the President's authority in terms of executive power, not merely "executing the law." The latter is merely a component of the former, which on one hand is limited by the requirement that the President "take Care that the Laws be faithfully executed." But the former proves more expansive to also include the "nation's action, strength, or force."

It follows that the expansive definition of "executive power," girded in the text and history of Article II, necessitates a broad concomitant authority to remove executive officials, for the President must have sufficient authority to remove people whom he views as undermining that strength or lacking in action or forcefulness.

Not only is this understanding of the President's executive power textually and historically more accurate, but it also clarifies the breadth of the President's removal authority. The President's law-executing authority (which is part of his executive power) reveals that he can hire and fire subordinates engaged in law enforcement. And his executive power—understood more fully as the nation's action or force—establishes that he can also hire and fire all other sorts of subordinates. *See Collins v. Yellen*, 594 U.S. 220, 256 (2021) ("The President must be able to remove not just officers who disobey his commands but also those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political party who is dead set against the President's agenda, and those in whom he has simply lost confidence.") (cleaned up). Removal of subordinates is thus inherently

part of the President's broad executive power. *See Seila Law*, 591 U.S. at

238; *Free Enter. Fund*, 561 U.S. at 483; *Myers*, 272 U.S. at 134.

## III. UNLIKE THE CONSTITUTION'S APPOINTMENTS CLAUSE, THE POWER OF REMOVAL IS ABSOLUTE

Although the President's executive power includes both hiring and

firing authority, the Constitution treats them differently. Article II

modifies and limits the Executive's power of appointments, but in its

purposeful silence leaves the removal power unrestrained.

That executive power to remove officers is absolute was spelled out

in 1789 by Representative John Vining of Delaware:

> [T]here were no negative words in the Constitution to
> preclude the President from the exercise of this power, but
> there was a strong presumption that he was invested with it;
> because, it was declared, that all executive power should be
> vested in him, except in cases where it is otherwise qualified;
> as, for example, he could not fully exercise his executive power
> in making treaties, unless with the advice and consent of the
> Senate—the same in appointing to office.

John Vining (May 19, 1789), *in* 10 Documentary History of the First

Federal Congress 728 (Charlene Bangs Bickford, et al., eds., The Johns

Hopkins Univ. Press, 1992). James Madison was equally emphatic,

writing:

> The legislature creates the office, defines the powers, limits
> its duration, and annexes a compensation. This done, the

10

> legislative power ceases. They ought to have nothing to do with designating the man to fill the office. That I conceive to be of an executive nature. ... The nature of things restrains and confines the legislative and executive authorities in this respect; and hence it is that the constitution stipulates for the independence of each branch of the government.

James Madison (June 22, 1789), *in* 11 Documentary History of the First Federal Congress 1032 (Charlene Bangs Bickford, et al., eds., The Johns Hopkins Univ. Press, 1992).

Madison rejected the argument that limits on Presidential appointments implied similar limits on removals, writing that although the power of appointment "be qualified in the constitution, I would not extend or strain that qualification beyond the limits precisely fixed for it." *Id.* (quoted in *Myers*, 272 U.S. at 128).

The First Congress confirmed these views: In 1789, the First Congress rejected efforts to statutorily limit the President's removal authority, in what has since been misleadingly referred to as "The Decision of 1789." Branding this rejection a "decision" inaccurately suggests the President owes his unlimited removal authority to congressional acquiescence. In fact, it has always been the Constitution's text and structure that established the President's absolute removal authority—by granting the President executive power without additional

11

language qualifying his executive removal authority. The 1789 debate, thus, merely provides further evidence of the contemporaneous understanding of the Constitution.[3]

In short, at the time of the Founding it was clearly understood that the President's unlimited removal power differed from, and stood in contrast to, his somewhat cabined power of making appointments. Although both powers are part of the "executive power," the latter was substantially qualified by the text of the Constitution itself, whereas the former remained unqualified and thus absolute.

## IV.  ONLY BY POSSESSING AN ABSOLUTE REMOVAL AUTHORITY CAN THE PRESIDENT "TAKE CARE THAT THE LAWS BE FAITHFULLY EXECUTED"

The Executive's absolute removal authority provides the sole mechanism for the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The President, of course, may, and indeed must, delegate much of his *authority* to carry the laws into execution to subordinates. *See Myers*, 272 U.S. at 117; *Cunningham*, 135

---

[3] According to the Supreme Court: "Since 1789, the Constitution has been understood to empower the President to keep [his] officers accountable— by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. More accurately, the Court might have said: "Since 1787, … "

U.S. at 63-64. At the same time his *duty* "to take Care that the Laws be faithfully executed" is non-delegable, and he remains exclusively responsible for this function of the Government. It therefore follows that the President must hold the power to remove individuals who, in his view, do not help him fulfill, or worse yet, undermine his duty of faithful execution of the nation's laws. Said otherwise, if such subordinates are essential for executing the law, then the Constitution must also "empower the President to keep these officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483.

Only by threat of removal may the President exercise control over his subordinates, thereby ensuring that through *their* actions or inactions, *he* doesn't fail in *his* duty "to take Care that the Laws" are faithfully executed. "[T]o hold otherwise would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed." *Myers*, 272 U.S. at 164.

"A lawsuit is the ultimate remedy for a breach of the law, and it is to the President … that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Buckley v. Valeo*, 424

13

U.S. 1, 138 (1976) (quoting U.S. Const. art. II, § 3). It therefore follows that any official who is authorized to bring suit as a "remedy for a breach of the law" must be directly answerable to the President and removable by him. The Take Care Clause thus underlines and confirms that the President's executive power includes a discretionary authority to remove officials who exercise his authority under that Clause.

