# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARY BOYLE; ALEXANDER HOEHN-SARIC; RICHARD TRUMKA JR.,
*Plaintiffs-Appellees*,

vs.

DONALD J. TRUMP, in his official capacity as President of the United States;
SCOTT BESSENT, in his official capacity as Secretary of the Treasury;
RUSSELL VOUGHT, in his official capacity as Director of the Office of
Management and Budget; PETER A. FELDMAN, in his official capacity as Acting
Chairman of the U.S. Consumer Product Safety Commission,
*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Maryland,
No. 8:25-cv-01628-MJM, Hon. Matthew James Maddox

## THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA'S MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS-APPELLANTS OUT OF TIME

MICHAEL H. MCGINLEY
BRIAN A. KULP
CORY J. KOPICKI
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JORDAN L. VON BOKERN
MARIA C. MONAGHAN
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
  *Counsel of Record*
RILEY D. COMPTON
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel for the Chamber of Commerce of the United States of America*

The Chamber of Commerce of the United States of America ("Chamber") respectfully seeks leave to file an *Amicus Curiae* Brief in Support of Defendants-Appellants (attached as Exhibit 1) out of time by one day.[1]  No party will suffer any prejudice from the filing of the brief, and the Court may benefit from the receipt of the views of *amicus curiae*.

Good cause exists for this brief extension of time because counsel for the Chamber recently learned that the Court expedited the briefing schedule.  On July 7, 2025, this Court issued a briefing order, providing that Appellants' opening brief would be due on August 18, 2025.  ECF 21 at 1.  Under that schedule, *amicus curiae* briefs in support of Appellants would have been due seven days later, on August 25, 2025.  *See* Fed. R. App. P. 29(a)(6).  On July 29, 2025, however, the Court granted Appellees' motion to expedite the appeal.  *See* ECF 25 at 1.  In doing so, the Court updated the due date for Appellants' opening brief to August 11, 2025.  *See id.* at 2.  That order, in turn, shifted the due date for *amicus curiae* briefs in support of Appellants to August 18, 2025.  *See* Fed. R. App. P. 29(a)(6).

As *amicus curiae*, the Chamber had not yet filed an appearance in this case when the new briefing schedule was issued.  Counsel for the Chamber discovered

---

[1]  All counsel for the parties to this appeal have been informed of the intended filing of this motion.  Appellants have stated that they do not oppose the filing of the motion.  Appellees have stated that they oppose.  A corporate disclosure statement for the Chamber is included in the attached brief.

the schedule change upon checking the docket this morning, on August 19, 2025. Upon learning of the revised schedule, counsel for the Chamber acted diligently to prepare and file this motion along with the accompanying brief.

This Court has the discretion to permit an *amicus curiae* to file its brief more than seven days after the principal brief of the party being supported. Indeed, Rule 29 explicitly contemplates that a "court may grant leave for later filing" of an *amicus curiae* brief. Fed. R. App. P. 29(a)(6); *see also* Fed. R. App. P. 26(b) (authorizing court to "extend the time prescribed by these rules" for good cause).

The Chamber respectfully requests that the Court exercise that authority here. The Court's amended briefing schedule and the Chamber's swift action upon discovering that change provides good cause for the requested one-day extension. And no party would be prejudiced by granting such modest relief. Appellees will have ample time to consider and respond to the Chamber's arguments, if they choose, given that the brief is being filed only one day after the deadline.

In addition, the Chamber believes that its brief may provide assistance to the Court in deciding this case of national importance. The Chamber has filed *amicus curiae* briefs addressing these Article II issues in federal courts throughout the country. *See, e.g.*, *Amicus Curiae* Br. of Chamber of Com. of U.S., *Wilcox v. Trump*, No. 25-5057 (D.C. Cir. Mar. 29, 2025); *Amicus Curiae* Br. of Chamber of Com. of U.S., *Space Expl. Techs. Corp. v. NLRB*, Nos. 24-50627, 24-40533, 24-10855 (5th

Cir. Dec. 18, 2024).  As the attached brief explains, insulating Commissioners of the Consumer Product Safety Commission from the President's oversight violates Article II, but such a holding will not undermine the independence of the Federal Reserve System in regulating monetary policy.  Neither Appellants nor other *amici* have addressed the impact that this Court's decision could have on the Federal Reserve System.  *See generally* ECF 26, 28-1, 29-1.  But that concern has been raised by several members of the Supreme Court, including in this case.  *See Trump v. Boyle*, 145 S. Ct. 2653, 2656 (2025) (Kagan, J., joined by Sotomayor and Jackson, JJ., dissenting from the grant of the application of the stay); *Trump v. Wilcox*, 145 S. Ct. 1415, 1421 (2025) (Kagan, J., joined by Sotomayor and Jackson, JJ., dissenting from the grant of the application of the stay).  The Court therefore may benefit from receiving the views of *amicus curiae*.

For these reasons, the Chamber respectfully requests that the Court grant it leave to file the attached *amicus curiae* brief one day past the deadline.

Respectfully Submitted,

MICHAEL H. MCGINLEY
BRIAN A. KULP
CORY J. KOPICKI
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JORDAN L. VON BOKERN
MARIA C. MONAGHAN
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

*/s/ Steven A. Engel*
STEVEN A. ENGEL
  *Counsel of Record*
RILEY D. COMPTON
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 715 words, excluding those portions of the motion exempted by Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), and 4th Cir. R. 32(f). This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-pt font.

Dated: August 19, 2025         */s/ Steven A. Engel*
                                        Steven A. Engel
                                        DECHERT LLP
                                        1900 K Street, NW
                                        Washington, DC 20006
                                        (202) 261-3369
                                        steven.engel@dechert.com

                                        *Counsel of Record for the*
                                        *Chamber of Commerce of the*
                                        *United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing motion to be filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit. The Court's CM/ECF system was used to file the motion. All counsel of record were served on August 19, 2025.

