No. 25-1687

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

MARY BOYLE, ALEXANDER HOEHN-SARIC, and
RICHARD TRUMKA JR.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United
States; SCOTT BESSENT, in his official capacity as Secretary of the
Treasury; RUSSELL VOUGHT, in his official capacity as Director of the
Office of Management and Budget; and PETER A. FELDMAN, in his
official capacity as Acting Chairman of the U.S. Consumer Product
Safety Commission,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Maryland, No. 8:25-cv-01628-MJM
Hon. Matthew J. Maddox, United States District Judge

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

Nicolas A. Sansone
Stephanie Garlock
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs-Appellees*

August 22, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION .......................................................................... 1

ISSUES PRESENTED ...................................................................... 3

STATEMENT OF THE CASE ............................................................... 4

    Statutory Background ............................................................... 4

    Factual and Procedural Background ................................................. 7

SUMMARY OF ARGUMENT ............................................................. 16

ARGUMENT ............................................................................. 19

    I.     The district court correctly granted summary judgment in
          favor of the Commissioners. ................................................. 19

    II.    The district court acted within its discretion in granting
          injunctive relief. ............................................................ 37

CONCLUSION ........................................................................... 47

CERTIFICATE OF COMPLIANCE ....................................................... 48

CERTIFICATE OF SERVICE ............................................................. 49

# TABLE OF AUTHORITIES

**Cases**                                             **Page(s)**

*Arrow-Hart & Hegeman Electric Co. v. Federal Trade Commission*,
   291 U.S. 587 (1934) ................................................................. 35

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................. 41

*Berry v. Reagan*,
   1983 WL 538 (D.D.C. Nov. 14, 1983) ..................................... 43

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
   403 U.S. 388 (1971) ................................................................. 24

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ............................................................... 35, 36

*City of Arlington v. Federal Communications Commission*,
   569 U.S. 290 (2013) ................................................................. 26

*Collins v. Yellen*,
   594 U.S. 220 (2021) ...................................... 23, 25, 30, 31

*Consumers' Research v. Consumer Product Safety Commission*,
   91 F.4th 342 (5th Cir. 2024) ........................................... 20, 21

*Delgado v. Chavez*,
   140 U.S. 586 (1891) ................................................................. 39

*Egbert v. Boule*,
   596 U.S. 482 (2022) ................................................................. 24

*Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*,
   259 U.S. 200 (1922) ................................................................. 24

*Flast v. Cohen,*
  392 U.S. 83 (1968) ...............................................................23

*Flood v. Kuhn,*
  407 U.S. 258 (1972) .............................................................24

*Free Enterprise Fund v. Public Co. Accounting Oversight Board,*
  561 U.S. 477 (2010) ............................................... 23, 27, 36

*Hein v. Freedom from Religion Foundation, Inc.,*
  551 U.S. 587 (2007) .............................................................24

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) ...................................................... passim

*In re Sawyer,*
  124 U.S. 200 (1888) .............................................................41

*Leachco, Inc. v. Consumer Product Safety Commission,*
  103 F.4th 748 (10th Cir. 2024) ......................................20, 21

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .............................................................40

*Morrison v. Olson,*
  487 U.S. 654 (1988) .............................................................36

*Muth v. United States,*
  1 F.3d 246 (4th Cir. 1993) ...................................................42

*Paroczay v. Hodges,*
  219 F. Supp. 89 (D.D.C. 1963)..............................................43

*Pelicone v. Hodges,*
  320 F.2d 754 (D.C. Cir. 1963)...............................................43

*PHH Corp. v. Consumer Financial Protection Bureau,*
  881 F.3d 75 (D.C. Cir. 2018)................................................31

*Priddie v. Thompson*,
  82 F. 186 (D.W.V. 1897) ....................................................... 40

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
  490 U.S. 477 (1989) ............................................................. 23

*Schulman v. Axis Surplus Insurance Co.*,
  90 F.4th 236 (4th Cir. 2024) ................................................ 38

*Seila Law LLC v. Consumer Financial Protection Bureau*,
  591 U.S. 197 (2020) ...................................................... passim

*Severino v. Biden*,
  71 F.4th 1038 (D.C. Cir. 2023) ...................................... 40, 41

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ...................................... 40, 41

*Town of Chester v. Laroe Estates, Inc.*,
  581 U.S. 433 (2017) ............................................................. 40

*United States v. Johnson*,
  921 F.3d 991 (11th Cir. 2019) ............................................. 23

*United States v. SunSetter Products LP*,
  2024 WL 1116062 (D. Mass. Mar. 14, 2024) ...................... 20

*Vitarelli v. Seaton*,
  359 U.S. 535 (1959) ............................................................. 43

*Walton v. House of Representatives*,
  265 U.S. 487 (1924) ............................................................. 41

*White v. Berry*,
  171 U.S. 366 (1898) ............................................................. 41

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................. 40

**Statutes**

15 U.S.C. § 2051(a)(4) .................................................................6

15 U.S.C. § 2051(b)(1) .................................................................4

15 U.S.C. § 2051(b)(4) .................................................................4

15 U.S.C. § 2053(a) ................................................ 4, 7, 21, 36

15 U.S.C. § 2053(b)(1) .................................................................6

15 U.S.C. § 2053(b)(2) .............................................................6, 8

15 U.S.C. § 2053(c) ...............................................................7, 21

15 U.S.C. § 2056(a) ...............................................................5, 22

15 U.S.C. § 2057 ..........................................................................5

15 U.S.C. § 2058 ..........................................................................5

15 U.S.C. § 2064(c) ....................................................................22

15 U.S.C. § 2064(c)(1) ................................................................5

15 U.S.C. § 2064(d) ...................................................................22

15 U.S.C. § 2064(d)(1) ................................................................5

15 U.S.C. § 2076 .........................................................................22

15 U.S.C. § 2076(b)(7) ...............................................................22

15 U.S.C. § 2076(b)(7)(A) ...........................................................6

15 U.S.C. § 2076(b)(7)(B) .....................................................6, 36

Federal Trade Commission Act,
  Pub. L. No. 63-203, 38 Stat. 717 (1914) .......................22, 33

## Other Authorities

122 Cong. Rec. S15211 (daily ed. May 24, 1976) ......................................6

*Power of the President to Remove Members of the Tennessee Valley*
  *Authority from Office,*
  39 U.S. Op. Att'y Gen. 145 (1938) ........................................................25

## INTRODUCTION

Three and a half months ago, President Donald J. Trump purported to terminate Plaintiffs-Appellees Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. from their positions on the U.S. Consumer Product Safety Commission (CPSC). He did so without any stated justification and in violation of a statutory provision that forbids the President from terminating CPSC Commissioners absent neglect of duty or malfeasance in office.

Commissioners Boyle, Hoehn-Saric, and Trumka promptly filed suit against President Trump, as well as the Secretary of the Treasury, Scott Bessent; the Director of the Office of Management and Budget, Russell Vought; and the CPSC's Acting Chairman, Peter A. Feldman. The Commissioners sought a declaration that their terminations were unlawful and an injunction barring Secretary Bessent, Director Vought, and Acting Chairman Feldman from giving effect to the terminations.