## V.    THE ACTIONS OF THE REINSTATED COMMISSIONERS CONFIRM ONLY AN ABSOLUTE REMOVAL CAN SAFEGUARD OUR CONSTITUTIONAL STRUCTURE

Within days of being reinstated, Commissioners Boyle, Hoehn-Saric, and Trumka sought to re-impose their agenda, despite its direct conflict with President Trump's stated policies and Executive Orders or the Acting Chair's prerogatives. *See, e.g.*, Exec. Order No. 14,219, 90 Fed. Reg. 10,583 (Feb. 19, 2025) (ordering deregulatory initiatives); Exec. Order No. 14,215, 90 Fed. Reg. 10,447 (Feb. 18, 2025) (ordering independent agencies, like CPSC, to submit new regulations for review by the Office of Information and Regulatory Affairs ("OIRA"));[4] Exec. Order No. 14,210, 90 Fed. Reg. 9,669 (Feb. 11, 2025) (ordering workforce

---

[4] Non-independent agencies have long been subject to OIRA review. *See* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).

optimization and reductions in force (RIFs)); see also J.A. 115-16 (reduction-in-force actions are at the direction of the CPSC's Chair or Executive Director).

For example, on June 16, 2025, Commissioner Trumka led the effort to unwind the actions taken by the two-member Commission that had been in place since Plaintiffs' removal.[5] J.A. 103-107 (email chain); J.A. 109-113 ("Time Critical Ballot"). In pursuing the reinstated Commissioners' agenda, Commissioner Trumka tacitly threatened CPSC staff. See J.A. 103 ("[L]et me be clear: you are instructed to attend the meeting as usual. If you chose to ignore the directive of the Commission, I suggest you read the Court order and decide whether you want to personally violate it."). The reinstated Commissioners' effort included forcing staff to "submit a proposed Performance Budget Request" by June 25 and holding the CPSC's public "Mid-Year Decisional" on that same day. J.A. 111. It also included scheduling the Commission's agenda and priorities hearings for fiscal years 2026 and 2027. *Id.*; *see also* Notice of Hearing, 90 Fed. Reg. 26,983 (June 25, 2025) (the hearing would have

---

[5] Under 15 U.S.C. § 2053(d) the CPSC may operate with a two-member quorum "for the six[-]month period beginning on the date of the vacancy" causing the Commission's composition to reduce to two members.

covered "the agency's fiscal year 2026 Operating Plan and fiscal year 2027 Congressional Budget Request"). These actions effectively hijacked the Commission's agenda and budget planning for the remainder of this fiscal year—indeed for nearly the entirety of the Trump presidency.

The reinstated Commissioners also invalidated certain two-member Commission votes taken between May 8 and June 17, 2025, as "null, void, and of no effect" and withdrew and replaced at least one notice of proposed rulemaking. J.A. 111-12. That notice of proposed rulemaking was at the center of controversy of whether to submit it for OIRA review in accordance with Executive Order No. 14,215.[6] Finally, the reinstated Commissioners sought information about cancelled contracts and issued a new policy regarding RIFs. J.A. 112-13.

These actions, taken in blatant contravention of the Executive's directives, confirm absolute removal authority is foundational to our constitutional structure. For the Executive to both "execute the law" and "execute the nation's action, strength, or force," the President must hold

---

[6] U.S. CPSC, Minutes of Commission Meeting: Safety Standard for Lithium-Ion Batteries Used in Micromobility Products 2 (Apr. 30, 2025), https://www.cpsc.gov/s3fs-public/Comm-mtg-Minutes-NPR-Safety-Standard-for-Lithium-Ion%20Batteries-Micromobility-Products.pdf?VersionId=g.bJfRvJ5jx8.vqIMh97vWBbvNnqEf03.

absolute removal authority. Any contrary conclusion would instead vest the Boyles, Hoehn-Sarics, and Trumkas of this country with the Article II authority our Constitution bestows on the President—and it would likewise usurp the will of the American people who elected Donald Trump as President of the United States.

## CONCLUSION

For the foregoing reasons and those provided by Appellants, the Court should REVERSE the lower court's decision that President Trump's removal of CPSC Commissioners Boyle, Hoehn-Saric, and Trumka Jr. was *ultra vires*, contrary to law, and without legal effect, and REMAND the case to the district court with directions to enter summary judgment in favor of Defendants-Appellants.

August 18, 2025                         Respectfully submitted,

                                        */s/ John J. Vecchione*
                                            *Counsel of Record*
                                        John J. Vecchione
                                        Zhonette Brown
                                        NEW CIVIL LIBERTIES ALLIANCE
                                        4250 N. Fairfax Dr., Suite 300
                                        Arlington, VA 22203
                                        (202) 869-5210
                                        John.vecchione@ncla.legal

                                            *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this *Amicus Curiae* brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and 29(a)(5) because this brief contains 3,092 words, excluding those portions of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

August 18, 2025

Respectfully,

/s/ *John J. Vecchione*
John J. Vecchione

18

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2025, I electronically filed this *Amicus Curiae* brief with the Clerk of this Court using the CM/ECF system, which will send notice of such filing to all counsel of record.


August 18, 2025

Respectfully,

/s/ *John J. Vecchione*
John J. Vecchione