Dated: August 19, 2025        */s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the*
*Chamber of Commerce of the*
*United States of America*

# EXHIBIT 1

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARY BOYLE; ALEXANDER HOEHN-SARIC; RICHARD TRUMKA JR.,
*Plaintiffs-Appellees*,

vs.

DONALD J. TRUMP, in his official capacity as President of the United States; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget; PETER A. FELDMAN, in his official capacity as Acting Chairman of the U.S. Consumer Product Safety Commission,
*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Maryland,
No. 8:25-cv-01628-MJM, Hon. Matthew James Maddox

## BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

MICHAEL H. MCGINLEY
BRIAN A. KULP
CORY J. KOPICKI
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JORDAN L. VON BOKERN
MARIA C. MONAGHAN
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
  *Counsel of Record*
RILEY D. COMPTON
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel for the Chamber of Commerce of the United States of America*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1687</u>        Caption: <u>Boyle, et al. v. Trump, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Chamber of Commerce of the United States of America</u>
(name of party/amicus)

_____

 who is _____<u>amicus curiae</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Steven A. Engel                         Date: _____8/19/2025_____

Counsel for: Chamber of Commerce of the U.S.A.

Print to PDF for Filing     Reset Form

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*.............................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT ...........................................................................................................7

I.  Congress May Not Shield CPSC Commissioners from the President's
    Removal Authority. .......................................................................................7

    A.  No Exception to the President's Removal Authority Applies. ............9

    B.  The District Court's Contrary Conclusion Is Untenable....................12

II.  Ruling for the President Would Not Imperil the Independence of the
    Federal Reserve. ..........................................................................................16

    A.  The Federal Reserve's Structure Differs from Other Agencies.........19

    B.  The Sinking Fund Commission Supports the Constitutionality
        of Removal Protections for the Federal Reserve................................20

    C.  The First and Second National Banks Similarly Suggest that the
        Federal Reserve Is Constitutionally Distinct from the CPSC............23

CONCLUSION.......................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
   121 F.4th 1314 (D.C. Cir. 2024)..........................................................................17

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024)...............................................................................................6

*City of Arlington v. F.C.C.*,
   569 U.S. 290 (2013)..............................................................................................14

*Cmty. for Creative Non-Violence v. Pierce*,
   786 F.2d 1199 (D.C. Cir. 1986)..........................................................................12

*Collins v. Yellen*,
   594 U.S. 220 (2021)...............................................................................11, 13, 16

*Comm. of Monetary Reform v. Bd. of Govs. of the Fed. Rsrv. Sys.*,
   766 F.2d 538 (D.C. Cir. 1985)............................................................................19

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
   91 F.4th 342 (5th Cir. 2024) ...............................................................................15

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
   98 F.4th 646 (5th Cir. 2024) ....................................................................5, 17, 27

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*,
   45 F.4th 127 (D.C. Cir. 2022).............................................................................11

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)...............................................................................3, 8, 13, 16

*Ex parte Hennen*,
   38 U.S. (13 Pet.) 230 (1839)................................................................................13

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935)........................................................................................*passim*

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ..............................................................................16

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ...........................................................................18

*Melcher v. Fed. Open Mkt. Comm.*,
  644 F. Supp. 510 (D.D.C. 1986)..........................................................................19

*Morrison v. Olson*,
  487 U.S. 654 (1988)...............................................................................................8

*Myers v. United States*,
  272 U.S. 52 (1926)....................................................................................3, 8, 16

*PHH Corp. v. CFPB*,
  881 F.3d 75 (D.C. Cir. 2018).........................................................................19, 27

*Printz v. United States*,
  521 U.S. 898 (1997).............................................................................................18

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020).......................................................................................*passim*

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021).............................................................................................12

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025).......................................................................5, 7, 15, 16

*Trump v. United States*,
  603 U.S. 593 (2024)...................................................................................2, 3, 13

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025)...................................................................................*passim*

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021)...................................................................................................9

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 2.....................................................................................22

U.S. Const. art. II, § 1, cl. 1 .................................................................................2, 7

U.S. Const. art. II, § 3 ................................................................................. 2, 7, 8

**Statutes and Regulations**

12 U.S.C. § 241 ............................................................................................ 19

12 U.S.C. § 242 ............................................................................................ 19

12 U.S.C. § 248(f) ........................................................................................ 20

12 U.S.C. § 263(a) ....................................................................................... 19

12 U.S.C. § 263(b) ....................................................................................... 23

12 U.S.C. § 282 ............................................................................................ 19

15 U.S.C. § 77s(b)(1) ................................................................................... 17

15 U.S.C. § 2056 ....................................................................................... 9, 11

15 U.S.C. § 2057 .......................................................................................... 11

15 U.S.C. § 2058 ....................................................................................... 9, 11

15 U.S.C. § 2064(c) ...................................................................................... 10

15 U.S.C. § 2064(d) ................................................................................. 10, 12

15 U.S.C. § 2064(e) ...................................................................................... 10

15 U.S.C. § 2064(f) ....................................................................................... 10

15 U.S.C. § 2076(a) ...................................................................................... 12

15 U.S.C. § 2076(b) ...................................................................................... 10

15 U.S.C. § 2076(b)(3) .................................................................................. 12

15 U.S.C. § 2076(b)(4) .................................................................................. 12

15 U.S.C. § 2076(b)(7)(A) ............................................................................ 12

15 U.S.C. § 2076(b)(7)(B) ............................................................................ 12

15 U.S.C. § 2076(c) ...................................................................................... 12

Act of Aug. 12, 1790, ch. 47, 1 Stat. 186 .....................................................18, 20, 21

Act of Feb. 25, 1791, ch. 10, 1 Stat. 191 ..................................................................24

Act of Apr. 10, 1816, ch. 44, 3 Stat. 266 .................................................................25

16 C.F.R. § 1025.1 ...................................................................................................12

**Other Authorities**

1 *Annals of Cong.* (Joseph Gales ed., 1834) ..............................................................8