The district court granted summary judgment in favor of the Commissioners and entered the requested declaratory and injunctive relief. On the merits, the court noted that the government did not dispute that the President had violated the Commissioners' statutory tenure

protections and, agreeing with decisions of the Fifth and Tenth Circuits, the court rejected the argument that those protections unconstitutionally infringe on the President's Article II authority to remove executive officers. As the district court explained, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), holds that Congress may confer protections against at-will removal on the heads of multimember agencies that perform quasi-legislative and quasi-judicial functions, and the structure and functions of the CPSC closely parallel those of the agency considered by the Supreme Court in *Humphrey's Executor*. As to relief, the court concluded that the equities supported an injunction barring Secretary Bessent, Director Vought, and Acting Chairman Feldman from giving effect to the unlawful terminations and that such relief has historically been available both in equity and by writ of mandamus.

The government offers no sound basis for reversal. On the merits, it identifies no meaningful distinction between this case and *Humphrey's Executor*. Instead, it urges this Court to impose limitations on that longstanding precedent that appear nowhere in *Humphrey's Executor* itself or in the Supreme Court's later decisions applying it. And on remedy, the government attempts to overrule *Humphrey's Executor*

through the back door. According to the government, even if the President acted outside the scope of his lawful authority by violating statutory tenure protections that Congress viewed as necessary to ensure the CPSC's independence, courts are powerless to enjoin federal officers from giving effect to his efforts to unlawfully manipulate the CPSC's composition. That argument defies both common sense and a long historical tradition of courts using their equitable and mandamus powers to restore officers to positions that they are lawfully entitled to occupy. Meanwhile, the government does not respond to the district court's analysis of why the case's equities support injunctive relief, let alone show that the court's analysis reflects an abuse of discretion.

This Court should promptly affirm the district court's judgment so that Commissioners Boyle, Hoehn-Saric, and Trumka can return as quickly as possible to their critical roles protecting the American people against hazardous consumer products.

## ISSUES PRESENTED

1.    Whether Congress permissibly structured the CPSC as a nonpartisan, multimember independent expert agency whose

Commissioners may be removed by the President only for neglect of duty or malfeasance in office.

2. Whether the district court acted within its discretion by enjoining Secretary Bessent, Director Vought, and Acting Chairman Feldman from giving effect to terminations that the court determined were unlawful and without legal effect.

## STATEMENT OF THE CASE

**Statutory Background**

Congress enacted the Consumer Product Safety Act (CPSA) in 1972 to "protect the public against unreasonable risks of injury associated with consumer products," 15 U.S.C. § 2051(b)(1), and to "promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries," *id.* § 2051(b)(4), among other things. To further these statutory aims, the CPSA establishes the CPSC as an "independent regulatory commission … consisting of five Commissioners who shall be appointed by the President" and confirmed by the Senate, and who hold "background and expertise in areas related to consumer products and protection of the public from risks to safety." *Id.* § 2053(a).

The CPSA empowers the CPSC to administer the statute by performing rulemaking and adjudicatory functions. On the rulemaking side, for example, after making specified findings, giving notice, and allowing for public comment, *see id.* § 2058, the CPSC may promulgate "consumer product safety standards" that are "reasonably necessary to prevent or reduce an unreasonable risk of injury." *Id.* § 2056(a); *see id.* § 2057 (authorizing the CPSC to "promulgate a rule declaring" an unreasonably risky product to be a "banned hazardous product" if "no feasible consumer product safety standard … would adequately protect the public"). On the adjudicatory side, the CPSC may conduct hearings to determine whether a consumer product "presents a substantial product hazard," and may remedy such hazards by ordering the product's manufacturer, distributor, or retailer to take actions such as ceasing distribution of the product, giving notice of the hazard, or modifying the product to ameliorate the hazard. *Id.* §§ 2064(c)(1), (d)(1).

The CPSA also enables the CPSC to seek judicial enforcement of its product safety standards and adjudicatory orders. Specifically, the CPSC may ask the Attorney General to file a civil enforcement action on its behalf and, if the Attorney General fails to do so within 45 days, the

CPSC may file a civil lawsuit "through its own legal representative." *Id.* § 2076(b)(7)(A). The CPSC may also pursue criminal sanctions "through the Attorney General" or, with the Attorney General's concurrence, "through its own legal representative." *Id.* § 2076(b)(7)(B).

Given the importance and technical nature of the CPSC's work, Congress has long recognized the need to ensure that Commissioners are free to exercise their independent expert judgment, "unfettered by political dictates, self-interested industry pressure or blind consumer zeal." 122 Cong. Rec. S15211 (daily ed. May 24, 1976). In structuring the CPSC, Congress therefore struck a careful balance between enabling presidential oversight and guarding against a level of political interference that could risk compromising public safety or unnecessarily burdening manufacturers. *Cf.* 15 U.S.C. § 2051(a)(4) (finding that "control by State and local governments" of product-safety issues had created such problems). For example, the CPSA provides that Commissioners are to serve staggered seven-year terms and that a Commissioner who is appointed to fill a vacancy created by the premature departure of a predecessor is appointed only for the remainder of the predecessor's term. *See id.* §§ 2053(b)(1)–(2). These provisions

ensure that each President has a chance to influence, but not fully determine, the CPSC's composition. The CPSA also provides that "[n]ot more than three of the Commissioners shall be affiliated with the same political party," *id.* § 2053(c), ensuring that the CPSC can give voice to the views of the President's party while continuing to include diverse expert perspectives. And the CPSA provides that Commissioners may be "removed by the President" before the end of their terms only "for neglect of duty or malfeasance in office but for no other cause," *id.* § 2053(a), thus ensuring that the President can correct agency dysfunction but may not leverage the threat of reprisal to chill Commissioners from giving an independent assessment of the evidence.

**Factual and Procedural Background**

**A.** Plaintiffs-Appellees Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. were each nominated by President Joseph R. Biden Jr. and confirmed by the Senate to serve as CPSC Commissioners. JA31. Their terms are set to expire on October 27, 2025; October 27, 2027; and October 27, 2028, respectively, JA31–32, although under certain circumstances, a Commissioner may continue to serve for up to one

additional year after the expiration of his or her term, *see* 15 U.S.C. § 2053(b)(2).

Commissioners Boyle, Hoehn-Saric, and Trumka all have extensive professional backgrounds in consumer-protection issues, JA8, JA21, JA25, and all three have undisputedly performed ably in their roles as Commissioners, JA32; *see* JA51. Neither President Biden nor President Trump has ever accused any of the three Commissioners of neglect of duty or malfeasance in office. JA32; *see* JA51.

On May 8, 2025, Commissioners Boyle and Trumka received emails from the Deputy Director of Presidential Personnel, stating in full: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety Commission is terminated effective immediately. Thank you for your service." JA32. The following day, May 9, CPSC security barred Commissioner Hoehn-Saric and two of his staff members from entering their offices at CPSC headquarters, and Acting Chairman Feldman informed him that he had been terminated from his role as a CPSC Commissioner and should leave the agency's premises. JA32–33. Neglect of duty or malfeasance in office was not cited as a reason for the termination of any of the Commissioners. JA33.