*Appointment and Removal of Federal Reserve Bank Members of the
    Federal Open Market Committee*,
    43 Op. O.L.C. 263 (2019).....................................................................................19

Aditya Bamzai & Aaron L. Nielson, *Article II and the Federal
    Reserve*, 109 Cornell L. Rev. 843 (2024).......................................................*passim*

Aditya Bamzai, *Tenure of Office and the Treasury: The Constitution
    and Control over National Financial Policy, 1787 to 1867*, 87
    Geo. Wash. L. Rev. 1299 (2019)...........................................................21, 25, 26

Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An
    Originalist Argument for Independent Agencies*, 96 Notre Dame L.
    Rev. 1 (2020) ...................................................................................20, 21, 22, 23

Federal Reserve Bank of Philadelphia, *The First Bank of the United
    States: A Chapter in the History of Central Banking* (2021) .............................24

Federal Reserve Bank of Philadelphia, *The Second Bank of the United
    States: A Chapter in the History of Central Banking* (2021) .............................25

Lawrence Lessig & Cass R. Sunstein, *The President and the
    Administration*, 94 Colum. L. Rev. 1 (1994)......................................................26

Letter from James Madison to Thomas Jefferson (June 30, 1789), in
    16 *Documentary History of the First Federal Congress* 893 (2004)................13

Letter from Sarah Harris, Acting Solicitor General, U.S. Department
    of Justice, to Senator Richard J. Durbin, Ranking Member,
    Judiciary Committee, U.S. Senate (Feb. 12, 2025),
    tmsnrt.rs/3FHYQH6 ..............................................................................................4

Peter Margulies, *Reform and Removal at the Federal Reserve: Independence, Accountability, and the Separation of Powers in U.S. Central Banking*, 108 Marquette L. Rev. 117 (2024).....................17, 20, 21

Jerry L. Mashaw, *Creating the Administrative Constitution: The Lost One Hundred Years of American Administrative Law* (2012) .....................23, 24

Aaron L. Nielsen & Christopher J. Walker, *The Early Years of Congress's Anti-Removal Power*, 63 Am. J. Legal His. 219 (2023)..................22

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

Businesses are subject to regulations promulgated by, and are defendants in administrative adjudications and judicial actions brought by, the Consumer Product Safety Commission ("CPSC" or "Commission") and other federal agencies. The Chamber therefore has a significant interest in ensuring that those actions respect the Constitution's structural limitations. But because the analysis may differ depending on the federal agency in question, the Chamber submits this brief to address two points. First, under the Supreme Court's existing precedent, insulating CPSC

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

Commissioners from the President's oversight violates Article II.[2]  Second, such a holding would not undermine the independence of the Federal Reserve System ("Federal Reserve" or "Fed") in supervising the country's money supply.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress may not bar the President from supervising the officers who exercise executive power on his behalf, including by the threat of removal.  The statute purporting to restrict the President's ability to remove CPSC Commissioners is thus unconstitutional.  The district court erred by enforcing that law to nullify the President's "conclusive and preclusive" removal authority.  *Trump v. United States*, 603 U.S. 593, 609 (2024) (citation omitted).  This Court should reverse.

The Framers adopted a unitary executive structure that maintains accountability for Executive Branch actions by placing ultimate authority in a single President.  Specifically, Article II of the Constitution vests "[t]he executive Power" in one elected President, who "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3.  That entrustment of sole executive authority to the President ensures that a leader "chosen by the entire Nation" will "oversee the

---

[2] *See, e.g.*, *Amicus Curiae* Br. of Chamber of Com. of U.S., *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, No. 23-1323 (U.S. July 18, 2024); *Amicus Curiae* Br. of Chamber of Com. of U.S., *Am. Home Furnishings Alliance v. Consumer Prod. Safety Comm'n*, No. 22-60639 (5th Cir. Feb. 17, 2023); *Amicus Curiae* Br. of Chamber of Com. of U.S., *Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, No. 22-1300 (D.C. Cir. Feb. 7, 2023).

execution of the laws." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010).

Yet, the President can hardly ensure that the laws are faithfully executed "if he cannot oversee the faithfulness of the officers who execute them." *Id.* at 484. Article II therefore grants the President the "prerogative to remove executive officials." *Seila Law LLC v. CFPB*, 591 U.S. 197, 214 (2020). Indeed, "[s]ince 1789, the Constitution has been understood to empower the President to keep [his] officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. And "Congress lacks authority to control the President's 'unrestricted power of removal'" for these Officers. *Trump*, 603 U.S. at 608–09 (quoting *Myers v. United States*, 272 U.S. 52, 176 (1926)). To hold otherwise would hamstring his ability to supervise the Executive Branch and would vest executive power in unaccountable actors.

The law here runs roughshod over these structural safeguards. CPSC Commissioners serve as principal officers. They exercise substantial executive power, yet they are statutorily insulated from removal by the President. The result threatens to ensconce a body of agency leaders who are "neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who is." *Seila Law*, 591 U.S. at 224–25. Without such meaningful control, the President

may not take care that the consumer safety laws be faithfully executed. That violates Article II.

The district court countered that "statutory tenure protection for CPSC Commissioners is constitutionally justified by the *Humphrey's Executor* exception to the President's removal power." Dist. Ct. Dkt. 24 ("Op.") at 14; *see Humphrey's Executor v. United States*, 295 U.S. 602 (1935). Outside this case, the Department of Justice has indicated that it intends to urge the Supreme Court to overrule *Humphrey's Executor*. *See, e.g.*, Application for Stay at 14, *Trump v. Wilcox*, No. 24A966 (U.S. Apr. 9, 2025); Letter from Sarah Harris, Acting Solicitor General, U.S. Department of Justice, to Senator Richard J. Durbin, Ranking Member, Judiciary Committee, U.S. Senate (Feb. 12, 2025), tmsnrt.rs/3FHYQH6. But this Court need not anticipate any overruling or modification of that decision, because the district court here has overread it.