After Commissioners Boyle, Hoehn-Saric, and Trumka were barred from performing their duties, the other two Commissioners proceeded to engage in agency business. For example, the two remaining Commissioners moved forward with plans for reorganizations and reductions in force that Commissioners Boyle, Hoehn-Saric, and Trumka had opposed as inimical to consumer safety prior to their purported terminations. *See* JA34. The remaining Commissioners canceled budgetary and planning meetings and approved a midyear review package recommending adjustments to the CPSC's operating plan that Commissioners Boyle, Hoehn-Saric, and Trumka did not favor. JA34–35. And the remaining Commissioners stalled or reversed progress on consumer safety standards that Commissioners Boyle, Hoehn-Saric, and Trumka viewed as important and would have worked to advance. JA35.

**B.** On May 21, Commissioners Boyle, Hoehn-Saric, and Trumka filed suit against President Trump, Secretary Bessent, Director Vought, and Acting Chairman Feldman in their official capacities. JA1–7. The Commissioners' complaint alleged that President Trump acted ultra vires and in violation of the CPSA by terminating them absent neglect of duty or malfeasance in office and that Secretary Bessent, Director

Vought, and Acting Chairman Feldman acted ultra vires and in violation of the CPSA by taking action to effectuate their terminations, including by obstructing their access to CPSC staff and resources and withholding their pay and benefits. JA6. As relief, the Commissioners sought a declaration that their terminations were unlawful and without legal effect and an injunction barring Secretary Bessent, Director Vought, and Acting Chairman Feldman from effectuating the terminations. JA7.

On June 13, following expedited briefing and argument on cross-motions for summary judgment, *see* JA135–37, the district court granted the Commissioners' motion and denied the government's cross-motion, JA83. After observing that "[n]o material facts are disputed in this case," the court held that the termination of Commissioners Boyle, Hoehn-Saric, and Trumka violated the CPSA provision that bars the President from terminating Commissioners absent neglect of duty or malfeasance in office. JA65–66. The court then rejected the government's argument that this provision impermissibly infringes on the President's power under Article II of the U.S. Constitution to remove executive officers at will. JA66–75. "[A]greeing with several other courts," including the Fifth and Tenth Circuits, the district court held that the CPSA's statutory

tenure protections are "not inconsistent with Article II." JA66. The court acknowledged that Article II "generally" confers authority on the President "to remove executive officials." JA59 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020)). But it noted that "the President's power of removal is not absolute," JA59, and that *Humphrey's Executor*, which upheld statutory tenure protections for members of the Federal Trade Commission (FTC) in 1935, creates an exception for "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions," JA60 (quoting *Seila Law*, 591 U.S. at 217). Explaining that "the CPSC closely resembles the 1935 FTC in both structure and function," the court held that the CPSC "qualifies for the *Humphrey's Executor* exception" and that the statutory "restriction against [the Commissioners'] removal … does not offend the President's Article II removal power." JA75.

As to the form of relief, the district court found declaratory relief "appropriate" to "clarify and settle the parties' legal relationships," JA76, and it accordingly entered a declaration that the purported terminations of Commissioners Boyle, Hoehn-Saric, and Trumka were "ultra vires, contrary to law, and without legal effect," JA84. The court also enjoined Secretary Bessent, Director Vought, and Acting Chairman Feldman from

effectuating the unlawful terminations, JA84, finding that the Commissioners had "suffered irreparable harm" from being "unlawfully barred from participating in ongoing, consequential decisions of the CPSC that w[ould] substantially impact Commission operations and its work on behalf of the public," JA78. The court noted that this harm could not "be redressed adequately through money damages" because, absent an injunction, the Commissioners "would be prevented from serving out the remainder of their limited terms and therefore forever lose the opportunity to fulfill the[ir] statutory duties." JA79. And the court also held that an injunction was "favored by the balance of relevant hardships and d[id] not run counter to the public interest" because "[d]epriving th[e] five-member Commission of three of its sitting members threatens severe impairment of its ability to fulfill its statutory mandates and advance the public's interest in safe consumer products." JA80.

Responding to the government's argument that the court "lack[ed] the equitable power to order [the Commissioners'] reinstatement," the district court explained that the argument "misconstrue[d] the equitable relief" that the Commissioners sought. JA77. The Commissioners "d[id] not seek to enjoin the President to reappoint them," but "only to enjoin

the President's subordinates from obstructing their performance of their duties as CPSC Commissioners and their access to the resources necessary for such performance." JA77. In any event, the court observed, "[e]ven if de facto reinstatement" were "unavailable as a form of equitable relief, it is available alternatively by a writ of mandamus." JA81. And under the circumstances of this case, the court concluded, "issuance of a writ of mandamus would be right and just." JA82.

After the district court entered judgment, Commissioners Boyle, Hoehn-Saric, and Trumka returned to work at the agency. JA88–90.

**C.** The government appealed, JA86, and asked both the district court and this Court to stay the district court's judgment pending resolution of the appeal. *See* JA138; App. Ct. Dkt. 13.

The district court denied the government's stay motion on June 23. JA121–28. The court reiterated that *Humphrey's Executor*, persuasive authority from the Fifth and Tenth Circuits, and historical practice all support its holding that the CPSA's tenure protections are constitutional. JA123–25. It then rejected the government's argument that allowing Commissioners Boyle, Hoehn-Saric, and Trumka to continue serving in their roles would cause irreparable harm. JA125–26. Although the

government submitted evidence that the Commissioners had begun to unwind actions that the CPSC had taken without a three-Commissioner quorum during the period in which they were unlawfully barred from serving, *see* JA104–05, the court noted that the government complained of "official actions" that Commissioners Boyle, Hoehn-Saric, and Trumka had taken in "exercise of powers duly vested in them as CPSC Commissioners," as well as "differences of opinion … over substantive and procedural matters of policy" of the sort that "are to be expected of a multimember adjudicatory body that is bipartisan by design," JA125–26. Finally, the court found that the balance of harms and the public interest weighed in favor of allowing Commissioners Boyle, Hoehn-Saric, and Trumka to serve because "each day [the Commissioners] are deprived of the opportunity and resources necessary to perform the functions and duties they were duly appointed to perform as CPSC Commissioners is time lost that they—and the public—cannot regain." JA126–27. As the court explained, the Commissioners have performed ably, and the loss of their "abilities and expertise" would "pose[] a danger to the vital role the CPSC plays in ensuring the safety of consumer products." JA127.

On July 1, a unanimous panel of this Court likewise declined to stay the district court's judgment. App. Ct. Dkt. 19. Judge Wynn separately concurred, explaining that "the [CPSC's] statutory removal protections remain constitutional under *Humphrey's Executor* and its progeny," and that this precedent "remains binding on this Court unless and until the Supreme Court overrules it." *Id.* at 5. After stating that the government's merits argument was "thoroughly foreclosed by existing case law," *id.*, Judge Wynn observed that barring Commissioners Boyle, Hoehn-Saric, and Trumka from their roles would "substantially injure both the [Commissioners] and the public" by "thwart[ing]" Congress's decision to insulate the CPSC to a degree from political pressure and "depriv[ing] the public of the [CPSC's] full expertise and oversight," *id.* at 6.