The CPSC already falls outside *Humphrey's Executor*. "*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise *any* executive power." *Seila Law*, 591 U.S. at 216 (emphasis added). The *Humphrey's Executor* exception does not extend though to an agency like the CPSC, which plainly does wield substantial executive power.

4

The Supreme Court reaffirmed this reading just a few weeks ago. In *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), the Court granted a stay pending appeal from district court orders enjoining the President's removal of a member of the National Labor Relations Board and a member of the Merit System Protections Board. *Id.* at 1415. The Supreme Court granted that stay because it determined that "the Government is likely to show that both the NLRB and MSPB exercise considerable executive power." *Id.* And the Court has since granted a stay with respect to the decision below, recognizing that the CPSC too "exercises executive power in a similar manner as the National Labor Relations Board, and the case does not otherwise differ from *Wilcox* in any pertinent respect." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

The conclusion that the CPSC wields "executive power" does not necessarily speak to the constitutionality of for-cause protections for other government entities. Justice Kagan, for instance, recently expressed concern that a ruling against the Plaintiffs in this case might threaten the independence of the Federal Reserve. *See id.* at 2655 (Kagan, J., dissenting from the grant of the application of the stay); *see also Wilcox*, 145 S. Ct. at 1421 (Kagan, J., dissenting from the grant of the application of the stay) ("For the Federal Reserve's independence . . . rests largely on *Humphrey's*.").

5

That concern is misplaced. As the Supreme Court itself recently emphasized, "[t]he Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States." *Wilcox*, 145 S. Ct. at 1415 (majority op.). That is because the Federal Reserve's control over the nation's "money supply is not an *executive* function," and so lodging that power in an entity insulated from presidential control "does not offend the traditional principle that all executive power is vested in the President." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 98 F.4th 646, 657 (5th Cir. 2024) (Oldham, J., dissenting from denial of rehearing en banc) (emphasis added).

Indeed, both the First and Second Banks of the United States—which were public-private hybrids and precursors to the Federal Reserve—set monetary policy and operated outside of executive control. The same goes for the Sinking Fund Commission, which Congress created to direct open market purchases of U.S. securities, while limiting the President's ability to remove or control two of its five members. These early examples of Congress limiting the President's authority over federal fiscal policy "provide[] contemporaneous and weighty evidence of the Constitution's meaning." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) (citation omitted). That is, they may support unconventional

structures, including removal protections, of government-created bodies that do not perform executive powers.[3]

But whatever the scope of the *Humphrey's Executor* exception, there is no similar text or history to support removal protections for CPSC Commissioners. The CPSC unquestionably exercises "executive Power." *Boyle*, 145 S. Ct. at 2654. The CPSC's removal protections undermine the President's "take Care" authority. U.S. Const. art. II, § 3. And the early Republic provides no historical analog for such a scheme. Thus, insulating the CPSC from the President "has no basis in history and no place in our constitutional structure." *Seila Law*, 591 U.S. at 220. The district court's decision should be reversed.

## ARGUMENT

### I. Congress May Not Shield CPSC Commissioners from the President's Removal Authority.

Article II provides that "[t]he executive Power shall be vested in a President." U.S. Const. art. II, § 1, cl. 1. "The entire 'executive Power' belongs to the President alone." *Seila Law*, 591 U.S. at 213. But because the President "alone and unaided"

---

[3] This appeal thus need not address the constitutionality of for-cause removal protections beyond the CPSC, since there may be other agencies, like the Federal Reserve, which perform functions whose historical pedigree suggest that they may be insulated from presidential removal.

cannot perform all of the nation's executive functions, he necessarily must rely on "the assistance of subordinates." *Myers*, 272 U.S. at 117.

At the same time, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 591 U.S. at 213. After all, it is the President's solemn duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. And because "[t]he buck stops with the President," he "must have some 'power of removing those for whom he can not continue to be responsible.'" *Free Enter. Fund*, 561 U.S. at 493 (quoting *Myers*, 272 U.S. at 117). The Framers quickly embraced this understanding in the "decision of 1789," concluding after "great debate" that the President's ability to remove executive officials was "essential to the executive power." *Myers*, 272 U.S. at 121, 142. Without that ability, it would be "impossible for the President" to fulfill his constitutional prerogative, and to "keep [his] officers accountable" to the law and the people whom he serves. *Seila Law*, 591 U.S. at 214–15 (citations omitted); *see* 1 *Annals of Cong.* 518 (1789) (Joseph Gales ed., 1834) (James Madison) (explaining that the President's removal power is necessary to preserve "the chain of dependence" and ensure that "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community").

That is why "the President's removal power is the rule, not the exception." *Seila Law*, 591 U.S. at 228. The Supreme Court has carved out "only two exceptions

to [this] unrestricted removal power"—"one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 204, 218; *see Morrison v. Olson*, 487 U.S. 654, 691–96 (1988); *Humphrey's Executor*, 295 U.S. at 628–29. This case involves neither.

### A. No Exception to the President's Removal Authority Applies.

The exception for "inferior officers with limited duties" plainly does not apply here. *Seila Law*, 591 U.S. at 218. As in *Seila Law*, "[e]veryone agrees" that the CPSC Commissioners are "not . . . inferior officer[s]." *Id.* at 219. They are appointed by the President with the advice and consent of the Senate, supervise their own agency, and "have the 'power to render a final decision on behalf of the United States' without any . . . review by [a] nominal superior or any other principal officer in the Executive Branch." *United States v. Arthrex, Inc.*, 594 U.S. 1, 14 (2021) (citation omitted). The Commission's statutory duties are also "far from limited." *Seila Law*, 591 U.S. at 219. Congress has provided the Commission with rulemaking authority to impose product safety standards, including performance standards, warning label requirements, and even product bans. *See* 15 U.S.C. §§ 2056, 2058. Those actions may implicate tens of thousands of consumer products and impact millions of consumers throughout the country. And to enforce these rules, the

9

Commission may conduct adjudications and bring enforcement actions with all such incidental powers. *Id.* §§ 2064(c)–(f), 2076(b).