**D.** The government then filed an emergency application in the U.S. Supreme Court for a stay of the district court's judgment. Over the dissent of three Justices, the Court granted the application on July 23, 2025, staying the judgment pending the resolution of this appeal and any subsequent proceedings in the Supreme Court. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). In doing so, the Court relied on its prior order granting the government's stay application in a separate case, *Trump v.*

*Wilcox*, 145 S. Ct. 1415 (2025). The Court explained that, although the earlier order was "not conclusive as to the merits" of the constitutional issues presented here, it "inform[ed] how a court should exercise its equitable discretion" in deciding whether to grant interim relief while a case like this one is on appeal. *Boyle*, 145 S. Ct. at 2654.

With the Supreme Court's order now barring Commissioners Boyle, Hoehn-Saric, and Trumka from serving in the roles that the district court held they are lawfully entitled to occupy, the Commissioners moved for this Court to expedite the government's appeal. *See* App. Ct. Dkt. 24. This Court granted the motion and entered an expedited briefing schedule pursuant to which briefing will be complete as of August 29. *See* App. Ct. Dkt. 25.

## SUMMARY OF ARGUMENT

**I.** This Court should affirm the district court's grant of summary judgment in favor of the Commissioners. The termination of Commissioners Boyle, Hoehn-Saric, and Trumka undisputedly violated the CPSA's tenure protections, and *Humphrey's Executor* forecloses the government's challenge to the constitutionality of those protections. The CPSC, like the 1935 FTC considered in *Humphrey's Executor*, is a

nonpartisan, multimember expert body responsible for administering the details of a circumscribed statutory scheme by performing quasi-legislative and quasi-judicial functions. Just as *Humphrey's Executor* upheld statutory tenure protections for FTC Commissioners, this Court should uphold comparable protections for CPSC Commissioners.

The government urges a contrary conclusion by encouraging this Court to adopt a narrow reading of *Humphrey's Executor* that would foreclose its application to essentially any administrative agency. This Court should reject the invitation. Although the Supreme Court in *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), declined to extend *Humphrey's Executor* to the historically anomalous context of an independent agency that is headed by a single individual, the Court has repeatedly reaffirmed that *Humphrey's Executor* remains binding when it comes to traditional multimember agencies that perform administrative functions similar to those of the 1935 FTC. And while the government catalogues the CPSC's functions, it identifies no error in the district court's conclusion that those functions resemble those of the 1935 FTC.

**II.** Having correctly held that the terminations of Commissioners Boyle, Hoehn-Saric, and Trumka were unlawful, the district court acted

well within its discretion by declaring the terminations ultra vires and without legal effect, and by enjoining Secretary Bessent, Director Vought, and Acting Chairman Feldman from effectuating them. As an initial matter, the government does not argue that the district court abused its discretion in entering a declaratory judgment and so has waived any challenge to that form of relief. As for injunctive relief, although the government contends that courts lack the power to order formal reinstatement of an unlawfully terminated officer, courts have recognized their authority to grant equitable relief of the sort ordered here: an injunction barring officers from preventing an individual from occupying the office to which he or she is lawfully entitled. Meanwhile, as for mandamus relief, even the cases on which the government relies recognize that such relief is available to restore an officer to his or her lawful position, and the district court held that such relief is appropriate here. The government did not contest the availability of mandamus relief below, and its efforts to do so belatedly on appeal are unavailing.

The government also contends that the equities do not support the injunctive relief that the district court ordered. It does not address, however, the district court's reasons for concluding otherwise, let alone

establish that the district court's conclusion is an abuse of discretion. Instead, the government raises separation-of-powers concerns that this Court already will have resolved on the merits if it reaches the question of remedy. The government also invokes concerns about allowing the Commissioners to continue to serve while the parties' rights are in the process of being adjudicated, overlooking that the Supreme Court's order staying the district court's judgment (and preventing the Commissioners from serving) during the pendency of this appeal obviates these concerns. Thus, the question here is whether the district court entered a remedy that can properly take effect *after* the Commissioners' terminations have conclusively been deemed unlawful. Once again, the answer to that question is yes.

## ARGUMENT

### I. The district court correctly granted summary judgment in favor of the Commissioners.

Neither below nor on appeal has the government disputed that Commissioners Boyle, Hoehn-Saric, and Trumka have committed no neglect of duty or malfeasance in office and that their terminations thus violate the CPSA's plain terms. The government instead argues that the CPSA provision that limits the President's ability to terminate CPSC

Commissioners is unconstitutional because it impermissibly infringes on the President's Article II authority to remove executive branch officers at will. As both federal courts of appeals that have considered the issue have held, however, the CPSA's tenure protections are fully consistent with Article II. *See Leachco, Inc. v. CPSC*, 103 F.4th 748, 760–63 (10th Cir. 2024); *Consumers' Research v. CPSC*, 91 F.4th 342, 351–56 (5th Cir. 2024); *see also United States v. SunSetter Prods. LP*, 2024 WL 1116062, at *2–4 (D. Mass. Mar. 14, 2024) (holding the same).

**A.** As the district court explained, JA66–75, the constitutionality of the CPSA's tenure protections follows directly from the Supreme Court's opinion in *Humphrey's Executor*. In that case, the Court unanimously upheld a statutory provision barring the President from removing members of the FTC except for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 620 (quoting 15 U.S.C. § 41); *see id.* at 631–32. As the Court held, "[t]he authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted." *Id.* at 629. In the case of "an administrative body created by Congress to carry into effect legislative policies embodied in [a] statute

in accordance with the legislative standard therein prescribed," it was "plain under the Constitution that illimitable power of removal is not possessed by the President": Congress has "power to fix the period during which" the members of such bodies "shall continue, and to forbid their removal except for cause in the meantime," allowing them to "maintain an attitude of independence against the [President's] will." *Id.* at 628–29.

Like the Fifth and Tenth Circuits, the district court recognized that "the CPSC closely resembles the 1935 FTC in both structure and function." JA75; *see Leachco*, 103 F.4th at 760–63; *Consumers' Research*, 91 F.4th at 351–56. As to structure, the CPSC, like the 1935 FTC, is "a multimember body of experts, balanced along partisan lines." *Seila Law*, 591 U.S. at 216; *see Humphrey's Executor*, 295 U.S. at 619–20 (describing the FTC's structure and partisan balance); 15 U.S.C. § 2053(a) (creating the CPSC as a body of five Commissioners with "background and expertise in areas related to consumer products and protection of the public"); *id.* § 2053(c) (requiring that "[n]ot more than three of the [CPSC] Commissioners shall be affiliated with the same political party").