The district court erred, however, by finding that the exception for certain multimember agencies—the *Humphrey's Executor* exception—does apply. *Humphrey's Executor* involved a presidential attempt to remove a member of the Federal Trade Commission ("FTC"), which in its original form had been designed as a "non-partisan" body of "experts" that "must, from the very nature of its duties, act with entire impartiality." 295 U.S. at 624. The Court conceptualized the early FTC's duties as "neither political nor executive," but rather, as "quasi-judicial and quasi-legislative." *Id.* In other words, the FTC performed "specified duties as a legislative or as a judicial aid." *Id.* at 628. As a "legislative agency," it "ma[de] investigations and reports thereon for the information of Congress." *Id.* And as an "agency of the judiciary," it made recommendations to courts. *Id.*

The Supreme Court has since clarified that *Humphrey's Executor* should not be read expansively. It "permit[s] Congress to give for-cause removal protections to a multimember body of experts," but only where that body is statutorily "balanced along partisan lines" and "perform[s] legislative and judicial functions" such that it can be "said not to exercise *any* executive power." *Seila Law*, 591 U.S. at 216 (emphasis added).

10

The *Humphrey's Executor* exception thus applies to tenured officials who are "wholly disconnected from the executive department." *Humphrey's Executor*, 295 U.S. at 630. But it does not apply to those who wield the executive power vested in the President. In fact, *Humphrey's Executor* itself recognized that an officer "in the executive department" remains "subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is." *Id.* at 627.

The CPSC wields quintessential executive power and thus falls well outside the *Humphrey's Executor* exception. Through the Consumer Product Safety Act, Congress provided the Commission with far-reaching authority. As noted, the Commission may promulgate rules imposing product safety standards, performance or labeling requirements, and bans on products it deems hazardous. *See* 15 U.S.C. §§ 2056, 2057, 2058; *see also Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 134 (D.C. Cir. 2022) (recognizing the CPSC's "broad authority to promulgate 'performance requirements' for consumer products"). Because the CPSC issues "binding rules fleshing out" statutes, *Seila Law*, 591 U.S. at 218, it exercises a power that is "the very essence of 'execution' of the law," *Collins v. Yellen*, 594 U.S. 220, 254 (2021) (citation omitted).

The CPSC's executive powers do not stop with rulemaking. In response to perceived violations of consumer product laws and standards, the CPSC may commence, and render final decisions in, administrative adjudicative proceedings

11

that may impose civil penalties or direct nationwide product recalls. *See* 15 U.S.C. §§ 2064(d), 2076(a); 16 C.F.R. § 1025.1. "Under our constitutional structure," these administrative adjudications "*must be* exercises of . . . the executive Power." *Seila Law*, 591 U.S. at 216 n.2. The CPSC's investigatory powers are broad too, permitting it to conduct expansive investigations, issue subpoenas, and take testimony. *See* 15 U.S.C. § 2076(b)(3), (b)(4), (c). The CPSC may also enforce federal law by bringing civil actions in its own name in federal court, *id.* § 2076(b)(7)(A), and may even bring a criminal action with the concurrence of the Attorney General, *id.* § 2076(b)(7)(B). These "power[s] to decide when to investigate, and when to prosecute, lie[] at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch[.]").

In short, the CPSC undeniably wields substantial executive power. It follows that Congress may not insulate CPSC Commissioners from presidential control.

## B. The District Court's Contrary Conclusion Is Untenable.

The district court reached the opposite conclusion by overreading *Humphrey's Executor* and brushing aside the line of cases beginning with *Myers*. *See* Op. at 8–

10. That was error. Indeed, the Supreme Court "has already considered and rejected" similar efforts to "minimize[] *Myers*" and "downplay[] the decision of 1789." *Seila Law*, 591 U.S. at 231.

For good reason. As explained above, the President's removal power "was discussed extensively in Congress when the first executive departments were created." *Free Enter. Fund*, 561 U.S. at 492. "The view that 'prevailed, as most consonant to the text of the Constitution' and 'to the requisite responsibility and harmony in the Executive Department,' was that the executive power included a power to oversee executive officers through removal." *Id.* (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), in 16 *Documentary History of the First Federal Congress* 893 (2004)). That has long been the "settled and well understood construction of the Constitution." *Ex parte Hennen*, 38 U.S. (13 Pet.) 225, 259 (1839). And the Court's articulation of this historical understanding is more than a matter of dusty precedents. In recent years, the Supreme Court has consistently reaffirmed that the President's power of removal is a crucial aspect of his power to supervise the Executive Branch. *See Trump*, 603 U.S. at 609; *Collins*, 594 U.S. at 252; *Seila Law*, 591 U.S. at 214; *Free Enter. Fund*, 561 U.S. at 483.

The district court blew past this precedent and Founding-era history. In analyzing the removal restrictions here, the court focused not on the CPSC's exercise of executive power, but upon whether "the organization of the CPSC mirrors that of

the FTC." Op. at 16. The court noted that because the CPSC is a multimember commission balanced along partisan lines, it "shar[es] the FTC's organizational features" and "stands in stark contrast" to the "single-Director organization that the Supreme Court deemed unconstitutional in *Seila Law*." *Id.* at 16–17. By contrast, the court found that "the degree to which the CPSC wields executive power . . . alone does not determine" whether the removal restrictions violate Article II. *Id.* at 21. And by doggedly refusing "to engage in categorizing the CPSC's varied set of functions and powers as executive or non-executive," *id.*, the court read *Seila Law* to all but bless removal protections for multimember agencies.