As to function, the CPSC plays "quasi legislative and quasi judicial" roles resembling those of the 1935 FTC. *Humphrey's Executor*, 295 U.S.

at 629. On the legislative side, the 1935 FTC, like the CPSC, held "wide powers of investigation," *id.* at 621 (FTC); 15 U.S.C. § 2076 (CPSC), and the authority to issue substantive regulations. *Compare* Federal Trade Commission Act, Pub. L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914), *with* 15 U.S.C. § 2056(a) (empowering the CPSC to promulgate "consumer product safety standards"). On the judicial side, the 1935 FTC, like the CPSC, could conduct administrative adjudications within the scope of its statutory authority. *Compare Humphrey's Executor*, 295 U.S. at 620–21 (describing the FTC's power to issue a cease-and-desist order upon finding that a party has engaged in an unfair method of competition), *with* 15 U.S.C. §§ 2064(c)–(d) (authorizing the CPSC to order remedial measures upon finding a substantial product hazard). And the 1935 FTC, like the CPSC, could turn to the federal courts to enforce the statutory mandates it was responsible for implementing. *Compare Humphrey's Executor*, 295 U.S. at 620–21 (explaining that the FTC could enforce its orders in "the appropriate Circuit Court of Appeals"), *with* 15 U.S.C. § 2076(b)(7) (authorizing the CPSC to initiate enforcement actions).

The Supreme Court has recently—and repeatedly—affirmed that *Humphrey's Executor* remains good law. *See Collins v. Yellen*, 594 U.S.

220, 250–51 (2021) (noting the opinion's continued vitality); *Seila Law*, 591 U.S. at 204 (declining to "revisit" the precedent); *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483 (2010) (same). It therefore remains binding on this Court. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme] Court has direct application in a case, … the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."). And it requires affirmance of the district court's constitutional holding.

**B.** Despite nominally accepting that this Court remains bound by *Humphrey's Executor*, the government asks this Court to apply it "narrowly," Opening Br. 19, and treat it as "precedential only as to the specific question it resolved," *id.* at 17. Unless and until the Supreme Court holds otherwise, however, this Court "must apply [*Humphrey's Executor*] neither narrowly nor liberally—only faithfully." *United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc).

Nonetheless, the government asks this Court to treat *Humphrey's Executor* like a series of other precedents that have been narrowly confined in their application over time: *Flast v. Cohen*, 392 U.S. 83 (1968);

*Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922); and a line of cases derived from *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See* Opening Br. 18–20. The limitations on these precedents' application, though, have been created and defined by the Supreme Court itself, not by courts of appeals predicting novel limitations that the Supreme Court might someday impose. *See Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 609 (2007) (plurality opinion) (explaining that the Supreme Court "has largely … confined [*Flast*] to its facts"); *Flood v. Kuhn*, 407 U.S. 258, 282 (1972) (instructing courts to treat *Federal Baseball*, which held baseball to be exempt from antitrust laws, as "an aberration confined to baseball"); *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (instructing courts not to apply *Bivens* and its progeny in any new context "[i]f there is even a single 'reason to pause before'" doing so (quoting *Hernández v. Mesa*, 589 U.S. 93, 102 (2020))).

The limitations that the Supreme Court has placed on *Humphrey's Executor*'s application do not implicate the CPSC. Most notably, the Court has declined to "extend th[at] precedent[] to the novel context of an independent agency" that, unlike the CPSC, is "led by a single

Director." *Collins*, 594 U.S. at 251 (quoting *Seila Law*, 591 U.S. at 204). At the same time, the Court has explained that *Humphrey's Executor* continues to apply to independent agencies like the CPSC: "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions." *Seila Law*, 591 U.S. at 217. Although the government emphasizes that the Supreme Court has applied *Humphrey's Executor* to uphold tenure protections for heads of a multimember body that plays a quasi-legislative or quasi-judicial role on only "a single occasion," Opening Br. 15 (citing *Wiener v. United States*, 357 U.S. 349 (1958)), the Court has on no occasion declined to apply *Humphrey's Executor* to uphold statutory protections for the members of such a body.[1]

---

[1] The government's citation to a 1938 letter announcing the Attorney General's opinion that the President has authority to remove members of the Tennessee Valley Authority, *see* Opening Br. 14, offers no support for the government's position. Even setting aside that the letter reflects the opinion of the executive branch, not the Supreme Court, the letter addresses the President's *statutory* removal authority. *See Power of the President to Remove Members of the Tennessee Valley Authority from Office*, 39 U.S. Op. Att'y Gen. 145, 147 (1938) (finding in the relevant statute "no … indications of purpose on the part of the Congress to restrict the President's ordinary power to remove executive officers"). The letter does not address whether a statutory restriction would violate Article II.

The government also argues that *Humphrey's Executor* must be narrowly cabined—even in the context of multimember agencies—because it "rests on repudiated reasoning." Opening Br. 17. Noting that the FTC in *Humphrey's Executor* "was said not to exercise any executive power," *id.* at 13 (quoting *Seila Law*, 591 U.S. at 216), the government emphasizes that the Supreme Court has since clarified that executive agencies exercise executive power, even where their functions are quasi-legislative or quasi-judicial, *id.* at 16. But while the government is correct that the CPSC exercises executive power in a constitutional sense, so too did the 1935 FTC. *See Seila Law*, 591 U.S. at 216 n.2 ("[T]he powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." (quoting *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988))). And so too do *all* administrative agencies. *See City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (explaining that, although agency actions "take 'legislative' and 'judicial' forms, … they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'" (quoting U.S. Const. art. II, § 1, cl. 1)).

Treating *Humphrey's Executor* as applicable only to independent agencies that "exercise[] no part of the executive power," *Humphrey's Executor*, 295 U.S. at 628, would effectively overrule that precedent by rendering it inapplicable to *any* agencies, including the FTC. The Supreme Court, though, has pointedly declined to take that path. Despite noting that *Humphrey's Executor*'s characterization of the FTC as nonexecutive "has not withstood the test of time," *Seila Law*, 591 U.S. at 216 n.2, the Court has not repudiated the decision but has instead read it to create an "exception[]" to the President's "power to remove … those who wield *executive* power on his behalf." *Id.* at 204 (emphasis added); *see Free Enterprise Fund*, 561 U.S. at 495 (describing *Humphrey's Executor* as involving "protected tenure separat[ing] the President from an officer exercising executive power"). That the CPSC is an executive agency, as that term is now used, does not limit *Humphrey's Executor*'s applicability.