In this way, the district court cabined *Seila Law* to its facts but ballooned the reasoning of *Humphrey's Executor*. That gets things precisely backwards. Under Article II, the critical question must be whether the CPSC exercises executive power. And the district court offered no justification for ignoring the mountain of recent Supreme Court precedent establishing that the CPSC exercises plainly executive powers. *See, e.g.*, *City of Arlington v. F.C.C.*, 569 U.S. 290, 304 n.4 (2013) (holding that rulemaking and administrative adjudications "*must be* exercises of the 'executive Power'"); *Seila Law*, 591 U.S. at 219 (holding that the power to seek "daunting monetary penalties . . . on behalf of the United States in federal court" is a "quintessentially executive power"). Indeed, in *Seila Law*, the Supreme Court itself described the CPSC as serving as the "model[]" for the CFPB, whose exercise

of "quintessentially executive power" meant that the director could not be insulated from removal by the President. 591 U.S. at 205, 219.

The district court's opinion thus "*expands* the borders of *Humphrey's Executor* by extending the rule from agencies that *do not* exercise executive power to those that *do*." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 357 (5th Cir. 2024) (Jones, J., concurring in part and dissenting in part); *see also Seila Law*, 591 U.S. at 215 ("Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" (quoting *Humphrey's Executor*, 295 U.S. at 628)). "Unlike the 1935 FTC, the CPSC does exercise executive power." *Consumers' Rsch.*, 91 F.4th at 357 (Jones, J., concurring in part and dissenting in part). Accordingly, Congress may not inhibit the President's removal authority over CPSC Commissioners, because executive officers must remain subject to his supervision.

The district court's error here was all the more clear given that the Supreme Court has signaled that removal protections for NLRB members and the MSPB likely violate Article II. That is because "the Constitution vests the executive power in the President" alone, and "both the NLRB and MSPB exercise considerable executive power." *Wilcox*, 145 S. Ct. at 1415; *see also Boyle*, 145 S. Ct. at 2654.

The same conclusion follows here. As executive officers, CPSC Commissioners may not be shielded from presidential oversight by for-cause

15

protection.  *See Collins*, 594 U.S. at 250–56; *Seila Law*, 591 U.S. at 228; *Free Enter. Fund*, 561 U.S. at 497–98; *Myers*, 272 U.S. at 163–64.  The district court should have "disregard[ed]" that unlawful provision and decided this case "conformably to the [C]onstitution."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

\* \* \*

In sum, the "removal power" helps the President maintain "control over the subordinates he needs to carry out his duties as the head of the Executive Branch," and it ensures that these Officers "serve the people effectively and in accordance with the policies that the people presumably elected the President to promote." *Collins*, 594 U.S. at 252.  By reinstating the removed commissioners to the CPSC's leadership against the wishes of the elected President, the district court disregarded Article II's commands.  The decision should be reversed.

## II. Ruling for the President Would Not Imperil the Independence of the Federal Reserve.

In dissenting from the Supreme Court's stay of the district court's order, Justice Kagan suggested that upholding the President's removal authority here would imperil the Federal Reserve.  *See Boyle*, 145 S. Ct. at 2656.  But it does not follow that removal restrictions must be unlawful under all circumstances.  As the Supreme Court recently explained in *Wilcox*, "[t]he Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States."  145 S. Ct. at 1415.  The Framers

recognized that controlling "the money supply is not an *executive* function" at all. *Consumers' Rsch.*, 98 F.4th at 657 (Oldham, J., dissenting from the denial of rehearing en banc) (emphasis added). In view of the Federal Reserve's unique structure, function, and history, the case of the CPSC does not implicate removal restrictions on Federal Reserve officials.[4]

Early congressional practice recognized that the management of the nation's money supply fell outside the traditional scope of executive power. The First Congress created the Sinking Fund Commission to "facilitate orderly management of the nation's debts," and the Commission's "structure and operation reflected a substantial measure of independence from the political branches." Peter Margulies, *Reform and Removal at the Federal Reserve: Independence, Accountability, and the Separation of Powers in U.S. Central Banking*, 108 Marquette L. Rev. 117, 167 (2024). Shortly after adopting the decision of 1789 for executive agencies, Congress insulated the Commission from presidential control by appointing the Chief Justice

---

[4] This Court's consideration of the CPSC's removal protections also implicates different considerations from those underlying the structure of self-regulatory organizations, such as the Financial Industry Regulatory Authority and NASDAQ, *see, e.g.*, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1319–20 (D.C. Cir. 2024) (discussing history of self-regulatory organizations), or the Financial Accounting Standards Board, which the Securities and Exchange Commission relies upon to set generally accepted accounting principles, *see* 15 U.S.C. § 77s(b)(1). These private organizations are not part of the Executive Branch, and so their structures present different constitutional issues from those at issue in this appeal.

and the Vice President as two of the five members of the multimember entity charged with setting monetary policy and repaying the assumed national debt. *See* Act of Aug. 12, 1790, ch. 47, § 2, 1 Stat. 186, 186.

In addition, the Federal Reserve "follows in the distinct historical tradition of the First and Second Banks of the United States," *Wilcox*, 145 S. Ct. at 1415, which were structured, not as government agencies, but as chartered corporations. Both banks "used the same sorts of open-market tools to control monetary policy that the Fed does today." Aditya Bamzai & Aaron L. Nielson, *Article II and the Federal Reserve*, 109 Cornell L. Rev. 843, 901–02 (2024). "And like the Fed, the First and Second Banks had private shareholders in addition to government shareholders." *Id.* at 902.

Those early historical precedents are relevant to "fix[ing] the meaning of the Constitution," and they suggest that monetary policy is not an executive function, like the enforcement of the laws. *Printz v. United States*, 521 U.S. 898, 915 n.9 (1997). In fact, nobody argued otherwise during the frequent Founding-era debates over the wisdom and constitutionality of the National Banks. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). Even the Second Bank's most prominent critic and the man responsible for its demise—President Andrew Jackson—never made that argument. Because the Federal Reserve likewise exercises "special functions in setting monetary policy and stabilizing the financial

18

markets," *PHH Corp. v. CFPB*, 881 F.3d 75, 192 n.17 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting), it may—unlike the CPSC—"claim a special historical status," *Seila Law*, 591 U.S. at 222 n.8.