The government fares no better in suggesting that *Humphrey's Executor* applies only to multimember, independent executive agencies that lack "substantial" power. Opening Br. 21 (quoting *Seila Law*, 591 U.S. at 218). Although *Seila Law* held that tenure protections for the Director of the Consumer Financial Protection Bureau (CFPB) were

unconstitutional, in part because the Director exercised "significant executive power," 591 U.S. at 220, the Court held that the exercise of such power created a constitutional problem for an agency head "*acting alone*," *id.* at 238 (emphasis added). The Court did not hold that the Constitution bars a *multimember* independent body from exercising the level of authority held by the CFPB Director. In fact, the plurality opinion on remedy suggested the opposite. The plurality stated that the remedy that it ordered (severance and invalidation of the Director's for-cause removal protection) did not "foreclose Congress from pursuing alternative responses to the [constitutional] problem—for example, converting the CFPB into a multimember agency." *Id.* at 237 (plurality opinion).[2]

The government argues that this reasoning reflects an "overreading of *Seila Law*'s severability analysis." Opening Br. 21. But it is clear throughout *Seila Law* that the CFPB's single-Director structure was critical to the Court's holding. *See, e.g.*, 591 U.S. at 203 (stating, in the second sentence, that "[i]n organizing the CFPB, Congress deviated from

---

[2] Although only a plurality of Justices joined this portion of *Seila Law*, four dissenting Justices would have upheld the CFPB Director's statutory removal protections as consistent with the Constitution. Necessarily, those Justices would also discern no constitutional flaw with an independent multimember body that exercised the Director's powers.

the structure of nearly every other independent administrative agency in our history"); *id*. at 204 (describing "the novel context of an independent agency led by a single Director"); *id*. at 205 ("We … hold that the structure of the CFPB violates the separation of powers."); *id*. at 209 ("We granted certiorari to address the constitutionality of the CFPB's structure."); *id*. at 213 ("We hold that the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers."); *id*. at 218 (contrasting the CFPB's "single-Director structure" with the FTC's); *id*. at 220 ("An agency with a structure like that of the CFPB is almost wholly unprecedented."); *id*. at 222 ("The CFPB's single-Director structure is an innovation with no foothold in history or tradition."); *id*. at 222–23 (characterizing "the CFPB's single-Director configuration" as "incompatible with our constitutional structure," which "scrupulously avoids concentrating power in the hands of any single individual"); *id*. at 238 ("While we have previously upheld limits on the President's removal authority in certain contexts, we decline to do so when it comes to principal officers who, *acting alone*, wield significant executive power." (emphasis added)).

If *Seila Law* itself were not clear enough, the Court in *Collins* explained that the CFPB's historically unprecedented structure, rather than the "substantiality" of its powers, drove the result in *Seila Law*. As *Collins* recognized, "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." 594 U.S. at 253; *see id.* at 251 (rejecting the argument that Congress "should have greater leeway to restrict the President's power to remove" the head of a single-director independent agency whose "authority is more limited than that of the CFPB [Director]"). Instead, *Collins* explained that *Seila Law* declined to extend *Humphrey's Executor* "to the novel context of an independent agency led by a single Director" because such an agency "lacks a foundation in historical practice and clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control." *Id.* at 251 (quoting *Seila Law*, 591 U.S. at 204).

Here, in contrast, the district court correctly observed that "[t]he historical precedent for statutory removal restrictions among traditional multimember independent agencies" like the CPSC "gives strong

indication" that the CPSA's tenure protections are constitutional. JA75; *see Seila Law*, 591 U.S. at 230 (noting that statutory tenure protections "govern[] the removal of some two-dozen multimember independent agencies"); *PHH Corp. v. CFPB*, 881 F.3d 75, 173 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (contrasting the "historical anomaly" of "a single-Director independent agency exercising substantial executive authority" with a long list of historically independent "multi-member commissions or boards," including the CPSC, dating back to 1887).

To be sure, the nature of a multimember agency's powers is not immaterial to the question whether Congress may permissibly insulate the agency's members from at-will removal by the President. *Humphrey's Executor* itself explained that "[w]hether the power of the President to remove an officer shall prevail over the authority of Congress to condition the power by fixing a definite term and precluding a removal except for cause will depend upon the character of the office." 295 U.S. at 631. The relevant question, though, is not whether the tenure-protected officer's powers are substantial, *see Collins*, 594 U.S. at 253, but whether the officer "closely resemble[s] the FTC Commissioners" considered in *Humphrey's Executor*, *Seila Law*, 591 U.S. at 217. The district court here

analyzed precisely this question and concluded that "[w]hile sharing the FTC's organizational features, the CPSC also performs functions similar or identical to those of the FTC which, in 1935, *Humphrey's Executor* described as 'quasi legislative and quasi judicial.'" JA69 (quoting *Humphrey's Executor*, 295 U.S. at 629); *see supra* pp. 21–22. Contrary to the government's argument, this conclusion establishes that *Humphrey's Executor* controls the outcome here.[3]

**C.** When the government ultimately turns to the nature of the CPSC, *see* Opening Br. 23–27, it identifies no error in the district court's conclusion that the CPSC closely resembles the 1935 FTC in all relevant respects. As for structure, the government does not even attempt to draw a distinction between the structure of the CPSC and that of the 1935 FTC—a structure that the district court (just like the Fifth and Tenth Circuits) found to be "well-established in the history and tradition of the federal government." JA74 (citing *Consumers' Research*, 91 F.4th at 354;

---

[3] The government dramatically overstates the scope of the district court's holding by suggesting that the holding would permit Congress to "convert the Departments of Defense, State, and Justice into multimember commissions insulated from the President's control." Opening Br. 21. Needless to say, these agencies exercise powers that look nothing like the 1935 FTC's power to implement a circumscribed statutory mandate by issuing regulations and conducting adjudications.

*Leachco*, 103 F.4th at 762–63). As for functions, the government states that the CPSC "enacts substantive rules that bind the regulated public, engages in significant executive adjudication, and can conduct both civil litigation and criminal prosecution in federal courts," Opening Br. 23, but it disregards that the 1935 FTC had closely analogous powers.[4]

With respect to rulemaking, the CPSC may promulgate binding safety standards to implement its statutory mandate to protect the public against unreasonably hazardous products. *See id.* at 23–24. Likewise, the FTC has possessed significant authority "to make rules and regulations for the purpose of carrying out" the Federal Trade Commission Act since its inception twenty years before *Humphrey's Executor*. *See* Pub. L. No. 63-203, § 6(g), 38 Stat. at 722. Although *Humphrey's Executor* does not directly reference the 1935 FTC's rulemaking authority, the district

---

[4] The government is wrong to contend that "the district court noted" that "the CPSC undoubtedly 'wields executive power,' through a 'varied set of functions and powers' that are meaningfully different and greater than those considered in *Humphrey's Executor*." Opening Br. 18 (quoting JA73). The quoted part of the district court's opinion in fact "decline[d] [the government's] invitation to engage in categorizing the CPSC's varied set of functions and powers as executive or nonexecutive," and stated that "[t]he degree to which the CPSC wields executive power (in the modern sense) alone does not determine" the constitutionality of the CPSA's tenure protections. JA73; *see* JA69 (district court's description of the CPSC's functions as "similar or identical" to the 1935 FTC's).

court correctly observed that such authority "is plain on the face [of] the … Act, which is cited and heavily relied upon in *Humphrey's Executor*." JA70 n.6. And the government fails to explain why an agency exerts "materially different and materially greater executive power," Opening Br. 17, when it "fill[s] in and administer[s] the details embodied by [a] general [statutory] standard" through its rulemaking power rather than the sort of adjudicatory power that *Humphrey's Executor* explicitly discussed, *Humphrey's Executor*, 295 U.S. at 628. Indeed, the government itself acknowledges that both powers have been the hallmarks of administrative agencies "since the beginning of the Republic." Opening Br. 16 (quoting *City of Arlington*, 569 U.S. at 304 n.4).