### A.     The Federal Reserve's Structure Differs from Other Agencies.

The structure of the Federal Reserve, the entity responsible for "control[ling] the paper money supply," is unique.  Bamzai & Nielson, *supra*, at 846.  Unlike traditional government agencies, it "is composed of both public and private elements." *Comm. of Monetary Reform v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 766 F.2d 538, 539–40 (D.C. Cir. 1985); *see also Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 519 (D.D.C. 1986), *aff'd on other grounds*, 836 F.2d 561 (D.C. Cir. 1987).

The Federal Open Market Committee ("FOMC"), which directs U.S. monetary policy, consists of twelve members. *See generally Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. 263 (2019).  Seven of those members are drawn from the Federal Reserve's Board of Governors.  12 U.S.C. § 263(a).  Those members are appointed by the President with the advice and consent of the Senate, and they have statutory tenure protection. *See id.* §§ 241–42.  Five members, however, are drawn from the officers of the twelve regional Federal Reserve Banks, which are owned by the commercial banks within their regional districts. *See id.* §§ 263(a), 282.  Those

members are generally subject to supervision and removal by the Board of Governors.  *See id.* § 248(f).

This unique structure of the Federal Reserve—which mixes private and public elements and thereby insulates monetary policy from the President—drew from historical precedents that date to the Founding.

### B.     The Sinking Fund Commission Supports the Constitutionality of Removal Protections for the Federal Reserve.

Like the Federal Reserve, the Sinking Fund Commission was a Founding-era entity created, "with substantial independence from the President," to repay the national debt through open-market purchases of United States securities.  Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1, 4, 34 (2020); *see* Act of Aug. 12, 1790, ch. 47, 1 Stat. 186.  The Commission also helped the United States "cope with credit crunches when financial institutions were short on cash" by buying "Treasury bonds and notes from private sources."  Margulies, *supra*, at 167.  "These open-market purchases . . . inject[ed] liquidity into the system" to stave off financial disaster, foreshadowing the same "actions that the Federal Reserve" would take nearly 220 years later "to address the Great Recession of 2008."  *Id.* at 167–68.

The Sinking Fund Commission was proposed by Alexander Hamilton, passed by the First Congress, and signed into law by President Washington.  *See* Chabot, *supra*, at 1.  Under Hamilton's original proposal, the multimember Commission

would have included five officers: the Vice President, the Chief Justice, the Speaker of the House, the Treasury Secretary, and the Attorney General. *See id.* at 35. At the time of this proposal, the vice presidency went to the runner up in the presidential election. *Id.* at 37. Thus, three of the five officers would have possessed complete independence from the President, who had no ability to direct their action and needed at least one of their votes to act. *Id.*

Providing the Commission with this independence from executive control sought to avoid the issues that plagued earlier sinking funds in England. The King's ministers often diverted resources for their own short-term political benefit. *See id.* at 37–38. The people were aware of this English experience and cognizant of "the executive branch's incentive to spend money and put more money into circulation." Margulies, *supra*, at 162. So the "Framers, including Madison and Hamilton in the Federalist essays," understood "the value of independence" for those tasked with setting monetary policy and managing the country's finances. *Id.* And they acted accordingly in designing the new government.

The Sinking Fund Act of 1790 modified Hamilton's proposal by replacing the Speaker of the House with the Secretary of State on the Commission. *See* Act of Aug. 12, 1790, § 2. But this was not done to increase executive oversight; rather, it was thought necessary to avoid the constitutional prohibition on members of Congress holding other offices. *See* Aditya Bamzai, *Tenure of Office and the*

21

*Treasury: The Constitution and Control over National Financial Policy, 1787 to 1867*, 87 Geo. Wash. L. Rev. 1299, 1339 (2019); U.S. Const. art. I, § 6, cl. 2.

Although substituting the Secretary of State for the Speaker of the House meant that three members of the Commission were subject to removal by the President, "the Commission's structure" made it "difficult for the president to control it in the real world." Aaron L. Nielsen & Christopher J. Walker, *The Early Years of Congress's Anti-Removal Power*, 63 Am. J. Legal His. 219, 220, 225 (2023). In fact, two of the Commission's original members—Thomas Jefferson and Alexander Hamilton—were "known political rivals." Chabot, *supra*, at 41. Because the Commission required at least three votes to approve a purchase, if these men disagreed, the vote of the entirely independent Vice President or Chief Justice would be decisive.

That happened at least once. During the financial panic of 1792, four Commissioners met to consider purchases proposed by Hamilton, but they split, with Jefferson and Attorney General Edmund Randolph voting against Hamilton's proposal. *Id.* at 44. The Fifth Commissioner, Chief Justice John Jay, was absent because he was riding circuit. *Id.* Weeks passed before the Commission approved purchases, and this event demonstrates the President's limited control over purchase decisions. "Even though President Washington approved purchases in response to the 1792 market crash," he did not have authority to direct the Commission to

approve open-market purchases earlier, and the "Commission's independent structure prevented it from acting as quickly as it could have to address a financial panic." *Id.* at 46.

The Sinking Fund Commission thus provides a weighty historical analogue to the FOMC, which similarly purchases United States securities pursuant to a statutory mandate. *See* 12 U.S.C. § 263(b). Indeed, the decision of 1789 demonstrates that "the First Congress was carefully attuned to structural constitutional concerns related to the President's ability to control executive officers," and so there is no reason to think that it then "glossed over" a removal problem with the Sinking Fund Commission. Chabot, *supra*, at 42. This history indicates "that the independent structure of the [FOMC] is consistent with the original meaning of the Constitution." *Id.* at 54.

## C. The First and Second National Banks Similarly Suggest that the Federal Reserve Is Constitutionally Distinct from the CPSC.