As for adjudication, the government emphasizes that "[t]he CPSC may adjudicate whether products pose a substantial hazard," *id.* at 24, but it does not explain why this function differs in any meaningful way from the 1935 FTC's power to conduct administrative adjudications to determine whether a regulated party had engaged in unfair methods of competition in commerce. *See Humphrey's Executor*, 295 U.S. at 620–21. And although the government emphasizes that the CPSC can order statutorily authorized remedies when it finds a statutory violation, *see*

Opening Br. 24, so too could the 1935 FTC, *see Humphrey's Executor*, 295 U.S. at 620–21 (describing the FTC's power to issue judicially enforceable cease-and-desist orders); *see also Arrow-Hart & Hegeman Elec. Co. v. FTC*, 291 U.S. 587, 594–95 (1934) (acknowledging, one year before *Humphrey's Executor*, the FTC's power to order divestiture of stock).

The agencies' respective civil enforcement authorities are likewise comparable. The government notes that "[t]he CPSC may file injunctive actions in district court to restrain violations of its regulations" through its own legal representative. Opening Br. 6. The 1935 FTC, however, could similarly "apply to the appropriate Circuit Court of Appeals" for the enforcement of its administrative orders. *Humphrey's Executor*, 295 U.S. at 620–21. And although the government cites *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), for the idea that the Constitution entrusts civil enforcement powers to the President, Opening Br. 26 (citing *Buckley*, 424 U.S. at 138), that case is inapposite. *Buckley* addressed the issue whether Congress could constitutionally assign such powers to an agency whose members had not been appointed in accordance with the Appointments Clause, and some of whose members had been appointed with no presidential involvement. 424 U.S. at 138–39. That issue is not presented

here: Commissioners Boyle, Hoehn-Saric, and Trumka were appointed by the President and confirmed by the Senate, JA31, as required by law, 15 U.S.C. § 2053(a). This case presents the distinct issue whether "the President may … insist that [civil enforcement] functions be delegated to an appointee of his removable at will," *Buckley*, 424 U.S. at 141, and *Humphrey's Executor* resolves that issue in the negative.

Further, while the 1935 FTC lacked criminal enforcement authority, the CPSC's exercise of that authority is subject to the Attorney General's concurrence. *See* 15 U.S.C. § 2076(b)(7)(B). Because the President may remove the Attorney General at will, the government is wrong that the CPSC's enforcement activities are insulated from presidential oversight. *See* Opening Br. 27. And while the Supreme Court has voiced concern about the "dispersion of responsibility" that might result from "two layers of good-cause tenure" standing between the President and executive officers, *Free Enterprise Fund*, 561 U.S. at 497, here there is only one. The Attorney General's ability to guide the CPSC's criminal enforcement actions—if she authorizes such actions at all—thus allows the President to "attribute [any] failings" in those actions "to those whom he *can* oversee." *Id.* at 496; *see Morrison*, 487 U.S. at 692

(observing that the President "retain[ed] ample authority" over an officer who held "good cause" tenure protection but was subject to the Attorney General's oversight).

Given the close parallels between the CPSC and the 1935 FTC, it is not surprising that the district court, the Fifth Circuit, and the Tenth Circuit all agree that CPSC Commissioners' statutory tenure protections, like the statutory protections for FTC Commissioners upheld in 1935 by *Humphrey's Executor*, are constitutional. The government offers no persuasive reason for this Court to depart from this judicial consensus.

## II.   The district court acted within its discretion in granting injunctive relief.

Having correctly concluded that the purported terminations of Commissioners Boyle, Hoehn-Saric, and Trumka violated statutory tenure protections that Congress was within its constitutional authority to enact, the district court declared that the terminations were "ultra vires, contrary to law, and without legal effect." JA84. It further enjoined Secretary Bessent, Director Vought, and Acting Chairman Feldman from "taking any action to effectuate [the Commissioners'] unlawful terminations." JA84. This relief followed logically from the legal violation

that the district court discerned, and the government's arguments that it lay outside the scope of the district court's discretion are unavailing.

**A.** To begin, the government does not meaningfully challenge the district court's entry of declaratory relief. It makes the fleeting contention that "[t]he district court … erred by ordering that [the Commissioners'] removal [was] 'without legal effect.'" Opening Br. 27 (quoting JA84). But it offers no argument in support, and it devotes the entirety of the section of its brief that addresses remedy to the district court's entry of injunctive relief. *See id.* at 27–38. Assuming that this Court affirms on the merits, then, the government has waived any challenge to the district court's entry of declaratory relief. *See Schulman v. Axis Surplus Ins. Co.*, 90 F.4th 236, 245 n.5 (4th Cir. 2024) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument— even if its brief takes a passing shot at the issue." (citation omitted)).

**B.** As for injunctive relief, the government's arguments largely reiterate merits contentions that this Court will necessarily have rejected if it reaches the question of remedy. For example, should this Court hold that the CPSA's tenure protections are consistent with Article II, then it would be illogical to hold in the context of remedy that Congress is

"disabl[ed] … from acting upon the subject" of CPSC Commissioners'
termination, Opening Br. 28 (quoting *Trump v. United States*, 603 U.S.
593, 607 (2024)), or that "compell[ing]" the President "to retain the
services of a principal officer" whom he would like to remove creates
"obvious Article II problems," *id.* at 29. The government's effort to
analogize the district court's remedy to the "reinstatement of a dismissed
Secretary of State," *id.* at 28, is thus obviously inapt. The State
Department's structure and functions differ starkly from the structure
and functions of the CPSC (and of the 1935 FTC), so Congress likely could
not lawfully confer tenure protection on the Secretary in the first place.
*See supra* p. 32 n.3.

The government fares no better in arguing that the relief that the
district court ordered lies categorically outside the court's remedial
power. *See* Opening Br. 29–30. Courts, including the Supreme Court,
have long recognized the availability of such relief. *See, e.g.*, *Delgado v.
Chavez*, 140 U.S. 586, 591 (1891) (recognizing the validity of a court order
in favor of "certain parties showing themselves to be *de facto*
commissioners [seeking] to compel [a public official] to respect their
possession of the office, discharge his duties …, and not assume to himself

judicial functions, and adjudicate against the validity of their title"); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023) (recognizing a court's authority to enjoin the President's subordinates from giving effect to an unlawful termination); *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (same); *Priddie v. Thompson*, 82 F. 186, 192 (D.W.V. 1897) (entering "an injunction … to restrain [a United States] marshal … from any interference or molestation with [the deputy marshal] in the possession of the office"); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584, 589 (1952) (affirming a judgment enjoining a subordinate officer from implementing an unconstitutional presidential directive).