The history of the First and Second Banks of the United States similarly suggests that monetary policy is different from traditional executive action. These National Banks were precursors to the Federal Reserve, and both set monetary policy while operating outside of executive control.

The function of the First Bank "was essentially that now served by the Federal Reserve Board in regulating the money supply." Jerry L. Mashaw, *Creating the Administrative Constitution: The Lost One Hundred Years of American*

23

*Administrative Law* 47 (2012). "By managing its lending policies and the flow of funds through its accounts, the bank could—and did—alter the supply of money and credit in the economy and hence the level of interest rates charged to borrowers." Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* 9 (2021). And the First Bank "operated more independently of congressional instruction, or indeed presidential direction, than does the Federal Reserve Board today." Mashaw, *supra*, at 47.

The First Bank's structure fundamentally differed from a government agency. Like the Federal Reserve, it had both government and private shareholders. *See First Bank of the United States*, *supra*, at 4; Bamzai & Nielson, *supra*, at 902. The First Bank's initial \$10 million capitalization was likewise divided between the government and private investors. *See First Bank of the United States*, *supra*, at 4. This made it "not only the largest financial institution in the new nation but also the largest corporation of any type." *Id.* And instead of "placing appointment of the Bank President in the U.S. President's control," Congress "prescribed who could serve as a director—specifically excluding foreign nationals." Bamzai & Nielson, *supra*, at 875. The First Bank's shareholders selected these twenty-five directors, who then chose its president. *See First Bank of the United States*, *supra*, at 5; Act of Feb. 25, 1791, ch. 10, § 12, 1 Stat. 191, 196. The First Bank was thus privately controlled, though Congress authorized the Treasury Secretary to inspect the Bank's

books and remove government deposits at any time.  Bamzai & Nielson, *supra*, at 875.  The First Bank was controversial, and Congress allowed its charter to expire in 1811.  *Id.* at 876.

Five years later, Congress chartered the Second Bank of the United States.  *See* Act of Apr. 10, 1816, ch. 44, § 21, 3 Stat. 266, 276.  It was like the First in many ways.  *See* Federal Reserve Bank of Philadelphia, *The Second Bank of the United States: A Chapter in the History of Central Banking* 5–6 (2021).  "[L]ike its predecessor, the Second Bank could engage in monetary policy by using its holdings to control the amount of credit available."  Bamzai & Nielson, *supra*, at 877.  In fact, the "Second Bank possessed a greater power to control monetary policy than the First, due to its larger capitalization of thirty-five million dollars (seven of which came from the United States) and twenty-five branches."  *Id.*  It "had a greater impact on the Nation than any but a few institutions, regulating the Nation's money supply in ways anticipating what the Federal Reserve does today."  *Seila Law*, 591 U.S. at 274 (Kagan, J., concurring in part and dissenting in part).

But the Second Bank's structure differed from the First's in a key respect: Congress empowered the President to appoint five of the Second Bank's twenty-five directors with the Senate's advice and consent.  *See* Act of Apr. 10, 1816, §§ 8, 11.  Still, the twenty directors not nominated by the President were elected each year by the private stockholders.  *See id.*  And "as with the First Bank, the President of the

Second Bank was not nominated by the U.S. President, but was chosen by the bank's directors." Bamzai & Nielson, *supra*, at 877. "This unusual structure . . . mixed private and public features," prompting some to wonder whether the Second Bank was a commercial bank or a government bank. *Id.*

Despite this structure, no one argued that the Second Bank was unconstitutional because it was performing an *executive* function insulated from presidential control. Instead, most viewed the Bank to be a private entity. And those who argued that the Bank was unconstitutionally performing sovereign functions used "a variation of the modern argument that Congress may not delegate such functions to private entities." Bamzai, *supra*, at 1299.

In all these ways, the First and Second Banks were prototypes for the Federal Reserve. *See Seila Law*, 591 U.S. at 274 (Kagan, J., concurring in part and dissenting in part). Like the Federal Reserve today, the National Banks' directors made "policy decisions" that had "a dramatic effect upon the nation," yet "the vast majority of those directors were outside the control of the President." Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 30–31 (1994).

Thus, the legacy of the National Banks establishes a historical practice, which has continued into the present, of employing a public-private hybrid institution to set monetary policy. Like the Banks of the United States—but unlike other modern

agencies—the Federal Reserve is a "*sui generis* mishmash of the public and private sectors," Bamzai & Nielson, *supra*, at 853, tasked with carrying out "special functions in setting monetary policy and stabilizing the financial markets," *PHH Corp.*, 881 F.3d at 192 n.17 (Kavanaugh, J., dissenting). These are not traditional "executive" functions. *Consumers' Rsch.*, 98 F.4th at 657 (Oldham, J., dissenting from denial of rehearing en banc). And at the same time that they were establishing the Executive Branch, the Framers insulated these functions from direct presidential control.

Because of this, the Federal Reserve can "claim a special historical status" in its responsibility for monetary policy. *Seila Law*, 591 U.S. at 222 n.8 (majority op.). The CPSC cannot. Congress cannot insulate CPSC Commissioners from the President's oversight as they wield executive power in his name.

## CONCLUSION

For the foregoing reasons, the Chamber respectfully requests that this Court reverse.

Respectfully Submitted,

MICHAEL H. MCGINLEY
BRIAN A. KULP
CORY J. KOPICKI
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JORDAN L. VON BOKERN
MARIA C. MONAGHAN
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

*/s/ Steven A. Engel*
STEVEN A. ENGEL
  *Counsel of Record*
RILEY D. COMPTON
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel for the Chamber of Commerce of the United States of America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,341 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f) and 4th Cir. R. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-pt font.

Dated: August 19, 2025

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the*
*Chamber of Commerce of the*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing *amicus curiae* brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit. The Court's CM/ECF system was used to file the brief. All counsel of record were served on August 19, 2025.

Dated: August 19, 2025
 */s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the
Chamber of Commerce of the
United States of America*