The government argues that *Swan* and *Severino* are irrelevant because they addressed the question of remedy only in connection with standing. *See* Opening Br. 32. This argument, however, does not account for cases like *Delgado* and *Priddie*. In any event, it is unavailing. Redressability is one of "the essential elements of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992), and it must be established separately "for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). Had the requested injunctive relief been

unavailable in *Severino* and *Swan*—which both courts held it was not, *Severino*, 71 F.4th at 1042–43; *Swan*, 100 F.3d at 980–81—the plaintiffs would have lacked standing to pursue such relief and the courts would have been constitutionally powerless to consider the plaintiffs' claims.

The cases on which the government relies do not call into question the availability of the relief the district court ordered. *Walton v. House of Representatives*, 265 U.S. 487, 489 (1924), and *In re Sawyer*, 124 U.S. 200, 212 (1888), describe limits on federal courts' equitable powers with respect to *state* officers and proceedings. *See Baker v. Carr*, 369 U.S. 186, 231 (1962) (describing *Walton* and *Sawyer* as "h[olding] that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer"). And although *White v. Berry*, 171 U.S. 366 (1898), applied *Sawyer* to a federal officer (albeit without explaining its basis for doing so), *id.* at 376–78, that opinion recognized that mandamus relief is available "to determine the title to a public office," *id.* at 377. The Commissioners argued below that they were entitled to mandamus relief, and the district court agreed. JA81–82; *cf. Swan*, 100 F.3d at 976 n.1 ("[A] request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the

injunction is sought to compel federal officials to perform a statutorily required ministerial duty."). The government made no contrary argument below, so it has forfeited any challenge to mandamus relief on appeal. *See Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (noting that this Court has "repeatedly held" that "issues raised for the first time on appeal generally will not be considered").

In any event, the government's arguments against mandamus relief largely mimic its arguments elsewhere and should be rejected for the same reasons. The government contends that the Commissioners lack "a 'clear' right to relief." Opening Br. 33 (quoting *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)). But should this Court affirm the district court's conclusion on the merits that the Commissioners' terminations were unlawful, their right to the positions from which they have impermissibly been barred will be clear. And although the government argues that mandamus is improper because "equitable factors weigh decisively in the government's favor," *id.* at 35, the district court reasonably found otherwise, JA78–81; *see also infra* pp. 44–47.

Taken together, the government's remedial arguments boil down to the proposition that backpay is the only recourse available for an officer

who has been unlawfully terminated. *See* Opening Br. 29, 34. This proposition, however, would contravene historical practice. *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) (holding that an unlawfully discharged employee of the Department of the Interior was "entitled to the reinstatement which he seeks"); *Pelicone v. Hodges*, 320 F.2d 754, 757 (D.C. Cir. 1963) (holding that an unlawfully discharged employee of the Department of Commerce was "entitled to reinstatement to Government service"); *Berry v. Reagan*, 1983 WL 538, at *6 (D.D.C. Nov. 14, 1983) (enjoining the President from "preventing or interfering" with the service of unlawfully terminated members of the U.S. Commission on Civil Rights); *Paroczay v. Hodges*, 219 F. Supp. 89, 95 (D.D.C. 1963) (declaring that an unlawfully terminated Department of Commerce employee was "entitled to be reinstated to his position" and "retain[ing] jurisdiction … so that a mandatory injunction can issue" if needed).

Moreover, in the context of this case, the government's argument would effectively abrogate the merits holding of *Humphrey's Executor*, rendering statutory tenure protections for multimember agency heads impotent. Under the government's theory, the President could terminate such officers at will so long as he offered them backpay. *Humphrey's*

*Executor*, though, held that Congress may limit the President's ability to use his "power of removal" to exert "coercive influence" over "the independence of a commission." 295 U.S. at 629–30. Transforming a statutory guarantee of agency independence into a severance-pay provision would make Congress's permissible judgment, embodied in a statute signed into law by the President, entirely ineffectual.

**C.** Because the relief ordered by the district court fell within its remedial power, the only remaining question is whether the district court acted within its discretion in concluding that the equities warranted such relief. It did. As the district court thoroughly explained, Commissioners Boyle, Hoehn-Saric, and Trumka will be irreparably injured if they are permanently deprived of the opportunity to serve in the unique, high-level offices with which they were entrusted by the American people, acting through the President who appointed them and the Senate that confirmed them. JA78–80. At the same time, the district court explained that any harm caused to the President if the Commissioners ultimately return to service at the end of this lawsuit is mitigated by the fact that the President will be able to appoint Commissioner Boyle's successor as early as October, thereby influencing the composition of the CPSC. JA80.

Allowing the CPSC to operate without a quorum in the meantime, the district court observed, would compromise its ability to fulfill its statutory mandate and thus place the public at risk. JA80.

The government addresses none of this analysis. Instead, it repeats its argument that allowing the Commissioners to serve in their lawful roles would harm "the separation of powers." Opening Br. 38. Again, though, if this Court concludes (as it should) that the CSPA's tenure protections are consistent with Article II, there is no reason why enforcing them against Secretary Bessent, Director Vought, and Acting Chairman Feldman would somehow introduce a constitutional problem. And although the government contends that injunctive relief is unnecessary to prevent irreparable harm to the Commissioners because they "have no personal right to exercise the powers of an office after having been removed," *id.* at 37, the government ignores the fact that this Court will reach the issue of remedy only if it affirms the district court's holding that the Commissioners' removals were beyond the President's power and so without legal effect.

The remainder of the government's equities arguments muddle the procedural posture of this appeal. The government first quotes the

Supreme Court's *Wilcox* order for the proposition that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Id.* at 36 (quoting *Wilcox*, 145 S. Ct. at 1415). This statement, though, arose in the context of the Court's decision to temporarily stay a reinstatement order while the lawfulness of the underlying termination is adjudicated. It did not purport to decide whether a court, after conclusively determining that a termination was unlawful, must proceed to hold that the termination shall nonetheless be given effect, not only during the pendency of an appeal but even *after* all layers of appellate review are complete, even if the court's holding as to the termination's illegality is ultimately upheld.

The government's argument that injunctive relief poses the risk that "any actions taken by the CPSC with [Commissioners Boyle, Hoehn-Saric, and Trumka] as reinstated Commissioners will be called into question" should "the government prevail[] after all review," *id.* at 38, is similarly confused. The district court's order is stayed pending the conclusion of all appellate review, including in the Supreme Court, so there is no risk that the Commissioners will return to their roles before

the rights of the parties are settled. The possibility that the government might ultimately prevail on the merits in this Court or in the Supreme Court is not a basis for overturning the district court's well-reasoned determination that Commissioners Boyle, Hoehn-Saric, and Trumka should be allowed back to their jobs in the event that the government does *not* ultimately prevail.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

Nicolas A. Sansone
Stephanie Garlock
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs-Appellees*

August 22, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 9,347 words.

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Nicolas A. Sansone
Nicolas A. Sansone
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Response Brief for Plaintiffs-Appellees with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit on August 22, 2025, using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Nicolas A. Sansone
Nicolas A. Sansone
*Counsel for Plaintiffs-Appellees*